UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCANSOFT, INC.<br><br>Plaintiff,<br><br>v.<br><br>VOICE SIGNAL TECHNOLOGIES, INC., LAURENCE S. GILLICK, ROBERT S. ROTH, JONATHAN P. YAMRON, and MANFRED G. GRABHERR<br><br>Defendants. | Civil Action No. _____<br><br>Jury Trial Demanded |

**04 10353 PBS**

<u>COMPLAINT</u>

Plaintiff, ScanSoft, Inc. ("ScanSoft") brings this Complaint ("Complaint") against the defendants Laurence S. Gillick ("Gillick"), Robert S. Roth ("Roth"), Jonathan P. Yamron ("Yamron"), Manfred G. Grabherr ("Grabherr"), (collectively, the "Scientists"), and Voice Signal Technologies Inc. ("VST") (collectively with Scientists, "the Defendants"). By this action, ScanSoft seeks damages against the Defendant Voice Signal Technologies, Inc. based upon VST's infringing conduct in connection with the manufacture, sale and distribution of certain software products. ScanSoft seeks, *inter alia*, injunctive relief and damages for acts of patent infringement in violation of the United States patent law, 35 U.S.C. § 101 *et seq.*, and other applicable law. In addition, ScanSoft seeks damages to prevent the inevitable use, disclosure and misappropriation of ScanSoft's trade secrets and confidential and proprietary information by the Defendants.

## The Parties

1.     Plaintiff ScanSoft, Inc. is a Delaware corporation with a principal place of business at 9 Centennial Drive, Peabody, Massachusetts 01960.  ScanSoft, Inc. is the assignee of certain rights previously held by Lernout & Hauspie Speech Products, N.V. ("L&H"). Specifically, on or about December 2001, ScanSoft purchased substantially all the rights, title, and obligations held by L&H with respect to its speech technology, including but not limited to, automatic speech recognition ("ASR") and text-to-speech ("TTS").

2.     Defendant VST is a Delaware corporation with a principal place of business at 300 Unicorn Park Drive, Woburn, Massachusetts.  VST was founded in 1995.

3.     On information and belief, defendant Gillick is an individual residing at 55 Esty Farm Road, Newton, Massachusetts.

4.     On information and belief, defendant Roth is an individual residing at 508 Walnut Street, Newtonville, Massachusetts.

5.     On information and belief, defendant Yamron is an individual residing at 511 Peakham Road, Sudbury, Massachusetts.

6.     On information and belief, defendant Grabherr is an individual residing at 33 Brackett Street, Medford, Massachusetts.

## Jurisdiction and Venue

7.     This Court has subject matter jurisdiction over this action for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).  In addition, this Court has jurisdiction over the state law and common law claims under the doctrine of pendant jurisdiction.

8.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b).

## The Patent Infringed

9. On December 31, 2002, United States Patent No. 6,501,966 was duly and legally issued in the names of Bernard F. Bareis, et al. for an invention entitled "Speech Recognition System For Electronic Switches in a Non-Wireline Communications Network" ("the '966 patent").

10. ScanSoft is the owner of the entire right, title, and interest in and to the '966 patent. A copy of the '966 patent is attached to this Complaint as Exhibit A.

11. Defendant VST has and is engaged in acts of direct and contributory infringement and has and is actively inducing infringement of the '966 patent by making, using, offering to sell, and selling products using speech recognition technology which embody one or more of the inventions claimed in the '966 patent. Upon information and belief, VST's infringing activity has taken place in Massachusetts.

## The Defendants' Trade Secret Violations and Acts of Unfair Competition

A. The Business of ScanSoft and L&H

12. L&H was a world leader in the research, application and development of advanced speech and language technologies, products and services. L&H developed and manufactured a broad range of speech and language technology components, products and solutions for developers, OEMs, consumers and businesses, until December 2001, when plaintiff ScanSoft purchased substantially all the operating and technology assets of L&H's speech and language business and became the owner of such products and intellectual property and research.

