EXECUTION COPY

# ASSET PURCHASE AGREEMENT
## (LOTS 1-3)

BY AND AMONG

SCANSOFT, INC.

AND

LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.,

L&H HOLDINGS USA, INC.

AND

THE OTHER SELLERS NAMED ON ANNEX A ATTACHED HERETO

DATED AS OF DECEMBER 7, 2001

*NY1:#3305335*

EXHIBIT C

## TABLE OF CONTENTS

Page No.

### ARTICLE I - THE PURCHASE ............................................................................................ 2

| | | |
|---|---|---|
| 1.1 | PURCHASE AND SALE OF ASSETS AND ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACTS ...... | 2 |
| 1.2 | ASSUMPTION OF LIABILITIES ........................................................................................ | 6 |
| 1.3 | RETAINED LIABILITIES ................................................................................................ | 6 |
| 1.4 | PURCHASE PRICE ........................................................................................................ | 8 |
| 1.5 | THE CLOSING ............................................................................................................. | 9 |
| 1.6 | ASSIGNED CONTRACTS ............................................................................................... | 11 |

### ARTICLE II - REPRESENTATIONS AND WARRANTIES OF THE SELLERS ............... 11

| | | |
|---|---|---|
| 2.1 | ORGANIZATION, QUALIFICATION AND CORPORATE POWER ................................................. | 11 |
| 2.2 | AUTHORITY ............................................................................................................... | 12 |
| 2.3 | NON-CONTRAVENTION .............................................................................................. | 12 |
| 2.4 | OWNERSHIP AND SUFFICIENCY OF ASSETS ................................................................... | 13 |
| 2.5 | ASSIGNED CONTRACTS ............................................................................................... | 13 |
| 2.6 | TAXES ...................................................................................................................... | 15 |
| 2.7 | INTELLECTUAL PROPERTY .......................................................................................... | 16 |
| 2.8 | LITIGATION ............................................................................................................... | 18 |
| 2.9 | WARRANTIES AND INDEMNITIES ................................................................................. | 18 |
| 2.10 | EMPLOYEES .............................................................................................................. | 18 |
| 2.11 | BROKERS .................................................................................................................. | 19 |
| 2.12 | INSURANCE ............................................................................................................... | 19 |
| 2.13 | RESERVED ................................................................................................................ | 19 |
| 2.14 | RESERVED ................................................................................................................ | 19 |
| 2.15 | RESERVED ................................................................................................................ | 19 |
| 2.16 | INVESTMENT REPRESENTATIONS ................................................................................. | 19 |
| 2.17 | RESERVED ................................................................................................................ | 20 |
| 2.18 | CERTAIN SEVERANCE COSTS ...................................................................................... | 20 |

### ARTICLE III - REPRESENTATIONS AND WARRANTIES OF THE BUYER ................ 20

| | | |
|---|---|---|
| 3.1 | ORGANIZATION .......................................................................................................... | 20 |
| 3.2 | AUTHORIZATION OF TRANSACTION .............................................................................. | 21 |
| 3.3 | NON-CONTRAVENTION .............................................................................................. | 21 |
| 3.4 | CAPITALIZATION ........................................................................................................ | 21 |
| 3.5 | SEC REPORTS AND FINANCIAL STATEMENTS ................................................................ | 21 |
| 3.6 | SHARES .................................................................................................................... | 22 |
| 3.7 | LITIGATION ............................................................................................................... | 22 |
| 3.8 | FINANCING ............................................................................................................... | 22 |
| 3.9 | BROKERS .................................................................................................................. | 22 |

### ARTICLE IV - PRE-CLOSING COVENANTS ............................................................ 22

| | | |
|---|---|---|
| 4.1 | COMMERCIALLY REASONABLE EFFORTS ...................................................................... | 23 |
| 4.2 | NOTICES AND CONSENTS ........................................................................................... | 23 |
| 4.3 | BANKRUPTCY COVENANTS ........................................................................................ | 23 |
| 4.4 | OPERATION OF BUSINESS ........................................................................................... | 24 |
| 4.5 | FULL ACCESS AND CONFIDENTIALITY .......................................................................... | 24 |
| 4.6 | NOTICE OF BREACHES ................................................................................................ | 25 |
| 4.7 | TRANSITION SERVICES ................................................................ ERROR! BOOKMARK NOT DEFINED.5 |
| 4.8 | RESERVED ................................................................................ ERROR! BOOKMARK NOT DEFINED.5 |
| 4.9 | EMPLOYEE MATTERS .................................................................................................. | 25 |
| 4.10 | ALLOCATION OF PURCHASE PRICE .............................................................................. | 28 |
| 4.11 | TAXES ...................................................................................................................... | 28 |
| 4.12 | INTELLECTUAL PROPERTY ................................................................ ERROR! BOOKMARK NOT DEFINED.8 |
| 4.13 | GOOD FAITH ............................................................................................................. | 28 |

4.14   REGISTRATION RIGHTS .......................................................................... 29
4.15   ADEQUATE ASSURANCES REGARDING CONTRACTS .......................... 28
4.16   RESERVED .............................................................................................. 28
4.17   BANKRUPTCY OR CONCORDAT PROCEEDINGS INITIATED BY OTHER SELLERS ... 29
4.18   RESERVED .............................................................................................. 28
4.19   REIMBURSEMENT OF BELGIAN VAT TAXES; TAX WAIVER ................ 29
4.20   FURTHER ASSURANCES .......................................................................... 30

## ARTICLE V - CONDITIONS TO CLOSING ........................................ 30

5.1    CONDITIONS TO OBLIGATIONS OF THE BUYER .................................. 30
5.2    CONDITIONS TO OBLIGATIONS OF THE SELLER ................................ 32

## ARTICLE VI - POST CLOSING COVENANTS AND AGREEMENTS ...... 33

6.1    PROPRIETARY INFORMATION .................................................................. 33
6.2    NON-COMPETITION ................................................................................ 33
6.3    BOOKS AND RECORDS ............................................................................ 34
6.4    COOPERATION ........................................................................................ 35
6.5    RESALE OF SHARES ................................................................................ 35
6.6    LEGENDS ................................................................................................ 36
6.7    RESERVED .............................................................................................. 36
6.8    RECEIVABLES; ACCOUNTING .................................................................. 36
6.9    TRADEMARKS/DOMAIN NAMES .............................................................. 36
6.10   SHARED TECHNOLOGY CONTRACTS ...................................................... 36
6.11   SURVIVAL OF REPRESENTATIONS AND WARRANTIES .......................... 37
6.12   NO OTHER REPRESENTATIONS .............................................................. 37
6.13   DISCLOSURE SCHEDULE .......................................................................... 37

## ARTICLE VII - RESERVED ................................................................ 387

## ARTICLE VIII - TERMINATION ........................................................ 38

8.1    TERMINATION OF AGREEMENT ................................................................ 38
8.2    STATUS OF AGREEMENT AFTER TERMINATION ...................................... 38
8.3    FEES AND EXPENSES .............................................................................. 39
8.5    EXCLUSIVE REMEDY .............................................................................. 39

## ARTICLE IX - MISCELLANEOUS ...................................................... 39

9.1    PRESS RELEASES AND ANNOUNCEMENTS .............................................. 39
9.2    NO THIRD PARTY BENEFICIARIES .......................................................... 39
9.3    ENTIRE AGREEMENT .............................................................................. 40
9.4    SUCCESSION AND ASSIGNMENT .............................................................. 40
9.5    COUNTERPARTS ...................................................................................... 40
9.6    HEADINGS .............................................................................................. 40
9.7    NOTICES ................................................................................................ 40
9.8    GOVERNING LAW .................................................................................. 41
9.9    JURISDICTION ........................................................................................ 42
9.10   WAIVER OF JURY TRIAL ........................................................................ 42
9.11   BULK SALES LAWS ................................................................................ 42
9.12   AMENDMENTS AND WAIVERS .................................................................. 43
9.13   SEVERABILITY ........................................................................................ 43
9.14   EXPENSES .............................................................................................. 43
9.15   SPECIFIC PERFORMANCE ........................................................................ 43
9.16   CONSTRUCTION ...................................................................................... 43
9.17   INCORPORATION OF EXHIBITS AND SCHEDULES .................................. 43

## <u>ANNEXES</u>

Annex A     List of Other Sellers

Annex B     List of L&H Text to Speech Assets
         List of Speech Processing/Dialog (and Automotive) Assets
         List of Dragon Speech Processing/Dialog Assets

Annex C
         List of ISI Speech Processing/Dialog Assets
         List of L&H Intelligent Content Management Assets
         List of L&H AudioMining Assets
         List of L&H Knexys Assets
         List of L&H Machine Translation Assets

## <u>EXHIBITS</u>

Exhibit A    Form of Bill of Sale
Exhibit B    Form of Instrument of Assumption
Exhibit C    RESERVED
Exhibit D    RESERVED
Exhibit E    Form of Promissory Note
Exhibit F    Form of Registration Rights Agreement

## <u>SCHEDULES</u>

Schedule 1.1(a)(i)  Tangible Personal Property
Schedule 1.1(a)(vii) Accounts Receivable
Schedule 1.1(b)(vi) Certain Excluded Contracts
Schedule 1.1(b)(ix) Additional Excluded Tangible Assets
Schedule 1.1(b)(x) Seller Names
Schedule 1.2(a)  Assumption of Liabilities
Schedule 4.10   Allocation Schedule
Schedule 6.9   Trademarks /Domain Names
Disclosure Schedule

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into as of December 7, 2001 (this "Agreement"), by and among ScanSoft, Inc., a Delaware corporation (the "Buyer"), on the one hand, and Lernout & Hauspie Speech Products N.V., a corporation organized and existing under the laws of the Kingdom of Belgium ("L&H"), L&H Holdings USA, a Delaware corporation that is a wholly-owned subsidiary of L&H ("Holdings"), and the other corporations listed on <u>Annex A</u> to this Agreement, on the other hand (L&H, Holdings, and the other corporations listed on <u>Annex A</u> to this Agreement are each individually referred to herein as a "Seller" and collectively as the "Sellers").  The Buyer and the Sellers are referred to collectively herein as the "Parties."

W I T N E S S E T H:

WHEREAS, L&H and Holdings (the "Bankruptcy Sellers") have filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "U.S. Bankruptcy Code") (Case Nos. 00-4397 through 00-4399 (JHW), jointly administered) (the "U.S. Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court");

WHEREAS, L&H has been the subject of a concordat proceeding under the Belgian law of July 17, 1997 on judicial composition *(gerechtelijk akkoord)* in Belgium before the Commercial Court of Ieper and has been declared bankrupt (in *staat van faillissement)* pursuant to a judgment of October 24, 2001 (the "Belgian Bankruptcy Case" and together with the U.S. Bankruptcy Case, the "Bankruptcy Cases") of the Commercial Court of Ieper (such court, together with the bankruptcy trustees *(curatoren;* hereinafter the "Trustees") and the designated judges *(rechters-commissarissen)* appointed in connection with the Belgian Bankruptcy Case (the "Designated Judges", together with the Trustees, the "Belgian Bankruptcy Authorities", and together with the U.S. Bankruptcy Court, the "Bankruptcy Courts") pursuant to Belgian law of August 8, 1997 (the "Belgian Bankruptcy Code" and, together with the U.S. Bankruptcy Code, the "Bankruptcy Codes");

WHEREAS, the Sellers desire to sell, transfer and assign to the Buyer and the Buyer desires to purchase and acquire from the Sellers (i) (A) the assets contained within the Sellers' Text-to-Speech Asset Group, (B) the assets contained within L&H's Speech Processing/Dialog (and Automotive Applications) Asset Group, and (C) the assets contained within the Dragon Speech Processing/Dialog Asset Group, as such assets are more fully described on <u>Annex B</u> attached hereto (collectively the "Purchased Asset Groups") and (ii)  the business lines of Sellers directly relating to the development, production, marketing and sale of the Purchased Asset Groups ((i) and (ii) together, the "Acquired Business"; it being understood, however, that the Acquired Business shall not include any item listed on <u>Annex C</u> attached hereto (the "Non-

Purchased Asset Groups"), or the business lines of Sellers directly relating to the development, production, marketing and sale of the Non-Purchased Asset Groups (together with the Non-Purchased Asset Groups, the "Non-Purchased Business")), in each case free and clear of all liens, mortgages, security interest, pledges, claims, encumbrances, liabilities and other obligations and interests of every kind and nature (the "Encumbrances", it being understood, however, that the term Encumbrances shall not include any licenses or any escrow agreements) other than assets being sold, transferred or assigned by the Sellers that are not Bankruptcy Sellers (the "Non-Bankruptcy Sellers"), in which case subject to Permitted Encumbrances (as defined in Section 2.4);

WHEREAS, in connection with the transactions contemplated hereby, the Parties hereto desire that the Assigned Contracts (as defined in Section l.l(a)(ii)) to which L&H or Holdings is a party (the "Debtor Assigned Contracts") be assumed by them and assigned to the Buyer pursuant to Section 365 of the U.S. Bankruptcy Code and that the Buyer succeed to all of the rights and assume the duties and obligations thereunder which arise on or after the Closing Date under such Debtor Assigned Contracts.

