# Exhibit 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SCANSOFT, INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) C.A. No. 04-10353-PBS |
|  | ) |
| VOICE SIGNAL | ) |
| TECHNOLOGIES, INC., | ) |
| LAURENCE S. GILLICK, | ) |
| ROBERT S. ROTH, | ) |
| JONATHAN P. YAMRON, | ) |
| and MANFRED G. GRABHERR, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

DEPOSITION OF PETER J. FOSTER, a witness called
by and on behalf of the Defendants, taken pursuant to
the applicable provisions of the Federal Rules of
Civil Procedure, before Dana Ulrich Welch, CSR,
Registered Professional Reporter, and Notary Public,
in and for the Commonwealth of Massachusetts, at the
offices of Choate, Hall & Stewart, 53 State Street,
Boston, Massachusetts, commencing at 10:13 a.m.
Job No.: 2196

Page 2

```
 1   APPEARANCES:
 2   For the Defendants:
 3       CHOATE, HALL & STEWART, P.C.
         Exchange Place
 4       53 State Street
         Boston, Massachusetts  02109
 5       (617) 248-5000
         By:  Sarah Chapin Columbia, Esq.
 6       And:  Paul E. Bonanno, Esq.
 7
     For the Plaintiff:
 8
         BROMBERG SUNSTEIN, LLP
 9       125 Summer Street
         Boston, Massachusetts  02110-1618
10       (617) 443-9292
         By:  Robert M. Asher, Esq.
11       And:  Jack C. Schecter, Esq.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1            INDEX
 2
     WITNESS: PETER J. FOSTER           PAGE NO.
 3
     By Ms. Columbia           4
 4
 5   Certificate of the Reporter        148
 6
 7
 8
 9         EXHIBITS
10   NO.    DESCRIPTION          PAGE NO.
11
12   1 - Patent No. 5,297,183        18
13   2 - Patent No. 5,659,597        18
14   3 - Patent No. 6,501,966 B1       18
15   4 - Patent No. 6,157,848        18
16   5 - Uniden Voice Dial Operating Guide    44
17   6 - Dr. Helms Article Speech Tech '86   57
18   7 - Amendment to License Agreement
19       with Cover Letter 1/13/05        88
20   8 - Subpoena              89
21   9 - 5/28/04 Letter re: Assignment Document  102
22   10 - VCS Article 9/15/98        113
23
24
```

Page 4

```
 1            PROCEEDINGS
 2       (The Texas driver's license number as
 3   identification of the deponent was noted for the
 4   record.)
 5   WHEREUPON,
 6           PETER J. FOSTER,
 7   having duly sworn or affirmed that his testimony
 8   would be the truth, the whole truth, and nothing but
 9   the truth, testified as follows:
10          DIRECT EXAMINATION
11   BY MS. COLUMBIA:
12       Q.  Good morning, Mr. Foster.  My name is Sarah
13   Columbia.  I'm here with my colleague, Paul Bonanno.
14   We represent Voice Systems Technology in a lawsuit
15   between Voice Systems Technologies and ScanSoft.
16   Are you familiar generally with that lawsuit or the
17   fact of that lawsuit?
18       A.  Fact of that lawsuit.
19       Q.  Have you ever had your deposition taken
20   before, sir?
21       A.  Yes.
22       Q.  Was it in a commercial litigation context;
23   that is, a lawsuit between businesses or some other
24   context?
```

Page 5

```
 1       A.  Yes.
 2       Q.  And you're probably very familiar with the
 3   proceedings today.  But let me just say that I'm
 4   going to ask you a series of questions.  I'd like
 5   you to do your best to answer them.
 6       If at any time you don't understand what
 7   I've asked you, please ask me to rephrase it or to
 8   repeat the question.  The court reporter would also
 9   be happy to repeat the question for you if you
10   haven't heard the whole question.
11       Similarly, if for whatever reason you need
12   to take a break during the course of the day, feel
13   free to do that.
14       I will assume, if you don't ask me to
15   explain the question or repeat the question or to
16   rephrase the question, that you have understood the
17   question.  So please try your best to let me know if
18   you're having trouble understanding the questions or
19   hearing them.  Is that okay?
20       A.  Sure.
21       Q.  Okay.  Just to get us started, Mr. Foster,
22   would you tell me where you're presently living and
23   working?
24       A.  Living in Dallas, Texas and working in
```

2 (Pages 2 to 5)

Page 26

1 there's this continuum of what we're doing.
2      But it centers around the inventions that
3 we made that went into the McCaw cellular voice
4 dialing system; that was the trigger that caused us
5 to say, well, this stuff is now getting out. That
6 was a commercial product, you know, something that
7 the average person I think would think is
8 commercial. We sold it. They put it into general
9 use among their wireless customers in Dallas, Texas.
10      Q. Okay.
11      A. So we, you know, we thought we'd patent it.
12 We went back and looked at any number of inventions
13 that we had, figured out the ones that were possible
14 or let's say, the aspects of this that were possible
15 to protect with patent, with a patent law and dealt
16 with those in these patents. And the core of it is,
17 you know, voice dialing in this wireless
18 environment.
19      Q. Okay. And the patent counsel that you
20 referred to, was that Mr. Judson at the time?
21      A. David Judson, yes.
22      Q. Putting aside -- we'll get back to the
23 materials you've collected up for your patent
24 counsel. So putting those aside and focusing

Page 27

1 instead on the collaborative work that you did in
2 advance of that to develop the invention itself,
3 were there lab notebooks or meeting notes or
4 engineering notes or anything of that sort created
5 contemporaneous with that work?
6      A. You know, I just don't remember. I didn't.
7 But my personality is such that I don't like to
8 write a lot of stuff down. I'm more of a sales guy,
9 in that aspect of things. So I don't remember any.
10      Q. Okay.
11      A. And I know I didn't do anything, for sure.
12      Q. Okay. One of the things you said when I
13 asked what your role was in the development of the
14 inventions that are described in this family of
15 patents was that you -- I'm trying to think how you
16 said it. So I may not use the right words, but that
17 you were responsible for sort of seeing this market
18 opportunity or seeing it as a market that Voice
19 Control Systems wanted to try to be in. Is that
20 fair?
21      A. Yes.
22      Q. And I take it from your earlier testimony,
23 you would have been the guy who approved putting
24 resources into developing this technology, correct?

