UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

RECEIVED

MAR 0 3 2005

BROMBERG & SUNSTEIN

| | |
|---|---|
| ———————————————— ) | |
| ) | |
| SCANSOFT, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 04-10353-PBS |
| ) | |
| VOICE SIGNAL ) | |
| TECHNOLOGIES, INC., ) | |
| LAURENCE S. GILLICK, ) | |
| ROBERT S. ROTH, ) | |
| JONATHAN P. YAMRON, ) | |
| and MANFRED G. GRABHERR, ) | |
| ) | |
| Defendants. ) | |
| ———————————————— ) | |

DEPOSITION OF JORDAN R. COHEN, a witness called
by and on behalf of the Plaintiffs, taken pursuant to
the applicable provisions of the Federal Rules of
Civil Procedure, before Dana Welch, CSR, Registered
Professional Reporter, and Notary Public, in and for
the Commonwealth of Massachusetts, at the offices of
Bromberg & Sunstein, 125 Summer Street, Boston,
Massachusetts, on February 28, 2005, commencing at
10:04 a.m.

Job No.: 2651                          ORIGINAL

Page 2

```
 1    APPEARANCES:
 2    For the Defendants:
 3          CHOATE, HALL & STEWART, P.C.
            Exchange Place
 4          53 State Street
            Boston, Massachusetts  02109
 5          (617) 248-5000
            By:  Paul D. Popeo, Esq.
 6
      For the Plaintiff:
 7
            BROMBERG & SUNSTEIN, LLP
 8          125 Summer Street, 11th Floor
            Boston, Massachusetts  02110-1618
 9          (617) 443-9292
            By:  Lee Carl Bromberg, Esq.
10          And: Lisa Fleming, Esq.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

1                          I N D E X

2

    WITNESS:   JORDAN R. COHEN              PAGE NO.

3

    EXAMINATION:

4

    By Mr. Bromberg                              4

5

6   Certificate of the Reporter              291

7

8                        E X H I B I T S

9   NO.         DESCRIPTION              PAGE NO.

10  (Exhibits attached to transcript.)

11  1 - Carlin E-mail (CV)                   160

12  2 - Agreement 2/3/99                     162

13  3 - Non-Competition Agreement 2/16/99   163

14  4 - E-mail 6/8/00                        167

15  5 - Press Release 4/3/01                 168

16  6 - EE Times Article 11/27/00            169

17  7 - U.S. Pat. Ap. 2004/0049388 A1        195

18  8 - PowerPoint 7/6/01                     206

19  9 - VOX PowerPoint '02                    231

20  10- Temporary Injunction                 237

21  11- 9/6/01 Press Release                 258

22  12- U.S. Pat. Ap. 2004/0073428 A1        264

23  13- U.S. Pat. Ap. 2004/0260547 A1        267

24  14- 12/29/04 Letter/Chart                270

Page 4

```
 1                    P R O C E E D I N G S

 2            (The United States passport number as

 3         identification of the deponent was noted

 4         for the record.)

 5    WHEREUPON,

 6                    JORDAN R. COHEN,

 7    having duly sworn or affirmed that his

 8    testimony would be the truth, the whole truth,

 9    and nothing but the truth, testified as

10    follows:

11                    DIRECT EXAMINATION

12    BY MR. BROMBERG:

13         Q.   Good morning, Mr. Cohen.

14         A.   Good morning.

15         Q.   Am I correct that you've had your

16    deposition taken only once before?

17         A.   Yes.

18         Q.   And it was in this case?

19         A.   Yes.

20         Q.   Okay.  Would you give me your

21    educational background, sir?

22         A.   I have a bachelor's degree from the

23    University of Massachusetts in electrical

24    engineering.  I have my master's degree from
```

Page 77

1      A.   Yes.

2      Q.   What were they?

3      A.   There was a microwave oven was the

4   demonstration.

5      Q.   Once the decision was made, Dr. Cohen,

6   to target the mobile handset market, what steps

7   were taken by VST to enter that market?

8          MR. POPEO:   Object to the form of the

9       question.

10         THE DEPONENT:   I'm not sure I know.

11      That wasn't -- that wasn't my purview

12      particularly.

13   BY MR. BROMBERG:

14      Q.   Did you have any involvement at all in

15   dealing with potential customers --

16      A.   No.

17      Q.   -- in that market?

18      A.   No.

19      Q.   Is that still true today?

20      A.   Yes.

21      Q.   Did you have involvement, sir, in the

22   -- well, let me back up and ask you a different

23   question.  While that activity was going on,

24   what were you doing?

Page 78

```
 1              MR. POPEO:  Objection.  But you can

 2         answer.

