# Exhibit 1

# Foster Transcript Excerpts

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SCANSOFT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-10353-PBS |
| | ) | |
| VOICE SIGNAL | ) | |
| TECHNOLOGIES, INC., | ) | |
| LAURENCE S. GILLICK, | ) | |
| ROBERT S. ROTH, | ) | |
| JONATHAN P. YAMRON, | ) | |
| and MANFRED G. GRABHERR, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEPOSITION OF PETER J. FOSTER, a witness called
by and on behalf of the Defendants, taken pursuant to
the applicable provisions of the Federal Rules of
Civil Procedure, before Dana Ulrich Welch, CSR,
Registered Professional Reporter, and Notary Public,
in and for the Commonwealth of Massachusetts, at the
offices of Choate, Hall & Stewart, 53 State Street,
Boston, Massachusetts, commencing at 10:13 a.m.

Job No.: 2196

ORIGINAL

Page 2

```
 1   APPEARANCES:
 2   For the Defendants:
 3        CHOATE, HALL & STEWART, P.C.
          Exchange Place
 4        53 State Street
          Boston, Massachusetts  02109
 5        (617) 248-5000
          By:  Sarah Chapin Columbia, Esq.
 6        And:  Paul E. Bonanno, Esq.
 7
     For the Plaintiff:
 8
          BROMBERG SUNSTEIN, LLP
 9        125 Summer Street
          Boston, Massachusetts  02110-1618
10        (617) 443-9292
          By:  Robert M. Asher, Esq.
11        And: Jack C. Schecter, Esq.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                    I N D E X

 2

        WITNESS:  PETER J. FOSTER              PAGE NO.

 3

        By Ms. Columbia                             4

 4

 5      Certificate of the Reporter             148

 6

 7

 8

 9                  E X H I B I T S

10      NO.          DESCRIPTION              PAGE NO.

11

12      1 - Patent No. 5,297,183                18

13      2 - Patent No. 5,659,597                18

14      3 - Patent No. 6,501,966 B1             18

15      4 - Patent No. 6,157,848                18

16      5 - Uniden Voice Dial Operating Guide   44

17      6 - Dr. Helms Article Speech Tech '86   57

18      7 - Amendment to License Agreement

19            with Cover Letter 1/13/05         88

20      8 - Subpoena                            89

21      9 - 5/28/04 Letter re: Assignment Document  102

22      10 - VCS Article 9/15/98               113

23

24
```

```
 1                    P R O C E E D I N G S

 2           (The Texas driver's license number as

 3        identification of the deponent was noted for the

 4        record.)

 5    WHEREUPON,

 6                         PETER J. FOSTER,

 7    having duly sworn or affirmed that his testimony

 8    would be the truth, the whole truth, and nothing but

 9    the truth, testified as follows:

10              .              DIRECT EXAMINATION

11    BY MS. COLUMBIA:

12        Q.  Good morning, Mr. Foster.  My name is Sarah

13    Columbia.  I'm here with my colleague, Paul Bonanno.

14    We represent Voice Systems Technology in a lawsuit

15    between Voice Systems Technologies and ScanSoft.

16    Are you familiar generally with that lawsuit or the

17    fact of that lawsuit?

18        A.  Fact of that lawsuit.

19        Q.  Have you ever had your deposition taken

20    before, sir?

21        A.  Yes.

22        Q.  Was it in a commercial litigation context;

23    that is, a lawsuit between businesses or some other

24    context?
```

1    Control Systems.  Is it fair, based upon your

2    testimony, that other than during the time you were

3    at Voice Control Systems, you were not involved

4    professionally with speech recognition technology?

5         A.  No.  Because of Philips, but --

6         Q.  Quite right.  Because there's a stretch at

7    the end of Voice Control Systems when you were at

8    Philips Speech.

9              So if I change my question to say other

10   than the stretch from 1985 through the end of 2000,

11   that included both Voice Control Systems and Philips

12   Speech Systems, that with the exception of those

13   years, your professional involvement did not involve

14   speech recognition technology?

15        A.  That's right.

16        Q.  Were you one of the founders of Voice

17   Control Systems?

18        A.  No.

19        Q.  When was Voice Control Systems founded; do

20   you know?

21        A.  No.

22        Q.  What caused you to go to work there?

23        A.  A business acquaintance through the U.S.

24   Tel period made an investment in the company and

1    recruited me to run the company.

