**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| SCANSOFT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-10353-PBS |
| | ) | |
| | ) | |
| VOICE SIGNAL TECHNOLOGIES, INC., | ) | |
| LAURENCE S. GILLICK, ROBERT S. | ) | |
| ROTH, JONATHAN P. YAMRON, and | ) | |
| MANFRED G. GRABHERR, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF WENDY S. PLOTKIN

Wendy S. Plotkin deposes and states as follows:

1.      I am an attorney in the law firm of Choate, Hall & Stewart, and a member of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts.  I am counsel to the above-named defendants and make this declaration in support of Voice Signal Technologies' Sur-Reply in Support of its Claim Construction Memorandum for U.S. Patent 6,501,966.

2.      Attached hereto as Ex. 1 is a true and correct copy of a portion of the deposition transcript of Thomas Schalk.

3944684v1

2

\*          \*          \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

<u>/s/ Wendy S. Plotkin</u>

Dated:  June 16, 2005

3944684v1

# Exhibit 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

———————————————    )
                     )
SCANSOFT, INC.,      )
                     )
        Plaintiff,   )
                     )
    v.               )    C.A. No. 04-10353-PBS
                     )
VOICE SIGNAL         )
TECHNOLOGIES, INC.,  )
LAURENCE S. GILLICK, )
ROBERT S. ROTH,      )
JONATHAN P. YAMRON,  )
and MANFRED G. GRABHERR, )
                     )
        Defendants.  )
                     )
———————————————    )


        DEPOSITION OF THOMAS B. SCHALK, a witness
called by and on behalf of the Defendants, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure, before Dana Ulrich Welch,
CSR, Registered Professional Reporter, and Notary
Public, in and for the Commonwealth of Massachusetts,
at the offices of Choate, Hall & Stewart, 53 State
Street, Boston, Massachusetts, on January 28, 2005,
commencing at 9:18 a.m.

