1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

3
                                          **RECEIVED**
      _____
4                              )              JUN 21 2005
    SCANSOFT, INC.,            )
5                              )        **BROMBERG & SUNSTEIN**
            Plaintiff,         )
6                              )
        v.                     )      C.A. No. 04-10353-PBS
7                              )
    VOICE SIGNAL              )
8    TECHNOLOGIES, INC.,       )
     LAURENCE S. GILLICK,      )
9    ROBERT S. ROTH,           )      PRESUMED CONFIDENTIAL UNTIL 7/6/2005
     JONATHAN P. YAMRON,       )      PURSUANT TO PROTECTIVE ORDER
10   and MANFRED G. GRABHERR,  )
                               )
11          Defendants.        )
      _____)
12                                      ORIGINAL
13

14

15

16          DEPOSITION OF MANFRED G. GRABHERR, Ph.D., a

17   witness called by and on behalf of the Plaintiffs,

18   taken pursuant to the applicable provisions of the

19   Federal Rules of Civil Procedure, before Dana Welch,

20   CSR, Registered Professional Reporter, and Notary

21   Public, in and for the Commonwealth of Massachusetts,

22   at the offices of Bromberg & Sunstein, 125 Summer

23   Street, Boston, Massachusetts, on June 16, 2005,

24   commencing at 10:04 a.m.

