## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCANSOFT, INC., <br><br> Plaintiff <br><br> v. <br><br> VOICE SIGNAL TECHNOLOGIES, INC., LAURENCE S. GILLICK, ROBERT S. ROTH, JONATHAN P. YAMRON, and MANFRED G. GRABHERR, <br><br> Defendants | C.A. No. 04-10353-PBS |

## SCANSOFT'S PROPOSED NEUTRAL EXPERT PROCEDURE

At the *Markman* hearing on June 17, 2005, this Court directed the parties to select a neutral expert and then to adopt a procedure designed to facilitate the expert's informed analysis of the parties' speech recognition engine source code. After that analysis, the expert will advise the Court on whether there is a good faith basis for ScanSoft's trade secret and VST's patent infringement claims. The Court has also ordered that the expert prepare a report of his findings.

The parties have exchanged names of potential experts, and the process for selecting an expert has thus begun. Accordingly, ScanSoft requests that, once a suitable neutral expert is retained, this Court adopt the following procedure for the expert to follow in his or her examination of the parties' source code.[1] This proposed procedure is based on procedures

---

[1] ScanSoft has objected to the employment of a neutral expert and has requested that the Court simply order the production of the source code under the terms of the protective order. The Court has overruled the objection, and ScanSoft will certainly follow the Court's direction. ScanSoft, however, wants to preserve its objection. Therefore, this proposed procedure should not be understood as a waiver of ScanSoft's objection.

suggested by an extensive review of literature on the use of neutral experts, including Federal Judicial Center materials, the *Manual of Complex Litigation* (3rd. ed.), law review and other articles on neutral experts, case reports in which neutral and court-appointed experts have been used, Fed. R. Civ. P. 53 (Masters), and Fed. R. Evid. 706 (Court Appointed Experts). The proposed procedure represents a synthesis of the procedures and commentary found in this literature.[2]

First, the neutral expert will sign the confidentiality undertaking included in this Court's protective order. The expert will not use the source code or any insights gained from it except for the purpose of this litigation. The parties may have no *ex parte* contact with the expert. All communications will be in the presence of both parties' counsel. The expert will bill his time at an agreed rate, and the parties will each pay 50% of his fees and expenses in this engagement. ScanSoft requests that the Court formalize these instructions in a written order. One example of such an order is seen in Judge Kollar-Kotelly's order appointing an expert (**Exhibit A**) in one of the *MicroSoft* cases.

Second, both parties' counsel and their retained experts (Dr. Goldhor and Mr. Wooters) will meet with the neutral expert to explain the case and legal theories. ScanSoft suggests that the meeting occur in court, on the record, or, if not in court, at least with a reporter transcribing

---

[2] ScanSoft has not cited all the copious sources, but several sources in particular may be helpful. For example, a report from the Federal Judicial Center, entitled "Neutral Science Panels: Two Examples of Panels of Court-Appointed Experts in the Breast Implants Product Liability Litigation," authored by Laural Hooper, Joe Cecil, and Thomas Willging (2001), extensively discusses different approaches to the use of neutral experts. The report is voluminous and thus is not attached as an exhibit, but ScanSoft will provide a copy if the Court so desires. Likewise, ScanSoft has relied on an order (**Exhibit A**) appointing a technical expert in *New York v. Microsoft Corp.*, Civ. A. No. 98-1233(CKK), in which Judge Kollar-Kotelly appointed Professor Lee Hollaar to inspect Microsoft's source code. Her Honor also allowed the plaintiff's retained experts to inspect the source code under the terms of a protective order.

the proceedings. ScanSoft suggests a time limit on this meeting of three hours, with each side having one hour to explain its case and one hour for questions.

Third, on an assigned date, shortly after meeting with the expert, the parties will produce the source code and related technical documentation (unredacted) so that counsel and their retained experts may review it. The source code will be treated as Highly Confidential under the protective order. No in-house counsel or other employees of the parties may view the source code at this time. [3]

Fourth, after a brief period of review (for example, 15 business days), the parties, through their counsel and retained experts, will present their arguments to the neutral expert via briefs and then an oral presentation (also on the record). The purpose of the briefs and presentation is to direct the expert where to look in the copious source code and related technical documents for alleged evidence of trade secrets or patent infringement. Indeed, this Court has already suggested this procedure when it contemplated the use of a neutral expert at the *Markman* hearing. *See* **Exh. B**, *Markman* Hearing Trans. (excerpts) at 6-12 and 93-101 (discussion on potential use of a neutral expert).

