1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3
                                        **RECEIVED**
_____
4                                )        JUN 21 2005
   SCANSOFT, INC.,               )
5                                )      **BROMBERG & SUNSTEIN**
           Plaintiff,            )
6                                )
     v.                          )      C.A. No. 04-10353-PBS
7                                )
   VOICE SIGNAL                  )
8  TECHNOLOGIES, INC.,           )
   LAURENCE S. GILLICK,          )
9  ROBERT S. ROTH,               )
   JONATHAN P. YAMRON,           )
10 and MANFRED G. GRABHERR,      )
                                 )
11         Defendants.           )
_____  )
12                                      ORIGINAL
13

14

15

16         DEPOSITION OF MANFRED G. GRABHERR, Ph.D., a
17 witness called by and on behalf of the Plaintiffs,
18 taken pursuant to the applicable provisions of the
19 Federal Rules of Civil Procedure, before Dana Welch,
20 CSR, Registered Professional Reporter, and Notary
21 Public, in and for the Commonwealth of Massachusetts,
22 at the offices of Bromberg & Sunstein, 125 Summer
23 Street, Boston, Massachusetts, on June 16, 2005,
24 commencing at 10:04 a.m.

Page 2

```
 1    APPEARANCES:
 2    For the Defendants:
 3         CHOATE, HALL & STEWART, P.C.
           Exchange Place
 4         53 State Street
           Boston, Massachusetts  02109
 5         (617) 248-5000
           By:  Paul D. Popeo, Esq.
 6
      For the Plaintiff:
 7
           BROMBERG & SUNSTEIN, LLP
 8         125 Summer Street, 11th Floor
           Boston, Massachusetts  02110-1618
 9         (617) 443-9292
           By:  Lisa Fleming, Esq.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1      did was --

2           MR. POPEO:  If she has a follow-up

3      question she will ask you.

4           THE DEPONENT:  All right.

5   BY MS. FLEMING:

6      Q.  So it's your testimony that you were

7   unsure as to whether you had confidential

8   information from previous employers when you

9   joined Voice Signal Technologies?

10          MR. POPEO:  I object.  You may answer.

11          THE DEPONENT:  Yes.

12  BY MS. FLEMING:

13     Q.  Now, it's true, isn't it, that when you

14  worked for Lernout & Hauspie you were involved

15  in developing algorithms for speech

16  recognition; is that true?

17     A.  That is true.

18     Q.  And in the course of your work in

19  developing these algorithms, did you have an

20  understanding about whether the work that you

21  did in that development was confidential?

22          MR. POPEO:  Object to the form of the

23      question.  If that was your understanding,

24      you may answer.

1    THE DEPONENT:  I would like to clarify

2    one thing, which is speech recognition and

3    the basic algorithms is an area that's been

4    well understood for a very long time.  So

5    the first approach to solve the problem of

6    speech recognition dates back I don't know,

7    maybe three decades or so, probably even

8    longer.

9    And also, there is this one technique

10    which is called hidden Markov model, which

11    most commercial and open source speech

12    recognition systems use.  And that's also

13    been very well understood for a long time.

14    There are many other things, like the

15    use of a language model to assist

16    large-vocabulary recognition, which is also

17    widely known and published in the public

18    domain and many other things.

19    So this is, I think important to

20    understand, that if you work on something,

21    then it's not necessarily immediately clear

22    whether you do something that is totally in

23    the public domain or your specific

24    implementation is something that's

Page 38

1          proprietary.

2     BY MS. FLEMING:

3          Q.   And is it your testimony that the

4     specific implementation was not confidential?

5              MR. POPEO:   I object to the form of the

6          question.   If you understand that question,

7          you may answer.

8              THE DEPONENT:   So is the question

9          whether the specific implementation was

10         proprietary information?

11    BY MS. FLEMING:

12         Q.   Yes.

13             MR. POPEO:   Slow down.   Are you asking

14         whether he was aware of a proprietary

15         implementation?

16    BY MS. FLEMING:

17         Q.   Did you understand my question?

18         A.   Can you say it again, please.

19             MS. FLEMING:   Sure can you read it

20         back.

