UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SCANSOFT, INC.,

    Plaintiff,

       v.

VOICE SIGNAL TECHNOLOGIES, INC.,
LAURENCE S. GILLICK, ROBERT S. ROTH,
JONATHAN P. YAMRON, AND
MANFRED G. GRABHERR,

    Defendants.

CASE NO.    04-10353-PBS

## MEMORANDUM OF SCANSOFT IN OPPOSITION TO MOTION TO DISQUALIFY GOODWIN PROCTER LLP

Paul F. Ware Jr., P.C. (BBO # 516240)
Kenneth A. Cohen (BBO #089560)
Douglas J. Kline (BBO # 556680)
Daniel F. Forman (BBO # 637405)
GOODWIN PROCTER  LLP
53 State Street
Boston, MA 02109-2881
Tel:    (617) 570-1000
Fax:    (617) 523-1231
*Counsel for Plaintiff ScanSoft, Inc.*

DATED:  November 18, 2005

Voice Signal Technologies, Inc.'s Motion to Disqualify Goodwin Procter is based on VST's interview of Goodwin Procter when it was choosing counsel to represent it in this case one and a half years ago. Daniel Roth, VST's President, states that VST met with Choate, Hall & Stewart and Goodwin Procter "to decide on which should represent us," and after two meetings with Goodwin, "Voice Signal chose Choate to represent Voice Signal in this litigation." Though VST never retained Goodwin to represent it in this litigation, it now argues that Goodwin should be disqualified under Rule 1.9 of the Massachusetts Rules of Professional Conduct because it implicitly became VST's attorneys during VST's "beauty contest." VST's motion is not supported by Massachusetts law. VST did not reasonably believe that Goodwin was acting as its attorneys, did not disclose non-public information that could now be used to its disadvantage and did not receive legal advice from Goodwin. Accordingly, Goodwin and VST never formed even an implicit attorney-client relationship and VST's motion should be denied.[1]

Under Massachusetts law, preliminary consultations with a prospective client do not automatically create an attorney-client relationship. Whether an attorney-client relationship was formed depends on the particular facts and VST bears the burden of proof. Here, VST has made general allegations that its interview of Goodwin involved discussion about various issues raised by the patent case. But VST has not identified any particular information it gave Goodwin that was confidential or non-public; nor does VST even claim that any information it provided to Goodwin would cause prejudice to it if Goodwin represented ScanSoft.

One initial example: VST asserts that it talked to Goodwin about its product. Goodwin attorneys recall only the most general explanation that its product permits the use of voice recognition technology in telephones; something that any user of such a telephone would know.

---

[1]    ScanSoft submits herewith the Declarations of Paul F. Ware, Jr. ("Ware Decl."), J. Anthony Downs ("Downs Decl.") and Daniel M. Forman ("Forman Decl.") in support of its opposition.

(Downs Decl. ¶ 16(a).)  ScanSoft's '966 patent concerns user interfaces for mobile telephones, which cannot be kept secret from the public that buys and uses those phones.  While it is thus literally true that, as VST asserts, "VST shared information about its products," statements at that level of generality are hardly helpful in determining whether VST sought and received legal advice about whether the product infringes the patent.  Certainly they do not show that any information given was confidential.

Similarly, in asserting that Goodwin gave it legal advice, VST speaks only generally, for example, about Goodwin's "strategic assessments" and "advice" relating to litigation strategy about patent infringement, in court and out of court avenues to attack the validity of ScanSoft's patent, and VST's potential counterclaims.  These assertions are so vague that Goodwin (and the Court) cannot tell what they refer to.  Certainly, Goodwin and VST discussed the fact that ScanSoft accused VST of infringing.  Id. ¶ 15.  That is not, however, legal advice.  Goodwin never performed a claim construction or provided VST with an opinion as to the merits of any particular claim interpretation, Id. ¶ 9, or the strength of ScanSoft's infringement claim under any particular interpretation.  Possible "in court and out of court avenues to attack the validity of ScanSoft's patent" likely mean nothing more than identifying the standard approaches of locating prior art and deciding whether that prior art invalidates the patent, and how and when to raise that issue.  Because Goodwin was not retained for the case, however, it did not perform an analysis sufficient to make any recommendation as to the course VST should follow.  Id. ¶¶ 9, 13, 17.

At the outset, it is important to note three points about VST's motion.

First, VST does not assert that Goodwin obtained facts that will now give ScanSoft an advantage in this litigation.  While this factor is not alone dispositive, it is the key fact about

fairness and possible prejudice. Goodwin assures the Court that it has not used, and would not use, confidential information provided by a prospective client, VST, to its detriment.

