UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SCANSOFT, INC., <br><br> Plaintiff, <br><br> v. <br><br> VOICE SIGNAL TECHNOLOGIES, INC., LAURENCE S. GILLICK, ROBERT S. ROTH, JONATHAN P. YAMRON, and MANFRED G. GRABHERR, <br><br> Defendants. | C.A. No. 04-10353-PBS |

DECLARATION OF J. ANTHONY DOWNS
REGARDING MOTION TO DISQUALIFY
GOODWIN PROCTER LLP

I, J. Anthony Downs, depose and say the following, based on my personal knowledge.

1. I am a partner at Goodwin Procter LLP. I have read the motion of Voice Signal Technologies, Inc. ("VST") to disqualify Goodwin Procter LLP from representing ScanSoft in the above-referenced case. I have also read the declaration of Daniel Roth that VST filed to support its motion to disqualify.

2. The events and communications that form the basis for VST's motion occurred during a brief period over a year and a half ago; specifically, according to my records, from Wednesday, February 26th, through Monday, March 1, 2004. VST asked Goodwin Procter to make a "pitch" to see if VST would decide to hire us to represent VST in connection with the present litigation. Paul Ware asked me to participate in the pitch. I attended two meetings with VST, one on Thursday, February 27th, and one on Monday, March 1st. I also sent and received

some e-mails from persons at VST, and I had a limited number of phone calls with VST. We were told shortly after March 1st that Goodwin Procter would not be hired by VST to represent them in the litigation, and when VST later asked us if we were interested in doing some other work for VST, we declined.

3.   My communications with VST, and those of my colleagues, were all part of this unsuccessful pitch, and at no time did I understand that I or the law firm had been retained in any capacity by VST.[1] VST made clear, also, that Choate Hall had previously represented them in connection with this matter, and that Choate Hall was one of the firms VST was still considering as its counsel for the litigation. At some point after the meeting on March 1st, I learned that VST had decided to continue working with Choate Hall as its counsel on this matter adverse to ScanSoft.

4.   Our first meeting with VST was on Thursday, February 27th. Before that, my records show that on February 26th, I spent about 18 minutes looking at background materials, which I recall to be publicly available information about VST (it is my practice to look up a prospective client on the Internet) and a copy of the complaint filed against VST (with the ScanSoft patent attached). I cannot recall whether the complaint was supplied to us by VST, or whether we obtained a copy from the District Court. The first meeting, as I recall it, principally focused on a general discussion of Goodwin Procter and its capabilities in patent and civil litigation. I recall Mr. Dan Roth (President of VST) and Mr. Richard Geruson (CEO) being present at the meeting. Mr. Ware and I, and Doug Doskocil of our office, talked about the cases we had handled, and about various defensive strategies we had employed in our cases. Mr. Roth or Mr. Geruson also gave us some information about their business and the history and

---

[1] We did not open a new matter in our billing databases, and we did not bill VST for the time in these initial conversations.

2

background of the law suit, including the fact that the trade secret allegations in the lawsuit had already been the subject of litigation in a prior state court action (and possibly in a bankruptcy proceeding). This litigation history, I believe, was public information. I have a single page of notes from this February 27th meeting. At the present time, I do not recall any details of what we discussed beyond what is recorded in my notes. The notes refer to information that I would think was known outside of VST, including a reference to the nature of VST's business in general, some well-known customers, and the average price of a VST chip. The discussions were, in any event, at a high level, and I do not recall that we imparted any advice, or received any truly confidential information, about the case or about VST. An e-mail sent to Mr. Ware by Mr. Roth of VST after this initial meeting recognized that we had not had enough time to study the case before our meeting, and invited us to have a follow-up discussion. This is consistent with my recollection that at the first meeting we had a high level discussion, and that our knowledge of the case and ability to comment on it were very limited.

5.   Paragraph 11 of Mr. Roth's affidavit states that "The attorneys at Goodwin assured us that the discussions were covered by attorney-client privilege and that we could feel free to share any and all information that we felt was pertinent to the case." I do not recall this being stated. My point of view was that Goodwin Procter was making a pitch to get hired by VST, and that in the course of doing that, I would if asked provide some preliminary thoughts about possible approaches to the litigation based on a quick review of the limited information provided to us. I certainly agree that we did receive information from VST and did talk with them about the litigation, and that we at least implicitly undertook at that time not to make any truly confidential information public.

6.  Following our meeting on Thursday, February 27th, on the morning afterwards Mr. Ware provided to Mr. Geruson and Mr. Roth a list of client references that VST could contact. This is the kind of information we routinely provide to prospective clients, and VST had indicated that they wanted to move quickly to select counsel.