13. L&H's products and services originated from a number of core technologies: automatic speech recognition, natural language understanding, dialog systems, speaker verification, text-to-speech translation, and digital speech and music compression. ScanSoft is

the assignee of those products and services, including a number of patents for these core technologies.

14. ScanSoft's speech recognition products and applications are used in commercial and consumer electronic devices, including, but not limited to, computers, dictation machines, automobiles, personal digital assistants ("PDAs"), and mobile phones, and allow such devices to process a user's spoken words to control the device.

15. ScanSoft, as assignee of L&H's rights, seeks methods for improving the speed and accuracy of speech recognition, as well as for embedding speech technology on smaller platforms, such as PDAs and mobile phones, to expand the market for the technology. For example, ScanSoft recently released Dragon PDsay™, an application that adds voice control and speech capabilities to Microsoft® Windows® CE-based Pocket PC devices. (A copy of the press release announcing the launch of Dragon PDsay is attached to this Complaint as Exhibit B.)

16. The success of ScanSoft's business depends on the confidential information and proprietary research, findings, intellectual property, strategic plans, manufacturing initiatives, financial information, and methods of operation that L&H developed over its fifteen-year history which ScanSoft purchased in December 2001.

B. The Business of VST

17. VST is a speech technology company. Among its activities, VST develops speech recognition technologies for the recognition, synthesis, and representation of human speech and markets products for various platforms based on those technologies.

18. VST is a competitor of ScanSoft. Indeed, VST identified ScanSoft's predecessor-in-interest, L&H, as a competitor in an August 8, 2000 article published on the

4

LocalBusiness.com Internet web site. (A copy of this article is attached to this Complaint as Exhibit C.) In the article, VST's Vice President of Business Development, Christopher Reine, was quoted extensively and acknowledged the competitive relationship between L&H and VST in the area of speech technology.

19. The competitive relationship between ScanSoft, as assignee of L&H's rights, and VST was further established in a November 27, 2000 article published by Knight-Ridder/Tribune Business News. (A copy of this article is attached to this Complaint as Exhibit D.) The article summarized the comments of VST's Chief Executive Officer, Daniel Roth, as follows: "All [Roth] will say is the company, which counts several engineers from the former Dragon Systems in Newton, has figured out how to use much smaller mathematical algorithms than would be found in systems marketed by industry leaders such as Lernout & Hauspie."

C. <u>Gillick's, Roth's, and Yamron's Employment at Dragon Systems, Inc.</u>

20. Defendants Laurence Gillick, Robert Roth, and Jonathan Yamron were each previously employed by Dragon Systems, Inc. ("Dragon"), a predecessor-in-interest to L&H. Dragon was a leader in the speech recognition field, with a global customer base that included corporate clients such as Bank of America, Boeing, Citibank, Compaq, Dell, Deutsche Bank, Fujitsu, Kaiser Permanente, Peugeot, Seiko, Sony, Toshiba, Wells Fargo, and many others.

21. On information and belief, Gillick is a highly educated scientist and mathematician who achieved a Bachelor of Arts degree in Physics, a Master of Arts degree in Chemistry, and a Ph.D. in Mathematics (Statistics).

22. Gillick worked for Dragon for approximately sixteen (16) years. Dragon hired Gillick as a Research Scientist and ultimately promoted him to head of its Research Department. As Dragon's head of Research, Gillick supervised all of Dragon's speech recognition research.

23. Gillick is identified as an inventor on at least fourteen (14) patent applications filed by Dragon with the United States Patent and Trademark Office. Some of these patent applications were acquired by ScanSoft in December 2001.

24. On information and belief, Roth is a highly educated scientist who achieved a Bachelor of Science degree, a Master of Arts degree and a Ph.D., all in the field of Physics.

25. Roth was a founder of Dragon and worked for Dragon for approximately eighteen (18) years, in the positions of a Senior Scientist and Principal Research Scientist. As Dragon's Principal Research Scientist, Roth specialized in research of speech recognition algorithms and in optimizing performance on smaller platforms, and supervised all of Dragon's product-related research. Roth also was a member of Dragon's Board of Directors.