WHEREAS, subject to approval of the Bankruptcy Courts, as set forth herein, the Sellers shall be authorized to sell the Acquired Assets to the Buyer.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

# ARTICLE I

## THE PURCHASE

1.1    <u>Purchase and Sale of Assets and Assumption and Assignment of the Assigned Contracts.</u>

(a)    Upon and subject to the terms and conditions of this Agreement, the Buyer shall purchase from each Seller, and each Seller shall sell, transfer, convey, assign and deliver to the Buyer, at the Closing (as defined in Section 1.5(a)), free and clear of all Encumbrances (other than assets being sold, transferred, conveyed or assigned by the Non-Bankruptcy Sellers, in which case subject to the Permitted Encumbrances, if any), for the aggregate consideration specified below in this Article I, all of such Seller's right, title and interest in and to the following assets of such Seller existing as of the Closing, regardless of whether such assets existed prior to the commencement of the Bankruptcy Cases or arising thereafter (the "Acquired Assets"):

(i)    all servers, computers, network infrastructure, associated software (used for administrative purposes), machinery, equipment, tools and tooling, furniture, fixtures, supplies, other tangible property and leasehold improvements set forth on the fixed asset property

NYI:83303235

schedule attached hereto as <u>Schedule 1.1(a)(i)</u>, as such may be amended from time to time in the sole discretion of the Buyer prior to Closing to add or delete any tangible property owned by Sellers and used primarily in the conduct of the Acquired Business;

(ii)     subject to Section 1.1(b)(vi) below, all rights under all, (A) contracts, (B) purchase and sales orders, (C) instruments, (D) licenses and sublicenses and (E) leases, all as set forth on <u>Schedule 1.2(a)</u> hereto, as such schedule may be amended from time to time prior to Closing in accordance with Section 1.2(a) to add or delete any items referred to in clauses (A) - (E) hereof, in each case, to the extent such items relate to the conduct of the Acquired Business (collectively, the "Assigned Contracts"), it being expressly understood that Buyer will not delete any Technology Licenses (as defined in Section 2.4(b));

(iii)     all inventory, including raw materials, work in process, finished goods, supplies, packaging materials, spare parts and similar items, consignment inventory and inventory held on order or in transit to the extent used primarily in the operation of the Acquired Business;

(iv)     subject to Section 1.1(b)(v) below, all Intellectual Property and Other Intellectual Property (as such terms are defined in Section 2.7(a)) (collectively, the "Acquired Intellectual Property");

(v)     RESERVED;

(vi)     all permits, non-intellectual property licenses, registrations, certificates, orders, approvals, franchises, variances and similar rights necessary for the conduct of the Acquired Business (collectively, "Permits") issued by or obtained from any court, arbitrational tribunal, administrative agency or commission or other governmental or regulatory authority or agency (each, a "Governmental Entity");

(vii)     all extant and future (A) trade and other accounts receivable, (B) notes and loans receivable and (C) other rights to payment from customers of the Acquired Business for goods sold or services rendered, together with any security held by such Seller for the payment of any of the foregoing thereof (the "Acquired Receivables"), in each case, to the extent arising out of the contracts listed on Schedule 1.2(a), excluding any of the foregoing to the extent that they relate to Excluded Contracts (as defined in Section 1.1(b)(vi)). Schedule 1.1(a)(vii) contains an accurate list of Sellers' accounts receivable as of November 30, 2001 (or later,

3

if available), which will be provided on or prior to the Closing Date;

(viii)    all payments of cash or cash equivalents received by the Sellers from customers in respect of the Acquired Receivables on or after the Closing Date;

(ix)    except as excluded in Section 1.1(b)(vii) below, and except for those items that otherwise constitute Intellectual Property or Other Intellectual Property, all books, records, files and databases (including employee files relating to any Transferred Employees (as defined below), and all client files and databases), documents, correspondence, lists (including client lists), engineering drawings or specifications, advertising and promotional materials, studies, reports and other printed or written materials in whatever format, written, electronic or otherwise,  relating to the items listed in clauses (i) through (iii) above, in each case, to the extent used in the operation of the Acquired Business; and

(x)    all goodwill of such Seller relating to the Acquired Business or the Acquired Assets.

(b)    Notwithstanding the provisions of Section 1.1(a), the Acquired Assets shall not include the following assets (collectively, the "Excluded Assets"):

(i)    the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books and other documents relating to the organization and existence of the Sellers;

(ii)    any of the rights of the Sellers under this Agreement or the Ancillary Agreements (for purposes of this Agreement, "Ancillary Agreements" shall mean the bill of sale in the form attached hereto as <u>Exhibit A</u> (the "Bill of Sale"), the instrument of assumption in the form attached hereto as <u>Exhibit B</u> (the "Instrument of Assumption"), that certain Deposit Escrow Agreement dated November 19, 2001, by and among L&H, Buyer and Wilmington Trust Company, as escrow agent (the "Deposit Agreement"), the promissory note in the form attached hereto as <u>Exhibit E</u> and any other agreement entered into by the Parties hereto in connection with this Agreement) and other instruments referred to in Sections 1.5(b)(v) and (vi));

(iii)    any avoidance actions of the Bankruptcy Sellers' bankruptcy estate under the Bankruptcy Codes, but excluding any rights in or to any

4

of the Acquired Assets or Assigned Contracts and any rights necessary for the Buyer to avoid losing the benefit of any Acquired Asset or Assigned Contract;

(iv)   any and all capital stock owned by any Seller in any of its Subsidiaries (as defined in Section 2.3);

(v)   any item of Intellectual Property or Other Intellectual Property that the Buyer identifies in writing to L&H prior to the Closing that the Buyer does not want included as "Acquired Intellectual Property", it being understood that such items shall not include the Technology Licenses (as defined in Section 2.4(b)) (the "Excluded Intellectual Property");

(vi)   any contracts, agreements, instruments or licenses identified in Schedule 1.1(b)(vi) and any other contracts, agreements, instruments or licenses, if any, relating to the Acquired Business that the Buyer identifies in writing to L&H prior to Closing that the Buyer desires to exclude from the Assigned Contracts, which exclusion shall not include the Technology Licenses (any such excluded contracts (the "Excluded Contracts") (the Schedule of Assigned Contracts (as defined in Section 1.2) shall be amended at Closing to delete such Excluded Contracts);

(vii)   unless otherwise expressly provided herein, all originals and copies of the items set forth in Section 1.1(a)(ix) above to the extent they relate solely to the Excluded Assets or the Retained Liabilities (as defined in Section 1.3) or, except in the case of files relating to the Acquired Intellectual Property, are the subject of attorney-client privilege between a Seller and its attorneys (such Seller specifically reserving and not waiving any and all such attorney-client privileges);

(viii)   cash and cash equivalents, except as provided in Section 1.1(a)(viii);

(ix)   the items listed in Schedule 1.1(b)(ix);

(x)   any rights to the names listed on Schedule 1.1(b)(x);

(xi)   any tax refunds to the extent that they relate to any period or portion of any period prior to the Closing Date (as defined in Section 1.5(a)); and

(xii)   unless otherwise expressly provided, all assets and property comprising the Non-Purchased Business.

NY1:#3305235

1.2    <u>Assumption of Liabilities</u>. Upon and subject to the terms and conditions of this Agreement, the Buyer shall assume, become responsible for, and discharge when due, from and after the Closing only the following liabilities (the "Assumed Liabilities"):

(a)    all obligations of the Sellers under the Assigned Contracts that accrue and are required to be performed from and after the Closing, provided that <u>Schedule 1.2(a)</u> attached hereto identifying each Assigned Contract may be amended (i) from time to time by the Seller prior to Closing solely to add contracts related to the Acquired Business to such schedule and (ii) from time to time by the Buyer, in its sole discretion prior to Closing, to designate any Assigned Contracts as an Excluded Contract, which designations shall not include Technology Licenses (as defined on Section 2.4(b))(as such schedule is so amended, the "Schedule of Assigned Contracts") and no liabilities arising under any such Excluded Contract shall be assumed by the Buyer; and

(b)    all obligations arising from the ownership and operation of the Acquired Business and the Acquired Assets from and after the Closing Date.

1.3    <u>Retained Liabilities</u>.

(a)    The Buyer shall not assume or otherwise become responsible for, and the Sellers shall remain liable for all Retained Liabilities. For purposes of this Agreement, the term "Retained Liabilities" shall mean any and all liabilities or obligations (whether known or unknown, whether absolute or contingent, whether liquidated or unliquidated, whether due or to become due, and whether claims with respect thereto are asserted before or after the Closing) of the Sellers or any of their respective Subsidiaries which are not Assumed Liabilities, including without limitation:

(i)    all liabilities and obligations of any Seller or its Subsidiaries, any of its affiliates or any predecessor employer of any current, retired, former or inactive employee of any Seller or its Subsidiaries, any of its affiliates or any predecessor employer, under any employee benefit plans, incentive compensation plans, bonus plans, pension and retirement plans, vacation plans, sabbatical plans, profit-sharing plans (including any profit-sharing plan with a cash-or-deferred arrangement) share purchase and option plans, savings and similar plans, medical, dental, travel, accident, life, disability and other insurance and other plans or arrangements, whether written or oral and whether "qualified" or "non-qualified";

(ii)    all liabilities and obligations of any Seller or any of their respective Subsidiaries for, on account of, or arising from, (A) any violation of Environmental Laws (as defined below); (B) the release of any Materials of Environmental Concern (as defined below) into the environment; and (C) any pending or threatened civil or criminal litigation, written notice of violation, formal administrative

6

proceeding, or investigation, inquiry or information request by any Governmental Entity relating to any Environmental Law involving the Acquired Business, the Acquired Assets or any Seller or any of its Subsidiaries. For purposes of this Agreement, "Environmental Laws" means any foreign, federal, state or local law, statute, rule, regulation, judgment, order, injunction, decree, arbitration award, agency requirement, license, permit or approval or the common law relating to the environment or occupational health and safety, including any statute, regulation, administrative decision or order pertaining to (1) treatment, storage, disposal, generation and transportation of industrial, toxic or hazardous materials or substances or solid or hazardous waste; (2) air, water and noise pollution; (3) groundwater and soil contamination; (4) the release or threatened release into the environment of industrial, toxic or hazardous materials or substances, or solid or hazardous waste, including emissions, discharges, injections, spills, escapes or dumping of pollutants, contaminants or chemicals; (5) the protection of wild life, marine life and wetlands, including all endangered and threatened species; (6) storage tanks, vessels, containers, abandoned or discarded barrels and other closed receptacles; (7) health and safety of employees and other persons; and (8) manufacturing, processing, using, distributing, treating, storing, disposing, transporting or handling of materials regulated under any law as pollutants, contaminants, toxic or hazardous materials or substances or oil or petroleum products or solid or hazardous waste. As used above, the terms "release" and "environment" shall have the meaning set forth in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"); and "Materials of Environmental Concern" shall mean any chemicals, pollutants, contaminants, hazardous substances (as such term is defined under CERCLA), solid wastes and hazardous wastes (as such terms are defined under the Resource Conservation and Recovery Act, as amended), toxic materials, oil or petroleum and petroleum products, asbestos, radon, mold, polychlorinated biphenyls or any other materials subject to regulation under any Environmental Law;

(iii)    except as provided in Section 4.11, all liabilities and obligations of any Seller for, or relating to, any Taxes (as defined in Section 2.6(c)) for any periods (or portions thereof) prior to Closing;

(iv)    all liabilities and obligations of any Seller for, or relating to, any Permits to the extent such liabilities accrued prior to Closing;

(v)     except as provide in Section 4.9, all liabilities and obligations of any Seller for, or relating to, such Seller's employees (including, without limitation, any liability relating to employee wages, benefits and related taxes and any and all severance benefits or obligations or other restructuring costs), incurred as a result of the transactions contemplated by this Agreement, including all Required Severance Payments (as defined in Section 4.9(d))

(vi)    all liabilities and obligations of any Seller for any broker's or finder's commission, fee or similar compensation relating to the transactions contemplated by this Agreement;

(vii)   all liabilities and obligations of each of the Sellers for repair, replacement or return of products sold prior to Closing and all marketing discretionary funds, price protection or other credits provided prior to the Closing pursuant to an Assigned Contract (the Buyer agrees that it will not induce or encourage customers to swap out like for like inventory); provided, however, that Buyer will assume responsibility for marketing discretionary funds and other valid credits to the extent, and only to the extent, of the amount provided on Schedule 1.1(a)(vii), Accounts Receivable; and provided further that in no event will Buyer be responsible for any amount of marketing discretionary funds or other valid credits on any Assigned Contract that exceeds the Acquired Receivable due from that Assigned Contract as of the Closing Date; and

(viii)  all liabilities of each of the Sellers arising out of any claim, suit, action, arbitration, proceeding, investigation or other similar matter relating to the ownership of the Acquired Assets or the operation of the Acquired Business prior to the Closing.

(b)     With respect to the Bankruptcy Sellers, the Retained Liabilities shall constitute claims and alleged claims in the Bankruptcy Cases; provided, however, that nothing herein shall grant or create any rights in favor of the holders of Retained Liabilities or create any priority to right of payment. It is expressly understood and agreed that the Parties intend that the Buyer shall not be considered to be a successor to any Seller by reason of any theory of law or equity and that the Buyer shall have no liability except as expressly provided in this Agreement for any liability of any Seller or any of their respective Subsidiaries.