Page 28

1      A. Ultimately, yes.
2      Q. Okay. Was there any process at Voice
3 Control Systems at the time that would have -- that
4 would be in a document sort of, you know, setting
5 out, here's the market, here's our strategy, please
6 approve putting, you know, X-amount of resources
7 over the next two years into this?
8      A. Well --
9      Q. Anything like that that I might look for?
10      A. I don't think so. We were, you know, a
11 small company. We had fairly regular weekly
12 meetings where we discussed allocation of resources,
13 but it wasn't real hard because there was only a
14 handful of us. And when you take the sales people
15 out of it --
16      Q. It's a small handful?
17      A. -- there were even fewer. It's kind of
18 like what are you doing today. My style is/was,
19 consensus building and we wouldn't have -- we had no
20 marketing person. So it truly was boot strap. And
21 we wouldn't have embarked on it had we not had
22 unanimity of belief that that was a good market for
23 the company. It was not sufficient for me to say
24 let's do it.

Page 29

1      Q. Okay.
2      A. At least that's not the way it was run.
3      Q. Okay.
4      A. But I don't remember even if we took notes
5 at those meetings. I know I wouldn't have.
6      Q. Did the company have an e-mail system at
7 the time?
8      A. Kind of. This was before e-mail, these
9 days -- well, no, no, not -- okay.
10      Q. Before modern e-mail?
11      A. That's right.
12      Q. Yes.
13      A. We had a local sort of system that was DEC
14 mail or something like that.
15      Q. On the Vox (sic) box?
16      A. Yeah. So was it e-mail, boy, that's a
17 stretch.
18      Q. Okay.
19      A. VAX.
20      Q. VAX, not Vox. Yeah.
21      Okay. When you got to the company, were
22 their sales people? I hate to call it a sales force
23 in a 17 person company, but did the company have
24 dedicated sales people at that time?

8 (Pages 26 to 29)

Page 30

1    A. I think it was just myself and Gene Helms,
2  Dr. Helms. And we, you know, Helms was -- his title
3  was not sales. But, you know, where you're selling
4  engineering services, the best people to sell them
5  are the engineers. I don't think we had anybody
6  that carried a title of salesman at that time.
7    Q. Okay. As you, I think you called it
8  broadened your horizons as a company to include
9  product development as well as the offering of
10  custom services, did you somewhere in that
11  development bring on sales people, you know, product
12  sales type people?
13    A. Yes.
14    Q. When did you hire your first sales people?
15    A. Boy, I don't remember.
16    Q. Do you remember who they were, who your
17  first sales hire was?
18    A. No.
19    THE DEPONENT: Can I just make one joke?
20    MR. ASHER: No.
21  BY MS. COLUMBIA:
22    Q. It's okay with me. Did he tell you not to
23  make jokes?
24    A. No.

Page 31

1    Q. You mentioned Dr. Helms; what was his role
2  at Voice Control Systems in the late 1980s?
3    A. I'm pausing because I can't even remember
4  when Gene left the company. But I think he was
5  there in the late '80s. From the time I got there,
6  I had Gene move out of, I think his title was
7  product development or something like that, into a
8  sales and marketing type role. Gene was very good,
9  very credible and, you know, had as much experience
10  as anyone else in the company in speech recognition.
11    Q. Okay.
12    A. He had some projects in which he was
13  technically involved, but primarily I had him as our
14  sales person, probably our best one.
15    Q. Okay. So I may have asked you the wrong
16  question before. I asked you who your first hire
17  was. Is it fairer to say that what you really did
18  was move Dr. Helms into a more sales oriented
19  position as you moved into the area of more sales
20  products?
21    A. That was certainly my intention. Gene
22  didn't go willingly. But he was real good.
23    Q. Do you know where he is today, either where
24  he's living or working?

Page 32

1    A. No.
2    Q. Do you know where he went after he left
3  Voice Control Systems?
4    A. I don't remember.
5    Q. When were you last in touch with him; have
6  you been in touch with him since he left?
7    A. Yes. But it was soon thereafter.
8    Q. I asked you some questions about what
9  documents there might be, lab notebooks and so
10  forth. And I understand that you don't recall
11  whether there were any. If there were any, where
12  would they have ended up after the Philips
13  transaction; do you know?
14    A. No.
15    Q. Let's talk about the Philips transaction a
16  little bit. That transaction took place in 1999?
17    A. I think that's right.
18    Q. Did I understand you earlier to say that as
19  a result of that, you had some employment
20  relationship with Philips for a period of time after
21  Philips bought Voice Control Systems?
22    A. Yes.
23    Q. What was your employment relationship with
24  Philips after Philips bought Voice Control Systems?

Page 33

1    A. I had several roles. One was the
2  development organization reported to me, which
3  consisted of the U.S. development organization and
4  the European -- well, world-wide development. I was
5  the general manager of the Americas. I sat on the
6  board of management; that's what I remember.
7    Q. And my question may not have been clear.
8  But the answers you just gave relate to the Philips
9  Speech Recognition Systems entity or to Philips NV,
10  the big organization?
11    A. No. This was Philips Speech Processing.
12  And I have -- it's a very complex corporate. I'm
13  speaking in a non-technical sense, because somehow
14  there's Phillip North America and blah, blah, blah,
15  blah. But if you took the corporate shells out, so
16  to speak --
17    Q. Yeah.
18    A. -- and you looked at it as a business unit
19  rather than a corporation.
20    Q. A legal unit?
21    A. Yeah. That was the context of my answers.
22    Q. Okay. And I presume some chunk of the
23  Philips Speech Processing unit was the same guys in
24  Dallas who had been Voice Control Systems employees,

9 (Pages 30 to 33)

Page 34

1  correct?
2      A. Yes.
3      Q. Did Philips have additional speech
4  recognition employees in the Dallas area that were
5  merged in with those guys?
6      A. No.
7      Q. And where else did Philips have speech
8  recognition employees, if you will, or pieces of
9  that business?
10      A. World-wide.
11      Q. Okay. So after the Philips acquisition,
12  the Philips speech recognition business had
13  facilities world-wide?
14      A. That's correct.
15      Q. Okay. Do you know -- strike that. And
16  you're aware I take it, that since Philips acquired
17  Voice Control Systems, the speech recognition
18  business of Philips, or at least some part of it,
19  has been acquired by ScanSoft?
20      A. I know there was some transaction, but
21  that's all.
22      Q. Okay. Do you know whether the unit of
23  people that worked for Voice Control Systems and
24  then Philips, do you know whether those are the