 3              THE DEPONENT:  I was looking at

 4         technology to see what was going on in the

 5         world.  I was identifying interesting

 6         people.  I was looking at new markets.  I

 7         think that's -- that's a fair summary of

 8         what I was doing.

 9    BY MR. BROMBERG:

10         Q.  Are those activities, Dr. Cohen,

11    congruent with your job responsibilities as

12    chief technology officer?

13              MR. POPEO:  Objection to form.  You can

14         answer the question.

15              THE DEPONENT:  It's a subset.

16    BY MR. BROMBERG:

17         Q.  What else do you do as chief technology

18    officer?

19         A.  I encourage people to write patent

20    disclosures; I discuss with the government our

21    mutual interests; that's probably a pretty good

22    set.

23         Q.  Does VST have government sponsored

24    research projects?
```

Page 81

```
 1        Q.   Does it meet from time to time?

 2        A.   Yes.

 3        Q.   What does it do when it meets?

 4        A.   We discuss ideas for inventions.

 5        Q.   Does VST have a policy for written

 6   invention disclosures?

 7             MR. POPEO:  Object to the form.

 8             THE DEPONENT:  We encourage them.

 9   BY MR. BROMBERG:

10        Q.   Is there a form for doing that?

11        A.   No.

12        Q.   Is there any written policy that

13   company employees can refer to to determine

14   when or if they ought to write up an invention

15   disclosure and what to do with it once they've

16   written it up?

17             MR. POPEO:  Objection to form.

18             THE DEPONENT:  No.  There's general

19        guidance in the employee's employment

20        agreement, that's all.

21   BY MR. BROMBERG:

22        Q.   Okay.  You mentioned that you look at

23   technology in the world and you identify new

24   markets and you identify interesting people,
```

Page 82

```
 1    correct?

 2        A.   Yes.

 3        Q.   Is that all from a technical

 4    perspective?

 5            MR. POPEO:  Object to the form.

 6            THE DEPONENT:  At that level, technical

 7        and business merge.  So I would say it's

 8        from a broader perspective than that.

 9    BY MR. BROMBERG:

10        Q.   When you first came to Voice Signal

11    Technologies, did you play any role in

12    recruiting new people to come to work at Voice

13    Signal?

14            MR. POPEO:  Object to the form of the

15        question.

16            THE DEPONENT:  My role was to identify

17        people.

18    BY MR. BROMBERG:

19        Q.   Okay.  Did you identify people from

20    Dragon?

21            MR. POPEO:  Object to the form of the

22        question.

23            THE DEPONENT:  I think the Dragon

24        people were well-known to VST.
```

Page 83

1    BY MR. BROMBERG:

2        Q.   When you say your role was to identify

3    people, what do you mean by identify people,

4    Dr. Cohen?

5            MR. POPEO:   In general or with respect

6        to the last question?

7            MR. BROMBERG:   In respect to this

8        activity of identifying interesting people.

9            THE DEPONENT:   I would -- I talk to

10       many people in the industry.   I always had

11       my eye out for interesting graduate

12       students and interesting people who are

13       leaving jobs.   And I would give that kind

14       of information basically to Dan Roth.   And

15       he would pursue them if he was interested.

16   BY MR. BROMBERG:

17       Q.   Did you tell Dan Roth that Larry

18   Gillick was an interesting person to pursue?

19           MR. POPEO:   Object to the form of the

20       question.

21           THE DEPONENT:   At some point, I did.

22   BY MR. BROMBERG:

23       Q.   Did you tell Dan Roth that Robert Roth

24   was a good person to pursue?

```
 1            MR. POPEO:  Object to the form of the

 2        question, and particularly the manner in

 3        which it's been asked.  But if it's

 4        susceptible to a meaningful answer as

 5        asked, you can answer.

 6            THE DEPONENT:  I don't know that I can

 7        answer.  I'm sure at some point I answered

 8        a query from Dan Roth about Robert Roth.

 9    BY MR. BROMBERG:

10        Q.  Okay.  And so you recall receiving a

11    query from Dan Roth about Robert Roth?

12        A.  I'm sure that that happened.

13        Q.  What was your response to that query?

14        A.  Robert Roth is a very smart guy and I'm

15    sure I supported Dan in engaging him.

16        Q.  By engaging, you mean bringing him to

17    work at VST?