2         Q.  And so what was your job there or what were

3    your jobs over the period of time with Voice Control

4    Systems?

5         A.  CEO or an equivalent.  When I first joined

6    the company, it was a partnership.

7         Q.  Okay.  And roughly what was the size of the

8    company when you first joined in 1985?

9         A.  17 people, give or take.

10        Q.  Was Mr. Schalk already with Voice Control

11   Systems when you joined in 1985?

12        A.  Dr. Schalk was there.

13        Q.  Pardon me.  Dr. Schalk.  And is it Mr.

14   Bareis or Dr. Bareis or Bareis?

15        A.  At the time, it was Mr. Bareis.

16        Q.  Okay.

17        A.  I'm not sure at this stage.  He may have

18   gotten his -- I don't remember.

19        Q.  Okay.  Was he at the company when you

20   joined?

21        A.  No.

22        Q.  When did he come on board?

23        A.  I don't remember.

24        Q.  And describe for me, if you would, and

 1    please, if it changed over time, tell me how it

 2    changed, what your responsibilities and role were at

 3    Voice Control Systems from 1985 through 1999?

 4         A.   That's a hard question.

 5         Q.   Well, we can break it down, if that's

 6    easier.

 7         A.   Well, in this way.  In a small company, as

 8    CEO, I was responsible for everything from turning

 9    the lights on in the morning to making the coffee,

10    you know, to the partnership agreements.

11         Q.   Uh-huh.

12         A.   But in general, I was responsible for the

13    strategy of the company; funding the company; making

14    payroll; managing the board; I mean, literally soup

15    to nuts.  And in that sense, it didn't change, even

16    during my entire tenure.

17         Q.   Okay.  When you first joined, was there a

18    board?

19         A.   Again, it was a partnership.

20         Q.   Okay.

21         A.   But we had a group of people that

22    functioned as a board because the intent was to

23    become -- you know, to incorporate.

24         Q.   Yes.

1    dialing in a wireless environment.

2        Q.  What was your contribution to the overall

3    invention, understanding that it had many

4    subinventions to it.

5        A.  I don't remember the whole -- I'm sure

6    there's various aspects of it.  But remembering that

7    this was, you know, 13, 15 years ago.  Starting with

8    let's go after this market.  Determining the

9    requirements; you know, in advance of the invention.

10   In other words, what are you trying to do.  A lot of

11   the human factors; a lot of the telecommunications

12   strategy and overall systems design; the testing,

13   some of the testing for it; what are the -- maybe

14   that's requirements.  But you know, when is it

15   successful; when is it not successful.

16           Boy, just little bits and pieces.  Things

17   as simple as timers; where does one set timers.  I

18   had a lot of experience in telecommunications and so

19   brought that expertise to the situation, a lot of

20   experience with phones and switching systems.

21           So I mean, the three of us were, it wasn't

22   you just do this and you just do this and me just do

23   that.  I mean, we had primaries.  Tom, Dr. Schalk

24   was primarily responsible for the speech

1    recognition, but he also contributed heavily and in

2    some cases lead to the -- lead contributor to the

3    human factors.  Mr. Bareis also had switching

4    experience from a previous career and

5    telecommunications experience and he was primarily

6    in the hardware development.

7          But we would meet and collaborate on -- on,

8    you know, as a committee on most -- on where these

9    things came together.  And actually, critiqued is

10   probably too strong a word, but looked for holes in

11   the areas where someone else had the prime

12   responsibility.  So it was a pretty good

13   collaboration.

14        Q.   Okay.  When did Mr. Bareis join the

15   company?

16        A.   I don't remember.

17        Q.   I may have asked you that.

18        A.   After me.

19        Q.   Sorry.

20        A.   Yeah.

21        Q.   When approximately did the three of you

22   begin this collaborative process which resulted in

23   the invention that's described in this family of

24   patents?

1        A.  I don't really remember.

2        Q.  Do you remember if I -- the first patent

3   application was filed in April of 1992.  Can you

4   tell me, we started two years before that, five

5   years before that?  I assume it's a number of years

6   to develop this technology, but I may be wrong.

7        A.  Yeah, this invention -- let me answer it

8   this way:  We got together with patent counsel and

9   learned about patents because none of us were

10  experts in it.  And had to go through, jump through

11  some steps with the patent attorney to determine

12  what inventions were not accomplished prior or, you

13  know, too early in the process.  I don't even

14  remember how long that was.  I think it was a year.