Job No.: 2197                          ORIGINAL

```
 1     APPEARANCES:

 2     For the Defendants:

 3          CHOATE, HALL & STEWART, P.C.

            Exchange Place

 4          53 State Street

            Boston, Massachusetts   02109

 5          (617) 248-5000

            By:  Robert S. Frank Jr., Esq.

 6

 7     For the Plaintiff:

 8          BROMBERG & SUNSTEIN, LLP

            125 Summer Street, 11th Floor

 9          Boston, Massachusetts   02110-1618

            (617) 443-9292

10          And: Jack C. Schecter, Esq.

11
       Also Present:  Daniel Roth

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

1                           I N D E X

2

WITNESS:   THOMAS B. SCHALK                PAGE NO.

3

By Mr. Frank                                 4

4

Certificate of the Reporter                 245

5

6

7

8

9                         E X H I B I T S

10    NO.           DESCRIPTION                  PAGE NO.

11

12    1 - ComTel '85 Documents                      25

13    2 - Schalk Article                            30

14    3 - SpeechTech '86 Article                    54

15    4 - Uniden Voice Dial Operating Guide         91

16    5A- License Agreement                        133

17    5B- Amendment to License Agreement           133

18    6 - U.S. Patent 6,501,966 B1                 141

19

20

21

22

23

24

Page 4

1                    P R O C E E D I N G S

2              (The Texas driver's license number as

3         identification of the deponent was noted

4         for the record.)

5    WHEREUPON,

6                    THOMAS B. SCHALK,

7    having duly sworn or affirmed that his

8    testimony would be the truth, the whole truth,

9    and nothing but the truth, testified as

10   follows:

11             MR. FRANK:  I'm not quite sure what the

12        previous arrangement has been, but we're

13        prepared to stipulate that, although Mr.

14        Schalk should read and sign the deposition,

15        that it need not be -- his signature need

16        not be notarized.

17             And the only other agreement that I'd

18        ask is if there are no corrections after

19        30 days, that the deposition be deemed to

20        have been signed in its then current form.

21        Is that acceptable?

22             MR. SCHECTER:  That's acceptable.

23                    DIRECT EXAMINATION

24   BY MR. FRANK:

Page 5

1          Q.   Good morning, sir.  Tell us your name,

2    please.

3          A.   Thomas Barton Schalk.

4          Q.   Where do you live, Mr. Schalk?

5          A.   In Plano, Texas.

6          Q.   May I have the street address, please?

7          A.   6637 Muirfield Circle.

8          Q.   Are you presently employed?

9          A.   Yes.

10         Q.   By whom are you presently employed?

11         A.   ATX Technologies.

12         Q.   What is your position at ATX

13    Technologies?

14         A.   I'm vice-president of voice technology.

15         Q.   And as vice-president of voice

16    technology, what are your duties, just in

17    general?

18         A.   I lead the voice automation team.

19         Q.   Would you describe your educational

20    background beginning with college?

21         A.   I attended George Washington University

22    and graduated in 1973 with an EE in -- or a BS

23    in electrical engineering.

24              And then I went to graduate school at

Page 159

1    you to train it, you would instead attempt to

2    dial or play back the phone number pending.

3        Q.  So if you said a key word like "home"

4    or "office," it would determine whether there

5    was a previously stored telephone number

6    associated with that word.  And if it

7    determined that there was such a phone number,

8    it would then pass that phone number off --

9        A.  It would attempt to dial whatever was

10   programed in association with the target

11   designations like "home," "office" and so

12   forth.

13       Q.  And is it correct that the Uniden

14   system included or employed a speech

15   recognition method?

16           MR. SCHECTER:  Objection.

17           THE DEPONENT:  A speech recognition.  A

18       speech recognizer was used in the Uniden

19       phone that's described in the operating

20       guide.

21   BY MR. FRANK:

22       Q.  Okay.  Is it correct that the Uniden

23   phone utilized, and to be fair, I should point

24   out to you I'm following the words of the

Page 160

1    claim, is it correct that the Uniden phone

2    utilized a speech recognition method for a

3    mobile telecommunications system?

4            MR. SCHECTER:  Objection.

5            THE DEPONENT:  Can you repeat that?

6        I'm trying to get the question.

7    BY MR. FRANK:

8        Q.  Sure.  Is it correct that the method

9    incorporated in the Uniden system was a speech

10   recognition method for a mobile

11   telecommunications system?

12           MR. SCHECTER:  Objection.

13           THE DEPONENT:  Not a mobile

14       communications system.  It was an interface

15       to the phone, to the dialing process of the

16       phone.

17   BY MR. FRANK:

18       Q.  What's the distinction that you're

19   making?

20       A.  Well, the phone, and like a destination

21   that you're calling, I mean, that's all part of

22   the telecommunications system.  But this is an

23   interface to the dialer, in the case of the

24   Uniden phone.

Page 161

1        Q.   Okay.   Was the product that you called

2    an off-board product, a speech recognition

3    method for a mobile telecommunications system?

4            MR. SCHECTER:   Objection.

5            THE DEPONENT:   A speech recognition

6        method for a mobile telecommunications

7        system?   In the context that the recognizer

8        was designed to work or to work on speech,

9        perform it's algorithm processing on speech

10        generated over a mobile telecommunications

11        network.

12    BY MR. FRANK:

13        Q.   Okay.   You distinguished before between

14    what you called an on-board product and an

15    off-board product.

16        A.   Correct.

17        Q.   Is it your testimony that the -- a

18    speech recognition method for a mobile

19    telecommunications system --

20        A.   Let me just say, you're using verbiage

21    from the patent claims which are not -- I'm not

22    a patent expert.   And you're using terms that

23    are making it difficult for me to interpret.

24        Q.   Yes.   Except I'm trying to get your

Page 162

1  best understanding; that's all I can ask for.

2      A.  But if you use different ways of

3  wording things, I can answer the questions

4  better.

5      Q.  Unfortunately, I'm constrained by some

6  legal requirements to ask you some of these

7  questions this way.

8      A.  And I'm not someone who is in a

9  position from a legal standpoint to interpret

10  some of the language.

11      Q.  I'm asking from your perspective, both

12  as the inventor of this patent and as somebody

13  who's in the business.  And I'm simply asking

14  for your understanding.

15      A.  Okay.  And I'm going to have to answer

16  the questions using terms I am comfortable with

17  and hoping that they match what you're

18  thinking.

19      Q.  Okay.  So let me ask whether a method

20  employed in the Uniden product, as described in

21  Schalk Exhibit 4, was a speech recognition

22  method for a mobile communications system?

23      A.  The method employed in the Uniden

24  phone?  Method, I'm not sure if you're talking

Page 163

1    about the method of speech recognition, the

2    method associated with the logic of the call

3    flows.

4         Q.    The method of speech recognition.

5         A.    The method of speech recognition is

6    different in the Uniden phone than in a system

7    -- it's not necessarily the same.

8         Q.    And is it correct that the method, the

9    speech recognition method used in the Uniden

10   phone is, in your opinion, not a speech

11   recognition method for a mobile

12   telecommunications system?

13            MR. SCHECTER:   Objection.

14            THE DEPONENT:   In a general sense -- it

15        depends on how you define it.  The speech

16        recognizer in the Uniden phone is designed

17        to recognize speech going through the

18        handset, the audio as its received.

19            You may have situations where you're

20        speaking into a handset where the audio is

21        transmitted to an off-board recognizer, the

22        recognition would be different, details of

23        the algorithm and such.

24   BY MR. FRANK:

Page 164

1        Q.   In your understanding is the speech

2    recognition method used in the Uniden product

3    described in Exhibit 4, a speech recognition

4    method for a mobile telecommunications system?

5             MR. SCHECTER:   Objection.

6             THE DEPONENT:   System?   It doesn't make

7        a lot of sense to describe it that way.

8        The Uniden phone is an embedded speech

9        recognizer that has direct input from a

10       microphone and serves as an interface to a

11       phone that is then part of a system.

12   BY MR. FRANK:

13       Q.   When you say then part of the system,

14   you're referring to --

15       A.   A mobile -- when I think of mobile

16   telecommunications system, I think of, you

17   know, communications media, a way you can

18   communicate from one phone to another phone.

19   This is an interface to the dialing piece of

20   the phone.

21       Q.   Let me ask a question that may help

22   clarify.  You've described a system that Voice

23   Control Systems developed for Brite Voice,

24   McCaw --

Page 165