Page 2

```
 1    APPEARANCES:
 2    For the Defendants:
 3         CHOATE, HALL & STEWART, P.C.
           Exchange Place
 4         53 State Street
           Boston, Massachusetts  02109
 5         (617) 248-5000
           By:  Paul D. Popeo, Esq.
 6
      For the Plaintiff:
 7
           BROMBERG & SUNSTEIN, LLP
 8         125 Summer Street, 11th Floor
           Boston, Massachusetts  02110-1618
 9         (617) 443-9292
           By:  Lisa Fleming, Esq.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

1                    P R O C E E D I N G S

2              (The Massachusetts Driver's License

3          number as identification of the deponent

4          was noted for the record.)

5    WHEREUPON,

6                    MANFRED G. GRABHERR,

7    having duly sworn or affirmed that his

8    testimony would be the truth, the whole truth,

9    and nothing but the truth, testified as

10   follows:

11                   DIRECT EXAMINATION

12   BY MS. FLEMING:

13       Q.  Would you state your name for the

14   record please and spell it.

15       A.  My name is Manfred Gernot Grabherr.

16   It's M-A-N-F-R-E-D, G-E-R-N-O-T,

17   G-R-A-B-H-E-R-R.

18       Q.  And that's Dr. Grabherr, right?

19       A.  Yes.

20       Q.  Dr. Grabherr, I would like for you to

21   tell me about your educational background after

22   high school and with your collegiate studies.

23       A.  I studied physics at the Technische

24   Universitat Wien, which is the University of

1       proprietary.

2   BY MS. FLEMING:

3       Q.  And is it your testimony that the

4   specific implementation was not confidential?

5           MR. POPEO:  I object to the form of the

6       question.  If you understand that question,

7       you may answer.

8           THE DEPONENT:  So is the question

9       whether the specific implementation was

10      proprietary information?

11  BY MS. FLEMING:

12      Q.  Yes.

13          MR. POPEO:  Slow down.  Are you asking

14      whether he was aware of a proprietary

15      implementation?

16  BY MS. FLEMING:

17      Q.  Did you understand my question?

18      A.  Can you say it again, please.

19          MS. FLEMING:  Sure can you read it

20      back.

21          THE REPORTER:  "Question:  'And is it

22      your testimony that the specific

23      implementation was not confidential?'"

24          MR. POPEO:  Objection.

1          THE DEPONENT:  No.  I can't say that it

2      was not confidential.

3   BY MS. FLEMING:

4      Q.  Can you say it was confidential?

5          MR. POPEO:  Were you informed that it

6      was confidential?

7          MS. FLEMING:  Mr. Popeo, stop running

8      this deposition or we will terminate it and

9      go to the judge.

10         THE DEPONENT:  Sorry.  Say it again,

11     please.

12         MS. FLEMING:  Can you read the question

13     back?

14         THE REPORTER:  "Question:  'Can you say

15     it was confidential?'"

16         THE DEPONENT:  I can't remember a

17     single case in which I could say this is

18     definitely confidential.

19  BY MS. FLEMING:

20     Q.  Well, tell me about what you developed

21  at Voice Signal -- I'm sorry -- at Lernout &

22  Hauspie that you're not sure was confidential.

23         MR. POPEO:  He's testified he's not

24     sure anything was confidential.

1    BY MS. FLEMING:

2        Q.  I'll agree with you there.

3        A.  -- and you have many different modules

4    or pieces of this thing.  And each of them

5    wants to get memory.

6            So you can not easily do something like

7    say, oh, I'm going to make this one change and

8    I will drop the memory usage by, I don't know,

9    50 percent.  So usually that's not the way this

10   works.  You have all these different things and

11   each of one allocates, let's say one megabyte

12   of memory.  And if you can get this

13   one megabyte down to 0.8 megabyte, that's good.

14   Then you go on to the next thing, which uses 2

15   megabytes; you get it down to 1.8 megabytes.

16   But it all adds up.  So then you have to go

17   back and say, well, this still needs too much

18   memory, so maybe we can do something else.  We

19   have to, I don't know, look for other ways.

20       Q.  And so you would agree with me then

21   that a desired goal of the work in speech

22   recognition would be to reduce memory and at

23   the same time increase accuracy; is that an

24   accurate statement?

Page 48

1          MR. POPEO:  Object to the form of the

2     question.  Compound.  Are you asking for

3     him to generalize?

4  BY MS. FLEMING:

5     Q.  Do you understand the question?

6          MR. POPEO:  Or at Lernout & Hauspie?

7  BY MS. FLEMING:

8     Q.  Do you understand the question, sir?

9     A.  So you're asking about speech

10  recognition in general?

11    Q.  Yes.

12    A.  Yes.  That would be the goal, to have

13  something that uses virtually no memory, is

14  infinitely accurate, and doesn't use CPU

15  resources.  But in the real world -- I mean,

16  one would like that, right.

17    Q.  So in terms of the minor modification

18  that you made when you were at Lernout &

19  Hauspie to the short list, that would be