---

[3] The purpose of this review is so that counsel may direct the neutral expert in an informed manner. Another purpose, however, is to ensure that the parties have fully produced the complete source code. This review is important because, unfortunately, VST has already demonstrated its unwillingness to produce the complete and usable form of its source code. More specifically, as seen in Dr. Goldhor's accompanying declaration (**Exh. C**), VST produced user interface source code that was incomplete. It could not be compiled and run on a computer because many software files were missing. Dr. Goldhor found other deficiencies (*i.e.*, missing information) in the produced code. The end result is that the missing data prevented Dr. Goldhor from completing his analysis of the source code. He outlined what source code typically contains and what is missing from the code that VST produced. Dr. Goldhor's declaration is redacted to shield information that VST has designated as Confidential or Highly Confidential, but ScanSoft will provide the Court with an unredacted version upon request.

Fifth, the expert will then retire to review the presentations and the source code.  After an assigned period of review, the expert may contact the parties with additional questions.  Again, all contact will be in the presence of both parties.

Sixth, the expert will issue his written report to the parties.  The parties may then depose the expert, as this Court suggested at the *Markman* hearing, to test his analysis.  After the depositions, the expert will issue his report to this Court, as the Court requested in its order of July 11, 2005.  The parties may thereafter submit briefs challenging or supporting the report, based on the deposition and other arguments.

## CONCLUSION

Accordingly, ScanSoft respectfully requests that the Court adopt this proposed procedure for the employment of the neutral expert.

Dated:  July 18, 2005

SCANSOFT, INC.,
By its attorneys,

/s/ Erik P. Belt_____
Lee Carl Bromberg, BBO # 058480
Erik Paul Belt, BBO # 558620
Lisa M. Fleming, BBO # 546148
Jack C. Schecter, BBO # 652349
Rebecca L. Hanovice, BBO # 660366
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, Massachusetts 02110-1618
(617) 443-9292
ebelt@bromsun.com

02639/00509  417340.1

4

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 98-1233 (CKK) |
| MICROSOFT CORPORATION, | |
| Defendant. | |

**FILED**

FEB 2 0 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**ORDER**

This case comes before the Court upon the filing of "Plaintiff Litigating States'

Motion for Appointment of Expert Witnesses Under FED. R. EVID. 706 and To Compel

Inspection of Source Code Under FED. R. CIV. P. 37 & 34." Having considered

plaintiffs' motion and Microsoft's opposition, and for the reasons set forth in the

teleconference with the parties on February 15, 2002, it is this 19th day of February,

2002, hereby

**ORDERED** that plaintiffs' motion for appointment of court-appointed expert

witnesses under FED. R. EVID. 706 is DENIED; and it is further

**ORDERED** that plaintiffs' motion to compel inspection of source code is

GRANTED such that Professor Lee A. Hollaar of the University of Utah and other

computer science experts retained by plaintiffs who sign the protective order dated May

27, 1998, may inspect the source code for Windows XP Home and Windows Professional

operating systems that Professor Hollaar was provided on a confidential basis during the

mediation phase of this action for use in the parties' efforts to settle the action; and it is further

**ORDERED** that Microsoft shall promptly provide Professor Hollaar with a copy of the source code for Windows XP Embedded;

**ORDERED** that all of the Windows XP source code provided to Professor Hollaar and shown to other computer science experts retained by plaintiffs who sign the protective order shall be deemed Highly Confidential Information under the Protective Order; and it is further

**ORDERED** that Professor Hollaar and other computer science experts retained by plaintiffs who sign the protective order shall not use the Windows XP source code for any purpose other than in connection with their work as consulting or testifying experts in this action; and it is further

**ORDERED** that Professor Hollaar and other computer science experts retained by plaintiffs who sign the protective order shall keep the Windows XP source code in a secure location and shall take other appropriate steps to prevent the misappropriation of Microsoft's intellectual property.

**SO ORDERED.**

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

Dated: February 19, 2002

- 2 -

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SCANSOFT, INC.,                        )
                                       )
              Plaintiff                )
                                       )
      -VS-                             )  CA No. 04-10353-PBS
                                       )  Pages 1 - 102
VOICE SIGNAL TECHNOLOGIES, INC.,       )
LAURENCE S. GILLICK, ROBERT S. ROTH,   )
JONATHAN P. YAMRON, and                )
MANFRED G. GRABHERR,                   )
                                       )
              Defendants               )

**RECEIVED**

JUN 2 3 2005

**BROMBERG & SUNSTEIN**

**MARKMAN HEARING**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

    LEE C. BROMBERG, ESQ., ERIK PAUL BELT, ESQ.,
and LISA M. FLEMING, ESQ., Bromberg & Sunstein,
125 Summer Street, Boston, Massachusetts, 02110-1618,
for the Plaintiff.

    ROBERT S. FRANK, JR., ESQ., PAUL D. POPEO, ESQ.,
and SARAH CHAPIN COLUMBIA, ESQ., Choate, Hall & Stewart,
53 State Street, Boston, Massachusetts, 02109,
for the Defendants.

                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        June 17, 2005, 2:10 p.m.