21             THE REPORTER:   "Question:   'And is it

22         your testimony that the specific

23         implementation was not confidential?'"

24             MR. POPEO:   Objection.

1          THE DEPONENT:  No.  I can't say that it

2      was not confidential.

3  BY MS. FLEMING:

4      Q.  Can you say it was confidential?

5          MR. POPEO:  Were you informed that it

6      was confidential?

7          MS. FLEMING:  Mr. Popeo, stop running

8      this deposition or we will terminate it and

9      go to the judge.

10          THE DEPONENT:  Sorry.  Say it again,

11      please.

12          MS. FLEMING:  Can you read the question

13      back?

14          THE REPORTER:  "Question:  'Can you say

15      it was confidential?'"

16          THE DEPONENT:  I can't remember a

17      single case in which I could say this is

18      definitely confidential.

19  BY MS. FLEMING:

20      Q.  Well, tell me about what you developed

21  at Voice Signal -- I'm sorry -- at Lernout &

22  Hauspie that you're not sure was confidential.

23          MR. POPEO:  He's testified he's not

24      sure anything was confidential.

Page 40

1    BY MS. FLEMING:

2        Q.  Tell me what you worked on at Lernout &

3    Hauspie that causes you to believe that you're

4    not sure whether it was confidential or not?

5            MR. POPEO:  Object to the form.

6    BY MS. FLEMING:

7        Q.  Give me an example.

8        A.  Okay.  I'll give you an example.  One

9    of the problems in speech recognition is the

10   method to score parts of speech against your

11   acoustic models in order to get some measure of

12   how close, you know, a particular sound is with

13   a sound template that you have in the

14   recognizer.  And one of the problems is this

15   can take up quite a long time because this is a

16   rather expensive operation.

17           There are techniques in which -- which

18   allow you to do this faster by using certain

19   approximations.  And I remember that in one of

20   Lernout & Hauspie's speech recognizers, there

21   was a method being used that was well

22   published, was in the public domain.  But I did

23   a pretty minor modification to it, so make it

24   use less memory.  So the two things, whether

1    the fact that this technique was used was

2    confidential, I don't know.  I wasn't sure

3    about that.

4        Q.  Let me stop you there, if I can.

5        A.  Yeah.

6        Q.  And it's a long-winded answer and

7    there's a lot of information in there.

8        A.  Okay.

9        Q.  So let me ask you this:  You testified

10   to having recognized that the modeling may have

11   been disclosed in a publication, it may have

12   been publicly known; is that right?

13       A.  Yes.

14       Q.  What was that modeling?  Can you

15   describe it for me?

16       A.  It was a technique.  It was called

17   short lists.

18       Q.  Short lists?

19       A.  I believe that was title.  It might

20   have had a more complicated title, but that's

21   the name by which I remember this.

22       Q.  And your testimony is that that

23   technique of short lists was published?

24       A.  Yes.

1      Q.  And then I believe you said that you

2   made a minor modification to that technique; is

3   that right?

4      A.  Yes.

5      Q.  Okay.  And is it your testimony that

6   your minor modification of that technique was

7   not confidential to Lernout & Hauspie?

8          MR. POPEO:  Object to the form of the

9          question.  If you understand, you can

10         answer it.

11         THE DEPONENT:  No.  What I'm saying is

12         that there are two things here.  One is the

13         modification.  I can't say for sure whether

14         this is confidential; at the time, I

15         assumed it was.

16  BY MS. FLEMING:

17     Q.  You did?

18     A.  Yes.  The second thing is the fact that

19  this technique was used, I just don't know

20  whether this was confidential information.

21     Q.  You assumed it was, but you don't know;

22  is that --

23         MR. POPEO:  Object.

24         MS. FLEMING:  I just want to understand

Page 43

1          his testimony.

2               MR. POPEO:  Object to form.  That

3          mischaracterizes the testimony.

4               THE DEPONENT:  Yeah.  If there was ever

5          some doubt, I would assume that it's

6          confidential.

7     BY MS. FLEMING:

8          Q.  And did you treat that minor

9     modification that you made at Lernout & Hauspie

10    as confidential?