Second, the context here should be given great weight: VST interviewed Goodwin for a job, expressly reserving its decision to a later time. Id. ¶ 3. Absent some clear showing that VST switched gears and made a specific request for legal advice and obtained that advice, VST and Goodwin's understanding that Goodwin was making a "pitch" for business, not acting as counsel, shows that VST did not reasonably believe Goodwin was its attorney.

Third, the facts VST now asserts are phrased extremely generally. A motion to disqualify that speaks in such general terms of discussions about "the product" or "strategy" – and does so because the discussions were only about general approaches that might be investigated – should fail to carry the movant's burden of proof. Such general discussions should be seen as part of the potential client's getting to know the potential attorney, and not as a focused "request for legal advice" and delivery of such legal advice.

ScanSoft is entitled to its choice of counsel unless that counsel is disqualified under the rules. Massachusetts law has recognized that disqualification is a very significant step, not to be taken lightly in view of the important right of a party to choose its own counsel. VST's broad and general assertions do not carry VST's burden of proof.

## **ARGUMENT**

### I.    **THE LEGAL STANDARD**

#### A.    **VST Bears the Burden of Proving that an Attorney-Client Relationship Should Be Implied From the Circumstances of its Interview of Goodwin.**

VST contends that Goodwin should be disqualified from representing ScanSoft under Massachusetts Rule of Professional Responsibility 1.9(a), which provides:

3

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client . . . .

VST does not assert that it retained Goodwin.  Therefore, Rule 1.9 only applies here if an attorney-client relationship should be <u>implied</u> from the circumstances surrounding the interviews VST conducted to decide <u>whether</u> to hire Goodwin.

Although an attorney-client relationship may be implied as a result of initial consultations between a prospective client and an attorney, such a relationship is not automatically formed. <u>Mailer v. Mailer</u>, 390 Mass. 371, 374 (1983).  VST, as the party seeking disqualification, bears the burden of proving that an attorney-client relationship was formed under these circumstances. <u>See</u> <u>ebix.com, Inc. v. McCracken</u>, 312 F. Supp. 2d 82, 90-91 (D. Mass. 2004).

The courts are not quick to find a disqualifying relationship.  Disqualification is a serious step and contravenes an important interest:  the client's right to counsel of its choice, which should not be frustrated unless the need for disqualification is clear.  As this Court recognized in <u>Inverness Medical Switzerland GMBHZ v. Acon Laboratories, Inc</u>.:

> "Disqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." . . .  Such a measure is generally appropriate only when continued participation by the attorney "taints the legal system or the trial of the cause before it." . . . A court deciding whether to disqualify counsel should attempt "to reconcile an individual's right to counsel of his choice with the obligation of maintaining the highest standards of professional conduct and a scrupulous administration of justice."

2005 WL 1491233, at *4 (D. Mass. June 23, 2005) (internal citations omitted).

**B.    The Inquiry Under Massachusetts Law is Highly Fact-Specific, and the Facts in this Case Show that No Attorney-Client Relationship Was Established.**

An attorney-client relationship may be implied when (1) a person seeks advice from an attorney, (2) the advice sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give, or actually gives, the desired advice.

4

E.g. Bays v. Theran, 418 Mass. 685, 693 (1994). Massachusetts courts look to a variety of factors to determine whether an attorney–client relationship has been established, including whether the client shared confidential information with the attorney, and whether the client could reasonably have relied on the advice of the attorney or reasonably believed that the attorney was representing it. E.g., DeLoury v. DeLoury, 22 Mass. App. Ct. 611, 615 (1986) (finding reasonable belief that representation formed where client asked lawyer to do legal work, lawyer performed that work and rendered a bill); Feghi v. Concord Lane Assocs., 1998 WL 1198699, at *4 (Mass. Super. Ct. Aug. 19, 1998) (finding reasonable belief that representation formed where client and firm "enjoyed a long and mutually advantageous relationship based on plaintiff's need for legal representation").

The principal case cited by VST is Bays, affirming a trial court's decision to disqualify. 418 Mass. at 693. Bays presents a different and stronger case than VST offers here and does not require a finding that there was an attorney-client relationship here. Bays turned on findings that the prospective client had revealed specific confidential information to the attorney that was still important to the litigation. The court found the prospective client discussed the calculation of common area percentages (the specific issue being litigated) and the "complete background concerning how those percentages came about and how they were originally determined"; and provided documents, some of which were apparently not public, and "some confidential information concerning common area percentages." Id. at 688. The court also found specific legal advice concerning the governing statute and documents filed in Land Court.