7.  While Mr. Roth invited us to have a second meeting, I do not recall that we were asked, at any point, to provide any advice on any particular subject relating to the litigation. Again, my understanding was that we were being interviewed for the job, and as typical in these kind of situations, were being asked for our general comments and quick reactions to the case. A second meeting was scheduled for Monday, March 1st.

8.  Before the second meeting, Mr. Roth sent me copies of the settlement agreement and releases from the prior trade secret litigation. These documents are not marked confidential, nor designated confidential within the documents themselves. Mr. Roth also sent me some history about the prior state court litigation, which appeared to be public historical information. Mr. Roth did not indicate that the information was confidential, or that his communication with me was confidential. He did not mark this communication with me, or any earlier communication, as "privileged."

9.  I cannot recall receiving from VST any other documents, any citations to prior art to review, or anything VST had designated as relevant prior art. VST did not provide me with copies of the file history of the asserted patent and I have no recollection or record of obtaining it myself. Nor do I recall performing a claim construction analysis of any terms of the asserted patent. Without having considered the patent's prosecution history, it is unlikely that I would have expressed any legal opinion to VST about the meaning of any particular claim term.

10.     On Friday the 28th, I decided to do a search of the U.S. Patent Office's patent archive, to see if there was any prior art in the area of telephone dialing by voice recognition, which is the subject of the ScanSoft patent. The PTO web site has a publicly available search function that enables patents to be searched by key words. Without any previous knowledge of the art, I located four patents that I believed, based on my review of the list of references in the patent, had not been cited by the Patent Office. I ordered copies of the patents, and forwarded them to Mr. Roth. VST had not asked me to do a prior art search. I did it solely on my own to show initiative and to show that we were interested in working on the case. It is something I regularly do when I am hoping to be retained on a litigation matter. Neither Mr. Ware nor Mr. Doskocil had any role in the search.

11.     Mr. Roth's affidavit and VST's motion now highlight the fact that my e-mail forwarding this prior art states in the "subject" line: "from Goodwin Procter – PRIVILEGED." I did write this subject line into my e-mail although I had not done so on any of my previous communications. The later e-mails afterwards are all "reply" or "forwarded" e-mails in the chain, and thus the words "from Goodwin Procter -- PRIVILEGED" in these later e-mails has simply been copied automatically from this original e-mail from February 28th. I do not recall that I intended the use of "privileged" in this subject line to indicate that Goodwin Procter had already established an attorney-client relationship in the context of our attempt to get business from VST. I believe that I added the word "privilege" simply as a matter of habit because I was writing an e-mail that contained the fruits of my search for possible prior art, and was doing so to a potential client who might have an attorney/client relationship with us at some point in the future. I do note, moreover, that nothing in that e-mail reflected any confidential or even potentially privileged information *from the client* that was being communicated to me.

12. On Monday, March 1, 2004, Mr. Doskocil and I met with Mr. Roth and Mr. Jordan Cohen of VST. My recollection is that Mr. Ware might have been there for part of the meeting, but I do not believe he was there the whole time. Mr. Roth says in his affidavit that Mr. Geruson attended the meeting by telephone; I do not recall whether that was the case or not. My recollection is that we briefly discussed the prior art that I had located, but that we did not go over it in detail. I do not recall any other prior art that they mentioned, if they did. Nor do I recall, and my notes do not reflect, VST asking me to review or discuss any particular prior art.

13. As I recall, to the extent we discussed potential strategies, such as moving to dismiss the trade secret claims, or moving for summary judgment of invalidity or non-infringement, that these kind of options were already familiar to VST. I do not recall understanding, at any point, that VST would be relying upon or using our thoughts or ideas for the case if we were not hired, or that they were treating our preliminary ideas as actual conclusions on our part as to advice that they should follow. They knew and we knew, of course, that we had not yet been retained and might not be, and they knew our thoughts, based on a quick review of limited information, were in the nature of suggestions as to strategies we would investigate fully if retained.

14. At the end of the meeting, it was still clear that VST had not made any decision about which counsel to hire. Shortly after the meeting, Mr. Roth sent me an e-mail thanking us for the meeting, telling us that they had to choose between us and one other firm, and asking us for an estimate of litigation costs. I believe we did supply them with a rough estimate.