26. Roth is identified as an inventor on at least seven (7) patent applications filed by Dragon with the United States Patent and Trademark Office. Some of these patent applications were acquired by ScanSoft in December 2001.

27. On information and belief, Yamron is a highly educated scientist who achieved a Bachelor of Science degree, a Master of Arts degree and a Ph.D., all in the field of Physics.

28. Yamron worked for Dragon for approximately nine (9) years. Dragon hired Yamron as a Senior Scientist and ultimately promoted him to Principal Research Scientist. As Dragon's Principal Research Scientist, Yamron headed Dragon's Language Modeling Group.

29. Yamron is identified as an inventor on at least three (3) patent applications filed by Dragon with the United States Patent and Trademark Office. Some of these patent applications were acquired by ScanSoft in December 2001.

30. Gillick, Roth, and Yamron each executed an Invention, Non-Disclosure and Non-Competition Agreement (the "Non-Disclosure Agreement") with Dragon. Gillick signed his

Non-Disclosure Agreement on or about January 23, 1985. Roth signed his Non-Disclosure Agreement on or about April 2, 1993, and by the express terms of his Non-Disclosure Agreement, made the agreement retroactive to August 9, 1983. Yamron signed his Non-Disclosure Agreement on or about August 21, 1991. (True and accurate copies of Gillick's, Roth's, and Yamron's Non-Disclosure Agreements with Dragon are attached to this Complaint as Exhibits E, F and G, respectively, and are incorporated herein in their entirety.)

31.     The Non-Disclosure Agreements were, by their express terms, executed in consideration for Dragon's employment of these individual defendants. Indeed, each of these individual defendants continued to work at Dragon for several years following their execution of the Non-Disclosure Agreements. During their respective periods of continued employment with Dragon, Gillick, Roth and Yamron received compensation and other valuable employee benefits, including, but not limited to, salary increases, bonuses, and/or equity interests.

32.     By their execution of the Non-Disclosure Agreements, Gillick, Roth and Yamron agreed that they would protect Dragon's Confidential Information and would not "disclose, communicate or divulge to, or use for my own benefit or the benefit of another, any Confidential Information or Invention" during the course of their employment with Dragon or at any time thereafter. Section 1(a) of the Non-Disclosure Agreements defines "Confidential Information" as follows:

> [A]ll proprietary and/or confidential information (whether or not patentable) owned, possessed, developed, or used by the Company, including without limitation any Invention, design, formula, process, apparatus, equipment, trade secret, research, report, technical data, know-how, discovery, development, improvement, customer list, business plan, marketing plan or strategy of the Company which is (i) communicated to me during the Employment Period, or (ii) developed or otherwise acquired by me in the course of my performance of employment services to the Company during the Employment Period.

Section 1(c) of the Non-Disclosure Agreements defines "Invention" as follows:

> [A]ny invention, formula, process, discovery, development, design, innovation or improvement (whether or not patentable or registrable under copyright statutes) made, conceived, or first actually reduced to practice by me solely or jointly with others, in the course of my performance of employment services to the Company during the Employment Period.

See Exhibits E, F and G ¶¶ 1(a) and (c).

33. During their employment with Dragon, Gillick, Roth and Yamron had access to and became intimately familiar with Dragon's Confidential Information and Inventions. Indeed, each of these individual defendants developed patentable speech recognition technologies during their periods of employment with Dragon, and each filed or caused to be filed patent applications with the United States Patent and Trademark Office on behalf of Dragon.

34. By executing the Non-Disclosure Agreements, Gillick, Roth and Yamron agreed that, regardless of the reason for their separation from employment with Dragon, for a period of one year after their departure they would not compete with Dragon, directly or indirectly, in any business "which competes with any business then being conducted by [Dragon] or any business then planned by [Dragon]."

35. By their execution of the Non-Disclosure Agreements, Gillick, Roth and Yamron also agreed that the provisions contained therein "shall be binding upon and inure to the benefit of me and the Company and our respective heirs, executors, administrators, legal representatives, successors and assigns."