1.4     Purchase Price.

(a)     The aggregate purchase price to be paid by the Buyer for the Acquired Assets (the "Aggregate Purchase Price") shall consist of

(i)     an amount equal to U.S. $10,000,000 (the "Closing Cash Purchase Price");

8

(ii)     The Buyer's promissory note in the original principal amount of U.S. $3,500,000 in the form attached as Exhibit E (the "Promissory Note", together with the Closing Cash Purchase Price, the "Cash Purchase Price");

(iii)    7,400,000 shares of common stock, U.S. $0.001 par value per share, of the Buyer (the "Shares") (As of November 26, 2001, the Shares had a value of U.S. $26,048,000 based on a closing price of U.S. $3.52 per share.); and

(iv)     the assumption by the Buyer at Closing of the Assumed Liabilities.

(b)     The Closing Cash Purchase Price, the Shares and the Promissory Note shall be allocated among the Sellers in accordance with the allocation to be filed by the Bankruptcy Sellers with the U.S. Bankruptcy Court prior to the hearing for the Approval Order (as defined in Section 4.3(a)) (such allocation in the form approved by the U.S. Bankruptcy Court at the Approval Hearing, the "Schedule of Allocation Among Sellers"), provided that such allocation shall be subject to further order of the U.S. Bankruptcy Court and shall be further allocated among the Acquired Assets in the manner set forth in Section 4.10.

1.5     The Closing.

(a)     The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at a location as may be mutually agreed upon by the Buyer and L&H, commencing at 9:00 a.m. Eastern Standard Time on the first business day following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (the "Closing Date").

(b)     At the Closing:

(i)      the Sellers shall deliver to the Buyer the various certificates, instruments and documents referred to in Section 5.1;

(ii)     the Buyer shall deliver to the Sellers the various certificates, instruments and documents referred to in Section 5.2;

(iii)    L&H shall receive the Good Faith Deposit (as defined in the Deposit Agreement) pursuant to the terms of the Deposit Agreement and the Buyer shall pay to L&H the Closing Cash Purchase Price less the Good Faith Deposit in immediately available funds by wire transfer to an account or accounts to be designated by L&H and issue to L&H the Shares and the Promissory Note and thereafter, L&H shall allocate the Closing Cash Purchase Price, the Shares and the Promissory Note in accordance with the Schedule of Allocation Among Sellers;

(iv) RESERVED;

(v) or as soon as practicable after the Closing, the Sellers shall execute and deliver to the Buyer such instruments of conveyance, with respect to the Acquired Intellectual Property, in forms suitable for filing with the appropriate Governmental Entity;

(vi) the Sellers shall execute and deliver to the Buyer the Bill of Sale and such other instruments of conveyance as the Buyer may reasonably request in order to effect the sale, transfer, conveyance and assignment to the Buyer of all of Sellers' right, title and interest in and to the Acquired Assets and the Buyer shall issue to L&H an invoice for the sale of those of the Acquired Assets that are sold by L&H, in compliance with Belgian law;

(vii) the Buyer shall execute and deliver to the Sellers the Instrument of Assumption and such other instruments as the Sellers may reasonably request in order to effect the assumption by the Buyer of the Assumed Liabilities;

(viii) the Bankruptcy Sellers shall deliver or cause to be delivered a copy of the Approval Order, entered by the U.S. Bankruptcy Court approving this Agreement and the consummation of the transactions contemplated hereby;

(ix) the Bankruptcy Sellers shall deliver a certificate, as of a date not earlier than the eleventh day following the entry of the Approval Order or if the Approval Order includes a waiver of the stay provided for in U.S. Bankruptcy Rules of Procedure 6004(g) and 6004(d) a certificate as of the Closing Date of the Clerk of the U.S. Bankruptcy Court certifying as to the absence of a stay pending an appeal with respect to the Approval Order (as defined in Section 4.3(a)), or if certificates to such effect are not provided by such Clerk, then a certified copy of the court docket for the U.S. Bankruptcy Case establishing the absence of any such stay as of the Closing Date;

(x) L&H shall deliver proper evidence that this Agreement has been approved and authorized by the Belgian Bankruptcy Authorities (the "Belgian Bankruptcy Approval");

(xi) or as soon as practicable after the Closing, the Sellers shall deliver, and to the extent required by Buyer, shall cause their respective Subsidiaries to deliver, to the Buyer patent, trademark, service mark, service names, tradenames, domain name and/or copyright

NY1:#3305235

assignments relating to the Acquired Intellectual Property duly executed by the Sellers and/or their respective Subsidiaries and/or, if applicable, any party to which a security interest was granted or assignment made with respect to the foregoing providing for the assignment and transfer to the Buyer of all of such entity's right, title and interest in and to all such patents, copyrights, trademarks, service marks, service names, tradenames, domain names or any applications therefor and any other Acquired Intellectual Property, in form and substance reasonably acceptable to the Buyer and any and all files, applications, assignments or other documents relating to the prosecution or maintenance of any Acquired Intellectual Property;

(xii)   the Sellers shall deliver to the Buyer terminations of all Encumbrances which are of record with respect to the Acquired Assets in forms suitable for filing with the appropriate Governmental Entities;

(xiii)   the Sellers shall deliver to the Buyer, or otherwise put the Buyer in control of, all of the Acquired Assets of a tangible nature; and

(xiv)   the Buyer and the Sellers shall execute and deliver to each other cross-receipts and such other instruments, documents or agreements, in form and substance reasonably acceptable to the Buyer and the Sellers, as may be necessary to effect and evidence the transactions contemplated by this Agreement.

1.6   <u>Assigned Contracts</u>.  The Sellers shall be liable for all costs to cure any default under the Assigned Contracts that existed on or prior to the Closing Date.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each Seller, severally, and not jointly, represents and warrants to the Buyer that the statements contained in this Article II are true and correct, except as set forth in the disclosure schedule attached hereto (the "Disclosure Schedule").  Representations and warranties contained in this Article II that are made with respect to the Bankruptcy Cases are made only by L&H and Holdings, as applicable.  The Disclosure Schedule shall be arranged in paragraphs corresponding to the numbered and lettered paragraphs contained in this Article II, and the disclosures in any section of the Disclosure Schedule shall qualify (i) the corresponding section in this Article II and (ii) such other sections in this Article II only to the extent that it is reasonably apparent from a reading of such disclosure that it also qualifies or applies to such other sections.

2.1   <u>Organization, Qualification and Corporate Power</u>.

11

(a)     Each Seller is an entity duly organized and validly existing under the laws of its jurisdiction of incorporation as set forth on Section 2.1 of the Disclosure Schedule. If applicable, each Seller is in corporate and tax good standing in its jurisdiction of incorporation and is duly qualified to conduct its business and is in corporate and tax good standing under the laws of each jurisdiction in which the nature of the Acquired Business or the ownership or leasing of the Acquired Assets requires such qualification except for jurisdictions where the failure to so qualify would not have a Seller Material Adverse Effect. For purposes of this Agreement, "Seller Material Adverse Effect" means a material adverse effect, individually or in the aggregate, on the business, financial condition or results of operations of the Acquired Business or the condition or value of the Acquired Assets taken as a whole, provided, however, that for purposes of this Agreement, (i) conditions or events generally adversely affecting the speech recognition or speech synthesis industry or (ii) adverse changes in economic, regulatory or political conditions generally in any country where the Sellers operate the Acquired Business, in each case that do not materially disproportionately affect the Acquired Business, shall not be taken into account in determining whether there has been or would be a Seller Material Adverse Effect. Each Seller has all requisite corporate power and authority to carry on the business in which it is engaged and to own and use the properties owned and used by it, including without limitation the Acquired Assets.

2.2     Authority. Subject in the case of the Bankruptcy Sellers to the Approval Order and the Belgian Bankruptcy Approval, (a) each Seller has all requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder, (b) this Agreement has been duly and validly executed and delivered by each Seller and constitutes a valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms and (c) the Ancillary Agreements to which it is a party, when delivered by each Seller at Closing, will constitute valid and binding obligations of each Seller, enforceable against each Seller in accordance with its respective terms. The execution and delivery by each Seller of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of each Seller.

2.3     Non-Contravention. Subject in the case of the Bankruptcy Sellers to the Approval Order (as defined in Section 4.3(a)) and the Belgian Bankruptcy Approval, neither the execution and delivery of this Agreement or the Ancillary Agreements to which any Seller is a party, nor the consummation by any Seller of the transactions contemplated hereby or thereby, will (a) conflict with or violate any provision of any Seller's charter, by-laws or other corporate organizational documents, (b) require on the part of any Seller or any corporation with respect to which any Seller, directly or indirectly, has the power to vote or direct the voting of sufficient securities to elect a majority of the directors (a "Subsidiary"), any filing with, or any permit, authorization, waiver, consent or approval of any Governmental Entity other than any filings or notices required solely as a result of the legal or regulatory status of the Buyer, (c) violate in any material respect any order, writ, injunction, decree, statute, rule or regulation applicable to any Seller, the Acquired Assets or the Acquired Business or any of its other properties or assets, (d) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both)

12

a material default under, result in the acceleration of obligations under, create in any party the right to terminate, modify or cancel, or require any notice, consent or waiver under any contract or instrument, including any Assigned Contract (other than any Assigned Contract pursuant to which any Seller licenses in commercial off-the-shelf software), to which any Seller or any of its Subsidiaries is a party or by which any Seller or any of its Subsidiaries is bound or to which the Acquired Assets or the Acquired Business is subject, or (e) result in the imposition of any Encumbrance upon any Acquired Assets.

2.4    Ownership and Sufficiency of Assets.

(a)    Subject in the case of the Bankruptcy Sellers to the Approval Order and the Belgian Bankruptcy Approval, each Seller holds good and marketable title to the Acquired Assets and has the complete and unrestricted power and the unqualified right to sell, assign and transfer the Acquired Assets to the Buyer. Each Seller owns all of the Acquired Assets free and clear of all Encumbrances except for the Encumbrances set forth on Section 2.4 of the Disclosure Schedule that neither individually nor in the aggregate would have a Seller Material Adverse Effect. Each Non-Bankruptcy Seller represents and warrants that upon the consummation of the transactions contemplated by this Agreement, the Buyer will become the true and lawful owner of, and will receive good and marketable title to, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. For purposes of this Agreement, "Permitted Encumbrances" shall mean (i) any statutory Encumbrance arising in the ordinary course of business by operation of law with respect to any liability that is not yet due or delinquent and (ii) any minor imperfection of title or similar Encumbrance which, in each case, would not individually or in the aggregate, constitute a Seller Material Adverse Effect.

(b)    The Acquired Assets and the licenses to be granted to Buyer, as more specifically set forth on Annex B attached hereto are sufficient for the conduct of the Acquired Business as currently conducted and as currently proposed to be conducted by the Sellers. (The aforementioned licenses, together with the licenses to be granted by Buyer, as more specifically set forth on Annex B attached hereto, the "Technology Licenses.")

(c)    Each tangible Acquired Asset is free from material defects, has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear) and is suitable for the purposes for which it is currently used.

2.5    Assigned Contracts.

(a)    Except for Excluded Contracts, Schedule 1.2(a) of the Disclosure Schedule  sets forth a list of all material, and substantially all other, contracts, agreements, understandings, instruments or arrangements, whether oral or written, to which each Seller or any of its Subsidiaries is a party relating to the Acquired Assets or the Acquired Business, including, without limitation, all executory contracts within the meaning of U.S. Bankruptcy Code Section 365, all purchase and sales orders, all licenses and sublicenses, all leases, all indemnification and financing agreements, all original equipment manufacturer agreements, distribution agreements, warranty obligations (except warranty obligations entered in the

13

ordinary course of business) volume or quantity purchase agreement or other similar agreement relating to the Acquired Assets or Acquired Business or joint marketing, joint development or joint venture contract or arrangement or any other agreement relating to the Acquired Assets or Acquired Business. Schedule 1.2(a) of the Disclosure Schedule identifies under the heading "Material Contracts" all Assigned Contracts relating to licensees that either paid to the Sellers more than U.S. $50,000 in the first three quarters of 2001 or (ii) have committed more than U.S. $50,000 in future payments to the Sellers through December 31, 2002 (collectively, the "Material Contracts"). In addition, Schedule 1.2(a) of the Disclosure Schedule identifies, with respect to each such contract, agreement, understanding, instrument or arrangement, (y) which Seller is a party thereto and (z) the applicable Seller product licensed thereunder.

(b)    Prior to the Closing the Sellers shall have made available to the Buyer complete and accurate copies of the Assigned Contracts listed on Schedule 1.2(a). All Assigned Contracts are in full force and effect and no Seller is in material breach or violation of, or default under, any Assigned Contract (other than Debtor Assigned Contracts), and no event has occurred, is pending or, to the knowledge of the Sellers, is threatened, which, after the giving of notice, with lapse of time, or otherwise, would constitute a material breach or default by any Seller or any Subsidiary of any Assigned Contract.