Page 35

1  same, some of them are now the ScanSoft voice
2  recognition people in the Dallas area?
3      A. I know one or two.
4      Q. Okay. Who do you know who is still there,
5  who's now with ScanSoft from the Voice Control days?
6      A. Fadi Kaaki.
7      Q. Anyone else?
8      A. They closed the Dallas office last year.
9      Q. Okay.
10      A. I mean the big office.
11      Q. And is Fadi Kaaki a man or woman?
12      A. It's a man.
13      Q. Mr. Kaaki, for how long was he with Voice
14  Control Systems before Philips, et cetera?
15      A. Quite a while. But I don't remember when
16  he started. After me.
17      Q. In the late '80s sometime?
18      A. I don't know.
19      Q. Okay. I may have asked you this, but are
20  you aware of anyone else from the Voice Control days
21  who is now at ScanSoft in their voice recognition
22  business?
23      A. I really don't.
24      Q. When you looked out and decided that the

Page 36

1  voice recognition for mobile or cellar
2  communications was a market that voice recognition
3  systems was interested in pursuing, did you create
4  for yourself, mentally or physically, a list of
5  potential customers for that technology?
6      A. Yes.
7      Q. First of all, do you recall, was it a list
8  on paper or was it a list in Mr. Foster's head?
9      A. It was a list in my head.
10      Q. Okay. Tell me as you sat back at the
11  beginning, looking out at this market and how
12  attractive it was, what were you -- what was the
13  strategy in terms of the companies that were likely
14  going to be customers for what you were developing?
15      A. Start with the ones in Dallas.
16      Q. Okay. I guess either by name or by type of
17  company, who were the targets; was it the cellular
18  companies or the phone companies?
19      A. Both. And the providers thereto. Nortel,
20  McCaw Cellular. Oki Telecom.
21      Q. Is that O-K-E?
22      A. O-K-I.
23      Q. What did they do or what do they do, Oki
24  Telephone?

Page 37

1      A. They're actually a big Japanese supplier of
2  telecommunications and copiers, everything else in
3  the world, computers; they're one of these Japanese
4  conglomerates that's targeted in electronics.
5      Q. Equipment?
6      A. Oh, yeah. They're not a service provider.
7      Q. Who else?
8      A. Uniden, Nokia, Motorola. I forget the name
9  then, but it was Southwestern Bell's cellular
10  service provider, I think it was called Cell One
11  then.
12      Q. Could it be MetroCell?
13      A. MetroCell was McCaw.
14      Q. MetroCell was McCaw?
15      A. Yeah. So the other one. There were two at
16  the time and I don't remember what the other one was
17  called. But it was a Southwestern Bell entity.
18  There was one bell and one non-bell in every market.
19      Q. Okay. Who else?
20      A. Those are the ones I remember.
21      Q. As you sat back at the beginning
22  strategizing on this market and how to break into
23  this market or approach this market, what was the
24  strategy?

10 (Pages 34 to 37)

Page 138

1    -- had number dialing, meaning digits. It had
2    numeric memories, but I don't remember if it had
3    words like "home." I mean it would be stupid, yeah,
4    let's call ourselves. You know, it might have,
5    might not have; I just don't remember.
6        Q. Interesting. I was just about to ask you
7    whether there was some Southwest Bell product that
8    did have a dial or key pad?
9        A. It was a different division of Southwestern
10   Bell. I don't know the exact relationship, but it
11   really wasn't Southwestern Bell. It was sort of a
12   partner who Southwestern Bell let use the brand.
13   But they were out of Indianapolis and they were
14   pretty independent, very independent.
15       Q. Okay. Turning ahead to 1999 and the
16   Philips acquisition, it appears to me, and you can
17   check this on the patents, that as part of that
18   acquisition, a Philips lawyer took over prosecution
19   of the family of patents that we've talked about.
20   Do you recall that?
21       A. Yeah.
22       Q. Okay. And the new lawyer's name was --
23   well, I guess there was a couple of them. But the
24   one listed on the patents is Daniel Piotrowski.

Page 139

1        A. Piotrowski.
2        Q. Piotrowski. During the time after the
3    Philips acquisition, while you were still employed
4    by Philips Speech, did you have any involvement with
5    the Philips patent attorney in the prosecution of
6    the patents related to this family?
7        A. Yes.
8        Q. Okay. What was your interaction; what was
9    your responsibility?
10       A. Generally speaking?
11       MR. ASHER: Yeah. You can answer, but I'll
12   warn you again not to reveal attorney/client --
13       THE DEPONENT: First of all, we had to
14   explain it to them. Second of all, we had to
15   give them a copy, because Philips is a big
16   organization.
17   BY MS. COLUMBIA:
18       Q. Yeah.
19       A. There were pending cases that we had to
20   brief them on and there was new material to file,
21   you know, that Judson would have gotten around to
22   sooner or later. But there was no reason for
23   outside patent counsel since it was inside of
24   Philips and since we were paying for it anyway.

Page 140

1        Q. Okay. After you left Philips -- why did
2    you leave Philips, actually?
3        A. They wanted me to move to Europe. They
4    offered me a position as general manager of the
5    whole division, of two-thirds of Philips Speech.
6    And unfortunately, it was based in Aachen, Germany
7    and my family was not ready to do that at that time.
8        Q. And remind me, sorry, what time of year in
9    2000 you left, roughly?
10       A. I think it was the very end of the year,
11   like December 31st. I told them either A or B,
12   because we had talked about it for quite a while.
13   But --
14       Q. Okay. Since leaving Philips at the end of
15   2000, have you had any interaction with the Philips,
16   Philips patent attorney regarding this family of
17   patents?
18       A. No.
19       MS. COLUMBIA: Take a five-minute break.
20       (Proceedings interrupted at 3:10 p.m. and
21       reconvened at 3:17 p.m.)
22   BY MS. COLUMBIA:
23       Q. Just a couple of additional things, Mr.
24   Foster. I asked you earlier this morning, I think I

Page 141

1    was talking about a specific development
2    agreement -- I think the one with Brite Voice, but
3    I'm not sure -- if you really wanted to find that,
4    where would you look. And I believe you said at the
5    end of the VCS time period, you'd look in the CFO's
6    office.
7        A. Yeah.
8        Q. Is that true -- you testified with respect
9    to lot of things, that there would be development
10   agreements, license agreements and so forth. As of
11   the time you departed Philips Speech, where would
12   you have gone if you needed to pull out one of those
13   agreements and remind yourself what it said?
14       A. Yeah. She was the keeper of all the legal
15   documents.
16       Q. Did the CFO of Voice Control stay on in
17   some capacity in the Philips organization?
18       A. Yes.
19       Q. Was she CFO of that business division?
20       A. Well, of U.S., of our U.S. business unit.
21       Q. What was her name?
22       A. Kim Terry.
23       Q. Do you know whether she stayed on then
24   through the Philips time into the ScanSoft era?