18            MR. POPEO:  Objection.

19    BY MR. BROMBERG:

20        Q.  Or just contacting him?

21        A.  I mean discussing things with him.

22        Q.  Okay.  By discussing things with him,

23    do you mean your encouraging Dan Roth to talk

24    to Bob Roth about the possibility of coming to
```

Page 85

```
 1    work at VST?

 2         A.   That's not what I said.

 3         Q.   Well, what did you mean to say?

 4         A.   I said I'm sure I answered queries from

 5    Dan Roth about Bob.

 6         Q.   And do you recall encouraging Dan Roth

 7    to speak to Bob Roth?

 8              MR. POPEO:   Object to the form of the

 9         question.

10              THE DEPONENT:   I'm sure that was my

11         response.

12    BY MR. BROMBERG:

13         Q.   Okay.  And what would be the purpose

14    for Dan Roth speaking to Bob Roth?

15              MR. POPEO:   What did Dan Roth tell him?

16    BY MR. BROMBERG:

17         Q.   Well, your understanding.

18         A.   Dan was always looking for interesting

19    people for Voice Signal as it grew.

20         Q.   Okay.  So Voice Signal was a growing

21    company, correct?

22         A.   Yes.

23         Q.   And it needed talented speech

24    recognition people, among other things?
```

```
 1     A.  Sure.

 2     Q.  And Bob Roth fit that profile?

 3     A.  Yes.

 4     Q.  And that's what you told Dan Roth when

 5  he asked you about Bob Roth?

 6         MR. POPEO:  Object to the form of the

 7     question; mischaracterizes.

 8         THE DEPONENT:  I'm sure I would have

 9     told him that Bob Roth is a very smart guy.

10  BY MR. BROMBERG:

11     Q.  And that you supported Dan Roth

12  engaging Bob Roth?

13         MR. POPEO:  Same objection.  If you

14     remember the content of the conversation,

15     you can testify about it.  You needn't

16     adopt what he said, if you don't remember.

17         THE DEPONENT:  I don't remember the

18     details of that conversation.

19  BY MR. BROMBERG:

20     Q.  Okay.  Do you remember in general?

21     A.   In general, when we were discussing

22  bright people, I encouraged Dan to think about

23  them as potential employees.

24     Q.   That would include Bob Roth?
```

Page 87

```
 1         A.   That would include Bob Roth.

 2         Q.   That would include Larry Gillick?

 3         A.   I'm sure that's true.

 4         Q.   How about Jonathan Yamron?

 5         A.   He falls into the category of bright

 6    people.

 7         Q.   So your previous answers would apply in

 8    his case as well?

 9         A.   Yes.

10         Q.   And in the -- how about Manfred

11    Grabherr?

12         A.   What's the question now?

13         Q.   Did you encourage Dan Roth to speak to

14    Manfred Grabherr about employment at VST?

15              MR. POPEO:  Object to the form of the

16         question.  You may answer the question.

17              THE DEPONENT:  No.

18    BY MR. BROMBERG:

19         Q.   Did you know Manfred Grabherr before he

20    came to VST?

21         A.   I did not.

22         Q.   Did you come to know him once you got

23    there?

24         A.   I did.
```

```
 1                  C E R T I F I C A T E

 2           I, Jordan Cohen, do hereby certify that

 3    I

 4    have read the foregoing transcript of my

 5    testimony,

 6    given on February 28, 2005, and I further

 7    certify that said transcript is a true and

 8    accurate record of said testimony (with the

 9    exception of the corrections listed below):

10    Page   Line         Correction

11

12

13

14

15

16    Dated at _____, this _____

17    day of _____, 2005.

18

19                       _____
                              Jordan Cohen

20

      SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

21

22

23

24    duw
```

Page 291

```
 1                        CERTIFICATE

 2

     COMMONWEALTH OF MASSACHUSETTS

 3   SUFFOLK, SS

 4        I, Dana Ulrich Welch, Registered

 5   Professional Reporter and Notary Public in and

 6   for the Commonwealth of Massachusetts, do

 7   hereby certify:

 8        That JORDAN COHEN, the witness whose

 9   deposition is hereinbefore set forth, was duly

10   sworn by me and that such deposition is a true

11   record of my stenotype notes taken in the

12   foregoing matter, to the best of my knowledge,

13   skill and ability.

14        IN WITNESS WHEREOF, I have hereunto set

15   my hand this 3rd day of March, 2005.

16

17            DANA ULRICH WELCH
              _____
              Dana Welch, CSR, RPR

18            Registered Professional Reporter

19

20

21

22

23

24
```