15  I might be wrong.

16        But we went through things like we had to

17  produce marketing documents to show him of all our

18  products and -- maybe not all of them, but anything

19  relevant, you know, so that we could sort of bound

20  this and determine where we could start with the

21  invention.

22        It was my opinion we had patentable

23  technology of other ilks, other inventions, let's

24  say, that we chose not to patent earlier.  So

1    there's this continuum of what we're doing.

2         But it centers around the inventions that

3    we made that went into the McCaw cellular voice

4    dialing system; that was the trigger that caused us

5    to say, well, this stuff is now getting out.  That

6    was a commercial product, you know, something that

7    the average person I think would think is

8    commercial.  We sold it.  They put it into general

9    use among their wireless customers in Dallas, Texas.

10        Q.  Okay.

11        A.  So we, you know, we thought we'd patent it.

12   We went back and looked at any number of inventions

13   that we had, figured out the ones that were possible

14   or let's say, the aspects of this that were possible

15   to protect with patent, with a patent law and dealt

16   with those in these patents.  And the core of it is,

17   you know, voice dialing in this wireless

18   environment.

19        Q.  Okay.  And the patent counsel that you

20   referred to, was that Mr. Judson at the time?

21        A.  David Judson, yes.

22        Q.  Putting aside -- we'll get back to the

23   materials you've collected up for your patent

24   counsel.  So putting those aside and focusing

```
 1    instead on the collaborative work that you did in

 2    advance of that to develop the invention itself,

 3    were there lab notebooks or meeting notes or

 4    engineering notes or anything of that sort created

 5    contemporaneous with that work?

 6         A.   You know, I just don't remember.  I didn't.

 7    But my personality is such that I don't like to

 8    write a lot of stuff down.  I'm more of a sales guy,

 9    in that aspect of things.  So I don't remember any.

10         Q.   Okay.

11         A.   And I know I didn't do anything, for sure.

12         Q.   Okay.  One of the things you said when I

13    asked what your role was in the development of the

14    inventions that are described in this family of

15    patents was that you -- I'm trying to think how you

16    said it.  So I may not use the right words, but that

17    you were responsible for sort of seeing this market

18    opportunity or seeing it as a market that Voice

19    Control Systems wanted to try to be in.  Is that

20    fair?

21         A.   Yes.

22         Q.   And I take it from your earlier testimony,

23    you would have been the guy who approved putting

24    resources into developing this technology, correct?
```

```
 1    and VCS, part.  I had to help them figure out how

 2    much they would charge because they didn't know much

 3    about the development side.

 4         Q.  Gotcha.  Okay.

 5         A.  So we worked very closely.  It was in our

 6    best interest for them to be successful.  They were

 7    -- I think they were the only distributor we had.

 8    I'm almost certain.  And -- does it have a picture?

 9         Q.  There's a picture on the front cover of the

10    unit.

11         A.  Oh, yeah, okay.  Good.  This voice dialer

12    was this piece in the middle here.

13         Q.  Okay.  Could you do me a favor, Mr. Foster,

14    since this is not very visual, just put a circle

15    with this blue pen on Exhibit 5 around the piece

16    that you just described as being the voice dialer.

17         A.  It's hard to see because of the xerox, but

18    generally in the middle.

19         Q.  Could you just write "voice dialer" there?

20         A.  Okay (indicating).

21         Q.  And do you know, did Uniden, in fact,

22    purchase the voice dialer from the combination of

23    By-Word and Voice Control Systems?

24         A.  When you say purchase, that's broad.
```

1          Q.   Okay.

2          A.   I mean, our technology was in it.   I don't

3     remember what they bought from whom.

4          Q.   How did you get paid?

5          A.   That's the part I don't remember.   Yeah, I

6     don't remember.   I don't know if it was a broad

7     license, a per unit license.   I don't even know.   We

8     could have built the hardware.   I just don't

9     remember.

10         Q.   Okay.   Do you remember whether Uniden then

11    marketed and sold this product that's reflected on

12    the front page of Exhibit 5?

13         A.   Yes, they did.

14         Q.   Okay.   Do you remember approximately when

15    Uniden, when this product was complete and when

16    Uniden began to offer it to the marketplace?

17         A.   No.

18         Q.   Do you remember what year?

19         A.   No.

20         Q.   Were you involved -- I think you said you

21    were involved in arbitrating the specifications.

22    What does that mean?

23         A.   Uniden's expectations were in excess of

24    what could be delivered.