```
 1        A.   An application, yes.

 2        Q.   An application?

 3        A.   Yes.

 4        Q.   Was that a speech recognition method

 5   for a mobile telecommunications system?

 6        A.   Speech recognition method is not a term

 7   that I'm comfortable with.

 8             There's speech recognition algorithm,

 9   the details of how you process the speech.  But

10   when you talk about a speech recognition

11   method, I'm not sure.  I need another way for

12   you to describe that; that's really as simple

13   as that.

14        Q.   Was it a speech recognition system for

15   a mobile telecommunications system, meaning

16   hardware and software together, that is, the

17   McCaw/MetroCell/Brite Voice product?

18        A.   You could call it that.  I'm just

19   making the point that when the term speech

20   recognition method, that doesn't -- that's not

21   consistent with how I would describe a speech

22   recognition algorithm or even a speech

23   recognition unit in a system.

24        Q.   Okay.  Now, let me ask you -- withdraw.
```

Page 199

```
 1      Q.   Yes.

 2      A.   Yeah.   The MIN is the cellular

 3  telephone number.   So you've got voice going

 4  back and forth and data going back and forth

 5  when you're using a cellular phone.   So the

 6  system knows your phone number as a way for,

 7  you know, part of your billing, you know, the

 8  phone number associated with your phone and

 9  then there's a serial number as part of the

10  phone itself.

11      Q.   Yes.

12      A.   So the recognizer is not recognizing

13  the phone number associated with your phone.