20  considered an improvement, wouldn't it?

21         MR. POPEO:  Object to the form.

22         THE DEPONENT:  Yeah.  It's an

23     improvement.

24         MR. POPEO:  Let's take our first break.

1     We've been going over an hour.

2         (Proceedings interrupted at 11:04 a.m.

3     and reconvened at 11:14 a.m.)

4  BY MS. FLEMING:

5     Q.  Dr. Grabherr, before the break, you

6  were describing for me some of the work that

7  you did at Lernout & Hauspie in connection with

8  short lists.  Do you recall that?

9     A.  Yes.

10    Q.  And I would like to refer you back to

11 Exhibit 2 you have in front of you and ask you

12 to look at page VST 03742.

13    A.  Yes.

14    Q.  And again, I'm going to refer you to

15 paragraph 8 of that agreement.  And that

16 paragraph does say that "During your employment

17 with the company," that being Voice Signal,

18 correct?

19    A.  Yes.

20    Q.  "You will not improperly use or

21 disclose any confidential information or trade

22 secrets by any former employer."

23    A.  That's what it says.

24    Q.  And it's your understanding that when

Page 57

1          MR. POPEO:  Whether or not -- the

2     nature of the communications that I've had

3     with my client are not a topic of discovery

4     or discussion today.

5          MS. FLEMING:  You're disclosing on the

6     record now that you will produce that

7     document on the basis that it's relevant?

8          MR. POPEO:  If the document exists, I

9     will determine whether it does exist, and

10    if so, if it responds to any discovery in

11    the case, then we will produce it.

12  BY MS. FLEMING:

13    Q.  Dr. Grabherr, do you recall the

14  substance of the agreement that you signed with

15  Kurzweil?

16         MR. POPEO:  Objection.  You can answer,

17    if you can.

18         THE DEPONENT:  I don't remember.

19  BY MS. FLEMING:

20    Q.  Was it an employment agreement?

21    A.  It was an employment agreement.

22    Q.  Did it offer you employment?

23    A.  I don't remember what the document

24  said.

Page 58

1      Q.  Did it contain any obligations to keep

2  information confidential that you obtained in

3  your employment with Kurzweil?

4          MR. POPEO:  Objection.  Only if you

5      remember.

6          THE DEPONENT:  I don't remember.

7  BY MS. FLEMING:

8      Q.  You don't remember?

9      A.  I don't remember any specific things

10  about this document.

11     Q.  You don't remember if you were under

12  any obligations to keep information

13  confidential while you worked at Kurtzweil?

14         MR. POPEO:  That wasn't the question.

15     That's a different question.  You can

16     answer that question, if you know the

17     answer to it.

18         THE DEPONENT:  It very much depends on,

19     you know, what the document says and what

20     the wording is.  I assume that there was

21     something in there that --

22         MR. POPEO:  Just what you remember,

23     please.

24

1    couldn't recognize?

2        A.   So there is in Voice Xpress, you had

3    the ability to define a vocabulary.  And within

4    this vocabulary, you could tell it, well, you

5    can recognize this word only if the preceding

6    word is either this or that or another word.

7    So you could constrain it, that not all word

8    combinations were possible.

9            But in order to do that, you have to

10   first figure out what are all these

11   constraints.  And then you have to tell it to

12   explicitly in its own internal representation

13   what it could recognize and what not.

14       Q.   And how do you do that in speech

15   recognition; do you use mathematical models to

16   do that?

17           MR. POPEO:  Objection.  How did he, in

18       fact, do it at L&H?

19           MS. FLEMING:  No.  I'm asking how did

20       he do it in speech recognition.

21           MR. POPEO:  If you can generalize, you

22       can answer the question.

23           MS. FLEMING:  Mr. Popeo, I really would

24       instruct you not to use speaking

Page 68

1    objections.  You know it's a violation of

2    the rules.  You're entitled to put an

3    objection on the record.  You're slowing

4    down and impeding this deposition and you

5    need to stop before we have to take a break

6    and call the court.  It's inappropriate

7    conduct.  You need to stop doing that, Mr.

8    Popeo.

9        MR. POPEO:  I don't agree with your

10    assessment.

11        MS. FLEMING:  Please state your

12    objection on the record and let me ask my

13    questions.

14        MR. POPEO:  I've done so.

15    BY MS. FLEMING:

16    Q.   Did you understand my question?

17    A.   Yes.

18    Q.   Could you please answer the question?

19    A.   I'm sorry.  But can you just before,

20    repeat the question?

21        MS. FLEMING:  Please read the question

22    back.

23        THE REPORTER:  "Question:  'And how do

24    you do that in speech recognition; do you

1    point became known as ELVIS.  And I don't know

2    exactly when it made the transition from just

3    being a recognizer to being ELVIS.

4        Q.  Okay.  And what language model was used