                   LEE A. MARZILLI
              CERTIFIED REALTIME REPORTER
              United States District Court
              1 Courthouse Way, Room 3205
                   Boston, MA  02210
                   (617)345-6787

1    patent.

2          Now, the third issue which is key to me that I'd

3    like to sort of work through is this trade secrets issue

4    because now I have a better familiarity with the case.  And I

5    was sort of thinking -- can I just throw this out so you

6    don't all have heart failure at the end.  I can't read those

7    documents.  I mean, that would be crazy for me to do

8    something in camera.  I started skimming through them.  I had

9    no idea what they were talking about.  We have two experts in

10   this room who are independently hired experts.  Why don't I

11   disclose the documents to them, and counsel can consult with

12   the expert on what they mean and whether they support your

13   claim.  And when similarly other documents are turned over

14   that ScanSoft must turn over under your claims for

15   infringement, et cetera, your expert will look at them.  And

16   that way it's not an in-house person, it's not a competitive

17   situation, and I'd have sort of signed waivers.  I don't know

18   that your experts would be willing to do it, or maybe there's

19   some palpable conflict that I'm not familiar with, but that

20   struck me as a good way out.  And I noticed some courts were

21   doing that, which is getting an outside expert.  And since we

22   have two people sitting right here, I thought maybe during

23   the break you could ask whether there would be any conflict

24   that would preclude it.

25          MR. BROMBERG:  That's acceptable to us, your

1   Honor.  I think that would work well.

2          MR. FRANK:  It's not acceptable to us, your Honor,

3   and I can explain why if you want.

4          THE COURT:  You know what, you're going to have to

5   come up with something because I can't read those documents.

6   It's clear I wouldn't create any harm in it because I can't

7   even understand them.

8          MR. FRANK:  Our proposal is that we get together

9   and agree on a genuinely neutral expert to look at them.

10          THE COURT:  Well, maybe the two experts today can

11   get together today and agree on a third one.

12          MR. FRANK:  And that would be an acceptable way,

13   your Honor.

14          THE COURT:  That would be acceptable to me too, but

15   we've got to break this logjam, and I can't look at those

16   documents in camera, and we've to get them the documents.

17   And so it should be an independent expert who's able to look

18   at them in conjunction with counsel because they've got to

19   make an assessment about whether it does or does not support

20   their claim.  Now, they can each be each respective's

21   experts, or it can be someone that they both can go outside

22   now and figure out who they both agree is an expert, but it's

23   got to be somebody who can talk with counsel, explain what

24   they mean to him, because I'm assuming Mr. Bromberg, as smart

25   as he is, probably won't understand what half this means

1    either.  He needs to be able to have someone interpret them.

2              MR. BROMBERG:  You're absolutely right, your Honor.

3              MR. FRANK:  If I may, your Honor.

4              THE COURT:  Yes.

5              MR. FRANK:  What we would propose is that it's fine

6    with us if the two experts get together and select a neutral

7    expert so that there's as little partisanship in that as

8    possible.  The second thing that we would be prepared to do

9    is to have the plaintiffs provide whatever code they think

10   was copied, may have been copied by our side.  And the expert

11   can look at the code that we have produced, and if that

12   expert finds in there the, you know, copying or the use of

13   the core idea and thinks it's genuinely a secret -- that is,

14   that the idea in question is not generally known -- that

15   seems to us to be a fair way to go forward.  We're concerned

16   about the misuse of this material, and we believe that

17   there's substantial --

18             THE COURT:  I understand.  This is what I'm going

19   to do.  I think, if there's a concern about the partisan

20   experts, pick a third name.  Have the person --

21   Mr. Bromberg's firm will have to explain what the theory of

22   the trade secrets are to him so that he'll know or she will

23   know what to look for, and then at some point you can either

24   sit down in a mutual meeting where the expert explains what

25   he has or has not found with all of you sitting there.  We

1    can do it by means of deposition, and you'll both pay the

2    person.

3         MR. FRANK:  Fine.

4         MR. BROMBERG:  Your Honor, we --

5         THE COURT:  And the counsel will be there, and

6    counsel will be able to talk to this expert, and this expert

7    will walk through those documents, because I can't do it.

8    And so maybe by within a week someone can come up with

9    another name, and we'll just see if the person is willing to

10   do it.  Whatever the big bucks are, you'll divvy them up

11   between everybody, and we'll just get this off the dime.

12        MR. BROMBERG:  Your Honor, my only concern is that

13   we already have retained an expert, and actually we have a

14   different expert who is also here, Mr. Goldhor, for the --

15   you know, he's an expert in speech recognition software,

16   so --

17        THE COURT:  Maybe he'll be mutually agreeable, but

18   if he isn't mutually agreeable, then there have got to be

19   other people out there that both can walk through it and

20   decide.  And exactly the same person will be used for

21   whatever documents that you provide to them, and that way the

22   person is hopefully going to be neutral, you know, with

23   respect to stock interests and consulting agreements,

24   et cetera, with respect to both sides, and he'll be our

25   court-appointed expert to walk through the trade secret and

1   source code kinds of issues.