11         A.  Yes.

12         Q.  And you never disclosed it to anyone?

13         A.  No.

14         Q.  Did you disclose it to anyone at

15    Lernout & Hauspie?

16         A.  I don't recall.  Probably.

17         Q.  And what did your minor modification to

18    the short list do, what did it achieve?

19              MR. POPEO:  Object to the form.  Answer

20         the question, if you can.

21              THE DEPONENT:  So from what I remember,

22         I don't remember the specific details, but

23         from what I remember, it reduced the memory

24         usage.

Page 44

1    BY MS. FLEMING:

2       Q.  The memory usage for what?

3       A.  For -- this particular technique

4    required you to store certain structures in

5    memory.  And this minor modification would

6    simplify this technique a little bit.  But it

7    would also save memory so you could fit it into

8    less memory.

9       Q.  And what's the result -- in speech

10   recognition research and development, what's

11   the result of being able to perform that task

12   with less memory?

13           MR. POPEO:  Object to the form of the

14       question.  You may answer, if you can

15       generalize and if you understand it.

16           THE DEPONENT:  Can you say it again,

17       please?

18           MS. FLEMING:  Will you read it back,

19       please.

20           THE REPORTER:  "Question:  'And what's

21       the result -- in speech recognition

22       research and development, what's the result

23       of being able to perform that task with

24       less memory?'"

1          MR. POPEO:  Same objection.

2          THE DEPONENT:  In general speech

3     recognition, if it would, in a very

4     straightforward way, and if you use memory

5     techniques that attempt to get you the

6     maximum accuracy for a task like

7     speech-to-text or large-vocabulary

8     recognition, you will end up using a lot of

9     memory because that's -- these algorithms

10    that deal with large amounts of data and

11    you have to keep the data somewhere.

12         Then in addition, just doing this

13    matching between, you know, speech and your

14    words in the vocabulary and the underlying

15    phonetics, if you don't do anything smart

16    about it, you will end up using very, very

17    much memory and also it will be very slow.

18         So any attempt, even on relatively

19    small modules to reduce the memory

20    footprint is beneficial and because

21    otherwise, you wouldn't be able to fit it

22    on a regular PC.

23 BY MS. FLEMING:

24    Q.  And when you say it's beneficial, do

Page 46

1    you mean in some commercial sense it's

2    beneficial?

3        MR. POPEO:  Object to the form of the

4        question.  If you know the answer, you may

5        answer.

6        THE DEPONENT:  Yes, because ultimately,

7        you don't want speech recognition systems

8        that run on super-high-end computers.  You

9        want speech recognition systems that, you

10       know, run on regular PCs; at least that was

11       the goal of Lernout & Hauspie.

12   BY MS. FLEMING:

13       Q.  And that was an important goal to the

14   company, wasn't it?

15       MR. POPEO:  If you know.

16       THE DEPONENT:  In this -- I don't

17       remember what the fact was of this

18       modification.  It was not a major thing.

19       It was not something that would make or

20       break, you know, the ability to run on a

21       PC.  But a speech recognition system is a

22       very complex thing and you have many, many

23       different --

24

1    BY MS. FLEMING:

2        Q.  I'll agree with you there.

3        A.  -- and you have many different modules

4    or pieces of this thing.  And each of them

5    wants to get memory.

6            So you can not easily do something like

7    say, oh, I'm going to make this one change and

8    I will drop the memory usage by, I don't know,

9    50 percent.  So usually that's not the way this

10   works.  You have all these different things and

11   each of one allocates, let's say one megabyte

12   of memory.  And if you can get this

13   one megabyte down to 0.8 megabyte, that's good.

14   Then you go on to the next thing, which uses 2

15   megabytes; you get it down to 1.8 megabytes.

16   But it all adds up.  So then you have to go

17   back and say, well, this still needs too much

18   memory, so maybe we can do something else.  We

19   have to, I don't know, look for other ways.

20       Q.  And so you would agree with me then

21   that a desired goal of the work in speech

22   recognition would be to reduce memory and at

23   the same time increase accuracy; is that an

24   accurate statement?