Moreover, the SJC noted that despite those findings, the trial judge later amended the disqualification order to allow the disqualified attorney to represent a new client in a trial that dealt with some claims, but not the claim with respect to which confidential information had

been obtained. 418 Mass at 689. Thus, the ultimate concern in <u>Bays</u> was confidential information, and the trial judge in fact <u>permitted</u> continuing representation where the particular confidential information was not involved.[2]

VST also cites <u>Mailer</u>, where the SJC decided that an attorney-client relationship was <u>not</u> formed during consultations between a divorce plaintiff and an attorney. 390 Mass. at 374. As in <u>Bays</u>, the prospective client in <u>Mailer</u> disclosed information to the attorney that she considered confidential, including information concerning her financial position. <u>Id.</u> The SJC concluded, however, that the information the prospective client had described was either already known to the defendant or had become a matter of public record by the time the attorney appeared for the defendant. <u>Id.</u> Accordingly, "there could be no compromising disclosure" of the prospective client's information in the subsequent representation; the confidential information was not a bar to representation where the information had become public. <u>Id.</u>

The SJC expressly refused to adopt the proposition that a "fiduciary obligation [i.e., an attorney-client relationship] results whenever a preliminary consultation occurs," even where that consultation involves a request for legal advice and the provision of some legal advice. <u>Id.</u> The prospective client consulted the attorney "to learn something about Massachusetts divorces and the procedure for getting a divorce . . . ." <u>Id.</u> at 372. As part of that discussion, the attorney explained the procedure for making attachments of real estate; indeed, the attorney's explanation

---

[2]  The time between the attorney's last consultation with the plaintiff and his appearance for the defendant, two months, was also a significant factor in the decision, not present here. <u>Id.</u> at 693 (expressing concern about an appearance of impropriety). VST also cites <u>Valdez v. Domeniconi</u>, 2 Mass. L. Rptr. 627 (Mass. Super. 1994), which also involved a short time between a defendant's communication about the subject matter of a dispute and the attorney's filing of an action against the defendant. <u>Id.</u> at 627.

Three years after <u>Bays</u>, which was decided under the old code, the SJC criticized the "appearance of impropriety" as a standard for deciding disqualification, contrasting the old code with the newly-adopted rules. <u>Adoption of Erica</u>, 426 Mass. 55, 64 n.10 (1997) (discounting former client's anxiety and subjective judgment). To the extent VST's motion is based on VST's "anxiety" "and subjective judgment" about Goodwin representing ScanSoft, rather than a genuine showing of prejudice, the motion should be denied.

6

was sufficiently specific that it frightened the prospective client away.  Id. at 372-73.  The

attorney also discussed a possible ground for divorce based on "adulterous conduct," "which

might be proved from the defendant's admission in this regard."  Id.  This high-level, general

counseling about divorce law principles, divorce procedure and possible litigation strategy–

directly analogous to the discussions here– did not create an attorney-client relationship.[3]

### C.    Other Jurisdictions Have Explicitly Separated the Analysis of the Attorney-Client Relationship From the Protection of Confidential Information.

Other cases involving corporate clients interviewing candidate attorneys in intellectual

property cases look primarily to whether the client reasonably believed that an attorney-client

relationship had formed.  Those courts also consider (as a separate matter, without resorting to

implying an attorney-client relationship) how any confidential information that might have been

disclosed during the interview process should be protected.

The case best describing the present situation is B.F. Goodrich Co. v. Formosa Plastics

Corp., 638 F. Supp. 1050 (S.D. Tex. 1986), where a plaintiff also conducted a "beauty contest"

before selecting a firm to represent it in a patent infringement action.  Goodrich brought five

patent litigators to its offices in Ohio for full-day interviews.  Id. at 1052.  During the interview,

Goodrich discussed the following topics with each attorney:

    a.     A summary . . . of Goodrich's status "in connection with the P.V.C. business";

    b.     Goodrich's prior relations with [the defendant], including Goodrich's evidence to date of a possible patent infringement on the part of [the defendant];

    c.     The advisability of joining a breach of contract claim to the proposed patent infringement claim against [the defendant];

---

[3]    VST also cites Commonwealth v. O'Brien, 377 Mass. 772 (1979), for the general proposition that the attorney-client privileged may extend to preliminary communications looking toward representation.  Motion at 5.  O'Brien does not, however, say when an attorney-client relationship is formed.  If anything, O'Brien holds "[t]here is no presumption of confidentiality" in preliminary communications looking toward representation.  O'Brien, 377 Mass. at 775.  VST's general assertions invoke an improper "presumption of confidentiality" and do not establish circumstances that would support a finding of an implied attorney-client relationship.

     d.     The likelihood that [the defendant], if sued for patent infringement, would counterclaim charging Goodrich with an anti-trust violation;

     e.     Which forum should be selected by Goodrich for the proposed suit.