15. Both VST's motion and Mr. Roth's affidavit reference a number of broad topics which Mr. Roth and VST assert we discussed. The conversations at our meetings did indeed touch on a number of the topics listed, in general terms. But the topics listed in VST's motion

are the type of topics that I would expect to be raised (and have raised) in making a pitch to a potential new client who is a defendant in a patent case. For example, as stated in paragraph 9 of Mr. Roth's affidavit, there were discussions about the infringement claims against VST, and about the fact that the claims against VST for trade secret misappropriation appeared to be covered by the pre-existing releases from the state law litigation. I do not recall any particular discussion about "settlement strategies and Voice Signal's tolerance for settlement options," but there likely was a discussion of how pressure points in a litigation (e.g., summary judgment motions) could facilitate settlement. In the particular context, I regarded such discussions not as legal advice to be relied upon without further investigation, but as an indication of the areas which we would explore, far more thoroughly, if retained, and about which we would then give focused legal advice.

16. In paragraph 10 of his affidavit, Mr. Roth states that he "shared with Goodwin" certain "confidential information," which I will address by topic: (a) "detailed description of our products" – VST's products were, I believe, used in cell phones and the operation of those products was publicly known at the time, and I cannot recall any confidential aspect of the products that was discussed. VST did not provide Goodwin with computer source code for its products or describe the algorithms its products use to perform voice recognition. My files contain no information about the details of VST's products; (b) "descriptions of the prior art searching we had performed and the most promising prior art found as of the date of the meetings" – I cannot recall any details of the prior art search that VST says it had performed, and I do not believe that I have any copies of, or particular identification of, any prior art that was located by VST (as opposed to my own search); (c) "ideas about potential design changes to our product which might minimize the risk that our products could be found to infringe the ScanSoft

patent" – The question of whether there was an easy "design around" that might render the case moot is one a patent lawyer would almost always ask. But I do not recall a discussion about any particular potential design change that could be made here, and my notes and files reflect no such discussion; (d) "our then current customers and potential customers" – My notes include a reference to two possible customers, both of whom appear on VST's web site. I believe this information was public, and the world of potential customers for a company in this field must be readily known in the industry; (e) "our pricing and pricing strategy" – I remember no discussion about this, but my notes contain a reference to "one chip per phone" at a particular number, which probably refers to current pricing. I did not understand this to be confidential, and I do not recall it factoring at all into our discussions. I do not recall, and have no records of, any broader discussion of pricing, pricing strategy or margins; (f) "our business and corporate strategic plan" – I can recall no discussion about this very generally phrased topic. I do not recall, and my notes do not reflect, and discussion of future products or product direction; (g) "our description of Voice Signal's pending patent applications in order to discuss present or future counterclaims" – I do not recall being shown or discussing issued VST patents or pending patent applications, and my files contain no information on any VST patents or pending applications. I did not compare any VST patent or pending application to a ScanSoft product or advise VST as to the viability of asserting any present or future patent against ScanSoft. I do not recall, and have no record of, any discussion with VST of any other particular counterclaim.

  17. Paragraph 12 of Mr. Roth's affidavit, after it repeats some subject areas that are discussed above, states that "Goodwin gave advice regarding a potential strategy to narrow or invalidate the ScanSoft patent through a re-examination procedure in the United States Patent Office." I do not recall a specific discussion on this topic, but the possibility of filing a

reexamination is the kind of strategic option I would likely have raised as a potential strategy for almost any patent defendant to consider if there is potential prior art to use against the patent. I do not recall that we specifically formulated a reexamination strategy and recommended it in this case, but we may well have raised as a possibility to be considered and evaluated, especially when there was prior art that had not been cited in the patent prosecution. I am reasonably certain, however, that I did not compare any particular prior art to the art of record, determine whether any particular prior art raised a "substantial new question of patentability," or provide an opinion that any particular request for re-examination, based on any particular prior art, would or would not be a useful exercise.

18.     I am only generally aware of the current posture of the present litigation between ScanSoft and VST. I have reviewed my notes, e-mails and files, and I have read Mr. Roth's affidavit and VST's motion, and I cannot recall any information that I obtained as a result of our meetings or correspondence with VST that appears to me to be of any real value to ScanSoft if Goodwin Procter is permitted to enter the case at this point to represent ScanSoft. If VST asserted any relevant prior art against ScanSoft's patent, even the art that I brought to VST's attention, I do not believe that I learned anything from VST concerning that art or any other art that would benefit ScanSoft. The information that I can recall obtaining from VST during our discussions is, to the best of my recollection, the kind of information that ScanSoft would be able to obtain through the regular course of discovery.

19.     I am regularly placed in a position where I am asked by a potential client to discuss a case in a circumstance where my firm is competing with other counsel for the work, and where both parties understand and know that the discussions are entirely preliminary and the law firm has not been retained and may not be retained.  Our conversations with VST were entirely of this type, to the best of my recollection.

I declare under penalty of perjury that the foregoing is true and correct.  Executed November 17, 2005.

_____
J. Anthony Downs