D. The Scientists' Employment with L&H

36. On or about June 7, 2000, L&H merged with Dragon. Pursuant to the merger, L&H became an assignee of Dragon and all of Dragon's products, research, technology, and other assets, including Dragon's contracts, were transferred to and adopted by L&H. On or

about December 11, 2001, ScanSoft purchased substantially all the assets of L&H's speech recognition technology division, including without limitation, all the assets of Dragon, and became an assignee of L&H.

37. Immediately after L&H's acquisition of Dragon, Gillick, Roth and Yamron became employees of L&H.

38. At the time of L&H's acquisition of Dragon, defendant Manfred Grabherr was employed by L&H as an engineer specializing in research of speech recognition algorithms and in optimizing performance on smaller platforms. On information and belief, in consideration of his employment with L&H, Grabherr signed an Invention, Non-Disclosure and Non-Competition Agreement ("Non-Disclosure Agreement").

39. Gillick was given the title of Vice President and was responsible for overseeing the L&H employees formerly employed in Dragon's Research Department. In this position, Gillick supervised and directed the research being conducted in the principal technology areas used in what are now ScanSoft products. These technology areas included all aspects of large vocabulary dictation systems, command-and-control speech user interfaces, and compact versions of speech recognition technology intended for small platforms such as PDAs.

40. Roth was given the title of Chief Researcher. Roth was given a broad range of responsibilities, including conducting research in speech decoder architectures with a particular focus on memory optimization for mobile devices.

41. Yamron was given the title of Manager-Language Modeling and continued to supervise and direct the efforts of Dragon's former Language Modeling Group. Yamron's responsibilities included overseeing research in the areas of statistical language modeling and

natural language understanding. Yamron's work included the creation of compact language models suitable for deployment on mobile devices.

42. Prior to and in consideration of the commencement of their employment with L&H, Gillick and Roth each executed an Employment Agreement with L&H. Gillick signed his Employment Agreement on or about May 25, 2000. Roth signed his Employment Agreement on or about May 30, 2000. (True and accurate copies of Gillick's and Roth's Employment Agreements are attached to this Complaint as Exhibits H and I, respectively, and are incorporated herein in their entirety.)

43. By executing the Employment Agreements, Gillick and Roth each agreed to protect L&H's proprietary information and trade secret information and to refrain from disclosing or using any of such information during *and after* their respective terms of employment with L&H. Section 11 (Protection of Proprietary Information) of Gillick's and Roth's Employment Agreements provides, in pertinent part:

> (a) Employee recognizes that the Company is engaged in a continuous program of research and development relating to its operating procedures, products, methods, service techniques, engineering and manufacturing data, machines, devices, apparatus, "know-how", formulas, secret processes, plans, designs, specifications, trade secrets, and Company data and that the Company has developed information regarding costs, profits, markets, sales, customer lists, plans for present and future development and other proprietary information not available to the public which gives it a special competence in its various fields of endeavor, all of which have been acquired at considerable expense to the Company. Employee understands that as part of his/her employment he/she is expected to make contributions of value to the Company. He/she acknowledges that this employment creates a relationship of confidence and trust between him/herself and the Company with respect to information of a confidential or secret nature which is made known to or learned by him/her during the period of his/her employment.
>
> (b) The Employee will not, during or after the term of his/her employment, disclose any of the proprietary information or trade secret information referred to above, or anything relating to it, to any person, firm, corporation, association or other entity for any reason or purpose whatsoever unless required by law;

provided, that prior to making any such disclosure the Employee shall notify the Company of the same, and the Company shall have the right to participate with the Employee in determining the amount and type [of] such information, if any, which must be disclosed in order to comply with applicable law. In the event of any breach or threatened breach by the Employee of the provisions of this paragraph, the Company shall be entitled to an injunction restraining such breach. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to the Company for such breach or threatened breach, including the recovery of damages from the Employee.

(c) The Employee further agrees that in the event of the termination of his/her employment by him/herself or by the Company for any reason, he/she will deliver to the Company all property belonging to it and all documents and data of any nature pertaining to his/her employment, and he/she shall not take with him/her any documents or data of any description or any reproduction of any description containing or pertaining to any proprietary information or trade secret information.