(c)    To the knowledge of the Sellers (i) no party to any Material Contract intends to cancel, withdraw, modify or amend such Material Contract and (ii) no party to any Assigned Contract (other than Material Contracts) intends to cancel, withdraw, modify or amend any such Assigned Contract, if such cancellation, withdraw, modification or amendment would, individually or in the aggregate, constitute a Seller Material Adverse Effect. Any cure or compensation due to any party to the Debtor Assigned Contracts or any other individual or entity as a result of the assumption and assignment of the Debtor Assigned Contracts to the Buyer pursuant to U.S. Bankruptcy Code Section 365(b), will be paid by the applicable Bankruptcy Seller prior to the Closing. By the Closing, the Bankruptcy Sellers will have obtained an order of the U.S. Bankruptcy Court authorizing the Bankruptcy Sellers to assign the Debtor Assigned Contacts to the Buyer pursuant to U.S. Bankruptcy Code Section 365.

(d)    No Seller has granted any third party any rights in or to any of the Assigned Contracts. Subject in the case of the Bankruptcy Sellers to the Approval Order and the Belgian Bankruptcy Approval, each Assigned Contract is assignable by the Sellers to the Buyer without the consent or approval of any party and will continue to be legal, valid, binding and enforceable and in full force and effect immediately following the Closing in accordance with the terms thereof as in effect prior to the Closing.

(e)    Section 2.5(e) of the Disclosure Schedule sets forth all contracts to which any Seller or any Subsidiary of any Seller is a party that has or could reasonably be expected to have the effect of prohibiting or materially impairing the conduct of the Acquired Business or the use of any of the Acquired Assets by the Buyer after the Closing, and no Assigned Contract will materially restrict the Buyer, from and after the Closing, from selling, licensing or otherwise distributing any technology or products, or providing services, to customers or potential customers or any class of customers, in any geographic area, during any period of time.

14

(f)    No Assigned Contract provides any third party with the right to receive a license or any other right to intellectual property of the Buyer or any affiliate of the Buyer (other than to the Acquired Intellectual Property to the extent such license or other rights are described on Section 2.7(c) of the Disclosure Schedule) following the Closing as a result of the consummation of the transactions contemplated by this Agreement.

2.6    Taxes.

(a)    Each of the Sellers has timely filed all Tax Returns (as defined below) that it was required to file, and all such Tax Returns were complete and accurate in all material respects. No Seller is or has ever been a member of a group of corporations with which it has filed (or been required to file) consolidated, combined or unitary Tax Returns, other than a group of which only the Sellers are or were members. Each group of corporations with which each Seller has filed (or was required to file) consolidated, combined, unitary or similar Tax Returns (an "Affiliated Group") has filed all Tax Returns that it was required to file with respect to any period in which such Seller was a member of such Affiliated Group (an "Affiliated Period"), and all such Tax Returns were complete and accurate in all materials respects. Each Seller has paid on a timely basis all Taxes that were due and payable and each member of an Affiliated Group has paid all Taxes that were due and payable with respect to all Affiliated Periods. All Taxes owed by any of the Sellers (whether or not shown on any Tax Return) have been paid. None of the Sellers currently is the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where any of the Sellers does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. All Taxes that the Sellers are or were required by law to withhold or collect have been duly withheld or collected and, to the extent required, have been timely paid to the proper taxing authority. None of the Sellers has waived or extended any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(b)    The Acquired Assets and the Acquired Business will be transferred free and clear of any Encumbrance relating to or in connection with Taxes except for Taxes assessed or incurred pursuant to Article 11 of the Belgian Value Added Tax Code, if applicable, in connection with the sale of the Acquired Assets (such value added taxes are referred to herein as the "Belgian VAT Taxes"). All Taxes relating to the Acquired Assets have been or will be paid by the Sellers for all periods (or portions thereof) prior to the Closing, and Encumbrances for any such Taxes as have not been paid will attach to the proceeds of the sale contemplated by this Agreement. The Sellers and any other person required to file Tax Returns relating to the Acquired Assets and the Acquired Business have duly and timely filed (or will file prior to the Closing) all Tax Returns relating to the Acquired Assets and the Acquired Business required to be filed prior to such date, and all such Tax Returns and reports are true, correct, and complete in all material respects. There are no pending or threatened proceedings with respect to Taxes relating to the Acquired Assets or the Acquired Business, and there are no outstanding waivers or extensions of statutes of limitations with respect to assessments of Taxes relating to the Acquired Assets or the Acquired Business.

(c)    For purposes of this Agreement, "Taxes" shall mean all taxes, charges, fees, levies or other similar assessments or liabilities, including income, gross receipts, ad

valorem, premium, value-added, excise, real property, personal property, sales, use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental, workers compensation, payroll, profits, license, lease, service, service use, severance, stamp, occupation, windfall profits, customs, duties, franchise and other taxes imposed by the United States of America or any state, local or foreign government (including without limitation, The Kingdom of Belgium), or any agency thereof, or other political subdivision of the United States or any such government, and any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any tax or any contest or dispute thereof. For purposes of this Agreement, "Tax Returns" means all reports, returns, declarations, statements or other information required to be supplied to a taxing authority in connection with Taxes.

2.7    Intellectual Property.

(a)    Section 2.7(a) of the Disclosure Schedule contains a true and complete list, arranged according to the identity of the applicable Seller, of all Intellectual Property and material items of Other Intellectual Property. For purposes of this Agreement:

(i)    "Intellectual Property" means (A) the items listed in Annex B attached hereto and any intangible and intellectual property rights contained in those items, including, without limitation, copyright and trade secret rights, (B) any patents, patent applications, provisional patent applications, patent disclosures, and all related continuation, continuation-in-part, divisional, reissue, re-examination, utility model, certificate of invention and design patents, patent application, registrations and applications for registrations listed in Annex B, and (C) any trademarks, service marks, trade dress, logos, tradenames, domain names and corporate names and registrations and applications for registration thereof and copyright registrations listed in Annex B ; and (D) any mask works and registrations and applications for registration thereof listed in Annex B; and

(ii)    "Other Intellectual Property" means all intangible and intellectual property rights used in or being developed for use in the Acquired Business (excluding Intellectual Property, as defined above), including, without limitation, inventions, specifications, technical manuals and data, drawings, product information and data, know-how, development work-in-progress, modifications, enhancements, designs, concepts, techniques, methods, ideas, flow charts, coding sheets, notes, test routine, prototypes developed in connection with any of the foregoing, design documentation, methodologies, processes, design information, technology, formulae, routines, engineering specifications, engineering work papers, and other works of authorship and proprietary information and materials of any kind and all other information similar in nature to the items

listed in this clause (ii) (except, in each case, any intangible or intellectual property listed on <u>Annex C</u> attached hereto).

(b)    The Sellers own or have the right to use all Intellectual Property in the operation of the Acquired Business as currently conducted and as currently proposed to be conducted by the Sellers. Upon the consummation of the transactions contemplated by this Agreement, each item of Intellectual Property shall be owned by the Buyer or licensed to the Buyer, following the Closing on substantially identical terms and conditions as it was used by the Sellers immediately prior to the Closing. Each Seller has taken reasonable measures to protect the proprietary nature of the Intellectual Property and to maintain in confidence all trade secrets and confidential information, that it owns or uses in connection with the Acquired Business. Other than licenses set forth on <u>Schedule 1.2(a)</u> and licenses granted in connection with the sale of commercial off-the-shelf software, (i) no Seller has granted to any third-party and no other person or entity has, any rights to any of the Intellectual Property; and (ii) to the knowledge of the Sellers, no other person or entity is infringing, violating or misappropriating any of the Intellectual Property.

(c)    Section 2.7(c) of the Disclosure Schedule under the heading "Material Third Party Contracts" identifies each license or other agreement or type of license or other agreement from a third party which is necessary for the conduct of the Acquired Business (the "Material Third Party Contracts").

(d)    To the knowledge of the Sellers, none of the Intellectual Property or the marketing, distribution, provision or use thereof, infringes or violates, or constitutes a misappropriation of, any intellectual property rights of any person or entity. Section 2.7(d) of the Disclosure Schedule lists any pending or unresolved complaint, claim or notice, or written threat thereof, received by any Seller or any Subsidiary alleging any such infringement, violation or misappropriation; and the Sellers have provided to the Buyer complete and accurate copies of all written documentation in the possession of each Seller or any Subsidiary relating to any such complaint, claim, notice or threat. Each Seller has made available to the Buyer complete and accurate copies of all written documentation in its possession relating to claims or disputes known to the Sellers concerning any Intellectual Property, other than documentation the production of which would result in a waiver or violation of either the attorney-client privilege or work product protections.

(e)    Except as set forth on Schedule 2.7(e) of the Disclosure Schedule, no Seller nor any Subsidiary has disclosed any source code or any other confidential information which is a part of the Intellectual Property to any person or entity other than employees, consultants and advisors of the Sellers who have executed and delivered to the Sellers appropriate confidentiality agreements agreeing to keep any such information confidential. No Seller nor any Subsidiary has received any third party demands for source code pursuant to an escrow agreement or any other agreement, and to the knowledge of the Sellers, no third party has threatened against any Seller or Subsidiary to bring any action, suit or proceeding, or other type of claim to demand any source code relating to the Intellectual Property.

17

(f)    Each Seller has received from all employees, consultants, advisors and contractors who may assert or have asserted any right in or claim to any Intellectual Property as an inventor, author or otherwise an assignment form, assigning such person's or entity's rights in the Intellectual Property to such Seller, as appropriate, which assignment forms have been filed with the appropriate patent, trademark or other office.

(g)    Each Seller has, in all material respects, paid all maintenance fees, annuities, and similar fees, and has filed all appropriate renewals, declarations, and other papers to keep all patents, patent applications, trademark registrations and trademark applications in force to the extent any of the foregoing relate to, or are used in, the Acquired Business.

2.8    <u>Litigation</u>.  Except for the Bankruptcy Cases, there is no action, suit, proceeding, claim, arbitration or investigation before any Governmental Entity or before any arbitrator which is pending or, to the knowledge of the Sellers, has been threatened against any Seller or any Subsidiary (a) relating to or affecting the Acquired Assets or the Acquired Business or (b) which could reasonably be expected to prevent, enjoin, alter or delay the transactions contemplated by this Agreement.

2.9    <u>Warranties and Indemnities</u>.  <u>Section 2.9</u> of the Disclosure Schedule sets forth (i) a list of all warranty and indemnity claims outside the ordinary course of business currently pending against the Sellers with respect to the Acquired Assets and (ii) a statement of the number of warranty and indemnity claims (whether or not in the ordinary course of business) and the aggregate dollar value of all such claims pending against the Sellers with respect to the Acquired Assets.

2.10    <u>Employees</u>.

(a)    On or prior to the date of this Agreement, the Sellers have provided to the Buyer a complete and accurate list of each current and former employee, advisor, consultant and contractor of any Seller that has not signed one or more written agreements (together, a "Confidentiality Agreement") under which such person or entity (i) is or was obligated to disclose and transfer to the Sellers, without the receipt by such person or entity of any additional value therefor (other than normal salary or fees for consulting services), all inventions, copyrights, developments and discoveries which, during the period of employment or engagement with or performance of services for any Seller, he, she or it makes or made or conceives or conceived of, either solely or jointly with others, that relate to any subject matter with which his, her or its work for any Seller was concerned, or relate or related to or are or were connected with the Acquired Assets or the Acquired Business, and (ii) is obligated to maintain the confidentiality of proprietary information of the Acquired Business.  The use of confidential information relating to the Acquired Assets and the Acquired Business by former employees of any Seller within the scope of their employment, if any, by the Buyer, will not conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any of the terms, conditions or provisions of, or constitute a default under, any agreement, contract, arrangement or understanding (whether oral or written) under which any Seller or any such employee is now obligated, and the Sellers expressly waive, to the extent related to the Acquired Business or the Acquired Assets, any such breach of a Confidentiality Agreement by any former

18

employee as may occur in the course of their employment by Buyer. No employee of the Seller will, after giving effect to the transactions contemplated herein, own or retain any rights in or to the Acquired Assets or the Acquired Business. To the knowledge of the Sellers, (i) no employee is in violation of any provision of a Confidentiality Agreement, and (ii) there has been no unauthorized use, infringement, misappropriation or disclosure by any employee, of any Acquired Intellectual Property, which could, individually or in the aggregate, have a material adverse effect on the Acquired Intellectual Property.

(b) On or subsequent to October 24, 2001, but prior to the date hereof, L&H dismissed all of its then current employees ("Recently Terminated Employees").

(c) On or prior to the date of this Agreement, the Sellers have provided to the Buyer a complete and accurate list of (i) all persons who have been terminated by L&H since March 31, 2001, other than the Recently Terminated Employees which were re-hired (the "Former Employees") and who have not executed and delivered to L&H release agreements releasing any and all claims in connection with or arising from such Former Employee's employment with or termination from, L&H, or any predecessor of L&H and (ii) each Recently Terminated Employee who was rehired by L&H pursuant to a contract, the expiration of which is on or about December 15, 2001 ("Rehired Employees"); together with the Former Employees, the "Employees"), identifying, for each Rehired Employee, his or her, total gross annual compensation (including year-end bonus).

(d) Except to the extent provided in Section 4.9, the Buyer will not be liable for (i) any payments due to a Non-Transferred Employee (as defined in Section 4.9(b)) or (ii) any payments with respect to amounts that become due and payable on or prior to the Closing Date to any Employee.

2.11    Brokers. All negotiations relating to this Agreement and the transactions contemplated hereby have been conducted without the intervention of any person or entity acting on behalf of any Seller in such a manner as to give rise to any claim against the Buyer for any broker's or finder's commission, fee or similar compensation.