36 (Pages 138 to 141)

Page 142

1    A. No. She left about a month after I did.
2    Q. Do you know who replaced her?
3    A. No.
4    Q. We also talked a little bit at the very
5  beginning of the day about development documents. I
6  asked you about lab books and all of that. To the
7  extent that stuff existed out of Dr. Schalk's lab or
8  Mr. Bareis' work, where was the repository for that?
9    A. On the VAX.
10   Q. On the VAX?
11   A. Yeah. No, I mean, it was the whole
12 environment.
13   Q. Okay. Do you know, when did you switch
14 over from the VAX to a more modern system?
15   A. You know, it's sort of like when did you
16 change from a Mac to a computer. They hung onto
17 that damn thing for much -- well --
18   Q. Longer than they should.
19   A. I could have bought five offices worth of
20 Microsoft or Apple-based stuff for just what the
21 maintenance agreements were costing us on that
22 thing, and there were three of them. I don't know.
23 Tom would probably know. I don't know.
24   Q. Okay. But that was the only repository for

Page 143

1  sort of development stuff?
2    A. Yeah. They were all into that stuff. You
3  know, the technical, they were all (indicating).
4    Q. Yeah. Okay. How about, you told me about
5  the sort of sales stuff and I think you told me it
6  was whatever was current, we tried to keep it
7  current on the shelf.
8    A. Right.
9    Q. Was there any repository for publications
10 or historical -- history not being very long in this
11 case, but a place where that kind of stuff was kept
12 or a person who tried to keep track of that?
13   A. Well, either individually, on the VAX
14 everybody had their own directories, or Kim. But
15 more likely -- there was no marketing person to, you
16 know, kind of pull together and keep it,
17 historically. Some of the articles, you know, were
18 stuck up there on that mailbox system to give out to
19 customers.
20   Q. Okay.
21   A. But we didn't have -- we just weren't big
22 enough to have any kind of central filing system.
23   Q. Okay.
24   A. Or even a distributed one.

Page 144

1    Q. You mentioned -- I think you mentioned that
2  to your knowledge ScanSoft closed the Dallas
3  office --
4    A. Yeah.
5    Q. -- sometime in the last year. Do you know
6  when that happened, roughly?
7    A. A year ago December. I mean, stages. But
8  I think they finally, whoever was left finally
9  turned the lights out the end of '03.
10   Q. Okay. Do you keep in touch with Dr. Schalk
11 or Mr. Bareis?
12   A. Probably not as much as I should. I
13 haven't talked to Tom in a year and a half probably.
14   Q. Have you talked to him at all since this
15 lawsuit came up or any of the issues around it?
16   A. Not the issues around it. I can't remember
17 if I talked to him. I don't even know when the
18 thing was filed.
19   Q. About this time last year.
20   A. No, I haven't talked to him since then that
21 I recall.
22   Q. How about Mr. Bareis?
23   A. I talk to him occasionally. He called me
24 up to ask me some things, just about the business

Page 145

1  side of it, you know, do I have to do it, that kind
2  of stuff. And I see him socially occasionally, two
3  or three times a year.
4    Q. Have you had any conversations with him
5  about the lawsuit or the merits of the lawsuit or
6  the patents?
7    A. He -- yeah, but very peripherally. Let me
8  take that back. It was more about if he was coming
9  to Boston. We did not talk about any of the issues.
10   Q. Okay. How about any of the other sort of
11 former Voice Control people. Have you had any
12 conversations with them in the last year or so about
13 the litigation or the merits or the patent?
14   A. Not the merits. The patents. Kim Terry
15 and I talk occasionally about the -- it's a valuable
16 asset, the set of patents is a valuable asset. But
17 not about this. I mean, she knows I'm up here.
18   Q. Anybody else?
19   A. No. I mean, I got a phone call once from
20 Walt Teschner -- in fact, that might be how I found
21 out about it -- who runs an industry trade
22 publication. But he was just hey, what do you
23 think, you know. And I didn't know anything about
24 it.

37 (Pages 142 to 145)

# Exhibit 7

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| SCANSOFT, INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) C.A. No. 04-10353-PBS |
|  | ) |
| VOICE SIGNAL | ) |
| TECHNOLOGIES, INC., | ) |
| LAURENCE S. GILLICK, | ) |
| ROBERT S. ROTH, | ) |
| JONATHAN P. YAMRON, | ) |
| and MANFRED G. GRABHERR, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

Job No.: 2458


     DEPOSITION OF MICHAEL PHILLIPS, a witness
called by and on behalf of the Defendants, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure, before Dana Welch, CSR,
Registered Professional Reporter, and Notary Public,
in and for the Commonwealth of Massachusetts, at the
offices of Choate, Hall & Stewart, 53 State Street,
Boston, Massachusetts, on Tuesday, February 8, 2005,
commencing at 10:36 a.m.

Page 2

1  APPEARANCES:
2  For the Defendants:
3     CHOATE, HALL & STEWART, P.C.
       Exchange Place
4     53 State Street
       Boston, Massachusetts 02109
5     (617) 248-5000
       By: Robert S. Frank Jr., Esq.
6
7  For the Plaintiff:
8     BROMBERG & SUNSTEIN, LLP
       125 Summer Street, 11th Floor
9     Boston, Massachusetts 02110-1618
       (617) 443-9292
10    By: Robert M. Asher, Esq.
       And: Jack C. Schecter, Esq.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1            I N D E X
2
3  WITNESS: MICHAEL PHILLIPS          PAGE NO.
4
   By Mr. Frank                4
5
   Certificate of the Reporter          158
6
7
8
9        E X H I B I T S
10
   NO.    DESCRIPTION         PAGE NO.
11
   (Exhibits attached to transcript.)
12
13  1  Notice of Deposition        4
14  2  Schalk Article          58
15  3  Uniden Operating Guide       67
16  4  Machine Design Article       94
17  5  U.S. Patent 5,182,765       107
18
19
20
21
22
23
24

Page 4

1        (Exhibit No. 1 marked for
2     identification.)
3        P R O C E E D I N G S
4        (The Massachusetts driver's license
5     number as identification of the deponent
6     was noted for the record.)
7  WHEREUPON,
8        MICHAEL PHILLIPS,
9  having duly sworn or affirmed that his
10 testimony would be the truth, the whole truth,
11 and nothing but the truth, testified as
12 follows:
13        DIRECT EXAMINATION
14 BY MR. FRANK:
15    Q. Good morning, sir. Would you state
16 your name for the record, please.
17    A. Michael Phillips.
18    Q. Where do you live, Mr. Phillips?
19    A. In Belmont, Massachusetts.
20    Q. Street address, please?
21    A. 39 Howells Road, in Belmont.
22    Q. Are you presently employed?
23    A. Yes.
24    Q. By whom are you employed?