1        Q.  So these were the front end specifications

2    for agreeing ahead of time what it was that the

3    combined By-Word/Voice Control Systems entity was

4    going to deliver?

5        A.   That's correct.

6        Q.   Did you have any involvement in reviewing

7    or commenting on this operating guide for the Uniden

8    phone which is Exhibit 5?

9        A.   I don't remember.

10        Q.   Did you have any involvement in testing the

11    Uniden phone that's shown in Exhibit 5?

12        A.   Again, I don't -- I don't remember.

13        Q.   Did you buy one or have one in your car?

14        A.   No.

15        Q.   Do you know if anybody at Voice Control

16    Systems had one?

17        A.   I don't remember.

18        Q.   Okay.  Did Voice Control Systems develop a

19    voice dialer for any other development manufacturer,

20    that is, the type of voice dialer that would be

21    compatible with a cell phone along the lines of

22    what's shown in Exhibit 5?

23        A.   You got to break that down into parts.

24        Q.   Okay.  Well, let me start with the broad

1    and, you know.

2         Q.  We're glad you're here today.

3         A.  Well, I couldn't miss the cold.  I needed a

4    change, you know.

5         Q.  This is actually, we're having a heat wave

6    today.

7         A.  Yeah, I heard that.  Tonight we're going to

8    get back to normal.

9         Q.  When you went to visit with Bill Opet at

10   McCaw --

11        A.  Well, at MetroCell.

12        Q.  At MetroCell.  Pardon me.

13        A.  No.  It's all --

14        Q.  I got it.  Was anybody in the industry at

15   that time, to your knowledge, were any of the

16   cellular companies offering voice recognition as a

17   service?

18        A.  Oh, god, no.  No one thought you could do

19   it.

20        Q.  So this was something new that you were

21   presenting to him.  Okay.

22        A.  Even some of us didn't think we could do

23   it, especially those that had to do it.

24        Q.  Okay.

1        A.  But I had confidence they could.

2        Q.  So the concept you were selling to McCaw

3   was that this would be voice recognition service

4   that would not be in the customer's handset but

5   rather be at some location --

6        A.  Right.

7        Q.  -- that was managed by MetroCell or McCaw

8   or somebody on their behalf?

9        A.  Right.

10       Q.  That would handle the voice recognition and

11  dialing features --

12       A.  Right.

13       Q.  -- that people need to be able to --

14       A.  Accomplish it.

15       Q.  -- accomplish it?

16       A.  Yes.

17       Q.  As of that time, had Voice Control Systems

18  built something that could do that or --

19       A.  I think --

20       Q.  -- or were you looking --

21       A.  I think I was a little out in front of it

22  myself.  We sure were looking for that up front

23  development money.

24       Q.  I take it you made a deal somewhere along

1    the way with MetroCell or McCaw?

2        A.  Yeah.

3        Q.  Tell me what that deal was.

4        A.  Again, I don't remember the specifics.

5        Q.  Okay.

6        A.  I think there was an up front number.  And

7    we agreed to develop an intelligent peripheral was

8    the term of art, in other words, a box that sat next

9    to the switch.

10       Q.  Next to the cellular service providers'

11   switch?

12       A.  Wireless, yes.  To accomplish voice

13   dialing.

14       Q.  Okay.  And if I heard you correctly, there

15   was some up front money to do --

16       A.  I think so.  I sure hope.

17       Q.  -- to do some development work?

18       A.  Yeah..

19       Q.  And then after that, was it a license

20   agreement?

21       A.  No.  We supplied boxes.  I mean, the

22   agreement was, the thought was that we would supply

23   boxes.

24       Q.  Okay.  And did you, in fact, supply boxes

1    to MetroCell?

2         A.   We supplied a box.  And then as it became

3    more apparent that it was going to be successful,

4    they felt they needed a company with more substance

5    to service them; they couldn't be dependent on a

6    very small, techy company; so we partnered with

7    Brite Voice Systems and the subsequent boxes were

8    built by Brite Voice Systems.

9         Q.   So you supplied the first box?

10        A.   Yeah.

11        Q.   Okay.  And was that a box that actually sat

12   next to a real live MetroCell switch?

13        A.   Yes.

14        Q.   And performed voice recognition and voice

15   dialing?

16        A.   Yes.

17        Q.   Do you remember when you supplied that

18   first box?

19        A.   No.  Sometime before, you know, just before

20   they started offering the service; but I don't

21   remember the exact dates.