14      Q.   Does the speech recognition system --

15      A.   The application does.   The speech

16  recognizer, itself, doesn't.   You may be

17  meaning the application when you say speech

18  recognition system.   System is a broad term to

19  me, for clarification purposes.

20      Q.   Was the decision to move or to have a

21  product where the voice recognition apparatus

22  was located at or as part of the central

23  switch, did that make it feasible to have a

24  combined speaker-dependent and
```

Page 200

1    speaker-independent voice recognition system?

2              MR. SCHECTER:  Objection.

3              THE DEPONENT:  Actually, in my opinion

4         the algorithms that came about, that were

5         developed, could also be used on a system

6         that was not an off-board application.  The

7         memory requirements turned out to be very,

8         very small.

9    BY MR. FRANK:

10        Q.  So it's your opinion that it was the

11   algorithms developed by your group that made it

12   feasible to have the combined system?

13             MR. SCHECTER:  Objection.

14        Mischaracterizes.

15   BY MR. FRANK:

16        Q.  I'm not trying to mischaracterize.

17   Correct me if I'm wrong.

18        A.  We developed a way to extend our

19   speaker-independent algorithm to operate in a

20   speaker-dependent mode.  The memory

21   requirements to represent what we refer to as a

22   template or a representation of something that

23   someone speaks, like a name, the memory

24   requirements for that were so small, the RAM

Page 201

1    requirements for an on-board solution, that it

2    was practical to implement that on an on-board,

3    meaning embedded, or off-board.

4         Q.   And do you find that algorithm or that

5    -- do you find that algorithm or that

6    development -- withdrawn.

7              MR FRANK:   Would you read the last

8         answer to me so I ask the question in the

9         terms that the last answer was articulated.

10             (The testimony referred to was read by

11        the stenographer.)

12   BY MR. FRANK:

13        Q.   And is that the method that you said

14   earlier was maintained as a secret at Voice

15   Control Systems?

16        A.   Details were never disclosed.  But some

17   of the manipulation of the speaker-dependent

18   representations, how you'd manipulate that and

19   do the averaging, was shared with Brite, for

20   example.  But how the actual numeric

21   representations were generated, how you got

22   that, was never revealed.

23        Q.   And there's nothing in this patent, the

24   966 patent, that describes the method that you

Page 202

1    just referenced; is that correct?

2        A.  The feature extraction process is not

3    disclosed.  And that's very relevant to how we

4    generated the speaker-dependent representations

5    of the words spoken.  That type of information

6    was not disclosed, to my knowledge, in patents,

7    not the algorithms, per se.

8        Q.  In the absence of the methodology that

9    you just described, the stuff that was not

10   disclosed, it's correct, is it not, that it

11   would at the time of the application for this

12   patent, been within the skill of people like

13   yourself to develop a speaker, a combined

14   speaker-dependent and speaker-independent voice

15   recognition system, except that it would have

16   required a lot more computing power and memory?

17           MR. SCHECTER:  Objection.

18           THE DEPONENT:  I can't paraphrase that

19       question to myself.  Are you saying that

20       someone else could go off and copy what we

21       did?

22   BY MR. FRANK:

23       Q.  No.  I'm saying based upon what was

24   known in the voice recognition art or business

Page 203

1    as of the date of the application for this

2    patent, is it correct that a person who did not

3    have access to the methodology that you

4    developed, could nevertheless, have had a

5    combined speaker-dependent and

6    speaker-independent voice recognition system,

7    as long as that person had sufficient computing

8    power available to them?

9         MR. SCHECTER:  Objection.

10         THE DEPONENT:  As long as you had

11    sufficient computing power.  In fact, I

12    believe there were other implementations of

13    hybrid recognition solutions,

14    speaker-independent, speaker-dependent.

15    You'd see it in the research labs.

16    BY MR. FRANK:

17    Q.  So that was within the scope of what

18    people in the business could do?

19    A.  In theory.  There was nothing

20    preventing anyone from doing exactly what we

21    did without us knowing it.

22    Q.  That's as of when the first of these

23    applications --

24    A.  At any time.