5    in the ELVIS technology that you're aware of

6    from October of 2000 to October of 2001?

7            MR. POPEO:  I object the form of

8            question.  You may answer -- you may

9            answer --

10            MS. FLEMING:  Mr. Popeo, please.

11            MR. POPEO:  You may answer if you can

12            do so without divulging any Voice Signal

13            trade secret.  With that instruction, you

14            can go ahead.

15            THE DEPONENT:  Sorry.  The question

16            again, please?

17            THE REPORTER:  "Question:  'Okay.  And

18            what language model was used in the ELVIS

19            technology that you're aware of from

20            October of 2000 to October of 2001?'"

21            THE DEPONENT:  This kind of a language

22            model was the just straightforward thing

23            that's published, that stores probabilities

24            for words and word translations.

Page 83

1    BY MS. FLEMING:

2        Q.   And what is that language model, sir;

3    can you describe it for me?

4        A.   At what level?

5        Q.   Any level you want.

6        A.   I can't really say anything about the

7    specific implementation without disclosing

8    Voice Signal secrets, I believe.  But on a more

9    general level, the thing that was being used,

10   again, for each word in your vocabulary, you

11   store this one probability that says how likely

12   is it to just stand all by itself, be

13   recognized all by itself.  And as soon as you

14   have the context, then you can look up what is

15   the probability between these two things.

16       Q.   And how did the language model in the

17   early ELVIS project do that, determine the

18   probability?

19          MR. POPEO:  Object to the form of the

20       question.

21          THE DEPONENT:  Determine the

22       probabilities --

23          MR. POPEO:  Object to the form of the

24       question.  But you may answer if your

1    answer will not disclose a Voice Signal

2    trade secret.

3        MS. FLEMING:  Let me just stop here for

4    a moment if I can.  Mr. Popeo, do I

5    understand that you're instructing the

6    witness not to disclose information that

7    related to work that he did in the first

8    year of his employment at Voice Signal

9    Technologies?

10        MR. POPEO:  That wasn't my instruction.

11        MS. FLEMING:  What's your instruction

12    just so that I'm clear.

13        MR. POPEO:  Sure.  So we're all clear.

14    The witness is free to testify about the

15    work that he performed during the first 12

16    months after he was hired by Voice Signal.

17    My only limiting instruction is that he not

18    disclose during the course of this

19    deposition a trade secret of Voice Signal.

20    It's nothing more complex than that.

21        MS. FLEMING:  All right.  I'd like to

22    take a five-minute break.

23        (Proceedings interrupted at 11:53 a.m.

24    and reconvened at 12:05 p.m.)

Page 92

1          believe was proprietary.

2     BY MS. FLEMING:

3          Q.   And is it your testimony that the

4     storage of language models at Lernout & Hauspie

5     was not proprietary to Lernout & Hauspie?

6          A.   I don't think -- it was not

7     proprietary.

8          Q.   You think it was proprietary?

9          A.   No.   I think it was not proprietary.

10         Q.   So I just want to be clear that I

11    understand your testimony, that the way that

12    Voice Signal Technologies, as you understand

13    it, stored its language models was proprietary,

14    but the way that Lernout & Hauspie stored its

15    language models was not; is that your

16    testimony?

17         A.   Yes.

18              MR. POPEO:   Objection.

19              THE DEPONENT:   Because it's different.

20    BY MS. FLEMING:

21         Q.   Why is it different?

22              MR. POPEO:   You can answer the question

23         without talking about Voice Signal's

24         methodology.

1          MS. FLEMING:  Excuse me.  Mr. Popeo,

2     have you just instructed the witness not to

3     talk about Voice Signal's technology with

4     respect to language models in the first

5     year of employment of Mr. Grabherr?

6          MR. POPEO:  I'm just reminding him not

7     to disclose trade secrets of Voice Signal.

8     But you can answer the question.

9          THE DEPONENT:  Okay.  So --

10          MS. FLEMING:  You're reminding him not

11     to disclose trade secrets within the first

12     year of his employment; is that -- am I

13     understanding your instruction?

14          MR. POPEO:  The witness may be capable

15     of answering the question without

16     disclosing trade secrets.

17          MS. FLEMING:  No.  Is your instruction

18     that he not disclose trade secrets during

19     the first year of his employment at Voice

20     Signal Technologies; Is that your

21     instruction, Mr. Popeo?

22          MR. POPEO:  My instruction to the

23     witness and general instruction is that he

24     not disclose trade secrets as a general

1    matter.