2         MR. FRANK:  That's fine with us.

3         THE COURT:  Okay?  And you'll work out a procedure;

4   you know, what's sauce for the goose is sauce for the gander;

5   and whichever side works for one will work for the other,

6   because you've got certain requests too, right?

7         MR. FRANK:  We have been trying to get from them

8   the code that underlies their accused product for six months.

9         THE COURT:  Because you want to know if there's an

10  infringement.

11        MR. FRANK:  Because we want to know if there is an

12  infringement.

13        THE COURT:  Fine.  This is exactly the kind of

14  thing we'll have this neutral person do.  It will not be

15  discloseable to anyone in the firms, and it will create or

16  destroy a good-faith belief on both sides' parts with respect

17  to either trade secret or infringement.  So that's why

18  there's an incentive on both sides to come up with an expert

19  you can agree on and a procedure you can agree on because

20  it's going to affect both sides.

21        MR. BROMBERG:  Okay, your Honor, with respect to

22  the -- well, we'll see what we can do by way of agreement.

23        THE COURT:  Right.  I don't want to take too much

24  time because we have so much to do today, but it's been

25  worrying me ever since I got the pile that that wasn't

1    realistic for me to be doing it, and it was holding the

2    litigation at a standstill.  And I also noticed the footnote

3    in the Markman hearing that you're going to have a similar

4    problem.  So since you're head-on-head competitors, that's

5    the best I can do.

6            MR. FRANK:  Let me just say this.  We have since

7    the beginning of this case asked the other side to identify

8    what trade secrets they --

9            THE COURT:  You know what, I'm past the issue.  I'm

10   past it, all right?  I'm going on.  I need to cut the -- and

11   I cannot look at those documents.  So that's what we're going

12   to do.  They'll disclose the source code that they think has

13   been copied to the independent expert.  The independent

14   expert will go through and see whether there are any trade

15   secrets that are reflected that would show that, and then

16   provide either a good-faith belief or a nongood-faith belief

17   on behalf of Mr. Bromberg that there have been some theft of

18   trade secrets.

19           And similarly on the infringement issue, you'll

20   tell him the source code.  And, of course, the two of you

21   will have it, but I'm assuming it's meaningless giving that

22   to you, to the two firms.  And you'll say the source code

23   that you think has been infringed, and the expert will have

24   to figure out from your source code whether there's an

25   infringement or not.  And then we'll get a neutral,

1  independent report that will be in camera and secret, and

2  we'll see where to go from there.  I don't know how else to

3  do this.  And we'll divvy up the payments 50/50.  And

4  hopefully you'll come up with someone who's, you know, as

5  knowledgeable as the experts in this case obviously are.

6           All right, so now let's start with your Markman

7  issue.

8           MR. BROMBERG:  Okay, your Honor, in connection with

9  the Markman hearing, we have prepared a booklet of exhibits,

10  and so I'd like to hand that up to you now.  I have two

11  copies for the Court.  And apropos with your question about

12  what's really in dispute here, the first two tabs, Tab 1 is

13  the three issues on the '966, and Tab 2 is what we thought

14  were the five issues on the '630, and hopefully that

15  simplifies and focuses it better.

16           THE COURT:  So this is what I'm hoping to do.  I'm

17  going to give you a half an hour on your issues.  That's it.

18  I've read it.

19           MR. BROMBERG:  Okay.

20           THE COURT:  I'm going to give you a half an hour on

21  your construction of your three claims under '966 and a half

22  an hour to respond, and then we're going to take a break for

23  the Court Reporter because this is thick going.  And then

24  we're going to do hopefully, you know, maybe a half an hour

25  on the three to five issues and then a half-an-hour response.

1    only what a syllable under any theory would be, right?

2         MR. BROMBERG:  I don't think so, your Honor.

3         THE COURT:  Is there anything here that we know

4    will make a difference in this litigation?

5         MR. BROMBERG:  Well, your Honor, since we can't

6    identify a product that this claim would read upon --

7         THE COURT:  Under any definition.

8         MR. BROMBERG:  Right, we don't know.  But they're

9    asserting it, and they're asking you to construe the terms;

10   and we're saying, this is the way they ought to be construed.

11        THE COURT:  Take their definitions.  Do you have

12   anything that infringes?

13        MR. BROMBERG:  I can't answer that question, your

14   Honor, without doing a lot of --

15        THE COURT:  So maybe what I should do is let

16   discovery proceed a little bit, and I'll see what matters.