Page 48

1          MR. POPEO:  Object to the form of the

2      question.  Compound.  Are you asking for

3      him to generalize?

4  BY MS. FLEMING:

5      Q.  Do you understand the question?

6          MR. POPEO:  Or at Lernout & Hauspie?

7  BY MS. FLEMING:

8      Q.  Do you understand the question, sir?

9      A.  So you're asking about speech

10  recognition in general?

11      Q.  Yes.

12      A.  Yes.  That would be the goal, to have

13  something that uses virtually no memory, is

14  infinitely accurate, and doesn't use CPU

15  resources.  But in the real world -- I mean,

16  one would like that, right.

17      Q.  So in terms of the minor modification

18  that you made when you were at Lernout &

19  Hauspie to the short list, that would be

20  considered an improvement, wouldn't it?

21          MR. POPEO:  Object to the form.

22          THE DEPONENT:  Yeah.  It's an

23      improvement.

24          MR. POPEO:  Let's take our first break.

Page 50

1    you were employed by Lernout & Hauspie, you may

2    have had access to confidential information?

3            MR. POPEO:  Object to the form.

4            THE DEPONENT:  Well, the thing is,

5        nobody ever told me this particular thing

6        is confidential or is a trade secret or

7        anything.  And also, I don't remember any

8        list or anything that says, well, look at

9        these areas, even like more broad level,

10       that these things would be confidential or

11       trade secret.  I don't even recall anything

12       that says use your own judgment.  So if --

13       again, I wasn't sure.  So to me it was a

14       very fuzzy thing.

15   BY MS. FLEMING:

16       Q.  Did you ever ask?

17       A.  I don't remember.

18       Q.  You don't remember if you ever asked

19   whether any of the work you worked on at

20   Lernout & Hauspie was confidential?

21       A.  It's likely that I did, but I don't

22   remember.  In any case -- but if I still

23   thought that, you know, there must be something

24   that's confidential, maybe.  And I don't know

Page 51

1   what it is.  Nobody ever told me.  But I'll

2   treat it as such if I'm not sure.

3       Q.  And that's, in fact, what you did,

4   treat it as such?

5       A.  Whenever I wasn't sure whether

6   something was confidential, I said well, I

7   treat it as confidential.  I'm not going to

8   disclose it.

9       Q.  Did you work on short lists at Voice

10  Signal Technologies?

11      A.  No.

12          MR. POPEO:  Object to the form of the

13      question.

14  BY MS. FLEMING:

15      Q.  Never?

16      A.  No.

17      Q.  Now, I direct your attention to

18  paragraph 9 of this Exhibit 2, the agreement,

19  on page VST 03743.

20      A.  Yes.

21      Q.  Paragraph 9 is subtitled, No

22  Conflicting Obligation.  Do you see that?

23      A.  Yes.

24      Q.  And you would agree with me that

1    obtained in the Voice Xpress project product of

2    Lernout & Hauspie, if you know?

3        A.   I don't remember how this worked in

4    Voice Xpress.

5        Q.   Do you remember how it worked in

6    Phoenix?

7        A.   I don't know the details about it

8    because I did not implement the language model

9    for Phoenix.

10       Q.   Did you implement the language model

11   for ELVIS?

12           MR. POPEO:   Objection to form.

13           THE DEPONENT:   No, I did not.

14   BY MS. FLEMING:

15       Q.   Okay.  How do you know then how the

16   scores are obtained in ELVIS if you didn't

17   implement the language model?

18       A.   Because I wrote some code that used the

19   language model.

20       Q.   So you're familiar with the language

21   model?

22       A.   Yes.  So I have to know what it's doing

23   in order to use it.

24       Q.   Did you write some code at Lernout &

Page 103

1    Hauspie?

2             MR. POPEO:  Any code?

3             THE DEPONENT:  Any code that used

4       language model?

5    BY MS. FLEMING:

6       Q.  Yes.

7       A.  Yes.

8       Q.  You did?

9       A.  Yeah.

10      Q.  So did you have access to the language

11   model in terms of how the scores were obtained?