Id. at 1053. Despite these extensive preliminary discussions, the court held that Goodrich failed to prove the existence of an attorney-client relationship because "there was clearly no intention on Goodrich's part to enter into such a relationship with [the attorney] during the initial interview. Instead, Goodrich was reserving unto itself the right to make a decision after meeting with all five candidates." Id. at 1052. The preliminary discussions about litigation strategy—including Goodrich's infringement case, the advisability of adding a contract claim, the likelihood of counterclaims and the selection of a forum—did not change the fact that Goodrich did not intend to hire any of the candidate attorneys during the initial interview. Id. at 1053-54.[4]

The court in Clark Capital Management Group, Inc. v. Annuity Investors Life Ins. Co., 149 F. Supp. 2d 193 (E.D. Pa. 2001), a trademark infringement suit, performed much the same analysis and came to the same conclusion. Potential co-counsel had three telephone calls in which the defendant alleged the attorneys discussed background facts of the case, the capabilities of opposing counsel, the nature of the defendant's defenses, the relative merits of each party's case, potential weaknesses in the plaintiff's case and a legal theory that might be employed as a defense. Id. at 194. The court found that the defendant could not have had a reasonable belief that the prospective co-counsel was acting as its attorney: counsel for the defendant initiated the communications with the prospective co-counsel for the purpose of deciding whether to retain the other attorney. Id. "At no time during the communication did Frechette offer to retain Biemer as co-counsel . . . . To the contrary, it was evident . . . that Frechette had not yet decided

---

[4]      The Goodrich court performed a separate analysis of whether the interviews created a fiduciary duty to preserve confidences. The court found that none of the information exchanged during the interview could be detrimental to Goodrich because the information was either public when it was disclosed, became public afterward, or had become irrelevant due to the passage of time and events in the litigation. Id. at 1053-54.

whether to retain Biemer as co-counsel . . . .   Frechette was reserving the right to make a decision after learning more about the firm."  Id. at 197; see also Benchmark Capital Partners IV, L.P. v. Vague, 2002 WL 31057462, at *4 (Del. Ch. Sept. 3, 2002) ("[I]t was not reasonable for [the defendant] . . . to have believed . . . that an attorney-client relationship had been created" where "everyone involved clearly understood that retention of [the law firm] was expressly conditioned upon action by the special committee.").[5]

The reasoning in Goodrich and Clark Capital Management was endorsed in February 2002 by the American Bar Association when it adopted Model Rule 1.18, which provides:

> (a)      A person who discusses with a lawyer the possibility of forming a client relationship with respect to a matter is a prospective client.

> (b)      Even when no client-lawyer relationship ensues, a lawyer who has had discussion with a prospective client shall not use or reveal information learned in the consultation except as Rule 1.9 would permit with respect to information of a former client.

> (c)      A lawyer subject to paragraph (b) shall not represent a client with interests adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter . . . .

ABA Model Rule 1.18 (attached hereto).

While not yet adopted in Massachusetts, Rule 1.18's guidance supports the logic of ScanSoft's position.  Model Rule 1.18 recognizes that, in preliminary discussions, an attorney who is not retained may still receive information or have discussions that would give it an unfair advantage if it represents the other side.  Rather than bending toward finding an attorney-client relationship in preliminary discussions to protect against unfairness, Rule 1.18 directly addresses the prospective client's interest in not being harmed by the use of information provided during

---

[5]      The disclosure of "sensitive and . . . non-public information regarding [the defendant's] financial condition and its plans for remedying its financial problems" was not enough to override the factor the court found most important:  defendant's express understanding that it was merely interviewing a potential attorney.  See Benchmark Capital Partners, 2002 WL 31057462, at *4.  The court conducted a separate inquiry into whether the law firm's receipt of non-public information would prejudice the fairness of the proceedings.

those discussions.  Rule 1.18 makes it unnecessary to characterize preliminary discussions—such as the discussions about law, procedure and strategy in <u>Mailer</u> and the discussions here—as legal advice.  Instead, the Court can focus on whether the attorney obtained information that "could be significantly harmful" to the prospective client.  Here no such harm is asserted.

The caselaw in Massachusetts and elsewhere shows that VST's Motion to Disqualify should be denied.  VST's stated expectation was that this was a preliminary interview and an attorney-client relationship had not yet been formed.  (Downs Decl. ¶¶ 2, 4, 5, 19; Roth Decl. ¶¶ 4, 13.)  Discussion of VST's product, strategy, and possible steps to take in defending the case were at a general level expected at an initial interview – raising issues to be explored rather than giving legal advice about them. (Downs Decl. ¶¶ 4, 13.)  Moreover, no confidential information was given to Goodwin that is even alleged to be prejudicial at this point to VST.