See Exhibits H and I ¶¶ 11(a), (b) and (c).

44. By their execution of the L&H Non-Disclosure Agreements, Gillick and Roth agreed that the covenants, promises and agreements contained therein "shall inure to the benefit of, and be binding upon, the successors and assigns of the parties hereto." See Ex. H and I, ¶ 15(d).

45. During the course of their employment with L&H, the Scientists had access to and became intimately familiar with various trade secrets and confidential and proprietary information of L&H, including, among other matters, speech recognition technology strategies, speech application design and development, ASR algorithms, small platform optimization strategies, data collection methods and strategies, strategies for selecting active ASR vocabularies for applications, methods for benchmarking, characterizing and improving recognition accuracy, names of key customers, information disclosed in patent applications or invention disclosures that are either pending or in progress, information provided to customers, product strategy, proprietary market information, competitive positioning and other confidential

information. All of these trade secrets and other confidential and proprietary information to which the Scientists had access have been assigned to plaintiff ScanSoft.

46. Gillick and Roth were provided access to this body of information subject to their obligations under their Employment Agreements and their Non-Disclosure Agreements.

47. On information and belief, Yamron and Grabherr were also provided access to this body of information subject to their obligations under their Non-Disclosure Agreements.

48. As a Vice President, Gillick was given access to intimate details regarding all of L&H's research and development projects, including, but not limited to, how L&H's voice recognition algorithms functioned and the substantial research and development that went into the creation of voice recognition software. Gillick's disclosure of these processes would provide VST with a tremendous unfair advantage at ScanSoft's expense.

49. As a Chief Researcher, Roth was given access to intimate details regarding all of L&H's research and development projects, including, but not limited to, how L&H's speech recognition algorithms functioned and the substantial research and development that went into the creation of vocabulary databases for the speech recognition software. Specifically, Roth was given access to L&H's "NAK Project," an effort to downsize L&H's large platform dictation systems onto smaller platforms, such as PDAs. L&H's NAK Project paralleled the Manhattan Project that Roth supervised while employed by Dragon. Roth's disclosure of these processes would provide VST with a tremendous unfair advantage at ScanSoft's expense.

50. As the manager of the Language Modeling Group, Yamron was given access to intimate details regarding all of L&H's research and development projects, including, but not limited to, L&H's efforts in the field of natural language understanding, statistical language modeling, and the substantial research and development that went into the creation of voice

recognition software. Yamron's disclosure of these processes would provide VST with a tremendous unfair advantage at ScanSoft's expense.

51.    As an engineer for L&H, Grabherr was given access to L&H's "Phoenix" project, creating speech recognition software for small platforms and developing algorithms aimed to put large vocabulary speech recognition on hand-held PDA technology.

52.    During their employment with Dragon and/or L&H, the Scientists learned which processes and research efforts were unsuccessful and which failed to work optimally. The disclosure by the Scientists of the results of these processes and research efforts would provide VST with a tremendous unfair advantage at ScanSoft's expense.

53.    ScanSoft has invested millions of dollars in connection with the development of its products and to compile the trade secrets and confidential and proprietary information associated with those products. Those expenditures and efforts include the acquisition of the trade secrets and intellectual property from L&H, research and development, product development, solutions, applications, sales and marketing. The trade secrets and confidential and proprietary information acquired by ScanSoft, as assignee of L&H's rights, are not readily available to its competitors or to the general public.

54.    ScanSoft has also taken reasonable precautions to protect its trade secrets and the confidentiality of its proprietary information, including, but not limited to, requiring its employees to sign restrictive covenants regarding confidentiality, non-competition and non-solicitation, utilizing computer security protocols, and counseling new employees with respect to their obligations to maintain the confidentiality of ScanSoft's proprietary information and trade secret information.

E.  <u>The Voluntary Termination of Employment with L&H of The Scientists.</u>

55.  In December 2000, Gillick voluntarily resigned his employment with L&H. In January 2001, Roth and Yamron also voluntarily resigned their employment with L&H. On information and belief, Grabherr also voluntarily resigned his employment with L&H.