2.12    Insurance. All premiums due and payable under all insurance policies and fidelity bonds relating to the Acquired Assets have been paid through the Closing and each Seller is otherwise in material compliance with the terms of such policies and bonds (or other policies and bonds providing substantially similar insurance coverage).

2.13    RESERVED.

2.14    RESERVED.

2.15    RESERVED.

2.16    Investment Representations.

(a)    Each Seller is either:

(i)    an "accredited investor" (as such term is defined in Rule 501 (a) promulgated under the Securities Act of 1933, as amended (the "Securities Act")) or

(ii)    not a "U.S. person" (as defined in Rule 902(k) promulgated under the Securities Act) and is not acquiring the Shares for the account or benefit of any U.S. person.

(b)    No Seller is acquiring the Shares with a view to, or for sale in connection with, any distribution thereof, nor with any present intention of distributing or selling the same in any manner that would violate the Securities Act or that would cause the Buyer's issuance of the Shares to the Sellers hereunder to be in violation of the Securities Act; and, except as contemplated by this Agreement, the Ancillary Agreements and the exhibits and schedules hereto and thereto, no Seller has any present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for the disposition thereof in any manner that would violate the Securities Act or that would cause the Buyer's issuance of the Shares to the Sellers hereunder to be in violation of the Securities Act.

(c)    Each Seller has carefully reviewed the representations concerning the Buyer contained in this Agreement and has made detailed inquiry concerning the Buyer, its business and its personnel; the officers of the Buyer have made available to each Seller any and all written information which it has requested and have answered to the satisfaction of each Seller all inquiries made by any Seller; and each Seller has sufficient knowledge and experience in finance and business that it is capable of evaluating the risks and merits of its investment in the Buyer by virtue of its receipt of the Shares pursuant to this Agreement and each Seller is able financially to bear the risks thereof.

2.17    RESERVED.

2.18    Certain Severance Costs.  L&H represents that all obligations of the Sellers to pay any severance or other similar amounts to employees other than the Belgian Retained Employees (the "Non-Transferred Belgian Employees") shall become prepetition claims in the Belgian Bankruptcy Case for which the Buyer cannot be held liable.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants (which representations and warranties shall terminate as of the Closing) to the Sellers as follows:

3.1    Organization.  The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware.  The Buyer has all requisite corporate

NYT:#3305233

power and authority to carry on the business in which it is engaged and to own and use the properties owned and used by it.

3.2 <u>Authorization of Transaction</u>. The Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Ancillary Agreements by the Buyer and the performance of this Agreement and the consummation of the transactions contemplated hereby and thereby by the Buyer have been duly and validly authorized by all necessary corporate action on the part of the Buyer. This Agreement has been duly and validly executed and delivered by the Buyer and constitutes a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms. The Ancillary Agreements, when delivered by the Buyer at Closing, will constitute valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms.

3.3 <u>Non-Contravention</u>. Neither the execution and delivery of this Agreement or the Ancillary Agreements by the Buyer, nor the consummation by the Buyer of the transactions contemplated hereby or thereby, will (a) conflict with or violate any provision of Buyer's certificate of incorporation or by-laws, each as amended and/or restated to date, (b) require, on the part of Buyer or any subsidiary of Buyer, any filing with, or any permit, authorization, waiver, consent or approval of any Governmental Entity other than any filings or notices required solely as a result of the legal or regulatory status of any Seller and the filing of an additional listing notification with respect to the Shares with the Nasdaq National Market, (c) violate in any material respect any order, writ, injunction, decree, statute, rule or regulation applicable to Buyer or any of its properties or assets, or (d) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a material default under, result in the acceleration of obligations under, create in any party the right to terminate, modify or cancel, or require any notice, consent or waiver under, any contract or instrument to which the Buyer or any of its subsidiaries is a party or by which the Buyer or any of its subsidiaries is bound.

3.4 <u>Capitalization</u>. As of the date of this Agreement, the authorized capital stock of the Buyer consists of 140,000,000 shares of common stock, $0.001 par value per share ("Buyer Common Stock") and 40,000,000 shares of preferred stock, $0.001 par value per share ("Buyer Preferred Stock"). As of October 31, 2001, (i) 51,046,133 shares of the Buyer Common Stock were issued and outstanding, of which 656,000 shares of the Buyer Common Stock were held in the treasury of the Buyer, all of which were duly authorized, validly issued, fully paid and nonassessable and free of statutory pre-emptive rights and (ii) 3,562,238 shares of Buyer Preferred Stock were issued and outstanding. As of the date of this Agreement, other than options granted by Buyer under the Buyer's option plans as described in the Buyer SEC Reports (as defined in Section 3.5), there are no outstanding options to purchase Buyer Common Stock with respect to the Buyer.

3.5 <u>SEC Reports and Financial Statements</u>.

(a) The Buyer has made available to the Sellers a true and complete copy of each form, report, schedule, registration statement, definitive proxy statement and other

document (together with all amendments thereof and supplements thereto) filed by Buyer or any of its Subsidiaries with the Securities Exchange Commission (the "SEC") since December 31, 2000 (as such documents have since the time of their filing been amended or supplemented, the "Buyer SEC Reports"), which are all the documents (other than preliminary material) that Buyer and its Subsidiaries were required to file with the SEC since such date. As of their respective dates, the Buyer SEC Reports (i) complied as to form in all material respects with the requirements of the Securities Act, or the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), as the case may be, and (ii) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)     The financial statements, including all related notes and schedules, contained in Buyer's most recent Annual Report on Form 10-K and each Buyer SEC Report, are complete and accurate in all material respects and fairly present the consolidated financial position of the Buyer as of the dates indicated, and the results of its operations and cash flows for the periods then ended, in accordance with generally accepted accounting principles applied on a consistent basis throughout the relevant period, except as may be noted therein, and subject in the case of the Form 10-Q for the period ended September 30, 2001 to normal year-end adjustments.

3.6     Shares.  The Shares have been duly authorized and, when issued in accordance with this Agreement, will be validly issued, fully paid and nonassessable, and free of pre-emptive rights.

3.7     Litigation.  There is no action, suit, investigation or proceeding pending against, or to the knowledge of the Buyer, threatened against or affecting, Buyer before any Governmental Entity which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement and the Ancillary Agreements.

3.8     Financing.  The Buyer has sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Cash Purchase Price and any other amounts to be paid by it hereunder and under the Ancillary Agreements.

3.9     Brokers.  All negotiations relating to this Agreement and the transactions contemplated hereby have been conducted without the intervention of any person or entity acting on behalf of the Buyer in such a manner as to give rise to any claim against the Sellers for any broker's or finder's commission, fee or similar compensation.

## ARTICLE IV

## PRE-CLOSING COVENANTS

NYI:#3305235

4.1    Commercially Reasonable Efforts.  Each Party shall use commercially reasonable efforts, to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement.

4.2    Notices and Consents.  The Buyer, on the one hand, and the Sellers, on the other hand, shall use commercially reasonable efforts to obtain all such waivers, permits, consents, approvals or other authorizations from third parties and Governmental Entities, and to effect all such registrations, filings and notices with or to third parties and Governmental Entities, as may be necessary to be obtained and effected by the Buyer, on the one hand, and the Sellers on the other hand, in order to permit the consummation of the transactions contemplated by this Agreement, and permit the Buyer to hold and employ the Acquired Assets following the Closing (including, without limitation in the case of the Sellers, those listed in Section 2.3 of the Disclosure Schedule).

4.3    Bankruptcy Covenants.

(a)    At the Approval Hearing, as defined in the Notice of Auction Procedures, dated October 30, 2001, related to the Bankruptcy Cases, the Bankruptcy Sellers shall use their respective commercially reasonable efforts to obtain the entry of an order, which may be substantially in the form of the Approval Order, authorizing the Bankruptcy Sellers to sell the Acquired Assets to the Buyer, which form has been provided to and is reasonably satisfactory to Buyer ("Approval Order") and to assign the Debtor Assigned Contracts to the Buyer (the "Assignment Order"), which may be part of the Approval Order.  The applicable Bankruptcy Seller shall be responsible for the payment at or prior to Closing of any amounts necessary to cure any defaults which exist on the Closing Date under the Debtor Assigned Contracts, and the Buyer shall be responsible for providing adequate assurance of its ability to perform the obligations of the Bankruptcy Seller under the Debtor Assigned Contracts following the Closing. The Buyer shall use its commercially reasonable efforts to assist the Bankruptcy Sellers in obtaining the Approval Order and the Assignment Order, as may be necessary, including without limitation, making officers and other principals of the Buyer available for testimony before the U.S. Bankruptcy Court.

(b)    From and after the date hereof, neither the Seller nor the Buyer shall, and each Seller and the Buyer shall ensure that none of its respective Subsidiaries shall, take any action or fail to take any action, which action or failure to act would reasonably be expected to (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement, or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner which would reasonably be expected to materially and adversely affect the Buyer's rights hereunder) or (B) the entry of a stay pending appeal, in the cases of each of sub-clauses (A) or (B) of this Section, with respect to the Approval Order or the Assignment Order or the Provision Order issued by the Bankruptcy Court pursuant to 11 U.S.C. §§105, 363 and 365, dated October 30, 2001, related to the U.S. Bankruptcy Case (the "Provision Order").

NY1:83305235

(c)    As soon as practical after the entry of the Approval Order, L&H shall seek to obtain the Belgian Bankruptcy Approval. The Buyer shall use its commercially reasonable efforts to assist the Bankruptcy Sellers in obtaining the Belgian Bankruptcy Approval, as may be necessary, including without limitation, making officers and other principals of the Buyer available for testimony before the Belgian Bankruptcy Authorities.

(d)    The Bankruptcy Sellers shall promptly provide the Buyer with drafts of all documents, motions, orders, filings or pleadings that the Bankruptcy Sellers propose to file with the Bankruptcy Courts which relate to the consummation or approval of this Agreement, the Ancillary Agreements, or any provision herein or therein, and will provide the Buyer with reasonable opportunity to review and approve such filings as reasonably practical. The Bankruptcy Sellers shall also promptly (within 24 hours) provide the Buyer with copies of all pleadings received by or served by or upon the Bankruptcy Sellers in connection therewith or in connection with the Belgian Bankruptcy Approval which have not otherwise been served on the Buyer.

4.4    Operation of Business. Except as contemplated by this Agreement and to the extent not inconsistent with the Bankruptcy Codes, the operation and information requirements of the Office of United States Trustee (the "OIRR"), and subject to any order or direction of the U.S. Bankruptcy Court or the Belgian Bankruptcy Authorities, during the period from the date of this Agreement to the Closing, the Sellers shall conduct the Acquired Business in the ordinary course of business consistent with past practice and in compliance with applicable laws and regulations, and to the extent consistent therewith so as to preserve the current value and integrity of the Acquired Business and the Acquired Assets, pay all post-petition taxes as they become due and payable, maintain insurance on the Acquired Assets (in amounts and types consistent with past practice), and use their respective reasonable best efforts to preserve their relationships with customers, suppliers and others having business dealings with them. Without limiting the generality of the foregoing, prior to the Closing and subject to the requirements of the Bankruptcy Codes, the OIRR, any orders entered by the U.S. Bankruptcy Court or the Belgian Bankruptcy Authorities, no Seller shall, without the prior written consent of the Buyer:

(a)    sell, assign, transfer, convey, lease, license, encumber or dispose of any Acquired Assets except in the ordinary course of business;

(b)    mortgage or pledge any of the Acquired Assets or subject any Acquired Assets to any Encumbrance other than Permitted Encumbrances;

(c)    take any action permitted by this Agreement that would result in any of the representations and warranties of any Seller set forth in this Agreement becoming untrue in any material respect; or

(d)    agree in writing or otherwise to take any of the foregoing actions.

4.5    Full Access and Confidentiality.

24

(a)    Each Seller shall, and shall cause each of its Subsidiaries to, permit representatives of the Buyer to have full access (at all reasonable times, and in a manner so as not to interfere with the normal business operations of such Seller or its Subsidiaries) to all premises, properties, financial and accounting records, contracts, other records and documents, and personnel, solely to the extent that they relate to the Acquired Assets. Notwithstanding the foregoing, the Buyer shall not have access to any employment records prior to the Closing and following the date that is ten (10) days following the entry of the Approval Order, shall have access to the performance records, evaluation records and other such similar information contained in the personnel records of the Transferred Employees to the maximum extent permitted by law unless such access would (in the reasonable judgment of the applicable Seller) subject the disclosing Seller to liability. At no time shall Seller provide Buyer with access to any medical records of any Transferred Employee or to any employment records of any Non-Transferred Employee (as defined below).

(b)    Without limiting the general applicability of the Confidentiality Agreement, dated as of November 5, 2001, by and between Buyer and L&H (the "Confidentiality Agreement"), any information provided in connection with this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby relating to the Sellers or the Acquired Assets will be treated as "Evaluation Material" under the Confidentiality Agreement.

4.6    Notice of Breaches.

(a)    The Sellers shall promptly deliver to the Buyer written notice of any event or development that would (i) render any statement, representation or warranty of any Seller in this Agreement (including exceptions set forth in the Disclosure Schedule) inaccurate or incomplete in any material respect, or (ii) constitute or result in a breach by any Seller of, or a failure by any Seller to comply with, any agreement or covenant in this Agreement applicable to any Seller. No such disclosure shall be deemed to avoid or cure any such misrepresentation or breach.