Page 5

1     A. ScanSoft.
2     Q. What is your position with ScanSoft?
3     A. Chief technology officer.
4     Q. How long have you held that position?
5     A. Since August 2003.
6     Q. And what are your duties as chief
7  technology officer of ScanSoft?
8     A. Overlooking technology development
9  within the company.
10    Q. Would you take just a moment and tell
11 us your educational background, beginning with
12 college?
13    A. Bachelor of science from Carnegie
14 Mellon University.
15    Q. When?
16    A. Graduated in 1982.
17    Q. Graduate degrees?
18    A. No.
19    Q. Any formal education after college?
20    A. Some master's program at MIT, but I did
21 not complete that.
22    Q. After you graduated from Carnegie
23 Mellon, what did you do?
24    A. I worked at a company called Scott

2 (Pages 2 to 5)

1    to answer that question.
2    BY MR. FRANK:
3        Q. Let me ask, sir, was the document to
4    which you referenced prepared in anticipation
5    of this lawsuit?
6        A. I don't recall the origin of the
7    document.
8        Q. Was it prepared prior to the
9    commencement of this lawsuit?
10       A. Yes.
11       Q. How long prior to the commencement of
12   this lawsuit was it prepared?
13       A. I don't recall precisely.
14       Q. Okay. Is it fair to describe the
15   document as an analysis, among other things, of
16   the question whether the -- whether one or more
17   products of Voice Signal Technologies infringed
18   the '966 patent? Yes or no?
19       A. Yes.
20       Q. Okay. And is it fair, does the
21   document also contain an analysis of the
22   validity of the claims of the '966 patent as
23   construed by counsel? Yes or no?
24       A. Yes.

1        Q. Okay. And was that analysis relied
2    upon in some way by ScanSoft in determining
3    whether to sue Voice Signal Technologies?
4        A. Yes.
5        MR. FRANK: I will ask that the
6    analysis be produced.
7        MR. ASHER: I'll take it under
8    advisement. But we'd ask that you submit
9    any request for documents to us in writing
10   and we'll respond appropriately.
11   BY MR. FRANK:
12       Q. You have the '966 patent in front of
13   you, sir?
14       A. Yes.
15       Q. Let me direct your attention, if I
16   could, to claim one of that document.
17       MR. FRANK: And I have made an error.
18   Let's go off the record.
19       (Off-the-record discussion held.)
20       (Proceedings briefly interrupted.)
21       MR. FRANK: The record should show that
22   I mistakenly handed Mr. Phillips a copy of
23   the '966 patent without columns 11 through
24   14.

1        I've now handed him columns 11 through
2    14 so that he belatedly has the full
3    patent.
4    BY MR. FRANK:
5        Q. Let me direct your attention, if I
6    could, to column 12 of the '966 patent, and in
7    particular, to claim one, which appears
8    beginning at line 21 of column 12. I take it
9    you've studied claim one in the past?
10       A. Yes.
11       Q. What, as you understand it, is the
12   invention of claim one?
13       A. A system allowing -- within a mobile
14   telecommunications system, allowing a user to
15   either dial a telephone number by speaking a
16   telephone number or by speaking a command. And
17   this command can be attached to a key word with
18   a previously stored telephone number to allow
19   the user to dial by key word, such as "home" or
20   "office" or something like that.
21       Q. Who, as you understand it, conceived
22   that invention; who first conceived of that
23   invention?
24       A. Well, the combination of Tom Schalk,

1    Bern Bareis and Pete Foster.
2        Q. When was that conception?
3        MR. ASHER: Objection.
4        THE DEPONENT: I'm sorry. I don't know
5    the exact date.
6    BY MR. FRANK:
7        Q. Do you know the approximate date?
8        A. In the early 1990s.
9        Q. Have you done anything to determine the
10   date of conception of the invention claimed in
11   the '966 patent?
12       A. No.
13       Q. Have you consulted any records in an
14   effort to determine when that conception took
15   place?
16       A. I did review the prosecution history,
17   which, by the way, I neglected to mention
18   before. I forgot.
19       Q. Thank you.
20       A. But I didn't look at the exact date
21   other than mentioned in the prosecution
22   history.
23       Q. Did you, apart from looking at the
24   prosecution history -- did you find in the

9 (Pages 30 to 33)

Page 34

1  prosecution history anything that helped you to
2  identify the date of conception of the
3  invention of claim one?
4      A. I did not look for the date of
5  conception.
6      Q. Okay. Did you do anything else to
7  identify or determine the date of the
8  conception of the invention in claim one?
9      A. No.
10     Q. What did Mr. Schalk conceive of as
11 distinguished from Mr. Bareis or Mr. Foster?
12     MR. ASHER: Objection.
13     THE DEPONENT: I don't know.
14 BY MR. FRANK:
15     Q. What did Mr. Foster conceive as
16 distinguished from that which was conceived by
17 Mr. Schalk or Mr. Bareis?
18     MR. ASHER: Objection.
19 BY MR. FRANK:
20     Q. If anything?
21     A. I don't know.
22     Q. Same question for Mr. Bareis.
23     MR. ASHER: Objection.
24     THE DEPONENT: I don't know.