22        Q.   Okay.  And then when you changed the

23   structure of the agreement to work with Brite Voice

24   Systems, did you then license the technology and

1    Brite Voice built the boxes?

2        A.  Yes.  Well, again, technology is a broad

3    word.  Brite had -- Brite's business was building

4    these intelligent peripherals.  And they had looked

5    at speech recognition, as one of their customers

6    were banks and that was a place, you know, put in

7    your account number, enter your account number by

8    voice for people with rotary phones.  So they really

9    had all that technology.  And again, without

10   knowing, they might just have licensed from us the

11   application.

12       Q.  Okay.

13       A.  Oh, and the speech algorithms.  But

14   technology being the broad word, if we shrink it

15   down to, I would say that they licensed at least the

16   voice dialing application and all that that entails,

17   the voice dialing application technology.

18       Q.  Okay.

19       A.  I don't know that they -- there was some --

20   they used boards that we built.  But they were using

21   those before for the banking.  And that went through

22   another, you know, circuitous route to get to them.

23   And they licensed -- we had some kind of royalty

24   arrangement that circumvented the normal thing and

1    it was all rolled together.

2         But specifically they licensed the voice

3    dialing technology and they paid us a lot of money

4    up front for that as I recall.

5         Q.  Brite?

6         A.  Brite did, yeah.  Hundreds of thousands.

7    And they paid us an ongoing royalty for what

8    essentially became this patent.  And as memory

9    serves me, the patent hadn't issued yet.  And so I

10   don't remember how it was worded, but it had to be

11   worded very carefully to protect us in either case;

12   well, what if it issues, well, what if it doesn't

13   issue.

14        Q.  The agreement itself?

15        A.  Yeah.  But it was clearly this technology.

16   I mean, we told them we had a patent application

17   pending and, you know, they had to put something, if

18   it's granted, then blah, blah, blah; if not, then,

19   blah, blah, blah.

20        Q.  Did you share with them the patent

21   application as your description of the technology?

22        A.  No.  I don't think we were supposed to do

23   that until after the thing was granted.

24        Q.  Based on your memory then, did the license

```
 1              MR. ASHER:  Okay.  Go ahead.
 2              THE DEPONENT:  She was telling me that, you
 3         know, I was going, you know, I was -- had some
 4         obligation to participate because of the
 5         assignment agreement.  And is this a copy.
 6         Yeah, she sent me the assignment.  I said okay,
 7         let me see what I signed.  I sure don't have a
 8         copy of it.
 9    BY MS. COLUMBIA:
10         Q.  Okay.  Did she say in this conversation on
11    May 28th what sort of participation she was looking
12    for?
13         A.  Yes.
14         Q.  And what did she tell you about that?
15         A.  She asked me to be a consultant.
16         Q.  And did she tell you what that would
17    entail?
18         A.  Generally.
19         Q.  What did she say?
20         A.  You know, it would take some time to review
21    things, possibly a deposition.
22         Q.  Okay.
23         A.  Well, actually, she didn't -- the
24    deposition was -- I asked her how much time would
```

1    this whole thing take of mine and she was saying,

2    well, because of this, you know (indicating), I

3    probably would be deposed, but that was going to

4    happen whether or not I was a consultant.  So she

5    asked me if I could be a consultant for ScanSoft.

6        Q.  Okay.  And did you, in fact, agree to be a

7    consultant for ScanSoft in connection with the

8    litigation?

9        A.  Yes.

10       Q.  And did you reach an agreement by which

11   you'd be paid to be a consultant for ScanSoft?

12       A.  Yes.

13       Q.  And are you currently being paid as a

14   consultant for ScanSoft?

15       A.  Yes.

16       Q.  And at what rate?

17       A.  $250 an hour for, you know, on-site time or

18   direct time, and then 40 percent discount off of

19   that if I had to travel.

20       Q.  Okay.  And what -- I don't want to know the

21   substance of what you've done as a consultant.  But

22   what types of tasks have you been asked to do?  So

23   don't tell me -- generically, I'm interested in the

24   types of tasks you've conducted as a consultant for

1    ScanSoft, but not in the substance of what you've

2    performed in those tasks.