2        MS. FLEMING:  Despite the Court's order

3    in this case?

4        MR. POPEO:  I'm not aware of any court

5    order that says that we ought to be

6    disclosing trade secrets.

7        THE DEPONENT:  I think I can answer the

8    question without disclosing confidential

9    information.

10       So you have to keep in mind that these

11   recognizers are really intended for very

12   different purposes.

13   BY MS. FLEMING:

14       Q.  What recognizers?

15       A.  So on one hand, you have L&H Voice

16   Xpress, and also later on, the Phoenix

17   recognizer, and the intention there was to run

18   in a -- in an environment in which you have an

19   operating system, you have file storage of some

20   sort, you have a pretty fast processor and you

21   have a lot of memory.

22       Now, on the other hand, if you look at

23   the ELVIS recognizer, that was designed to run

24   on embedded systems such as cell phones, where

Page 122

1      Q.   Okay.   I'd ask you just to focus on the

2  first sentence here and ask you, what work did

3  you specifically do to research and develop

4  robust speech interfaces to mobile and embedded

5  products at Voice Signal Technologies?

6          MR. POPEO:   Object to the form of the

7      question.   You can answer.   Please restrict

8      your answer to the first 12 months after

9      you were hired and don't disclose Voice

10     Signal trade secrets in the process.

11         THE DEPONENT:   So the question is what

12     project was I working on; is that correct?

13  BY MS. FLEMING:

14     Q.   No.   The question is a little bit more

15  specific than that.   What work did you do to

16  research and develop robust speech interfaces

17  to mobile and embedded products?

18         MR. POPEO:   Same objection.   You can

19     answer.

20         THE DEPONENT:   Okay.   Yeah, when I

21     started working for Voice Signal, there

22     were a number of things Voice Signal wanted

23     to do and all of them were for embedded

24     applications.

Page 130

1      you know, you may answer the question.

2          THE DEPONENT:  One of them I remember

3      is Jim McGinnis.

4  BY MS. FLEMING:

5      Q.  Tim?

6      A.  Jim.  M-C-G-I-N-N-I-S.  I hope that's

7  the proper spelling.  And for the more

8  technical questions, we also had embedded

9  engineers help us; but those I don't remember

10  specifically.

11      Q.  Okay.  And can you tell me what your --

12  specifically what your work was on this team?

13      A.  So my work on this team was to

14  contribute to the design process and also

15  implement certain parts.

16      Q.  Okay.  Let take each of those tasks

17  that you just described.  What did you do

18  specifically to contribute to the design

19  process of the recognizer?

20          MR. POPEO:  Objection.  Please restrain

21      yourself to the first 12 months after you

22      were hired and please don't disclose any

23      trade secrets.

24          THE DEPONENT:  I don't remember the

Page 132

1    BY MS. FLEMING:

2        Q.   Sure.   When you worked on this team and

3    you were part of this team, was it your

4    understanding that you were developing -- well,

5    in fact, you said you were developing a speech

6    recognizer, correct?

7        A.   Yes.

8        Q.   And you were contributing to the design

9    process of that speech recognizer, correct?

10       A.   Yes.

11       Q.   And as part of your contributions to

12   the design process, did you understand that the

13   information you were developing was

14   confidential to Voice Signal Technologies?

15       A.   Yes.   That was my understanding, right.

16       Q.   And what information in particular was

17   confidential if you can recall?

18           MR. POPEO:   I object to the form of the

19       question.   If you can answer the question

20       without divulging the confidential

21       information itself, you can do so.

22           THE DEPONENT:   Well, a lot of it is,

23       well, how do you actually make this run in

24       very little memory.   So rather than --

Page 133

1    there are two ways to approach this.  And

2    one is to start with something that's big

3    and make it small; and the other one is

4    start with something that's supposed to be

5    small in the beginning.  And the second way

6    is usually what works much better.

7        So a lot of this means you have to

8    structure things in certain ways so that

9    you keep one part of information here and

10   another part of the information there.

11   Because the hope is that, you know, if you

12   also have to distinguish between memory

13   you can write to and memory you cannot

14   write to.  And you don't want to keep

15   anything you don't -- are not going to

16   modify in memory you can write to because

17   that's precious.  And so that requires you

18   to structure this in a certain way.

19  BY MS. FLEMING:

20   Q.  What way?

21       MR. POPEO:  Objection.  Again, if you

22   can answer the question without divulging

23   trade secrets, you may do so.  But please

24   don't describe a trade secret.

Page 135