17   Does that make some sense?

18        MS. COLUMBIA:  Your Honor, I think we would be

19   happy for you to do it either way.  We are here today at this

20   time in the case because the other patent is blocking

21   discovery issues and making it difficult to make progress.

22        THE COURT:  And I understand, and I want to give

23   you your day in court too.  But since the other one, we know

24   that under their definition there's going to be some

25   infringements and we don't know the extent of it and what it

1    covers, we're not so sure here, even if you took every single

2    one of -- do you know for a fact that if we gave you every

3    single one of your definitions as you want them, do you know

4    of a product that infringes?

5         MS. COLUMBIA:  We have accused specific products of

6    infringement.  Because our patent goes to the guts of how the

7    voice recognizer works, we can't know until they produce

8    their source code.

9         THE COURT:  So that's what we need to know, we need

10    to tell that expert to look at under your definitions.

11         MS. COLUMBIA:  Yes, your Honor.

12         THE COURT:  And then also under their definitions,

13    and we'll see what's a fair debate.  Does that make some

14    sense?

15         MS. COLUMBIA:  We have no objection to proceeding

16    that way, your Honor.

17         THE COURT:  Does that make some sense?

18         MR. BROMBERG:  Well, your Honor, let me say two

19    things.  We don't object to deferring these issues until we

20    see if there is anything to them, but we do object to the

21    proposition that a neutral, independent expert can be the

22    decision-maker about any of these things.

23         THE COURT:  Sure, but they're going to at least get

24    me through this impasse on who sees what.  I'll at least have

25    some neutral person look at it and say under their -- we

1    could even call the person a court-appointed expert if you're

2    all more comfortable with me doing it that way, both for

3    purposes of discovery and for purposes of possible

4    infringement.  And then eventually I will give that --

5    obviously the lawyers will have the report, but we'll have to

6    have it in a format so the experts can look at it too, but at

7    least I'll know something is there from both ends.  I mean,

8    it can be secret with me.  I won't understand what they're

9    saying anyway.  Besides, you've both talked me into believing

10   this rug is blue, so. . .

11          So let's do this.  It's late on a Friday.  It's

12   been well briefed.  I'm very thankful that a number of things

13   have been honed in.  I'm going to be here next week, the end

14   of next week, but then I'm on vacation the last week in June,

15   and then I'm back for most of July and August.  So when do

16   you think you could come up with and find a neutral expert by

17   using both of your experts?  Do you think we could do this by

18   the second week in August?

19          MR. FRANK:  Your Honor, let me say --

20          THE COURT:  Excuse me.  The second week in July?

21          MR. BROMBERG:  Yes, your Honor.

22          MR. FRANK:  Why don't you turn us loose for some

23   defined period of time and see if we can agree.

24          THE COURT:  July 15 come up and find an expert who

25   can give us the time fairly rapidly?

1          MR. FRANK:  Yes, and I would add one more thing.

2    If we are unable to agree, then we should each nominate

3    someone, and your Honor can pick him out of a hat.

4          THE COURT:  Fair enough.  That's fine, okay.  And

5    then whoever that is, I'll designate an independent expert,

6    who will give me a first cut-through on trade secrets as well

7    as infringement.  And it obviously is not the final say.  I

8    don't think I get off that easy.

9          Is it possible that the answers that are provided

10   to facilitate a settlement -- I'm going to be working on, by

11   the way, the ScanSoft patent in any event.  That I'm not

12   putting off.  But it could help work through some of these

13   issues in a way that could help you enter into settlement

14   discussions.

15         I guess I'm putting this inartfully.  The question

16   I have is:  I'm going to be working on an opinion on the

17   ScanSoft, but if you've got some opinions from this

18   independent person that could help bring the parties

19   together, I wouldn't want for me to issue an opinion that

20   upset the apple cart one way or another.

21         MR. FRANK:  Your Honor, we have deposition

22   testimony that says that they have no idea whether we used

23   any trade secrets of theirs or not.  We can present that to

24   you.  They're not interested in that.  This case is about --

25   has little to do with the legal merits.

1          THE COURT:  Put the trade secrets aside for a

2     minute.  I'm talking about some sort of cross-licensing or

3     something like that.

4          MR. FRANK:  We're all ears.  This case is motivated

5     by something other than the merits of the case, and therefore

6     I think it's very unlikely that it's going to settle.

7          THE COURT:  Well, that may be.  I'm simply saying,

8     whatever this independent expert says may support or defeat

9     that theory.

10          MR. FRANK:  I predict that if your Honor were to

11     rule that there was nothing to any of this stuff, they'd sue

12     us for something else because their objective has to do with

13     continually suing us.

14          THE COURT:  Yes, but assume for a minute that the

15     independent expert says, "There's no trade secret here.

16     They've told us about the source code.  Don't worry about it,

17     there's nothing here that's related to it," or contrarily

18     that "Yes, there is," the question that I have is, would that

19     move you closer to settlement?