12            MR. POPEO:  Objection to form.

13            THE DEPONENT:  I could have looked it

14       up and probably did look at the code, but I

15       don't remember the specifics about it.

16   BY MS. FLEMING:

17      Q.  As you sit here today, you don't

18   remember the specifics of how the scores were

19   added up in the Phoenix project?

20      A.   Right.  I don't remember that,

21   specifically how this worked.

22      Q.  But you know it was different than how

23   the -- Voice Signal implemented the language

24   models?

1      faster.

2          But since building a tree -- I mean,

3      again, it matters what the tree is.  And I

4      also maybe should clarify another thing,

5      which is that the ELVIS recognizer did not

6      build the tree out of the vocabulary during

7      recognition -- or before recognition.  I'm

8      sorry.

9    BY MS. FLEMING:

10      Q.  Okay.  Before we get to that, though.

11   You're moving onto another subject.  I want to

12   make sure I understand what you're saying.  And

13   I believe that you testified that there are

14   ways to build the trees where it becomes faster

15   to go through the vocabulary.  Is that

16   accurate?

17          MR. POPEO:  Objection.

18          THE DEPONENT:  Yes.

19   BY MS. FLEMING:

20      Q.  And you built a lexical tree in

21   connection with your work on the Phoenix

22   project at Lernout & Hauspie, correct?

23      A.  Yes.

24      Q.  And you learned certain techniques

Page 185

1  about how to build that lexical tree when you

2  were at Lernout & Hauspie; is that correct?

3       MR. POPEO:  Object to the form of the

4       question.  Assumes a fact not in evidence.

5       THE DEPONENT:  Well, I did know how to

6       build lexical trees when I started to work

7       at L&H from my work at Philips.

8  BY MS. FLEMING:

9       Q.  So you built lexical trees when you

10  were at Philips?

11      A.  Yes.

12      Q.  And then you learned -- let me ask you

13  this:  Did you learn more about how to build

14  lexical trees in a faster way at Lernout &

15  Hauspie?

16      MR. POPEO:  Object to the form of the

17      question.

18      THE DEPONENT:  I don't think so.

19  BY MS. FLEMING:

20      Q.  Did you learn how to build lexical

21  trees in a faster way when you were at Voice

22  Signal Technologies?

23      A.  No.  And the reason is, at Voice Signal

24  in the ELVIS recognizer, the tree was built

1    off-line.  So it was not being processed on the

2    cell phone or the embedded device.  So

3    ultimately, it doesn't matter how long it

4    takes.

5        Q.  But you built it?

6        A.  I wrote the code that builds the

7    lexical tree in the ELVIS.

8        Q.  And you wrote the code that built the

9    lexical tree for the Phoenix project?

10       MR. POPEO:  Objection to form.

11   Mischaracterizes testimony.

12       THE DEPONENT:  Yes.

13   BY MS. FLEMING:

14       Q.  You also said you wrote the code, you

15   wrote the part of the code that was a module

16   for searching the lexical tree?

17       A.  Yes.

18       Q.  Is that right?

19       Okay.  Describe for me what that

20   portion of the code accomplishes or what tasks

21   does that accomplish?

22       MR. POPEO:  Objection.

23       THE DEPONENT:  Okay.  So if you talk

24       about a generic recognizer again, then the

Page 322

1                        CERTIFICATE

2

COMMONWEALTH OF MASSACHUSETTS

3    SUFFOLK, SS

4        I, Dana Welch, Registered Professional

5    Reporter and Notary Public in and for the

6    Commonwealth of Massachusetts, do hereby

7    certify:

8        That MANFRED G. GRABHERR, the witness

9    whose deposition is hereinbefore set forth, was

10   duly sworn by me and that such deposition is a

11   true record of my stenotype notes taken in the

12   foregoing matter, to the best of my knowledge,

13   skill and ability.

14       IN WITNESS WHEREOF, I have hereunto set

15   my hand this 16th day of June, 2005.

16

17            DANA ULRICH WELCH
         _____ __

              Dana Welch, RPR

18            Registered Professional Reporter

19

20

21

22

23

24