## II. THE FACTS ASSERTED BY VST ARE INSUFFICIENT TO JUSTIFY DISQUALIFICATION.

### A. VST did not Believe it had Retained Goodwin as its Attorney in this Case.

There is no question that VST never hired Goodwin to represent it in this case.  (Downs Decl. ¶ 2; Roth Decl. ¶ 13.)   In the language of Rule 1.18, VST was at most a "prospective client," considering which of two firms it should hire.  Under Massachusetts law, VST's actual belief that it had not yet decided whom to hire is a significant factor that weighs heavily against finding an attorney-client relationship.  See <u>DeLoury</u>, 22 Mass. App. Ct. at 615; <u>Feghi</u>, 1998 WL 1198699, at *4 (Mass. Super. Ct. Aug. 19, 1998).  Under <u>Goodrich</u> and <u>Clark Capital Management</u>, as well as the approach advocated in Model Rule 1.18, this fact is dispositive.  See <u>Goodrich, ,</u> 638 F. Supp. at 1053-54; <u>Clark Capital Management</u>, 149 F. Supp. 2d at 197.[6]

---

[6]    Although the Roth Declaration states that "Goodwin assured VST that the discussions were covered by attorney-client privilege," (Roth Decl. ¶ 11), neither Mr. Downs nor Mr. Ware recalls making any such statement, (Downs Decl. ¶ 5; Declaration of Paul F. Ware, ¶ 4 ).

**B.    VST Has Not Shown That Goodwin Provided VST with Legal Advice
Sufficient to Form an Attorney-Client Relationship.**

The general assertions in the motion to disqualify are insufficient to carry VST's burden

of showing that legal advice was asked for and given.  VST makes broad assertions that it

received Goodwin's legal assessment of ScanSoft's patent, ScanSoft's claim of infringement,

and strategies to design around the ScanSoft patent.  These descriptions are so broad that they

cover any discussions held in any interview to choose counsel in a patent lawsuit.  A closer look

at the facts in each area identified by VST shows that Goodwin's comments about the normal

course of patent litigation, or about the areas it would explore if retained, were not focused "legal

advice."

For example, VST does not claim that Goodwin provided a claim construction analysis or

analyzed the file history of the patent, which it did not.  (Downs Decl. ¶ 9.)  Nor does VST claim

that Goodwin obtained, much less analyzed, the dozens of references cited in the file history.  Id.

¶ 9.  Without some analysis of claim construction issues and a review of the prior art, the

Goodwin attorneys clearly had limited ability to develop arguments as to validity or

infringement.  Nor could they have provided legal advice as to whether any particular design-

around was likely to infringe and Mr. Downs does not recall any discussion of any particular

design-around options.  Id. ¶ 16(c).

Likewise, VST's assertion that Goodwin provided a legal assessment of ScanSoft's trade

secret claims is implausible in light of Goodwin's lack of information about VST's technology.

Id.  ¶ 16(a).  ScanSoft's trade secret allegations involve whether VST made improper use of

ScanSoft's source code or voice recognition algorithms.  Without a description of the algorithms,

Goodwin had no way of assessing whether VST's voice recognition algorithms resemble

ScanSoft's algorithms so that a finding of misappropriation might be viable.  Goodwin would

11

likewise have absolutely no way of "assessing" whether VST employees had taken ScanSoft's source code, a factual matter that VST does not assert it discussed with Goodwin.

VST makes equally broad claims that Goodwin advised VST concerning a potential strategy to narrow or invalidate the ScanSoft patent through re-examination and concerning potential counterclaims. VST does not contend that Goodwin ever analyzed whether any particular art would raise a "substantial new question of patentability" or result in a successful re-examination, and Goodwin did not provide legal advice to that effect. Id. ¶ 17. The idea of considering re-examination as an alternative (or in addition to) challenging validity in the courts is a commonplace concept; the mere mention that such a strategy may be used does not amount to legal advice. A contrary conclusion would turn any initial discussions in which the law firm says, "you should think about summary judgment" from a pitch for business to legal advice. That kind of discussion, though it tells a client that there is a possibility of summary judgment, should not be seen as "legal advice" that creates an attorney-client relationship. A statement that, if hired, Goodwin would look to see if partial summary judgment (or re-examination) were viable options, is a far cry from Goodwin being retained, looking at the issues sufficiently to make a judgment, and coming back to a client with a recommendation that summary judgment or reexamination should (or should not) be pursued. That of course did not happen. Id. ¶¶ 13, 17.