56.  Gillick's last date of employment with L&H was January 2, 2001. Roth's last date of employment with L&H was February 2, 2001. Yamron's last date of employment with L&H was February 9, 2001.

57.  In written notices of his resignation sent via electronic mail on December 6, 2000, and January 2, 2001, Gillick admitted that his entire body of knowledge regarding speech recognition technology came as a result of his employment with Dragon. Gillick's December 6, 2000 message provided, in pertinent part: "I am grateful to the 4 founders of [Dragon] – Jim, Janet, Bob, and Paul – for taking a chance on hiring a naïve academic mathematician without any significant programming experience and **without any knowledge of speech recognition** back in Dec [sic] 1984." (Emphasis added.) Gillick's January 2, 2001 message provided, in pertinent part: "I arrived at Dragon just about 16 years ago, fresh from an academic job in mathematics **and completely ignorant about speech recognition** and about working for a high-tech company. I am now somewhat more knowledgeable about these matters, I guess." (Emphasis added) (Copies of Gillick's electronic mail messages are attached hereto as Exhibits J and K respectively.)

F.  <u>The Scientists' Employment With VST and the Disclosure of ScanSoft's Proprietary and Confidential Information</u>

58.  Gillick, Roth, Yamron, and Grabherr are currently working for VST in Woburn, Massachusetts in the field of speech recognition technology.

59. VST is a direct competitor of ScanSoft and is engaged in the research, development, sale, distribution, installation and service of speech recognition technology, which includes technologies for the recognition, synthesis, and representation of human speech and applications that utilize such technologies. One example is VST's Embedded Large Vocabulary Interface System ("ELVIS"). ELVIS was announced in a press release on September 6, 2001. VST describes ELVIS as a modular scalable platform for assembling state-of-the-art speech recognition engines for mobile devices. This product has many of the same purposes, features and functionalities as those developed in the Manhattan and Phoenix Projects, the rights to which ScanSoft purchased from L&H in December of 2001. The capabilities of the speech recognizer described in the ELVIS product are identical to many of the capabilities present in the products developed at L&H under the direction of Gillick, Roth, and Yamron. ELVIS also has many of the capabilities present in the ASR 1600 product now owned by ScanSoft and to which Gillick and Roth had access. Similarly, ELVIS has many of the capabilities and features as those found in ScanSoft's Phoenix Project, developed in part by Grabherr's work. (A copy of the press release and a description of ELVIS from Voice Signal's Internet web site are attached hereto as Exhibit L.)

60. Prior to hiring Gillick, Roth, Yamron and Grabherr, VST knew or should have known that each of these defendants had executed restrictive covenants with L&H regarding confidentiality and use of trade secret information.

61. The Scientists' intimate knowledge of the confidential and proprietary information now owned by ScanSoft, VST's employment of the Scientists in any capacities involving the research and/or development of speech recognition technology or applications, and the inevitable disclosure to VST of ScanSoft's trade secrets and confidential and proprietary

information undermines ScanSoft's business and unfairly puts VST at a significant competitive advantage in a highly competitive industry.

## COUNT I
## INFRINGEMENT OF THE '966 PATENT (against VST)

62. ScanSoft realleges and incorporates paragraphs 1 through 61 of its Complaint as if set forth fully herein.

63. In violation of 35 U.S.C. §§ 271(a) and (c), VST has and is engaged in acts of direct and contributory infringement of the '966 patent, by making, using, selling and/or leasing within the United States, products embodying the inventions claimed in the '966 patent and will continue to do so unless enjoined by this Court.

64. In violation of 35 U.S.C. § 271(b), VST has and is actively inducing infringement of the '966 patent, and will continue to do so unless enjoined by this Court.

65. Upon information and belief, VST's infringement of the '966 patent has been and continues to be willful.

66. ScanSoft has been and continues to be damaged and irreparably harmed by the defendants' infringement of the '966 patent.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL AND PROPRIETARY INFORMATION (against all defendants)

67. ScanSoft restates and incorporates by reference all of the allegations in paragraphs 1 through 66 of the Complaint as if set forth fully herein.