(b)    The Buyers shall promptly deliver to the Sellers written notice of any event or development that would (i) render any statement, representation or warranty of the Buyer in this Agreement inaccurate or incomplete in any material respect, or (ii) constitute or result in a breach by the Buyer of, or a failure by the Buyer to comply with, any agreement or covenant in this Agreement applicable to the Buyer. No such disclosure shall be deemed to avoid or cure any such misrepresentation or breach.

4.7    Transition Services. Buyer and Sellers will negotiate certain services to be provided by Sellers to Buyer to facilitate the orderly transition of the Acquired Business. The services to be provided will be mutually agreed upon among the Buyer and Sellers and Sellers shall receive fair compensation therefor. Entering into any agreement with respect to such transition shall not be a condition of Closing for any Party.

4.8    RESERVED
4.9    Employee Matters.

NYI:#3305233

(a)    Following the execution of this Agreement, and continuing until the earlier of the termination of this Agreement and ten (10) days following the entry of the Approval Order, the Buyer shall have the right to approach and solicit for employment commencing as of or after the Closing Date any employee of the Sellers; and in connection therewith, the Sellers and the Buyer shall cooperate to effect an orderly transition of any of such employees hired by the Buyer. Each Seller hereby waives, with respect to the solicitation of employment or employment by the Buyer of any employee of such Seller, any claims or rights the Seller has against the Buyer or any such employee under any non-hire, non-solicitation, non-competition, confidentiality or employment agreement or any cause of action based on similar rights arising by contract, at common law or by statute or regulation; provided, however, that none of the foregoing waivers shall survive the termination of this Agreement, and provided further that the foregoing waiver of any non-hire and non-solicitation provisions is solely for the purpose of consummating the transactions contemplated by this Agreement and shall not extend to any solicitation or hiring by Buyer after the ten (10) days following the entry of the Approval Order. Each Seller hereby assigns to the Buyer but only to the extent they relate to the Acquired Assets, the right to enforce the provisions of any non-competition agreement between such Seller and any Transferred Employee (as defined below) hired by Buyer and any non-hire, non-solicitation, confidentiality, assignment of inventions or similar agreement between such Seller and any Transferred Employee hired by Buyer. Nothing in this Section 4.9 or any other agreement to which the Sellers may be a party, if applicable, shall prevent or inhibit Buyer from soliciting for employment, at any time, any Former Employee or any other former employee of the Sellers other than L&H.

(b)    During the ten (10) day period after the execution of this Agreement, the Buyer shall retain or offer employment (which offers shall be conditioned on the closing of the transactions contemplated hereby), and assume all employment obligations with respect to no fewer than 150 persons from a pool consisting of (i) Rehired Employees of L&H (the "Belgian Retained Employees"); and (ii) other employees of the Sellers not otherwise employed by L&H (the "Non-Belgian Retained Employees" and together with the Belgian Retained Employees, the "Transferred Employees"), or, in each case, such higher number as the Buyer may determine in its sole discretion. Of the employees that Buyer retains or offers employment to, Buyer shall designate (i) not less than 50 which shall be Belgian Retained Employees and (ii) any combination of the employees from a list separately provided to Buyer that Buyer retains or offers employment to that shall be sufficient to relieve the Sellers of not less than $2,200,000 in severance payments that Sellers are obligated to make under the Severance Plans (as defined below). Such employment or retention must be on terms and conditions that do not significantly diminish the Transferred Employee's position, level or responsibility, or his or her total compensation and benefits, in the aggregate, or require any such Transferred Employee to relocate his or her place of employment to a location that will increase his or her commute by more than fifty (50) miles in one direction (any of the foregoing constituting a "Constructive Termination"). The Transferred Employees shall have a reasonable amount of time within which to accept to reject Buyer's offer of employment. The Buyer shall provide Sellers with the list of the Transferred Employees in writing within ten (10) days after the execution of this Agreement. Nothing shall require L&H to continue to employ any employees in Belgium after December 14, 2001 or any Sellers to continue to employ any employees after the Closing Date.

(c)    If, within six (6) months after the date of hire, Buyer terminates a Transferred Employee without cause or takes any action that constitutes a Constructive Termination of a Transferred Employee, and such action on the part of Buyer results in a Seller making a payment to such Transferred Employee under L&H's 2001 Key Employee Retention Plan ("KERP") or the severance program authorized in accordance with the procedures set forth by the U.S. Bankruptcy Court on January 8, 2001 (collectively, the "Severance Plans"), then Buyer shall reimburse Seller for such amounts paid.

(d)    Subject to this Section 4.9, the Buyer shall not assume any obligations to any employee of any Seller, including the Belgian employees of L&H, that is not hired by the Buyer at the Closing (the "Non-Transferred Employees"), including, without limitation, any obligations or liabilities for any dismissal benefits that each such employee shall have accepted or shall accept in full satisfaction of his or her rights resulting from the termination of such ~~employee's employment by L&H (the "Required Severance Payments") or other severance or~~ restructuring costs. Except as set forth in Section 4.9(c) above and as set forth in the following sentence, the Buyer shall not assume any obligations to any employee of the Sellers, including any Transferred Employee, for any amounts accrued prior to the Closing. If Buyer hires any Non-Transferred Employee within one (1) month following the date that is ten (10) days following the entry of the Approval Order, then Buyer shall, within ten (10) business days of such employee's hire date, pay to L&H an amount equal to any severance amounts paid to such employee by any of the Sellers pursuant to the Severance Plans.

(e)    Nothing contained in this Agreement shall confer upon any Employee, any right with respect to employment or continuance of employment by the Buyer, except as may be required under the Belgian Collective Bargaining Agreement n°CBA 32*bis* of June 7, 1985 ("CBA 32*bis*") with respect to the Belgian Retained Employees, nor shall anything herein interfere with the right of the Buyer to terminate the employment of any Transferred Employee, with or without cause, subject to the provisions of any employment agreement with the Buyer and applicable law. No provision of this Agreement shall create any third party beneficiary rights in any employee, or any beneficiary or dependents thereof, with respect to the compensation, terms and conditions of employment and benefits that may be provided to any Employee by the Buyer or under any benefit plan which the Buyer may maintain.

(f)    During the time that this Agreement shall remain in effect and for a period of two (2) years following the Closing, each Seller agrees on behalf of itself and its Subsidiaries, and their respective officers, directors and agents (the "Seller Control Group") that the members of the Seller Control Group shall take no action, formal or informal, direct or indirect, to (i) solicit the employment of any Transferred Employees or any other employee, consultant or independent contractor of the Buyer other than through general advertising not specifically directed at such employees, (ii) hire any employee of the Buyer, except as a result of actions permitted by clause (i) above, or (iii) solicit, entice, induce or encourage any Transferred Employees or any other employee, consultant or independent contractor of the Buyer to terminate his, her or its relationship with the Buyer in order to become an employee, consultant or independent contractor of or to a person other than Buyer.

27

(g)     At the written request of the Buyer, each Seller (other than L&H) shall continue to employ such of the Transferred Employees as may have an H-1B visa status until the Buyer shall have filed the appropriate papers with the Immigration and Naturalization Service to have such H-1B status transferred to the Buyer. The Buyer shall reimburse any Seller for its out-of-pocket expenses, including for the provision of welfare and other benefits, in continuing such employment upon receipt of a bill from the Seller in a form reasonably acceptable to the Buyer. Each Seller shall cooperate in good faith with the Buyer and take commercially reasonable action and execute any documents, instruments or conveyances of any kind which may be necessary to ensure that the Buyer owns all right, title and interest in any intellectual property created by such employees between the Closing and the date on which the H-1B visa of such employee is transferred to the Buyer and such employee commences working directly for the Buyer.

4.10     Allocation of Purchase Price. The Aggregate Purchase Price shall be allocated among the Acquired Assets in proportion to their fair market values and not in excess thereof as provided in a schedule (the "Allocation Schedule") mutually agreed upon by Buyer and the Sellers as soon as practicable after the Closing Date, but in no event later than thirty (30) days following the Closing, with the Parties agreeing to negotiate in good faith with respect to such schedule. The Allocation Schedule shall be for purposes of complying with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended, and regulations thereunder. The Buyer and Sellers each agree to prepare and file on a timely basis with the Internal Revenue Service (and applicable state Tax authorities) substantially identical initial and supplemental Internal Revenue Service Forms 8594 "Asset Acquisition Statements Under Section 1060" consistent with the Allocation Schedule (and corresponding state Tax forms). If any Tax authority challenges such allocation, the party receiving notice of such challenge shall give the other party prompt written notice thereof, and the parties shall cooperate in order to preserve the effectiveness of such allocation;

4.11     Taxes. The Sellers will be solely responsible for and pay (and to the extent that Buyer pays, reimburse Buyer for), all sales, use, transfer, added or other similar taxes, other than Belgian VAT Taxes, if any, which shall be paid by Buyer (collectively, the "Transaction Taxes"), if any, due as a result of the transactions contemplated by this Agreement whether imposed by law on a Seller or the Buyer. It is expressly understood that Buyer shall have no obligation to take any affirmative steps nor will it oppose any attempts with respect to the collection of the Transaction Taxes. The Sellers shall furnish to the Buyer all resale, exempt use or other certificates as may be applicable to the transactions contemplated by this Agreement.

4.12     Intellectual Property. The Parties agree that, unless expressly indicated on Annex B and except for the licenses to the AudioMining Asset Group as set forth on Annex B, the Technology Licenses shall be perpetual, royalty-free, non-exclusive licenses, without the right to sub-license, except in connection with the distribution of products (or to any successor in interest).

4.13     Good Faith. The Sellers agree that the Buyer has negotiated in good faith and at arm's length with the Sellers. The Parties acknowledge and agree that the Buyer is a "good faith purchaser" within the meaning of U.S. Bankruptcy Code Section 363(m) and is thereby entitled to the protection afforded good faith, arm's length buyers under the U.S. Bankruptcy Code.

NY1:#3305235

Nothing in this Agreement constitutes or shall be construed or interpreted to constitute either a waiver of the protections afforded by Section 363(m) or the Buyer's consent to a stay of this Agreement pending appeal.

4.14   Registration Rights.   The Buyer will enter into a Registration Rights Agreement (the "Rights Agreement") with the Sellers named therein in the form attached as Exhibit F.

4.15   Adequate Assurances Regarding Contracts.   With respect to any Debtor Assigned Contract, the Buyer shall make commercially reasonable efforts to provide assurance as required under the Bankruptcy Code of the future performance of such Debtor Assigned Contract by the Buyer.   The Buyer shall promptly take all actions reasonably required by L&H or Holdings to assist in (i) obtaining the U.S. Bankruptcy Court's entry of the Approval Order, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the U.S. Bankruptcy Court and making the Buyer's employees and representatives available to testify before the U.S. Bankruptcy Court with respect to demonstrating adequate assurance of future performance by the Buyer under any Debtor Assigned Contract that is assumed and assigned by L&H or Holdings and (ii) obtaining any and all requisite Belgium Bankruptcy Approval.

4.16   RESERVED.

4.17   Bankruptcy or Concordat Proceedings Initiated by Other Sellers.   The Buyer agrees and acknowledges that (i) after the date hereof and until the Closing Date the Sellers that are Non-Bankruptcy Sellers on the date hereof, or any of them, may decide in their sole discretion based upon reasonable business judgment, in order to facilitate the consummation of the transactions contemplated hereby and in the Ancillary Agreements, to file bankruptcy petitions in either the U.S. Bankruptcy Court or Belgium bankruptcy court of competent jurisdiction, or both, and thereby become subject to bankruptcy or concordat proceedings in the U.S. and Belgium, respectively, and become Bankruptcy Sellers hereunder and (ii) neither the bankruptcy (faillissement) of L&H nor any filing or commencement of a U.S. bankruptcy or Belgian concordat or bankruptcy proceeding pursuant to the preceding clause (i) shall, in and of itself, be deemed to be a breach of any covenant, representation or warranty of any Seller hereunder, nor shall such event, in and of itself, constitute a Seller Material Adverse Effect hereunder; provided, that if the filing or commencement of a U.S. bankruptcy or Belgian concordat or bankruptcy proceeding by any Non-Bankruptcy Seller causes the Sellers to be unable to satisfy the conditions to closing set forth in Section 5.1 (c) or 5.1(d), the Buyer shall have the right to terminate this Agreement in accordance with Section 8.1 (c) hereof.

4.18   RESERVED.

4.19   Reimbursement of Belgian VAT Taxes; Tax Waiver.   Both before and after the Closing each Seller, at the request of the Buyer and without further consideration, shall use its commercially reasonable efforts to assist Buyer (i) in obtaining the recognition by the Belgian VAT authorities that no Belgian VAT Taxes are due on the Purchase Price or, in the absence thereof, in obtaining reimbursement for any Belgian VAT Taxes paid or incurred, if any, in connection with the transactions contemplated by this Agreement and (ii) in obtaining an

29

appropriate tax lien waiver from the Commonwealth of Massachusetts in connection with the transactions contemplated hereby.