Page 35

1  BY MR. FRANK:
2      Q. Okay. What was -- was the entire
3  invention conceived of at the same time or were
4  elements of the conception subsequent to other
5  elements?
6      MR. ASHER: Objection.
7      THE DEPONENT: I don't know.
8  BY MR. FRANK:
9      Q. Is there any documentary evidence of
10 which you are aware that identifies either the
11 time of or the fact of the conception, other
12 than the patent, itself, or the patent
13 application, itself?
14     A. I don't have knowledge of such
15 documentation.
16     Q. Have you done anything to look for that
17 documentation?
18     A. No, I haven't.
19     Q. Has anyone at ScanSoft done anything to
20 look for that documentation?
21     A. I don't know.
22     Q. Have you made inquiry to find out
23 whether anyone at ScanSoft looked for
24 documentation relating to the conception of the

Page 36

1  invention of claim one or any other claim in
2  the '966 patent?
3      A. No.
4      Q. Who at ScanSoft is the person of whom
5  you would make inquiry had you attempted to
6  determine the conception date or facts relating
7  to the conception of the invention of any of
8  the claims of '966?
9      A. My guess is that that knowledge does
10 not exist within ScanSoft.
11     Q. Did you -- well, with respect, the
12 answer my guess is doesn't --
13     A. Fine.
14     Q. -- carry us far enough. I take it you
15 have not done anything to find out whether that
16 information exists within ScanSoft; is that
17 correct?
18     A. That's right.
19     Q. Okay. Now, is there anyone within
20 ScanSoft of whom you would make inquiry in
21 order to determine whether your guess was
22 factual or not?
23     A. Richard Wong.
24     Q. Mr. Wong is a lawyer?

Page 37

1      A. Yes.
2      Q. Is there anyone presently employed by
3  ScanSoft who was employed by Voice Control
4  Systems at or about the time of the conception
5  of any invention or alleged invention claimed
6  in the '966 patent?
7      MR. ASHER: Objection.
8      THE DEPONENT: Not that I know of.
9  BY MR. FRANK:
10     Q. Who participated in the development or
11 reduction to practice of the -- of any
12 invention claimed in the '966 patent?
13     MR. ASHER: Objection.
14     THE DEPONENT: I don't know.
15 BY MR. FRANK:
16     Q. Did you make any effort to determine
17 who participated in the -- in efforts to
18 develop or to reduce to practice any invention
19 claimed in the '966 patent?
20     A. No.
21     Q. Has anyone at ScanSoft made any such
22 effort?
23     A. I don't know.
24     Q. Have you done anything to determine

10 (Pages 34 to 37)

Page 38

1  whether anyone at ScanSoft has made any such
2  effort?
3     A. No.
4     Q. Does any document exist within ScanSoft
5  that would -- that relates to the development
6  or reduction to practice of any invention
7  claimed in the '966 patent?
8     A. I don't know.
9     Q. Have you done anything to determine
10 whether any document, either paper document or
11 electronic document, exists that relates to the
12 development or reduction to practice of any
13 invention claimed in the '966 patent?
14    A. No.
15    Q. What was the first -- of whom would you
16 make inquiry to determine whether any such
17 document exists?
18    A. Richard Wong.
19    Q. Were documents relating to the
20 conception or reduction to practice of the
21 inventions claimed in the '966 patent destroyed
22 by ScanSoft at any time after the Philips'
23 transaction?
24    A. I don't know.

Page 39

1     Q. Okay. Have you made any effort to
2  determine whether those documents were
3  destroyed by ScanSoft after the Philips'
4  transaction?
5     A. No.
6     Q. Okay. Were any of those documents
7  destroyed after the commencement of this
8  action?
9     A. No.
10    Q. Was anything done to assure that those
11 documents would not be destroyed?
12       MR. ASHER: Objection.
13       THE DEPONENT: Yes.
14 BY MR. FRANK:
15    Q. What was done?
16    A. John O'Toole, who is a member of our
17 internal legal team, has -- am I allowed to say
18 --
19       MR. ASHER: I'm not sure what it is
20 you're going to say. Can I --
21       MR. FRANK: Step out if you want.
22       (Proceedings interrupted at 11:25 a.m.
23 and reconvened at 11:26 a.m.)
24       MR. FRANK: Would you repeat the

Page 40

1  question?
2        (The two preceding questions were read
3  by the stenographer.)
4        THE DEPONENT: So John O'Toole, the
5  attorney, internal lawyer, who was doing
6  the document discovery, when he sent an
7  e-mail out to the set of people for which
8  he was looking for documents, he included
9  in that e-mail the fact that they need to
10 produce all documents and need to be very
11 careful not to destroy any documents.
12 BY MR. FRANK:
13    Q. When was that message sent?
14    A. I don't remember the date.
15    Q. How long after the commencement of this
16 action was that sent?
17    A. It was during the document discovery.
18    Q. Okay. At the time when ScanSoft
19 received the legal opinion from Bromberg and
20 Sunstein, was anything done to assure that
21 documents relating to the conception or
22 reduction to practice of any invention or
23 alleged invention claimed in the '966 patent
24 were not destroyed?

Page 41

1     A. I don't know.
2     Q. Are you aware of any such steps taken
3  at that time?
4     A. No, other than a general practice to
5  not destroy documents.
6     Q. What is the date of the Bromberg and
7  Sunstein opinion?
8     A. I don't know.
9     Q. Approximately?
10    A. I really don't remember the date.
11    Q. Okay. What is the date that the former
12 Voice Control Systems' office -- I think you
13 told me the former Voice Control Systems'
14 office was closed at the end of 2003.
15    A. Approximately.
16    Q. And is there a record that one could
17 reference to determine when that office was
18 dismantled?
19    A. I assume so.
20    Q. Okay. And who would have that record?
21    A. Probably someone in our operations or
22 facilities group.
23    Q. And do you associate a name with that?
24    A. Rich Palmer would know.

11 (Pages 38 to 41)

Page 42

1    Q. So to summarize, is it fair to say that
2  you do not know when the invention of the '966
3  patent -- withdrawn.
4       Is it fair to say that you do not know
5  when the invention of claim one of the '966
6  patent was first conceived or reduced to
7  practice?
8    A. Yes.
9    Q. Yes, that is correct?
10    A. Yes, that is correct.
11    Q. Okay. And is it also correct that to
12  the best of your knowledge, after reasonable
13  inquiry, no one within ScanSoft knows when the
14  invention was conceived or reduced to practice?
15    A. No. I did not inquire.
16    Q. Okay. Did you do anything to find out
17  when the invention was conceived or reduced to
18  practice, the invention or alleged invention of
19  claim one?
20    A. No.
21    Q. Who within ScanSoft would have -- do
22  you know whether anyone within ScanSoft has
23  ever attempted to determine whether -- when the
24  invention of claim one was conceived or reduced

Page 43

1  to practice?
2    A. I don't know.
3       MR. FRANK: Off the record.
4       (Off-the-record discussion held.)
5       MR. FRANK: It's my view that ScanSoft
6  has not complied with its obligations under
7  Rule 30(b)(6) to make reasonable inquiry
8  with respect to the topics as to which this
9  witness was identified as the 30(b)(6)
10  witness.
11      And I request that ScanSoft either
12  identify another witness or acknowledge
13  expressly that the relevant knowledge with
14  respect to the conception and reduction to
15  practice of the invention of the '966
16  patent does not exist within ScanSoft.
17      MR. ASHER: Again, we'll attempt to
18  answer your question and appreciate if you
19  would send that in a letter.
20  BY MR. FRANK:
21    Q. What was the first product that
22  embodied the invention of claim one of the '966
23  patent?
24    A. I don't know.