3        A.   I'm kind of characterizing what we did that

4    led up to the patent, much as if I --

5            MR. ASHER:   I think -- excuse me.   But to

6        the extent you're going to explain the substance

7        of your discussions with the attorneys who had

8        retained you as a consultant, that's protected

9        by attorney work product privilege and I'd ask

10       you not to reveal that.   I think the question

11       just asks more generally whether you can

12       characterize generally what --

13   BY MS. COLUMBIA:

14       Q.   For example, were you asked to review the

15   family of patents that we've marked as Exhibits 1

16   through 4?

17       A.   No.

18       Q.   Were you asked to review the patent in

19   suit, the 966 patent?

20       A.   Yes.

21       Q.   Have you been asked, don't tell me what the

22   answer was, but have you been asked?

23       A.   Okay.

24       Q.   Have you been asked whether in your opinion

1    the Voice Signal Technology's voice recognition

2    product infringes the 966 patent?

3              MR. ASHER:  Objection.  I'm going to

4         instruct you not to answer.  That's privileged.

5         You're trying to find out what we said to him.

6              MS. COLUMBIA:  Well, I think he can answer

7         that yes or no.

8              MR. ASHER:  He might be able to answer it

9         yes or no.  But you're trying to put words in

10        his attorney's mouth and find out -- you can go

11        through a number of scenarios of what we asked

12        him with yes or no questions.  You're still

13        trying to find out what the attorneys had said

14        to him.

15    BY MS. COLUMBIA:

16        Q.  Have you, in connection with your

17    engagement as a consultant, had any access to Voice

18    Signal Technology's documents that describe their

19    technology?

20        A.  No.

21        Q.  Do you expect to be present in Boston,

22    Massachusetts to testify as a witness in the trial

23    in this case?

24        A.  I have no expectations.

```
 1       Q.  So it's not part of your consulting

 2  agreement that you will appear for trial?

 3       A.  No.  No.

 4       Q.  Have you prepared any sort of report as a

 5  result of your consulting activities for ScanSoft,

 6  written report?

 7       A.  No.

 8       Q.  You testified I think, very early on in the

 9  day about a process that you went through at Voice

10  Control.  I don't think you gave a date, but it was

11  a process of getting together with a patent

12  attorney.  I think you said it was Mr. Judson.  His

13  educating you a bit about the patent process and

14  looking at the technology that had been developed at

15  Voice Control Systems and making some determinations

16  about what of that technology should be patented,

17  could be patented, et cetera.  Understanding those

18  aren't your exact words, is that a fair

19  characterization?

20       A.  That's a generalization, yes.

21       Q.  Do you remember when you initiated that

22  process, when Voice Control Systems initiated that

23  process?

24       A.  No.
```

1        Q.  Do you remember what triggered it?

2        A.  Yeah.  It was triggered by me believing we

3    were going to get somewhere marketing to the

4    wireless folks.  In other words, that there was

5    going to be a product out there that was generally

6    known.  And knowing where we are and what we had to

7    do to get there, I wanted some way to protect it.

8            And it was difficult to protect it under

9    any other intellectual property protection.  And we

10   reluctantly -- or we had -- my strategy and I was

11   the chief IT strategist, along with everything else.

12       Q.  Among your many hats.

13       A.  Yeah.  Was okay, as a last resort, let's

14   patent it.  So I remembered Judson from some other

15   time and knew that he actually had done some speech

16   patents.  So I said well, at least we won't have to

17   train him.  And found out where he was and brought

18   him in.

19       Q.  And when you say -- I think you said it was

20   triggered by you were going to get somewhere in the

21   market with the wireless folk, is that --

22       A.  Service providers.

23       Q.  The wireless service providers?

24       A.  Uh-huh.

1    that was attached or inside the NEC phone.  You had

2    built a voice dialer for the Italtel phone and for

3    the Uniden phone.

4         What were the application challenges

5    specific to moving, I don't want to say moving

6    because that's probably wrong, but to having the

7    voice dialer at the central switch as opposed to in

8    the handset, which you had done to date?

9         MR. ASHER:  Objection.

10   BY MS. COLUMBIA:

11        Q.  Well, let me ask, were there challenges

12   associated with voice dialing application at the

13   central switch that were not present in the voice

14   dialing application in the handset or in the

15   cellular phone?

16        A.  I'd express it in a different way.

17        Q.  Okay.

18        A.  There was more to do and more you could do

19   and that's the key.