```
 1   make it go faster?
 2            MR. POPEO:  Object to the form.  You
 3       may answer the question, but please don't
 4       divulge a trade secret when you do so.
 5            THE DEPONENT:  No.  I'm just using this
 6       as an example.  So I'm not saying this is
 7       one of the particular problems.
 8   BY MS. FLEMING:
 9       Q.  Let me ask you a question, sir.  In
10   forming your answer to this question and the
11   previous two questions, have you -- is part of
12   your answer based on confidential information
13   that you have not disclosed to me?
14            MR. POPEO:  Object to the form of the
15       question.  If you understand it, you can
16       answer it.
17            THE DEPONENT:  Well, a lot of it has to
18       do with the fact that I just can't remember
19       the specifics of what we did.  I mean, if
20       you ask me -- if you tell me now, show me
21       the source code and say, oh, okay.
22   BY MS. FLEMING:
23       Q.  If I showed you the source code?
24       A.  If you showed me the source code and
```

Page 136

1    tell me, well, this is the way you did it, I

2    would say yes, now I remember.  But out of the

3    top of my head, I just don't remember these

4    things because they're very -- sometimes very

5    small details.

6        Q.  Sure.  So without looking at the source

7    code, you can't recall what the specific

8    contributions were this team made in the early

9    speech recognition engine that was being

10   developed as part of this team that you just

11   testified about?

12           MR. POPEO:  Object to the form of the

13       question.  It mischaracterizes.  You can

14       answer the question if you can.

15           THE DEPONENT:  And one thing that I

16       remember is that we went through each

17       possible data structure and tried to figure

18       out how can we organize this such that it

19       takes up the least amount of memory.

20   BY MS. FLEMING:

21       Q.  And do you recall what techniques you

22   came up with?

23           MR. POPEO:  Object to the form.  Again,

24       if you can answer the question without

Page 137

1          divulging a trade secret you may do so.

2     BY MS. FLEMING:

3          Q.  Can you answer that question with

4     divulging a trade secret?

5              MR. POPEO:  In other words, if you're

6          remembering a trade secret --

7              MS. FLEMING:  Excuse me, sir; it's my

8          question.

9              THE DEPONENT:  No, I understand.  No, I

10         don't think I could.

11     BY MS. FLEMING:

12         Q.  You can't answer that question with or

13     without confidential information?

14         A.  Right.

15             MS. FLEMING:  Okay.  Can you read me

16         back the question?

17             THE REPORTER:  "Question:  'And do you

18         recall what techniques you came up with?'"

19     BY MS. FLEMING:

20         Q.  Why can't you answer that question?

21         A.  Because I simply don't remember.  I

22     mean, see, these are very detailed things that

23     we did.

24         Q.  And you can't remember unless you

Page 192

1       A.   Right.

2       Q.   -- both speech recognition engines

3    needed a module in the source code to search

4    the lexical tree, didn't it?

5            MR. POPEO:   Object to the form of the

6        question.

7            THE DEPONENT:   I mean, again, on a very

8        general -- in a very general way, that's

9        true, but that's true for pretty much any

10       recognizer out there.

11   BY MS. FLEMING:

12       Q.   But both of those recognizers required,

13   in fact, some module in the source code to

14   search the lexical tree; is that right?

15           MR. POPEO:   Objection to the form of

16       the question.

17           THE DEPONENT:   Since they're both

18       HMM-based systems, like pretty much all

19       other systems that do a similar job, sure.

20   BY MS. FLEMING:

21       Q.   Sure.   And you testified that you wrote

22   the code for the module that searched the

23   lexical tree at Voice Signal Technologies,

24   correct?

Page 193

1      A.   Yes.

2      Q.   Now, the next module --

3           MR. POPEO:   Let's take a break before

4      we move on to the next module.

5           MS. FLEMING:   Do you need a break, sir?

6           MR. POPEO:   I need a break.

7           (Proceedings interrupted at 2:48 p.m.

8      and reconvened at 2:57 p.m.)

9  BY MS. FLEMING:

10     Q.   Dr. Grabherr, before your counsel asked

11 for a break, I was asking you about certain

12 modules and the source code that you wrote for

13 the ELVIS product, do you remember that

14 testimony -- or the ELVIS prototype; do you

15 remember that testimony?

16     A.   Yes.

17     Q.   And you identified four modules.  And I

18 wanted to ask you about the one that you

19 characterized as a module to ask for acoustic

20 scores; do you remember that description that

21 you gave?

22     A.   Yes.

23     Q.   Can you describe for me what the

24 purpose of that module is in the source code?

1      remember, the way it works is --

2            MR. POPEO:  And again, I caution you

3      not to disclose any trade secrets.

4            THE DEPONENT:  So my recollection is

5      that after you compute the scores, what you

6      do in the search is you want to add them up

7      over time to get an accumulated score for a

8      whole hypothesis.  Right.  And now, from

9      time to time you might decide to just, you

10     know, remove the bottom of the score.

11           So if the scores are 1,005, 1,010,

12     1,015, it's the same as, I don't know, 2,

13     5, 15; so the thousands don't matter

14     because you only compare hypotheses against

15     each other.  Whether I did that or not, I

16     don't remember.

17  BY MS. FLEMING:

18     Q.  Now, in the answer that you just stated

19  for the record, did you withhold any trade

20  secret information from your answer?

21           MR. POPEO:  Object to the form.  You

22     can answer, if you can.

23           THE DEPONENT:  No, I don't think so.

24

1    BY MS. FLEMING:

2         Q.   Yes.

3         A.   Okay.  No, there is not.

4         Q.   So ELVIS does not use duration

5    modeling?

6         A.   It does use duration modeling, but it

7    does not use a certain probability assigned to

8    whether it's better to stay within a state or

9    transition to another state.

10        Q.   Why not?

11             MR. POPEO:  Object to the form of the

12        question.  You may answer, if you can do so

13        without divulging a trade secret.

14             THE DEPONENT:  I don't know.

15   BY MS. FLEMING:

16        Q.   You don't know or you can't divulge it

17   without involving a trade secret?

18        A.   I don't know.  I don't think it helps

19   much with the recognition process.  This is

20   just something that people tried to increase

21   accuracy and I don't know how much that helps

22   at all, if it helps at all.

23        Q.   Whether it helps or not, does the ELVIS

24   prototype use that type of duration modeling?

Page 212

1          MR. POPEO:  Objection.  Asked and

2      answered.

3          THE DEPONENT:  No.

4   BY MS. FLEMING:

5      Q.  It doesn't?

6      A.  It doesn't.

7      Q.  But it uses duration modeling?

8          MR. POPEO:  Objection.

9          THE DEPONENT:  Yes.  That's what the

10     hidden Markov model is all about.

11  BY MS. FLEMING:

12     Q.  How did the ELVIS prototype model

13  duration?

14         MR. POPEO:  Object to the form of the

15     question.  You can answer, if you can

16     without divulging trade secrets.

17         THE DEPONENT:  This is the process that

18     I just described.

19  BY MS. FLEMING:

20     Q.  And the process you just described --

21     A.  It's the basic --

22         MR. POPEO:  Generic.

23         THE DEPONENT:  Well, it's the way in

24     which hidden Markov models work.  And these

Page 234

1        year, I don't remember.

2    BY MS. FLEMING:

3        Q.   Okay.   And you would agree with me that

4    this e-mail is dated within the first year of

5    your employment at Voice Signal Technologies,

6    wouldn't you?

7        A.   Yes.

8        Q.   And your testimony is you don't have

9    any recollection of attending a such a meeting?

10        MR. POPEO:   Objection.   Asked and

11        answered.   If you recall, you recall; if

12        you don't recall, you should say so.

13        THE DEPONENT:   I don't remember.

14    BY MS. FLEMING:

15        Q.   Putting aside the contents of this

16    e-mail, did you communicate to Mr. Gillick any

17    novel technical characteristics in the current

18    implementation of ELVIS?

19        MR. POPEO:   If you recall, please.

20        THE DEPONENT:   I don't remember.

21    BY MS. FLEMING:

22        Q.   Do you recall communicating to Mr.

23    Gillick any novel ideas that would be important

24    contributions to ELVIS?

Page 235