20          MR. FRANK:  Mr. Bromberg?

21          MR. BROMBERG:  Well, you mean apart from the patent

22     claim, your Honor?

23          THE COURT:  No.  Globally.  I mean, why would you

24     settle the trade secrets and not settle the -- I know that a

25     couple of the other cases have settled, right?  Or at least

1    one other one has, right?

2           MR. BROMBERG:  Yes, one other one did settle, your

3    Honor.  The resolution of the trade secret claim in one

4    direction or the other could spark settlement discussions.  I

5    believe your Honor's ruling on the '966 patent could have the

6    same effect.

7           THE COURT:  Well, I'm going to be chugging along,

8    I'm not going to stop then, because that's very discrete and

9    limited, and I can do something with it.  I'm going to hold

10   off on this to find out, once you've turned over all your

11   source code to this independent expert, whether or not

12   there's anything under their definitions that's going to be

13   infringing and whether it's infringing under yours, and then

14   I'll know if there's a real serious dispute here.  And then

15   we'll meet without the parties here with the independent

16   expert and possibly with an expert from each side to argue

17   the case, with clear protective orders against disclosing it

18   to the competing parties.  That's how I envision this

19   happening.

20          So just let me know where you are on July 15.  And

21   I'm around, and you can run in sometime around then, and I

22   will try and figure out a procedure if you don't agree,

23   okay?

24          MR. FRANK:  That's fine, your Honor.

25          MR. BROMBERG:  Your Honor, just one more thing.  I

1    think it goes with what you said, but we're out of time on

2    our schedule.  And I'm assuming that -- this is for

3    discovery, et cetera -- I'm assuming that those dates are

4    just pushed off while these issues get resolved?

5           THE COURT:  You know, I'm always nervous about

6    that.  Should I just say pushed off three months?  I mean, I

7    just don't want to leave it open-ended.

8           MR. BROMBERG:  That would be fine.

9           THE COURT:  Or do you want to just sit and talk by

10   the 15th and come up with an alternative schedule?

11          MR. FRANK:  Let me make a distinction, your Honor.

12   We are stuck on the trade secret side clearly on this

13   question of who converted what.

14          THE COURT:  Right.

15          MR. FRANK:  On the other hand, with respect to the

16   '966 patent, there has been a full opportunity for

17   discovery, and we think we're at the deadline.  We think that

18   part should be over.

19          THE COURT:  Both of those make sense.

20          MR. BROMBERG:  No, that's wrong, your Honor.

21          THE COURT:  You know, it's now five of 5:00, and

22   obviously there's some disagreement, not surprisingly.  So I

23   think what needs to happen is, I think what we're better off

24   doing is in a fresh way coming in, if Robert can find us a

25   half an hour in July.  I'll know where you are in finding an

1    expert.  I'll know what our timetable is.  If you'll both

2    give me proposals as to how you think it should continue.

3    Right now the deadlines are in place, so there's no more

4    discovery unless I allow more discovery.  And I may.  I just

5    don't know.  That's obviously not going to be true of the

6    trade secrets piece if I let it go forward, but under the

7    '966 it may.

8         MR. BROMBERG:  Well, your Honor, with due respect

9    to the Court, the last time we were here you said you would

10   not let the curtain come down on me being deprived of all

11   discovery on the trade secret claims.

12        THE COURT:  But it doesn't apply to trade secrets,

13   I agree.

14        MR. BROMBERG:  Okay, that's fine.  On the patent

15   side, your Honor, we have an order from Magistrate

16   Judge Alexander that says, "Turn over your source code," turn

17   over his source code to ScanSoft so ScanSoft can look at it

18   and assess the infringement issue.

19        THE COURT:  I just took care of that issue.

20        MR. BROMBERG:  But we haven't had a chance to look

21   at it yet, your Honor.

22        THE COURT:  No, no, now you're not hearing me.

23   That's why I'm setting up the independent expert is to deal

24   with that.

25        MR. BROMBERG:  I understand that, your Honor.

1          THE COURT:  So right now all discovery is under the

2     old deadlines until I get to impose new deadlines.  And you

3     obviously aren't agreeing, so I'm going to set up another

4     status conference so you can give me your respective

5     proposals and all of us aren't exhausted after a long week.

6     So that's the best bet.  I won't cut you off at the knees, I

7     promise, particularly on trade secrets.  I won't do that to

8     you, but I just don't think I'm ready -- it's now five of

9     5:00 -- to go head to head on a scheduling order, especially

10    since it will be so much more helpful when I have an expert

11    in mind, I have a timetable in mind, I'll know what to think

12    about it.  So in July, like around the 15th, 16th, the next

13    week, the 20th, somewhere in there?