The need to analyze the viability of potential counterclaims is also a general category of discussion that is likely to occur in any preliminary interview. VST does not contend that Goodwin was ever given copies of, or read, VST's patents or pending patent applications, ever did an analysis of those patents or applications, or ever compared those patents or applications to ScanSoft's products. In fact, Goodwin did not conduct any analysis of the viability of any counterclaim or provide VST with legal advice concerning any counterclaim. Id. ¶ 16(g).

Finally, VST incorrectly attempts to cast Goodwin's e-mail attaching possible prior art as legal advice. (Mot. at 6.) First, performing a quick search for prior art in order to show a prospective client that you have interest in their problem does not rise to the level of "legal advice." Second, Mr. Downs' recollection is that the art he provided was not discussed in with VST in detail. (Downs Decl. ¶12.)

The undisputed facts as to the very limited information Goodwin had available during this interview process explain why VST has phrased its allegations of legal advice in terms of broad categories. But given the lack of information needed to formulate and deliver actual legal advice, the "advice" in those categories could only have been the same kind of advice seen as insufficient in the Massachusetts cases: advice about potential options (summary judgment is possible on infringement or invalidity issues, for example), or on areas to be analyzed later by whatever counsel VST chose. (Downs Decl. ¶ 7; Ware Decl. ¶ 7). Such general indications of the approach Goodwin would bring to the case, if retained, is clearly less close to focused, fact-based legal advice than the general advice that appears in both Bays and Mailer. Those precedents thus support a finding that no "legal advice," properly understood, was given.

That conclusion also makes sense in policy terms. The general assertion that there was discussion in these areas does not show that legal advice was sought or given. To rule otherwise would turn essentially every "pitch" into an attorney-client relationship, and open the door to a wide range of tactical steps to limit the other side's access to counsel in litigation. Goodwin did not provide any legal advice that could have led VST to believe that it had formed an attorney-client relationship with Goodwin.

13

**C.      VST Has Not Shown That It Gave any Actual Confidential Information to Goodwin That Could Now be Used to VST's Disadvantage.**

VST also asserts the disclosure of confidential information so generally as to leave unclear what actual confidential information, if any, was disclosed. The generality with which VST's statements are phrased conceals two key points: first, discussion about those topics was brief, general, and innocuous; and second, the lack of specificity in VST's list of topics lets VST assume confidential information was disclosed without actually identifying any such information. Stating topics so generally – in effect saying "we discussed our product" or "we discussed our settlement position" – is not enough to carry VST's burden of proof. In effect, VST seeks to apply a presumption that its communications with Goodwin were confidential, a proposition that the Supreme Judicial Court explicitly rejected in O'Brien. 377 Mass. at 775 (rejecting claim that prospective client's statement of the obvious was confidential).

Moreover, the passage of one and one-half years since VST interviewed Goodwin has made any basic information provided by VST non-confidential, if it were confidential to begin with. The case law makes clear that there is no prejudice to VST if the information has become public (or has become known to ScanSoft through discovery). See Goodrich, 638 F. Supp. at 1054 (even if plaintiff disclosed confidential information, possibility of prejudice from disclosure was moot because plaintiff "publicly disclosed basically the same information" when it sued); Mailer, 390 Mass. at 374 (noting information concerning wife's financial position was on record in Probate Court and other information in case had been published); Polyagro Plastics, Inc. v. Cincinnati Milacron, Inc., 903 F. Supp. 253 (D.P.R. 1995) (holding "the definition of 'confidential information' for purposes of a disqualification motion is information that if revealed could put the plaintiff at a disadvantage or the other party at an advantage"). Id. at 258.

Here, both the motion to disqualify and the supporting affidavit speak about a series of obvious areas of relevance to the case, but only in general terms. As the analysis below shows, in each of these areas, either confidential information was <u>not</u> received or the disclosure has become harmless through the passage of time.

        **1.**      <u>**Information about Products and Potential "Design Around" Options.**</u>

VST asserts it gave Goodwin information about its products, but gives no specifics. Publicly available information about VST's products is far more detailed than anything VST shared with Goodwin. User Manuals for VST's VSuite products were and are readily available on the internet. For example, the User Manual for VST's VSuite 2.0 as installed on a Samsung SCH-i730 cell phone is publicly available on VST's web site. (Forman Decl. Ex. A). VST's User Manuals describe the entire user interface for VST's voice dialing product, including the different commands provided and the specific grammar of the dialog between the user and the phone. <u>Id.</u> Exs. B & C. VST does not assert it gave Goodwin even this much.