68. By virtue of their employment with L&H, Gillick, Roth, Yamron, and Grabherr acquired access to the trade secrets and confidential and proprietary information now owned by

ScanSoft and described above, including, but not limited to, information regarding ScanSoft's speech recognition research and development projects.

69. The Scientists are bound by their ongoing obligations not to disclose proprietary and confidential information obtained through their work at L&H and now owned by ScanSoft.

70. Gillick, Roth, Yamron, and Grabherr used and disclosed ScanSoft's trade secrets and confidential and proprietary information through their employment with VST.

71. Any use and disclosure of such information by VST constitutes an unauthorized disclosure and misappropriation of trade secrets and confidential and proprietary information in violation of M.G.L. c. 93, §§ 42 and 42A, and common law.

72. As a result ScanSoft has suffered monetary damages in an amount to be proven at trial.

## COUNT III
### UNFAIR COMPETITION (against VST)

73. ScanSoft restates and incorporates by reference all of the allegations in paragraphs 1 though 72 of the Complaint as if set forth fully herein.

74. By its actions, as set forth above, VST has engaged and continues to engage in unfair competition prohibited by the common law.

75. As a result of VST's actions, ScanSoft has suffered monetary damages in an amount to be proven at trial.

## COUNT IV
### UNFAIR COMPETITION (against Gillick, Roth, Yamron, and Grabherr)

76. ScanSoft restates and incorporates by reference all of the allegations in paragraphs 1 though 75 of the Complaint as if set forth fully herein.

77. By their actions, as set forth above, Gillick, Roth, Yamron, and Grabherr have engaged and continue to engage in unfair competition prohibited by the common law.

78. As a result of Gillick's, Roth's, Yamron's, and Grabherr's actions, ScanSoft has suffered monetary damages in an amount to be proven at trial.

## COUNT V
## VIOLATION OF M.G.L. c. 93A (against VST)

79. ScanSoft restates and incorporates by reference all of the allegations in paragraphs 1 through 78 in the Complaint as if set forth fully herein.

80. By its actions, as set forth above, VST, which is engaged in trade or commerce within the Commonwealth of Massachusetts, has engaged in unfair and/or deceptive conduct in trade or commerce in violation of M.G.L. ch. 93A §§ 2 and 11. VST's knowing and willful conduct of inducing Gillick, Roth, Yamron, and Grabherr to breach their employment obligations and covenants constitutes a knowing and willful use of an unfair method of competition and an unfair or deceptive act or practice in the conduct of a trade or business within the meaning of M.G.L. c. 93A, § 2, entitling ScanSoft to injunctive relief, the trebling of its actual damages as are proved at trial, and its attorneys' fees.

### Claim for Relief

WHEREFORE, ScanSoft requests that the Court enter a judgment and decree:

A. Holding that Voice Signal Technologies, Inc. has infringed one or more claims of the '966 patent;

B. Preliminarily and permanently enjoining Voice Signal Technologies, Inc. from continuing to infringe the '966 patent;

C. Awarding to ScanSoft damages arising from such infringement, and treble damages for willful infringement, together with interest and costs;

D. Awarding to ScanSoft damages arising from Defendants' misappropriation of trade secrets and acts of unfair competition, plus interest;

E. Awarding to ScanSoft treble damages for VST's willful misconduct, as provided by M.G.L. c. 93A, §§ 2 and 11;

F. Awarding to ScanSoft its attorneys' fees and costs as allowed by law; and

G. Granting ScanSoft such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38, ScanSoft respectfully demands a trial by jury on all issues that are properly triable to a jury in this action.

Dated: February 20, 2004                         SCANSOFT, INC.,
                                                 By its attorneys,

                                                 _____
                                                 Lee Carl Bromberg, BBO #058480
                                                 Robert Asher, BBO #022865
                                                 Lisa M. Fleming, BBO #546148
                                                 John F. Ward, BBO #646689
                                                 BROMBERG & SUNSTEIN LLP
                                                 125 Summer Street
                                                 Boston, Massachusetts 02110-1618
                                                 (617) 443-9292

02639/00509 289794.1