4.20    Further Assurances.  Both before and after the Closing, each Party will cooperate in good faith with the other and will take all appropriate action and execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder.  From and after the Closing, the Sellers will promptly refer all inquiries with respect to the ownership of the Acquired Assets to the Buyer and execute such documents as the Buyer may reasonably request from time to time to evidence the transfer of the Acquired Assets to the Buyer.  From and after the Closing Date, the Buyer will promptly respond to all inquiries with respect to the Assumed Liabilities and timely pay and satisfy all Assumed Liabilities in accordance with their terms, subject to the Buyer's right to contest in good faith any such obligations.

## ARTICLE V

## CONDITIONS TO CLOSING

5.1    Conditions to Obligations of the Buyer.  The obligation of the Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to the satisfaction or waiver by the Buyer of the following conditions:

(a)    the sale of the Acquired Assets by the Bankruptcy Sellers to the Buyer and the assumption and assignment by the Bankruptcy Sellers of the Debtor Assigned Contracts to the Buyer as contemplated by this Agreement shall have been approved by the U.S. Bankruptcy Court pursuant to the Approval Order and the Assignment Order and the Belgian Bankruptcy Approval shall have been obtained, and such orders and Belgian Bankruptcy Approval as of the Closing Date, shall be in full force and effect, and not stayed, modified, vacated, amended or revoked;

(b)    the Sellers shall have obtained all of the waivers, permits, consents, approvals or other authorizations, and effected all of the registrations, filings and notices required to be obtained or effected pursuant to Section 4.2 except where the failure to obtain any such waivers, permits, consents, approvals or other authorizations or to effect such registrations, filings or notices would not, individually or in the aggregate, have a Seller Material Adverse Effect;

(c)    the representations and warranties of the Sellers set forth in Article II that are qualified as to materiality shall be true and correct in all respects, and all other representations and warranties of the Sellers set forth in Article II shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing as though made as of the Closing (except to the extent such representations and warranties are specifically made as of a particular date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of the representations and warranties contained

30

NYI:#3305233

in Article II of this Agreement to be so true and correct would not individually or in the aggregate, constitute a Seller Material Adverse Effect;

      (d)    each Seller shall have performed and complied, in all material respects, with the agreements, covenants and obligations required to be so performed or complied with by such Seller under this Agreement as of or prior to the Closing;

      (e)    (i) no action, suit or proceeding against a Non-Bankrupt Seller shall be threatened or pending before any Governmental Entity, court or arbitrator which would reasonably be expected to result in unfavorable judgment, order, decree, stipulation or injunction that would (A) prevent the consummation of any of the transactions contemplated by this Agreement, (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation or (C) materially affect adversely the right of the Buyer to own, operate or control any of the Acquired Assets following the Closing, and (ii) no judgment, order, decree, stipulation or injunction that would have the result specified in clauses (A), (B) and (C) of this Section 5.1 (e) shall be in effect;

      (f)    each Seller shall have delivered to the Buyer a certificate (without qualification as to knowledge or materiality or otherwise) to the effect that each of the conditions specified in clauses (c) through (e) of this Section 5.1 is satisfied in all respects;

      (g)    the Buyer shall have obtained ownership of (or the right to access and use for a reasonable period of time after the Closing to effect the transfer of the Acquired Assets to the Buyer) any server containing any Acquired Assets;

      (h)    the Sellers shall have delivered to the Buyer such documents as are necessary to terminate all Encumbrances (other than the Permitted Encumbrances), including without limitation, those Encumbrances listed on Section 2.4 of the Disclosure Schedule, which are of record with respect to the Acquired Assets in forms suitable for filing with the appropriate Governmental Entities;

      (i)    (i) each Non-Bankruptcy Seller shall have delivered a certificate of its Secretary or other appropriate officer certifying as to (A) board and, if necessary, shareholder resolutions approving this Agreement and the transactions contemplated hereby, (B) such Non-Bankruptcy Seller's charter and by-laws and (C) incumbency of such Non-Bankruptcy Seller's officers; (ii) each Non-Bankruptcy Seller shall have delivered certificates of good standing in its jurisdiction of organization and in the Commonwealth of Massachusetts and (iii) each other Seller shall have delivered (to the extent not already delivered pursuant to clauses (i) and (ii) above), certified charter documents, certificates as to the incumbency of officers and all such other documents and or instruments as the Buyer shall reasonably request in connection with the Closing;

      (j)    the Seller shall have delivered to the Buyer the consent of any required third party to the assignment of the Material Third Party Contracts that provide for technology embedded in or products bundled with the products of the Acquired Business;

NY1:#3305233

(k)    the Seller shall have delivered Schedule 1.1(a)(vii);

(l)    There shall not have occurred from the period beginning on December 14, 2001 and ending on December 18, 2001, any action, event or occurrence that results (i) in Buyer not being able to hire a material number of employees that it has identified as being Belgian Retained Employees, or (ii) a diminution in the kind, value or usefulness of the Acquired Assets located in Belgium which results in a Seller Material Adverse Effect.

(m)    all actions to be taken by the Seller in connection with the consummation of the transactions contemplated hereby and all certificates, instruments and other documents required to effect the transactions contemplated hereby shall be reasonably satisfactory in form and substance to the Buyer.

5.2    <u>Conditions to Obligations of the Seller</u>. The obligation of the Sellers to consummate the transactions to be performed in connection with the Closing is subject to the satisfaction or waiver by the Sellers of the following conditions:

(a)    the Buyer shall have obtained all of the waivers, permits, consents approvals or other authorizations, and effected all of the registrations, filings and notices required to be obtained or effected by the Buyer pursuant to Section 4.2;

(b)    the representations and warranties of the Buyer set forth in Article III that are qualified as to materiality shall be true and correct in all respects, and all other representations and warranties of the Buyer set forth in Article III shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing as though made as of the Closing (except to the extent such representations and warranties are specifically made as of a particular date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of the representations and warranties contained in Article III of this Agreement to be so true and correct would not individually or in the aggregate, constitute a material adverse effect on the business, operations or financial condition of the Buyer;

(c)    the Buyer shall have performed and complied, in all material respects, with the agreements, covenants and obligations required to be performed or complied with under this Agreement as of or prior to the Closing;

(d)    No action, suit or proceeding shall be pending or threatened before any Governmental Entity (other than the Bankruptcy Cases) against the Buyer wherein an unfavorable judgment, order, decree, stipulation or injunction would (i) prevent consummation of any of the transactions contemplated by this Agreement or (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation.

(e)    the Buyer shall have delivered to the Sellers a certificate (without qualification as to knowledge or materiality or otherwise) to the effect that each of the conditions specified in clauses (b) through (d) of this Section 5.2 is satisfied in all respects;

32

(f)    the sale of the Acquired Assets by the Bankruptcy Sellers to the Buyer and the assumption and assignment by the Bankruptcy Sellers of the Debtor Assigned Contracts as contemplated by this Agreement shall have been approved by the U.S. Bankruptcy Court pursuant to the Approval Order and Assignment Order and the Belgian Bankruptcy Approval shall have been obtained, and such orders and Belgian Bankruptcy Approval, as of the Closing Date, shall be in full force and effect and not stayed, modified, vacated or revoked;

(g)    the Buyer shall have delivered the Promissory Note;

(h)    the Buyer shall have delivered certificates representing the Shares;

(i)    The Buyer shall have filed an additional listing notification with respect to the Shares with the Nasdaq National Market;

(j)    The Buyer shall have executed the Rights Agreement; and

(k)    all actions to be taken by the Buyer in connection with the consum... ... of the transactions contemplated hereby and all certificates, instruments and other documents required to effect the transactions contemplated hereby shall be reasonably satisfactory in form and substance to the Seller.

## ARTICLE VI

## POST-CLOSING COVENANTS AND AGREEMENTS

6.1    <u>Proprietary Information</u>.  From and after the Closing, each Seller agrees not to disclose or make use of, and shall use its commercially reasonable efforts to cause all of its affiliates not to disclose or make use of, any knowledge, information or documents of a confidential nature or not generally known to the public with respect to the Acquired Assets, the Acquired Business or with respect to the Buyer or its business (including the financial information, technical information or data relating to the products and names of customers of the Acquired Business), except to the extent that such knowledge, information or documents shall have become public knowledge other than through improper disclosure by the Sellers or an affiliate of such Seller.  Each Seller shall enforce, for the benefit of the Buyer, all confidentiality, invention assignments and similar agreements between such Seller and any other party relating to the Acquired Assets or the Acquired Business which are not Assigned Contracts. Notwithstanding the foregoing, the Sellers (and the Sellers' successors in interest or the person or persons to whom all or any portion of the SLT Assets (as defined in the Bidding Procedures) are sold) shall have the right to continue to use any knowledge, information or documents in connection with the Excluded Assets to the extent such knowledge, information or documents were used in connection with the Excluded Assets prior to the Closing Date; provided that such use does not infringe the patents or copyrights or any of the Intellectual Property.

6.2    <u>Non-Competition</u>.

33

(a)    For a period of two (2) years after the Closing Date, each Seller agrees not to, either directly or indirectly as a stockholder, investor, partner, consultant or otherwise, (i) design, develop, manufacture, market, sell or license any product or provide any service anywhere in the world which is competitive with any product designed, developed (or under development), manufactured, sold or licensed or any service provided by such Seller since inception in connection with the Acquired Assets or the Acquired Business or (ii) engage anywhere in the world in any business competitive with the Acquired Business as currently conducted or as currently proposed to be conducted by the Sellers. Each Seller shall enforce, for the benefit of the Buyer, all non-competition and similar agreements between such Seller and any other party which relating to the Acquired Assets or the Acquired Business are not Assigned Contracts. This Section 6.2(a) shall terminate and be of no further force or effect as to a Seller upon the closing of a transaction pursuant to which beneficial ownership of more than 50% of the such Seller's outstanding capital stock is transferred to a single person or entity, or a "group" (within the meaning of Rule 13d-5(b)(1) under the Securities Exchange Act of 1934) of persons or entities, in a single transaction or a series of related transactions.

(b)    Each Seller agrees that the duration and geographic scope of the non-competition provision set forth in this Section 6.2 are reasonable. In the event that any court determines that the duration or the geographic scope, or both, are unreasonable and that such provision is to that extent unenforceable such Seller and the Buyer each agree that the provision shall remain in full force and effect for the greatest time period and in the greatest area that would not render it unenforceable. Each Seller and the Buyer intend that this non-competition provision shall be deemed to be a series of separate covenants, one for each and every county of each and every state of the United States of America and each and every political subdivision of each and every country outside the United States of America where this provision is intended to be effective.

(c)    Each Seller shall, and shall use its respective commercially reasonable efforts to cause its affiliates to, refer all inquiries regarding the business, products and services of the Acquired Business to the Buyer.

6.3    <u>Books and Records</u>. To the extent that any of the books and records maintained by Sellers included in the Acquired Assets and the Acquired Business ("Business Books and Records") are items susceptible to duplication and are either (x) used in connection with any of Sellers' assets or businesses other than the Acquired Assets or the Acquired Business or (y) are required by law to be retained by any Seller, such Seller may deliver photostatic copies or other reproductions from which, in the case of Business Books and Records referred to in clause (x), information solely concerning Sellers' businesses other than the Acquired Business has been deleted. The Business Books and Records maintained by the Sellers included in the Acquired Assets and the Acquired Business will, following the Closing, be in the custody of the Buyer. However, the Buyer hereby agrees, for a period of three (3) years from and after the Closing Date, to permit L&H to have reasonable access to such Business Books and Records relating or pertaining to the business and operations of the Sellers to the extent L&H has need therefor in order to prepare and file tax returns and to complete the administration of the Bankruptcy Cases. If at any time the Buyer desires to dispose of or destroy any such records the Buyer shall provide L&H with 30 days (the "Notice Period") prior written notice thereof. If L&H desires to retain

34

any such Business Records or Books, L&H shall arrange to collect such Business Books and Records from the Buyer, at L&H's expense. In the event that the Buyer does not receive any notice of L&H's desire to retain any such books or records within such Notice Period, the Buyer may then dispose of or destroy such records or books without any further obligations.

6.4    Cooperation.

(a)    Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at the Buyer's request and without further consideration, the Sellers shall execute and deliver to the Buyer such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to the Buyer, and to confirm the Buyer's title to, all of the Acquired Assets, and, to the full extent permitted by law, to put Buyer in actual possession and operating control of the Acquired Assets and to assist the Buyer in exercising all rights with respect thereto, and otherwise to cause Sellers to fulfill its obligations under this Agreement and the Ancillary Agreements.

(b)    To the extent that any Assigned Contract is not assignable without the consent of another party, this Agreement shall not constitute an assignment or an attempted assignment thereof if such assignment or attempted assignment would constitute a breach thereof or a default thereunder. The Sellers shall use their commercially reasonable efforts to obtain the consent of any third party to the assignment of any Assigned Contract (bv the provisions thereof or by applicable law) in all cases in which such consent is or may be required (by the provisions thereof or by applicable law) for such assignment. If, by the 180th day following the Closing Date and after using their commercially reasonable efforts to obtain such consent, the Sellers are unable to obtain any such consent, then, at the Buyer's option, such Assigned Contracts shall not be assigned and transferred by the Sellers to the Buyer at the Closing (and shall be deemed to be Excluded Contracts) and the Buyer shall not assume the Sellers' liabilities or obligations with respect thereto. Sellers shall cooperate with Buyer in any reasonable arrangement designed to provide for Buyer the benefits intended to be assigned to Buyer under the relevant Assigned Contract, including enforcement at the cost and for the account of Buyer of any and all rights of the applicable Seller against the other party thereto arising out of the breach or cancellation thereof by such other party or otherwise. If and to the extent that such arrangement cannot be made, Buyer shall have no obligation with respect to any such Assigned Contract. The provisions of this 6.4(b) shall not affect the right of Buyer not to consummate the transactions contemplated by this Agreement if the condition to its obligations hereunder contained in Section 5.1 (b) or Section 5.1 (n) has not been fulfilled.