Page 44

1    Q. When was the first product that
2  embodied -- was a product ever created which
3  embodied the invention of claim one of the '966
4  patent?
5    A. I don't know.
6       MR. FRANK: I give notice that ScanSoft
7  will be bound by the answers that are being
8  given by this witness. And it has certain
9  obligations under Rule 30(b)(6) and I think
10  it's -- I'm entitled to assume that those
11  obligations have been met and that these
12  answers are being given by the corporation,
13  not just by this witness, and that
14  therefore, the corporation is bound by the
15  answers that this witness is giving.
16      You don't have to agree or disagree
17  with that. I simply want on the record
18  that that's our position.
19  BY MR. FRANK:
20    Q. Has any product been marked with the
21  number of the '966 patent, that is, with a
22  reference to the '966 patent?
23    A. I don't believe so.
24    Q. What products did Voice Control Systems

Page 45

1  sell to anyone at any time which were covered
2  by any of the claims of the '966 patent?
3       MR. ASHER: Objection.
4       THE DEPONENT: So I don't know the
5  details of all of the historic Voice
6  Control Systems' products. They certainly
7  included dialing products built into phones
8  and dialing products deployed in networks.
9  I did not do the analysis to see whether
10  those products embodied these claims.
11  BY MR. FRANK:
12    Q. Is ScanSoft presently aware of any
13  product that Voice Control Systems sold that
14  embodied the alleged invention of claim one of
15  the -- of the '966 patent?
16    A. No.
17    Q. Has -- did Philips sell any product
18  that embodied the invention of claim one of the
19  '966 patent?
20    A. Again, Philips had built various
21  products that are in this general space of
22  voice-activated dialing; whether those specific
23  products embodied these claims, I don't know.
24    Q. Did Voice Control Systems sell any

12 (Pages 42 to 45)

# Exhibit 8

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SCANSOFT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-10353-PBS |
| | ) | |
| | ) | |
| VOICE SIGNAL TECHNOLOGIES, INC., | ) | |
| LAURENCE S. GILLICK, ROBERT S. | ) | |
| ROTH, JONATHAN P. YAMRON, and | ) | |
| MANFRED G. GRABHERR, | ) | |
| | ) | |
| Defendants. | ) | |

To:    Lee Carl Bromberg, Esq.
       Robert Asher, Esq.
       Julia Huston, Esq.
       Lisa M. Fleming, Esq.
       Jack C. Schecter, Esq.
       BROMBERG & SUNSTEIN LLP
       125 Summer Street
       Boston, MA 02110-1618

## NOTICE OF RULE 30(b)(6) DEPOSITION OF SCANSOFT, INC.

Please take notice that, pursuant to Fed. R. Civ. P. 30(b)(6), defendant and counterclaim plaintiff Voice Signal Technologies, Inc. will take the deposition upon oral examination of plaintiff and counterclaim defendant ScanSoft, Inc. ("ScanSoft") on February 10, 2005 beginning at 10:00 a.m. The deposition shall be conducted at the offices of Choate, Hall & Stewart, 33rd Floor, Exchange Place, Boston, Massachusetts 02109, before an official authorized by law to administer oaths. The deposition shall be recorded by stenographic means and shall continue through the day until completed.

Please take further notice that, pursuant to Fed. R. Civ. P. 30(b)(6), ScanSoft shall designate to testify concerning each of the matters set forth in the attached **Schedule A** one or more of its officers, directors, managing agents or other persons who consent to testify on its behalf.

VOICE SIGNAL TECHNOLOGIES, INC.

By its attorneys,

Robert S. Frank, Jr. (BBO No. 177240)
Sarah Chapin Columbia (BBO No. 550155)
Paul D. Popeo (BBO No. 567727)
Paul E. Bonanno (BBO No. 646838)
CHOATE, HALL & STEWART
Exchange Place
53 State Street
Boston, MA 02109
(617) 248-5000

Dated: January 31, 2005
3794581_1.DOC

I HEREBY CERTIFY THAT A TRUE COPY OF
THE ABOVE DOCUMENT WAS SERVED
UPON THE ATTORNEY OF RECORD FOR
EACH OTHER PARTY BY MAIL/~~HAND~~ ON

DATE _1/31/05_ SIGNATURE _____

## SCHEDULE A

### DEFINITIONS

1.      The definitions set forth in Local Rule 26.5(C) and in 35 U.S.C. § 100 are deemed incorporated herein by reference.

2.      "And" and "or" shall, where the context permits, be construed to mean "and/or."

3.      "ScanSoft" or "plaintiff" refers to the plaintiff, ScanSoft, Inc., and to its officers, directors, employees, agents, attorneys, representatives, partners, corporate parents, subsidiaries, divisions, and/or affiliates, to the full extent set forth in Local Rule 26.5(C)(5).

4.      "VCS" refers to Voice Control Systems, Inc., and to its officers, directors, employees, agents, attorneys, representatives, partners, corporate parents, subsidiaries, divisions, and/or affiliates, to the full extent set forth in Local Rule 26.5(C)(5).

5.      "'966 patent" means United States Patent No. 6,501,966.

### SUBJECT MATTERS OF DEPOSITION

1.      The timing of and the reasons for the closing of ScanSoft's office (formerly VCS's office) in Dallas, Texas, and the disposition of all documents that were stored or located within that office.

2.      ScanSoft's efforts to respond to Defendants' First Set of Document Requests to Plaintiff served on May 26, 2004, including ScanSoft's efforts to locate responsive documents.