20        Q.  Okay.

21        A.  You didn't see tens of thousands of these

22   NEC phones running around.  And they didn't meet the

23   fundamental problem.  They were a nice algorithm

24   implementation and the application was terrible.

```
 1    People didn't use them.  Because of the ability to
 2    put it centrally, as opposed to having to replicate
 3    the hardware everywhere, you were afforded a cost
 4    savings per user that you couldn't even begin to
 5    approach in a phone.
 6          So we had failed at -- I mean, you know,
 7    the thing recognizes digits, big deal.  Nobody used
 8    it.  It was a pain in the rear end.  The only people
 9    who used it was somebody trying to impress somebody.
10    It wasn't safer because people didn't use it.
11          Once we got into being able to make it a
12    piece of the switch or of the network, you could
13    spend lots of money on hardware because it got
14    distributed across tens of thousands of customers.
15    So we were able to now really develop something
16    people could use from a cost perspective, which then
17    led to the challenges.  Okay?
18       Q.  Okay.
19       A.  Things like, how did you deal -- how do you
20    effectively deal with noise.  And I don't mean
21    steady state noise.  I mean, somebody tooting the
22    horn, PJ in the back seat saying, dad, in the middle
23    of me trying to talk to the thing, windshield wipers
24    being turned on, the radio going a little too loud;
```

1    I mean that's just one class of things.

2         Another class of things are the timeouts.

3    You couldn't have the -- most people in those days

4    were trying to do speech recognition with a digital

5    signal processor, which is an expensive class of

6    computer, very expensive, even more expensive in

7    terms of its memory system.  We had to deal with, I

8    think it was an Intel 8088 -- which was basically a

9    piece, an early, very early PC chip kind of thing --

10   because of the cost.

11        I mean, even then, phones were being given

12   away.  People wouldn't spend any more for a

13   peripheral to a phone, even to save their lives,

14   until afterwards.  I mean, it's just like today.

15   You go sign up for cellular service, you get a phone

16   for free or something like that.  And these things

17   were coming in at $300 retail.  You know, that was

18   insane.  So nobody -- didn't take off.  It was a

19   failure as a commercial product.  And as a speech

20   recognizer.

21        You didn't tell people this, but that's

22   what it was.  So with -- we could used whatever

23   computer, we could have used a Cray if we wanted to

24   at the central office because the cost was

1    distributed across thousands of people.

2              So then that let us do things like

3    nonstatic timing.  And what I mean by that is we had

4    to learn things about how people spoke digits in a

5    digit string and build intelligence around the

6    recognizer to interface with people -- you know,

7    it's a man machine interface -- which nobody knew

8    about, nobody had done.

9              We went out and finally bought a book about

10   how to interface it to -- how to interface this

11   intelligent peripheral to other parts, other

12   systems.  And they had sort of Bell standards for

13   land lines and then we had to adapt those to the

14   wireless environment.  There's timeout -- and

15   timeouts are a big one, believe it or not, for

16   regular phones.  How long you can sit there and not

17   dial anything and the dial tone either stays there

18   or it goes away.

19             Well, it's like, I don't know what it is,

20   30 seconds.  Well, you can't have an open microphone

21   for a speak recognizer for 30 seconds in a car;

22   sooner or later, the thing is going to think it

23   heard something, a bump in the road.  And especially

24   then, when the technology was very fragile.

```
1              So we had to do all that.  And that's, I
2    believe that's where most of the intelligence is in
3    these things, not in the speech recognition
4    algorithm.
5        Q.  Okay.
6        A.  But getting it back, pulling it back to, it
7    wasn't so much challenges afforded by the wireless
8    switch base, that's true, there were.  You had
9    another piece.  But that was more the recognizer
10   piece that was a challenge.  Because you had other
11   perturbations in the voice, in the speech; but that
12   was small compared to everything else.
13       Q.  The other things that hadn't been --
14       A.  Well, that would make a successful dialer.
15       Q.  Okay.  Going back to the voice dialers that
16   were developed for NEC, Uniden, the ones that were
17   hardware and software that were either inside the
18   handset or attached to the handset.  What, if you
19   recall, from the user's perspective, what was the
20   functionality, what could it do for me?  I heard
21   what you said about maybe it didn't do it as well as
22   I'd like, but when you -- what could it do for me?
23       A.  Well, it varied from one to another.
24       Q.  Are you able to distinguish in your mind,
```

```
 1    if I ask you about the NEC model, can you tell me

 2    what its functionality was and then we'll go through

 3    the others?

 4         A.   I think it was similar to the Uniden one,

 5    very similar to Uniden.

 6         Q.   So if I have the users manual from the

 7    Uniden one, it's fair to assume that its

 8    functionality from a user's perspective was the same

 9    or very similar to the others?

10         A.   I think that's fair.

11         Q.   Okay.  In terms of the functionality, that

12    is, what a user could do with it, not how well it

13    worked, but what I could do with it, is there any

14    difference between what I'll call the handset

15    models, the ones that were built early on for NEC

16    and Uniden and so forth, and the central switch

17    model?  Obviously, it's located in a different

18    place, but in terms of what I can expect it to do

19    for me, was there any difference?

20         A.   Yeah.

21              MR. ASHER:  Objection.

22              THE DEPONENT:  Oh, sorry.

23    BY MS. COLUMBIA:

24         Q.   What were the differences in functionality?
```