```
 1           MR. POPEO:  Objection.  Only if you

 2      recall, please.

 3           THE DEPONENT:  I don't remember.

 4   BY MS. FLEMING:

 5      Q.

 6

 7

 8

 9           MR. POPEO:  Objection.

10           THE DEPONENT:  I don't remember.

11   BY MS. FLEMING:

12

13

14

15           MR. POPEO:  Object to the form of the

16      question.

17

18

19

20

21

22

23

24
```

Page 237

1          it's still there.

2     BY MS. FLEMING:

3          Q.  And personal digital assistants have

4     technology for flash as well, don't they?

5              MR. POPEO:  Object to the form of the

6          question.  You may answer it, if you know.

7              THE DEPONENT:  I don't know.

8     BY MS. FLEMING:

9          Q.  Mini computer?

10         A.  Mini computers?

11             MR. POPEO:  Same objection.

12    BY MS. FLEMING:

13         Q.  You don't know what a mini computer is?

14         A.  No.

15

16

17

18

19

20             MR. POPEO:  Objection.

21             THE DEPONENT:  That's what I believe,

22         yeah.

23    BY MS. FLEMING:

24         Q.  On what do you base that belief?

Page 321

1                C E R T I F I C A T E

2          I, Manfred G. Grabherr, Ph.D., do hereby

3    certify that I have read the foregoing

4    transcript of my testimony, given on June 16,

5    2005, and I further certify that said

6    transcript is a true and accurate record of

7    said testimony (with the exception of the

8    corrections listed below):

9    Page  Line         Correction

10

11

12

13

14

15   Dated at _____, this _____

16   day of _____, 2005.

17

18                  _____

                    Manfred G. Grabherr

19   SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

20

21

22

23   duw

24

Page 322

1                    CERTIFICATE

2

COMMONWEALTH OF MASSACHUSETTS

3    SUFFOLK, SS

4        I, Dana Welch, Registered Professional

5    Reporter and Notary Public in and for the

6    Commonwealth of Massachusetts, do hereby

7    certify:

8        That MANFRED G. GRABHERR, the witness

9    whose deposition is hereinbefore set forth, was

10   duly sworn by me and that such deposition is a

11   true record of my stenotype notes taken in the

12   foregoing matter, to the best of my knowledge,

13   skill and ability.

14       IN WITNESS WHEREOF, I have hereunto set

15   my hand this 16th day of June, 2005.

16

17            DANA ULRICH WELCH
     _____
              Dana Welch, RPR

18            Registered Professional Reporter

19

20

21

22

23

24