14          THE CLERK:  July 18 at 2:00 p.m.

15          THE COURT:  All right, so it gives you basically a

16    month to get an expert in line, give me alternative sets of

17    proposals.  We'll be working on this, and hopefully we'll be

18    done with it by the end of the summer and so I don't start a

19    new clerk on it, but if not, it will create some delay.

20          MR. BROMBERG:  Your Honor, we do have some

21    depositions scheduled right now.  Are you saying that we

22    should not do them or just go ahead and --

23          THE COURT:  That's fine.  If they have been

24    prescheduled, do them.

25          Anybody want the Miriam Webster definition of

1                        C E R T I F I C A T E

2


3

UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7

8           I, Lee A. Marzilli, Official Federal Court

9  Reporter, do hereby certify that the foregoing transcript,

10 Pages 1 through 102 inclusive, was recorded by me

11 stenographically at the time and place aforesaid in Civil

12 Action No. 04-10353-PBS, ScanSoft, Inc. Vs. Voice Signal

13 Technologies, Inc., et al, and thereafter by me reduced to

14 typewriting and is a true and accurate record of the

15 proceedings.

16          In witness whereof I have hereunto set my hand this

17 22nd day of June, 2005.

18

19

20

21

22

23  _____
    LEE A. MARZILLI, ORR
24  OFFICIAL FEDERAL COURT REPORTER

25

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SCANSOFT, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 04-10353 PBS |
| | ) |
| VOICE SIGNAL TECHNOLOGIES, INC., | ) |
| LAURENCE S. GILLICK, ROBERT S. | ) |
| ROTH, JONATHAN P. YAMRON, and | ) |
| MANFRED G. GRABHERR | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF RICHARD GOLDHOR, PhD

I, Richard Goldhor, declare as follows.

1.    I am a consultant in the speech processing software industry, in which I have worked for the past 28 years. I have designed and developed speech recognition software and other innovations in speech processing technology for many companies including Kurzweil Applied Intelligence, Inc., once a leader in speech recognition research and development. I am also the inventor or co-inventor of several patents in the field. I have authored several publications on the design and implementation of speech recognition and speech processing technologies. I am currently principal and consultant of Grapevine Software, a consulting, research and development firm specializing in software development and research.

2.    ScanSoft, Inc. ("ScanSoft") has asked me to comment on the computer text files produced by Voice Signal Technologies, Inc. ("VST") in connection with the above-captioned lawsuit, and in particular, how the computer software works and what information the source code contains.

2

3.      In forming my opinions contained in this Declaration, I have examined a Compact Disk ("CD") provided to me by attorneys for ScanSoft. I understand VST has represented to ScanSoft that the CD contains the source code for the user interface portion of VST's VSuite product.

4.      As a general matter, there are several deficiencies with regard to the CD that are so significant that I cannot render any substantive opinion about the source code provided on the CD. These deficiencies are outlined below.

5.      I have observed that the CD contains four folders, or subdirectories, labeled: (1)



The attached Table 1 lists some basic information about each of these files.

6.      Table 1 also demonstrates that each of the files in the CD contain references to multiple "include files" Include files are also known as "header files" and conventionally have names that end in ".h." Such files generally contain additional lines of source code, which may substantially augment or alter the intellectual content of the source code. An "include statement" appearing in the source code indicates that the statement is to be replaced with the contents of the specified header file. The header file itself may contain any number of statements including complex source code that implements complete algorithms. The effect of the include statement in the source code is to insert the contents of the include file into the source file at the point in the source file where the include statement appears. The include statement has the effect of making the contents of the "include" file part of the source code. Table 2 shows the list of include files referenced by name but not provided in the CD.

3

7.     Because the include files have not been provided, the source code is incomplete, and has no single unambiguous meaning. That is, I cannot determine what the intellectual content of the source code is, because I only have access to part of it. I have confirmed this incompleteness by attempting to compile the source code. Compiling source code is the necessary first step in converting human-readable code into executable code. Any complete module of source code that conforms to the rules of the programming language in which it has been written can be compiled. Therefore, attempting to compile source code is an objective and reliable way to identify incomplete or incorrectly-written code.

8.     In order to compile source code, the expert must know the programming language in which the source code is written. My review of the CD provided by VST suggests that the source code is written in the "C" programming language. However, when I attempted to compile the source code with a standard C compiler, I observed multiple "fatal" compilation errors. My attempts to use a standard C compiler to compile the source code failed because as stated in paragraph 5 above, a number of "include" files are missing from the CD. These fatal error messages are not surprising, because when a standard C compiler is attempting to compile source code, if the compiler cannot locate certain files in the source code, it will generate a fatal error and abandon the attempt to build an object file from that source code.