As for "potential products" and "potential design changes," Mr. Downs does not recall, and his notes do not reflect, any discussion of any particular design change. (Downs Decl. ¶ 16(c).) In any event, it appears likely that any design changes contemplated by VST at the time this action was filed are reflected in VST's current product. Specifically, VSuite 2.0, released in 2005, replaced "digit dial" and "name dial" commands in VSuite 1, with a single "call" command, followed by digits or a keyword. <u>Compare</u> Forman Decl. Exs. B & C. It seems likely that this is the supposed "design around" VST claims to have discussed with Goodwin. If so, it is no longer confidential.

More generally, VST's product announcements and releases of new products have surely rendered obsolete any information about product direction, business strategy, strategic plans and the like. Around the beginning of 2005, Samsung announced its p207 cell phone, the first phone

with VST's new VoiceMode technology.  (Forman Decl. Ex. D.)  On September 19, 2005, VST announced VSuite 3.0, which purportedly provides several improvements over VSuite 2.0.  Id. Ex. E.  On September 26, 2005, VST announced VSpeak, its "top secret speech synthesis research project," which "had been going on in 'stealth mode' at VoiceSignal for the last year." Id. Ex. F.  Thus, even if VST presented a high-level overview of emerging products and strategy 18 months ago, and Goodwin cannot recall any such presentation, id. ¶16(f); (Ware Decl. ¶ 8), VST must show that the information it provided remains secret and could harm VST in this litigation.  Something more than an unsupported conclusory assertion should be required, particularly in light of the fact that VST has announced or released numerous products since its discussions with Goodwin.

## 2.    Information about Current and Potential Customers

VST claims it shared confidential information about its current and potential customers. The identity of VST's customers was not, and is not, confidential.  VST's Amended Response to Plaintiff's First Set of Interrogatories, which is not designated "Confidential," identifies six current customers:  Curitel, Motorola, Panasonic, Samsung, Sendo and Palm.  (Forman Decl. Ex. G at 4.)  VST's internet web site also identifies customers and identifies the specific models of its customers' phones that contain VST's voice recognition software.  Id. Ex. H.  This information about VST's customers, which VST actually *advertises* rather than protects, is far more detailed than any information about VST's customers shared with Goodwin.

## 3.    Information about Pricing, Pricing Strategy and Margins

VST may have told Goodwin the average price of its product, (Downs Decl. ¶ 4);[7] however, VST fails to explain why that information is confidential or how its disclosure could be

---

[7]    Goodwin has no recollection of VST discussing "pricing strategy" or "margins."  (Downs Decl. ¶ 16(e).)

damaging to VST in this litigation.  Certainly, VST's pricing is known to its customers and VST has offered no evidence that its customers are obligated to keep that information confidential.  In any event, VST's pricing, sales and profitability will be disclosed during damages discovery.

### 4.    Information Relevant to ScanSoft's Trade Secret Claims

VST's Motion asserts that VST disclosed confidential, detailed information relevant to ScanSoft's trade secret misappropriation claims, (Mot. at 6.); however, this is not supported by the Roth Declaration, which states only that VST sought Goodwin's assessment of ScanSoft's claims for trade secret misappropriation, not that any confidential information relevant to those claims was provided, (Roth Decl. ¶ 9, 10).  As stated above, VST never provided Goodwin with its source code and never discussed voice recognition algorithms that might be at issue in the trade secret claims.  (Downs Decl. ¶ 16(a).)  VST did provide Goodwin with the settlement agreement and releases from the prior state court litigation; however, ScanSoft already had a copy of the document when it filed this action, (Pl's. Opp. to Defs.' Mot. to Dismiss Counts II, III, IV and V of the Complaint at 3), and VST itself filed a copy with the Court without filing it under seal, (Popeo Decl. dated March 15, 2005 Exs. 5 and 7).  VST has provided nothing to substantiate its allegation that it gave Goodwin confidential information about the trade secrets claims.

### 5.    Information about Litigation Strategy

As for litigation strategy, the passage of time has rendered harmless any information VST claims to have discussed with Goodwin.  For example, although VST does not contend that it shared ideas about claim construction with Goodwin, and Goodwin did not do a claim construction analysis or discuss claim construction issues with VST, (Downs Decl. ¶ 9), the Court's claim construction ruling renders the subject of claim construction moot.  Likewise, VST's invalidity contentions, at least with respect to the best prior art before the PTO, are now a

part of the public record in this case because they too were submitted to the Court in a discussion starting at page 18 of VST's Claim Construction Memorandum.  VST's assertion that it provided Goodwin with the most promising prior art as of the date of the meeting is unsupported.  There is no record of VST asking Goodwin to review and be prepared to discuss any particular reference. Id.. ¶ 12.  Goodwin has no record of any transmittal from VST to Goodwin of copies of, or citations to, any prior art.  Id. ¶ 9.  And VST identifies no prior art that it presented to Goodwin.