6.5    Resale of Shares.

(a)    Each Seller acknowledges and understands that because the Shares have not been registered under the Securities Act, or applicable state securities laws, such Seller is aware that any disposition, transfer or resale inconsistent with the Securities Act may create liability on its part and/or the part of the Buyer.

35

(b)    Each Seller agrees that it will transfer the Shares only, (i) pursuant to an effective registration statement under the Securities Act, or (ii) pursuant to an available exemption from registration under the Securities Act and after delivering to the Buyer an opinion of counsel satisfactory to the Buyer to the effect that (A) registration under the Securities Act is not required and (B) such transfer without registration will not cause the initial issuance of the Shares by the Buyer to be in violation of Section 5 of the Securities Act.

(c)    Each Seller agrees that it will not engage in any hedging transactions with respect to the Shares unless in compliance with the Securities Act.

6.6    Legends.  Each Seller acknowledges and agrees that each certificate representing the Shares and each certificate representing shares of capital stock of the Buyer issued in respect of such Shares shall have the following legend stamped on the certificate in a prominent manner, in addition to any other legends that may be required under U.S. federal or state securities laws:

> "The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be offered, sold or otherwise transferred, pledged or hypothecated unless and until such shares are registered under such Act or an opinion of counsel satisfactory to the Corporation is obtained to the effect that (i) such registration is not required and (ii) such offer, sale, transfer pledge or hypothecation will not cause the initial issuance of the Shares by the Buyer to be in violation of Section 5 of the Securities Act.  Hedging transactions involving these shares may not be conducted unless in compliance with the Securities Act of 1933."

6.7    RESERVED.

6.8    Receivables; Accounting.  In the event that any Seller receives, after the Closing Date, any payments related to accounts receivable or any other payments related to any Assigned Contract, such Seller promptly shall forward such payment to the Buyer.  During the twelve (12) month period immediately following the Closing, the Sellers shall provide the Buyer with a monthly accounting of any and all such amounts received, such accounting, in a form reasonably satisfactory to the Buyer and the Buyer shall have the right, upon reasonable advanced notice and during normal business hours, to conduct, at its expense, an audit of any and all of the Sellers' books and records related thereto.

6.9    Trademarks/Domain Names.  The Parties hereby acknowledge and agree that Schedule 6.9 of the Seller Disclosure Schedule contains a complete list of (i) the additional trademarks referred to in Section D.1. of Annex B and (ii) the domain names to be provided pursuant to Section D.2. of Annex B.

6.10    Shared Technology Contracts.  Buyer hereby agrees that it shall, with respect to any Assigned Contract listed in Schedule 1.2(a) that contains the name of a Non-Purchased

36

Asset Group under the heading of "Technology" in the column next to such Assigned Contract (a "Shared Technology Contract") use commercially reasonable efforts to sublicense or otherwise convey that portion of the benefits related to the Non-Purchased Asset Group to the acquirer of such Non-Purchased Asset Group ("Other Buyer"), subject to the Other Buyer agreeing (to the reasonable satisfaction of the Buyer) to assume any and all of the related obligations related to such benefits.

6.11   Survival of Representations and Warranties.  All representations, warranties, covenants, agreements and obligations of the Parties contained in this Agreement shall expire on the Closing Date, and there shall be no liability in respect thereof (other than liability arising from fraud), whether such liability has accrued prior to the Closing Date or after the Closing Date, on the part of any Party or its officers, directors, employees, agents and affiliates.  This Section shall not limit in any way the survival and enforceability of any covenant or agreement of the parties hereto which by its terms contemplates performance after the Closing Date, which shall survive for the respective periods set forth herein.

6.12   No Other Representations.  Notwithstanding anything to the contrary contained in this Agreement, it is the explicit intent of each Party hereto that the Sellers are making no representation or warranty whatsoever, express or implied, including, but not limited to, any implied representation or warranty as to condition, merchantability or suitability as to any of the Acquired Assets, except those representations and warranties contained in Article II.  It is understood that, except to the extent otherwise expressly provided herein, Buyer takes the Acquired Assets "as is" and "where is".  In particular, Sellers make no representation or warranty to Buyer with respect to (i) the information set forth in the offering memorandum relating to the sale of the Acquired Assets, which was delivered by Sellers to the Buyer prior to the negotiation of this Agreement by the parties hereto or (ii) any financial projection or forecast relating to the condition of the Acquired Assets.  With respect to any such projection or forecast delivered by or on behalf of Sellers to Buyer, Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts, (ii) it is familiar with such uncertainties, (iii) it is taking full responsibility for making its own evaluation of the adequacy and accuracy of all such projections and forecasts furnished to it and (iv) it shall have no claim against Sellers with respect thereto.

6.13   Disclosure Schedule.  The Parties acknowledge and agree that (i) the Disclosure Schedule may include certain items and information solely for informational purposes for the convenience of Buyer and (ii) the disclosure by Sellers of any matter in the Disclosure Schedule shall not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

ARTICLE VII

RESERVED

37

# ARTICLE VIII

# TERMINATION

8.1    <u>Termination of Agreement</u>.  The Parties may terminate this Agreement prior to the Closing (whether before or after Approval Order) with the prior authorization of their respective Boards of Directors, as provided below:

(a)    the Parties may terminate this Agreement by written consent of each Party;

(b)    the Buyer may terminate this Agreement by giving written notice to the Sellers in the event any Seller is in material breach, and the Sellers may terminate this Agreement by giving written notice to the Buyer in the event the Buyer is in material breach, of any representation, warranty, or covenant contained in this Agreement; <u>provided, however</u>, that in the case of a breach of a covenant contained herein by any Party, the Party in breach shall have five business days after written notice has been received in which to cure such breach;

(c)    the Buyer may terminate this Agreement by giving written notice to the Sellers if the Closing shall not have occurred on or before December 18, 2001 by reason of the failure of any condition precedent under Section 5.1 hereof (unless the failure results primarily from a breach by the Buyer of any representation, warranty or covenant contained in this Agreement);

(d)    the Sellers may terminate this Agreement by giving written notice to the Buyer if the Closing shall not have occurred on or before December 18, 2001 by reason of the failure of any condition precedent under Section 5.2 hereof (unless the failure results primarily from a breach by any Seller of any representation, warranty or covenant contained in this Agreement);

(e)    the Buyer or the Sellers may terminate this Agreement by giving written notice to the other Party if the U.S. Bankruptcy Court has not entered the Approval Order and the Assignment Order on or before December 18, 2001; and

(f)    the Buyer or the Sellers may terminate this Agreement by giving written notice to the other Party if the Belgian Bankruptcy Approval have not been received within 45 days after the date of this Agreement.

8.2    <u>Status of Agreement after Termination</u>.  Upon any termination of this Agreement pursuant to Section 8.1, this Agreement and the Ancillary Agreements shall become void and shall have no effect; except for those obligations in Sections 4.5(b), 8.2, 8.3, 8.4, 9.8, 9.9, 9.10

38

and 9.14 of this Agreement and pursuant to the Confidentiality Agreement, which shall survive the termination of this Agreement in accordance with its terms.

8.3    Fees and Expenses.

(a)    If Sellers terminate this Agreement pursuant to (i) Sections 8.1(b) or 8.1 (d) hereof as a result of a breach or default by Buyer of any of its representations, warranties, covenants or agreements hereunder or the failure, delay or inaction on the part of the Buyer to perform its obligations hereunder or (ii) Sections 8.1(e), or 8.1(g) and the failure to obtain the Approval Order or the Assignment Order, or the Belgian Bankruptcy Approval is a result of the Buyer's breach of this Agreement, the Escrow Funds shall be transferred to Sellers (as liquidated damages and not as a penalty) not later than five (5) business days after termination.

(b)    If Buyer terminates this Agreement pursuant to Section 8.1 (other than a termination pursuant to Sections 8.1(e) or 8.1(g) resulting from the failure to obtain the Approval Order or the Assignment Order, or the Belgian Bankruptcy Approval as a result Buyer's breach of this Agreement), the Escrow Funds will be returned to the Buyer not later than five (5) business days after termination.

8.4    Exclusive Remedy. The Parties acknowledge and agree that the rights and remedies provided in this Article VIII are the exclusive rights and remedies in the event of any breach of any representation, warranty, agreement or covenant by the Buyer prior to the Closing other than an intentional breach. With respect to any Party's intentional breach of this Agreement nothing herein shall limit liability therefor.

# ARTICLE IX

# MISCELLANEOUS

9.1    Press Releases and Announcements. No Party shall issue any press release or announcement relating to the subject matter of this Agreement without the prior approval of the Buyer and L&H; provided, however, that (i) any Party may make any public disclosure if such Party is advised by legal counsel that public disclosure is required by law or regulation (in which case the disclosing Party shall advise the other Parties of such disclosure and provide it with a copy of the proposed disclosure prior to making the disclosure) and (ii) nothing will prevent the Bankruptcy Sellers from publicly filing this Agreement and the Ancillary Agreements in connection with the Bankruptcy Cases or discussing them before the U.S. Bankruptcy Court or Belgium Bankruptcy Court, or with appointed committees or commissioners or with the Sellers' Works Council or the Sellers' workers representatives.

9.2    No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns, except that any Other Buyer that is a purchaser of any Non-Purchased Asset Group is an express beneficiary of Section 6.10 hereof and has the right to directly enforce Buyer's obligations under Section 6.10 hereof.

39

9.3    Entire Agreement. This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof.

9.4    Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns and shall be binding upon any successor bankruptcy trustee or trustees. Prior to the Closing, no Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties; provided that the Buyer may assign all or any portion of its rights, interests and/or obligations hereunder to one or more direct or indirect wholly-owned Subsidiaries of the Buyer, provided that any such Subsidiary agrees in writing to be bound by all of the terms, conditions and provisions contained herein and no such assignment relieves Buyer of its obligations hereunder. The Buyer remains primarily liable therefor. Without limitation to the foregoing, the Buyer may elect prior to Closing to cause a wholly-owned Belgian Subsidiary of the Buyer, existing or in formation, to purchase from L&H those of the Acquired Assets that are owned by L&H, provided that the Buyer shall be jointly and severally liable with such Subsidiary for all liabilities of the Buyer under this Agreement and that such purchase shall in no way affect the obligations of the Sellers under this Agreement.

9.5    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

9.6    Headings. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

9.7    Notices. All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly delivered two business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent via a reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

If to the Seller:       Lernout & Hauspie Speech Products N.V.
                        Curaturan
                        Flanders Language Valley 50
                        B-8900 Ieper, Belgium
                        Telephone: 011-32-57-22-9540
                        Fax: 011-32-57-22-9545

with a copy to:         Milbank, Tweed, Hadley & McCloy LLP
                        One Chase Manhattan Plaza
                        New York, New York 10005

NY1:#3305235

Attn: Luc A. Despins, Esq.
Telephone: (212) 530-5000
Fax: (212) 822-5219

and a copy to:    Liedekerke, Wolters, Waelbroeck, Kirkpatrick & Cerfontaine
Attn: Thierry Tilquin
3, boulevard de l'Empereur
1000 Brussels
Belgium
Telephone: 011-32-2-551-1547
Fax: 011-32-2-551-1542

and a copy to:    Jean-Marc VANSTAEN
Curator
Nieuwstraat 23
8940 WERVIK
Belgium
Telephone: 011-32-5-631-1406
Fax: 011-32-5-631-4062

If to the Buyer:    ScanSoft, Inc.
9 Centennial Drive
Attention: Chief Financial Officer
Peabody, MA   01960
Telephone: 978-977-2000
Fax: 978-977-2436

Copy to:    Hill & Barlow, a Professional Corporation
One International Place
Boston, MA   02110
Attention: Charles R. Dougherty, Esq.
Telephone (617) 428-3000
Fax: (617) 428-3500

Any Party may give any notice, request, demand, claim, or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, facsimile, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the individual for whom it is intended.  Either Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

9.8    Governing Law.  THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT

NYI:#3305235

OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION).

9.9    <u>Jurisdiction</u>. Except as otherwise expressly provided in this Agreement, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought, during the pending of the U.S. Bankruptcy Case of any Seller, be brought in the U.S. Bankruptcy Court, and thereafter shall be brought in the United States District Court for the District of Massachusetts or any Massachusetts State court sitting in Suffolk County, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the Commonwealth of Massachusetts, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 9.7 shall be deemed effective service of process on such party.

9.10    <u>WAIVER OF JURY TRIAL</u>. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

9.11    <u>Bulk Sales Laws</u>. Buyer and Sellers each hereby waive compliance by Sellers with the provisions of the "bulk sales," "bulk transfer" or similar laws of any state or other jurisdiction.

NY1:#3305235