3.      The location or disposition of all VCS documents relating to the '966 patent, or the conception, development, or reduction to practice of subject matter disclosed or claimed in the '966 patent, or the public use, sale or offer for sale of any product or process described or claimed in the '966 patent.

# Exhibit 9

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SCANSOFT, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-10353 PBS |
| | ) | |
| VOICE SIGNAL TECHNOLOGIES, INC., | ) | |
| LAURENCE S. GILLICK, ROBERT S. | ) | |
| ROTH, JONATHAN P. YAMRON, and | ) | |
| MANFRED G. GRABHERR | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OBJECTIONS TO SECOND NOTICE OF RULE 30(b)(6)
## DEPOSITION OF SCANSOFT, INC.

Pursuant to the applicable Federal Rules of Civil Procedure and Local Rules, plaintiff ScanSoft, Inc. ("ScanSoft") responds and objects as follows to the Second Notice of Rule 30(b)(6) Deposition of ScanSoft, Inc. (the "Second Notice") and accompanying "Subject Matters for Deposition" served on ScanSoft by Voice Signal Technologies, Inc. ("VST") on February 1, 2005.

### GENERAL OBJECTIONS

1.      ScanSoft objects to the subject matters for deposition to the extent that they seek to impose discovery obligations beyond the scope of the applicable provisions of the Federal Rules of Civil Procedure.

2.      ScanSoft objects to the subject matters for deposition to the extent that they seek information protected from discovery by the attorney-client privilege, the work product doctrine, Fed. R. Civ. P. 26(b), and any other applicable privilege or immunity.

3. ScanSoft objects to the subject matters for deposition to the extent that they are vague, ambiguous, overly broad, unduly burdensome, oppressive, unreasonably cumulative, duplicative, meant only to harass ScanSoft, irrelevant to the subject matter of this action, outside the scope of permissible discovery, and/or unlikely to lead to the discovery of admissible evidence.

4. ScanSoft objects to the subject matters for deposition to the extent that they attempt to require ScanSoft to disclose information not within ScanSoft's possession, custody, or control.

5. The preceding objections apply to all of the subjects for deposition listed in Schedule A of the Subpoena.

## SPECIFIC OBJECTIONS AND RESPONSES

In response to the numbered paragraphs set forth in Schedule A of the Second Notice, ScanSoft hereby makes the following specific objections and designations:

1. ScanSoft designates Jeanne McCann to testify as to the facts currently known to ScanSoft regarding this subject matter for deposition.

2. ScanSoft objects to this subject matter for deposition as inappropriate and seeking information protected by the attorney work product doctrine and/or attorney client privilege.

3. ScanSoft designates Jeanne McCann to testify as to the facts currently known to ScanSoft regarding this subject matter for deposition.

2

Dated:  February 14, 2005

SCANSOFT, INC.,
By its attorneys,

Lee Carl Bromberg, BBO #058480
Robert Asher, BBO #022865
Julia Huston, BBO #562160
Lisa M. Fleming, BBO #546148
Jack C. Schecter, BBO #652349
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, Massachusetts 02110-1618
(617) 443-9292

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above document was served upon counsel for the defendants, Paul Bonanno, Esq., Choate, Hall & Stewart, 53 State Street, Boston, MA 02109-2804 by facsimile on the above date.

Jack C. Schecter

02639/00509  364362.1

3

# Exhibit 10



125 SUMMER STREET BOSTON MA 02110-1618

T 617 443 9292 F 617 443 0004 WWW.BROMSUN.COM



JACK C. SCHECTER
T 617 443 9292 x281
JSCHECTER@BROMSUN.COM

February 7, 2005

**VIA FACSIMILE**

Paul E. Bonanno, Esq.
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA 02109-2804

Re    *ScanSoft, Inc. v. Voice Signal Technologies, Inc., et al.,* Docket No. 04-10353(PBS)
      Our File    2639/509

Dear Paul:

Enclosed, please find objections to the document subpoena, dated February 1, 2005, seeking the production of documents by Mr. Fadi Kaake.

As for the scheduling of Mr. Kaake's deposition, Mr. Kaake is traveling on February 14, 2005 and is therefore unavailable on that date. We are coordinating with Mr. Kaake and will propose an alternative date shortly.

Sincerely,

Jack C. Schecter

02639/00509  36272R.1

ATTORNEYS AT LAW

# Exhibit 11

125 SUMMER STREET  BOSTON MA 02110-1618

T 617 443 9292  F 617 443 0004  WWW.BROMSUN.COM

**BROMBERG + SUNSTEIN LLP**

JACK C. SCHECTER
T 617 443 9292 x281
JSCHECTER@BROMSUN.COM

March 3, 2005

## VIA FACSIMILE AND FIRST CLASS MAIL

Paul E. Bonanno, Esq.
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA 02109-2804

Re  *ScanSoft, Inc. v. Voice Signal Technologies, Inc., et al.,* Docket No. 04–10353(PBS)
    Our File  2639/509

Dear Paul:

I write in response to your letter of February 25, 2005 regarding the Samsung VGA 1000 cell phone purchased by Michael Phillips and regarding the scheduling of depositions..

First, with respect to Mr. Phillips' VGA 1000 cell phone, ScanSoft is currently investigating whether any documents relating to Mr. Phillips' purchase of the VGA 1000 cell phone exist. To the extent such documents do exist and are non-privileged, they will be produced in response to Voice Signal's document request nos. 22, 23 and 27.

Second, ScanSoft is working with Mr. Kaake and Ms. McCann to determine their availability in response to Voice Signal's deposition notices. ScanSoft will work cooperatively with Voice Signal to make these witnesses available for deposition in conjunction with Voice Signal's reciprocal efforts to arrange dates certain for the depositions of the witnesses that ScanSoft has noticed, including Messrs. Gillick, Roth (Robert), Yamron, Grabherr, Pantzarr, Lazay, and Roth (Dan). Of course, in order to avoid having to recall the deponents, as ScanSoft will be forced to do with both Mr. Cohen and Voice Signal's Rule 30(b)(6) designee, the depositions of the individuals noticed by ScanSoft will have to be scheduled for dates following a full and complete response by Voice Signal to ScanSoft's document requests.

Paul Bonanno, Esq.
Choate, Hall & Stewart
March 3, 2005
Page 2

Please let me know when Voice Signal will provide the discovery called for in ScanSoft's outstanding document requests and as required by the Court's Orders, and please provide suggested dates for the depositions noticed up to this point.

Sincerely,

Jack C. Schecter

02639/00509 368394.1