1     recognition type intelligence, as opposed to any

2     kind of peripheral intelligence, mainly because of

3     cost, you know, the processor wouldn't support it

4     because we didn't -- well, we couldn't, for price

5     reasons, use anything more than the 8088.  And the

6     memory systems, memory was more expensive than

7     processors these days and every line of code you

8     fought them.

9         Q.   Okay.

10        A.   I mean, there was arguments.  The 8088 was,

11    I think it was a 16-bit bus, but the Japanese were

12    using 4-bit buses for their controllers.  And they

13    thought we were absolutely insane.

14             So this was just a recognizer, these early

15    ones basically was just a recognizer and implemented

16    hardware and didn't work very well.  When I say it

17    didn't work very well, it didn't really do the job.

18    You know, trying to dial by digits was painful; even

19    I didn't do it and I was the president of the

20    company.  And it pained me.  I hated to demonstrate

21    it.

22        Q.   So it was architected to receive a command

23    and then to receive digits, but you're saying it

24    didn't work very well to do that?

1      A.   Right.

2      Q.   Because it didn't have the other

3  peripheral?

4      A.   Yeah.  We didn't have enough to work with.

5      Q.   Okay.

6      A.   I'm a big Thomas Edison fan because I was

7  born in West Orange, but it's kind of like having a

8  light bulb that didn't light.  You know, you could

9  call it a light bulb, but if it didn't light, what

10  good was it.  And we had a voice dialer that didn't

11  dial by voice.

12      Q.   So there was speech recognition software in

13  the system?

14      A.   Yeah.

15      Q.   That was set up to receive a command to

16  dial digits, correct?

17      A.   Yes.

18      Q.   And the voice recognition software was set

19  up to collect those digits when you spoke them and

20  then to cause those digits to be dialed, correct?

21      A.   Yes.

22      Q.   And similarly, it had, it was set up to

23  receive a command to dial a key word or by memory

24  using a two digit code, correct?

1        A.   Yes.

2        Q.   And it was set up to be able to recognize

3    that key word or that two digit code, associate it

4    with a telephone number and cause the phone to dial

5    that number, correct?

6        A.   Yes.

7        Q.   Okay.  And that was true of all these early

8    -- well, at least the Uniden system?

9        A.   And the NEC system, as well, because it was

10   -- this was based on that.

11       Q.   You've already said they were essentially

12   the same.

13       A.   Yeah.

14       Q.   So I understand that in practice, it didn't

15   work very well and maybe not at all; but it was --

16   all of the software was there to perform those

17   tasks, correct?

18       A.   Yes.

19       Q.   Okay.  So looking at that, and if you can

20   for a moment, focusing not so much on whether it

21   worked well or didn't work well, tell me if there's

22   any other difference in, when I say functionality,

23   things I could do with it.  So with the Uniden

24   system, I could dial digits by giving a command or I

 1    could dial a memory code and associate it with a

 2    number by giving it a command or I could dial using

 3    a key word.

 4         I think you've already told me that in the

 5    central switch system an added feature was that I

 6    could, through speaker dependence, I could -- well,

 7    you didn't say -- you just said it had speaker

 8    dependent voice recognition.  So what did that add

 9    from the user's perspective; what could I do with

10    that?

11    A.   Make your own words.  You could record

12    Peter Foster, instead of friend one or instead of

13    representing Peter Foster by memory 02.

14    Q.   So that's a difference in terms of the

15    options available to the user.  Was there anything

16    else by move -- in the central switch version, let

17    me say it that way?

18    A.   Well, there was this whole human interface

19    that wasn't here.

20    Q.   What do you mean by that?

21    A.   The human factors' software that made it an

22    application as opposed to a digit recognizer.

23    Q.   Okay.

24    A.   You know --