9.     In my experience, there are typically multiple versions of a software product. There are many reasons for the existence of multiple versions of a software product. Perhaps the most obvious is that over time software developers create more complex versions of a product from earlier simpler versions. Software vendors are also likely to create multiple versions of a product in order to vary the functionality and capabilities of the software that they can offer customers.

4

As a result, the intellectual property content of a product will generally vary from version to version and in some cases may change substantially even though the change in intellectual property content may not be readily apparent or detectable at all to the average user of the product.

10.     It is a standard professional practice for software developers and vendors to maintain repositories or archives of material from which they can regenerate any version of a product. These repositories are created and maintained by computer applications called version control systems. An important goal of any version control system is to allow a software developer to reliably recreate any important version of a software product *ab initio*. In essence, the version control system provides a history of the source code's development over time.

11.     A standard version control system allows for every version of each file that was stored in the system to be faithfully maintained by the system along with detailed information about the times and dates when that file was modified. Thus, the contents of a version control repository serves as a useful and objective history of the development of a software product. The ability of a software vendor to rebuild versions at will is so valuable that considerable effort and resources are often devoted to supporting this activity. A corporate asset of roughly comparable value and commanding a comparable investment of resources might be a company's general accounting system for example.

12.     The CD I examined does not contain a version control repository or archive. Given the absence of any version control information on the CD I examined, I am not able to determine with any reasonable degree of certainty at what point in time any modifications were made to the source code. Table 1 shows that the date and time stamps of the files on the CD do not represent plausible dates for the actual creation of their content. Fourteen of the files have a nominal creation

5

date of March 9, 2005, and a "last edited" date ranging from February 10, 2005 to March 8, 2005. The other two files have a creation date of January 23, 2104, and a blank "last edited" date.

13.   In my opinion, additional computer files must accompany the source code in order for a technical expert to reach a reliable opinion about the intellectual content of the source code.  Moreover, I am not able to determine with any reasonable degree of certainty (i) the relationship between the source code provided and the VSuite product; (ii) the substantive characteristics of the environment in which the source code was designed to be built; and (iii) how to successfully compile the source code in the programming language in which it was designed.

14.   In my opinion, the requirements for developing reliable opinions on the intellectual content of VST's source code include: (1) information that identifies the particular version or release of the each of VST's speech recognition software products; (2)a specification of the target platform on which each product release is intended to operate (e.g. IBM, Windows, Macintosh); (3) information about the build and release tools used to create the product; (4) the specification and control files used with those tools to create the product; and (5) all source code components and other primary files necessary for rebuilding each relevant release component from the source code.  These files are typically available to software vendors and programmers as part of the vendor's archival and repository system.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON JULY 18, 2005.

RICHARD GOLDHOR, PhD.

9

| File name | Folder pre_vsuite | | | | Folder vsuite1.1 | | | | Folder vsuite1.3 | | | | Folder vsuite2.0 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nominal Creation Date | Nominal "Last Modified" Date | # of missing include files | # of undeclared identifiers[1] | Nominal Creation Date | Nominal "Last Modified" Date | # of missing include files | # of undeclared identifiers[1] | Nominal Creation Date | Nominal "Last Modified" Date | # of missing include files | # of undeclared identifiers[1] | Nominal Creation Date | Nominal "Last Modified" Date | # of missing include files | # of undeclared identifiers[1] |
| REDACTED | 1/23/2104[2] | [blank][2] | 12 | 5 | 3/9/2005 | 3/8/2005 | 22 | 18 | 3/9/2005 | 3/8/2005 | 22 | 18 | 3/9/2005 | 3/8/2005 | 22 | 18 |
| REDACTED | 1/23/2104[2] | [blank][2] | 6 | 10 | 3/9/2005 | 3/7/2005 | 15 | 19 | 3/9/2005 | 3/7/2005 | 18 | 33 | 3/9/2005 | 2/10/2005 | 24 | 44 |
| REDACTED | 3/9/2005 | 3/8/2005 | 7 | 18 | 3/9/2005 | 3/7/2005 | 17 | 25 | 3/9/2005 | 3/7/2005 | 18 | 25 | 3/9/2005 | 3/8/2005 | 19 | 32 |
| REDACTED | 3/9/2005 | 3/8/2005 | 6 | 7 | 3/9/2005 | 3/7/2005 | 17 | 13 | 3/9/2005 | 3/7/2005 | 17 | 18 | 3/9/2005 | 3/8/2005 | 20 | 29 |

**Table 1: Basic properties of Subject Material files.**

**Notes:**

[1] Approximate value: actual number of undeclared identifiers may be larger.

[2] These creation dates are illegal values—that is, dates that would never appear if the values were set to record the actual date that the file was created. The fact that the "last modified" date listings are blank indicate that their stored date values are also illegal.

REDACTED

ED

REDACTED

REDACTED

Table 2: List of missing include files: each of these files are specified in one or more "#include" statements in the Subject Material, but are not included in that Material.