VST's interrogatory responses set forth VST's non-infringement contentions. Specifically, according to VST's response to interrogatory no. 13, "VST states that its Speech Recognition Products do not infringe any claim of the '966 patent for at least the following reasons:  (1) no VST Speech Recognition Product uses a speech recognition method for a mobile telecommunication system;  (2) no VST Speech Recognition Product is a system associated with a mobile telecommunication switch."  (Forman Decl. Ex. G at 10-11). VST does not say that it discussed any other ideas with Goodwin concerning infringement (or even these ideas).  If it had other non-infringement contentions, it would have been obligated to disclose them in response to this interrogatory.

VST's Motion claims that VST and Goodwin discussed "Voice Signal's potential counterclaims"; however, VST has already asserted a counterclaim of patent infringement against ScanSoft, alleging infringement of VST's U.S. Patent No. 6,594,630.  VST's Response to Plaintiff's First Set of Interrogatories sets forth the particular ScanSoft products VST contends infringe and provides claim charts further explaining VST's infringement contentions. Id. Ex. G at 14-17.  Thus, even if VST did mention to Goodwin that it had its own patent that it was considering asserting, the existence of that patent was a matter of public record (it issued on July 15, 2003) and any reference to that patent has been rendered moot.  As for VST's pending

applications,[8] a simple search of the PTO's web site reveals numerous pending VST voice recognition patent applications, and, because more than 18 months has elapsed since the interview of Goodwin, any applications pending at that time should have been published by now. See 35 U.S.C. § 122.

### 6.    Information about Settlement Strategy

VST says that "settlement strategies" were discussed, but provides no specifics.  Could there be confidential information of this type?  Clearly, for example, the prospective client could have said "we'd be willing to settle for $10,000,000."  That kind of information would be material, but again there is no specific allegation that VST disclosed anything of the sort and the absence of such specifics is telling.  Goodwin attorneys recall no particular discussion of "settlement strategy and Voice Signal's tolerance for settlement options," other than Goodwin's comment that if the case could be narrowed by partial summary judgment, that might affect its settlement value. (Downs Decl. ¶ 15.)

### D.    Other Factors Cited by VST Do Not Create an Attorney–Client Relationship.

ScanSoft does not dispute VST's assertion that Mr. Downs labeled an e-mail attaching the results of his prior art search "privileged."  Mr. Downs' Declaration explains that he did so not because he understood that an attorney–client relationship had been formed, but to avoid any risk in case VST did hire Goodwin. (Downs Decl. ¶ 11.)  While his use of the term "privileged" provides some support for VST's position, even together with the other general statements VST has made it is not sufficient to support a conclusion that, in the context here, an attorney–client

---

[8]    Again, Mr. Downs has no recollection or written record of VST disclosing anything about pending patent applications.  (Downs Decl. ¶16(g).)

relationship was intended and established.[9]

　　　The motion to disqualify also refers briefly to the fact that Goodwin has represented another entity which made an investment in VST.  Goodwin's representation in that transaction was itself adverse to VST (rather than representing VST), and VST did not become a client of Goodwin.  Accordingly, Rule 1.9 does not apply.  VST makes no allegation that in the course of its representation of the investor Goodwin received any confidential information relating to the subject matter of this litigation or that might assist ScanSoft in this litigation.  VST does not allege that Goodwin did any intellectual property due diligence, for example, in helping the investor make the investment in VST, or that VST gave its shareholder (Goodwin's client) confidential information about this litigation, let alone that such information has been passed on to Goodwin.  This argument is clearly a makeweight.

## CONCLUSION

　　　For all the foregoing reasons, defendants' Motion to Disqualify Goodwin Procter LLP should be denied.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Paul F. Ware, Jr.
Paul F. Ware Jr., P.C. (BBO # 516240)
Kenneth A. Cohen (BBO #089560)
Douglas J. Kline (BBO # 556680)
Daniel F. Forman (BBO # 637405)
GOODWIN PROCTER  LLP
53 State Street
Boston, MA 02109-2881
Tel:    (617) 570-1000
Fax:    (617) 523-1231
*Counsel for Plaintiff ScanSoft, Inc.*

</div>

DATED:  November 18, 2005
LIBA/1645302.7

---

[9]    Mr. Downs has retained his emails, and Goodwin will produce them to the Court, if the Court would find it useful and if VST agrees they should be produced.  The emails have not been produced with this opposition solely because VST claims that these communications are privileged.