UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SCANSOFT, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 04-10353-PBS |
| VOICE SIGNAL TECHNOLOGIES, INC., LAURENCE S. GILLICK, ROBERT S. ROTH, JONATHAN P. YAMRON, and MANFRED G. GRABHERR, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**VOICE SIGNAL TECHNOLOGY'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISQUALIFY GOODWIN PROCTER LLP <u>FROM REPRESENTING SCANSOFT IN THIS CASE</u>**

Voice Signal Technologies, Inc. ("Voice Signal") submits this reply memorandum in support of its motion to disqualify Goodwin Procter LLP ("Goodwin") from representing ScanSoft in this case.

In its Opposition, Goodwin does not deny that: (1) Paul Ware and others at Goodwin met twice with the senior executives of Voice Signal for a period of several hours, (2) at these meetings Goodwin gave Voice Signal assurances of confidentiality, (3) Goodwin lawyers and Voice Signal executives then discussed the substance of this case; (4) Goodwin lawyers also spoke by telephone and exchanged e-mails with Voice Signal executives regarding this case, and (5) Goodwin labeled these e-mails "PRIVILEGED." As will be demonstrated below, in the course of these consultations Voice Signal disclosed confidential information to Goodwin and Goodwin gave legal advice that was specific to this case.

This motion is governed by Rule 1.9 of the Massachusetts Rules of Professional Conduct which provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Goodwin concedes that preliminary discussions, including discussions designed to determine whether to retain a lawyer, may constitute a "former representation" within the meaning of Rule 1.9. Goodwin acknowledges that its meetings and other communications with Voice Signal's executives related to the same matter as its proposed representation of ScanSoft here: it is the same lawsuit. Goodwin asks this Court to find that its several hours of meetings and consultations with Voice Signal were merely a "pitch" and that the "pitch" did not create an attorney-client relationship. Goodwin's argument is at odds with the undisputed facts, described below, and with Massachusetts law. Bays v. Theran, 418 Mass. 685 (1994).

Goodwin also asks the Court to ignore the Massachusetts Rules of Professional Conduct and Massachusetts case law and to decide this motion based on a rule that Massachusetts has not adopted and a decision of a District Court in the Southern District of Texas. The Court should not rely on these sources; but even if it were to apply them, Goodwin would be disqualified.

**I.      Goodwin Should Be Disqualified Under Rule 1.9 of the Massachusetts Rules of Professional Conduct.**

It is undisputed that Voice Signal's meetings and communications with Goodwin related to this case, that Goodwin now proposes to represent ScanSoft in this case, and that ScanSoft's interests are "materially adverse" to Voice Signal's interests. The only remaining question under Massachusetts Rule 1.9 is whether Voice Signal is a "former client" of Goodwin by reason of the content of the Voice Signal/Goodwin meetings and other communications. Goodwin argues (a)

2

that the information provided by Voice Signal to Goodwin was not confidential; and (b) that Goodwin rendered no real "advice." Its argument is belied by the objective facts.

## A. Voice Signal Disclosed Confidential Information

The communications between Voice Signal and Goodwin were confidential. Voice Signal's president, Daniel Roth, states that he asked for, and received, assurances from Goodwin that the content of the Voice Signal/Goodwin communications was subject to the attorney-client privilege and would be retained in confidence. Roth Decl., ¶11. His affidavit is uncontested. Declaration of J Anthony Downs, ¶11. Goodwin's lead counsel, Paul Ware, was among the Goodwin lawyers who met with Voice Signal's executives. Mr. Ware states that he "may well have told VST that to the extent they provided confidential information to us as part of our initial discussion, in order to decide whether to retain us, we would keep that information confidential." Declaration of Paul F. Ware, ¶ 4.

Moreover, Goodwin partner, J. Anthony Downs met, and corresponded by e-mail, with Voice Signal's executives. He marked his e-mails to Voice Signal "PRIVILEGED," and received return e-mail from Voice Signal that also was marked "PRIVILEGED." Goodwin does not deny that an expectation of confidentiality arose from this e-mail correspondence. In his affidavit, Mr. Downs merely states that he does not "recall" "that he intended his use of the word 'privileged' to indicate that Goodwin Procter had already established an attorney-client relationship," but he does not identify any other privilege that might plausibly have attached to his e-mail correspondence. *Deloury v. Deloury*, 22 Mass. App. Ct. 611, 615 (1986) (The client's belief "that the consultations were confidential . . . is itself entitled to respect").[1]

---

[1] If Goodwin were truly concerned that what it now calls a "pitch" would be deemed an attorney-client relationship, it should have provided Voice Signal with a clear statement that: (1) no attorney client-relationship would be formed until the firm was engaged; and (2) that the client should *not* share its confidential information with the firm during preliminary meetings. *See, e.g.* See Ex. A to Declaration of Richard C. Abati. (Attorney Liability Society, Inc.'s

3

Further, the specific content of the Goodwin/Voice Signal communications was confidential in nature. Voice Signal discussed with Goodwin its future product plans and, in particular, its ideas as to how it might design its products so as to move them as far away as possible from the claims of the ScanSoft patent-in-suit. One of the modifications that was discussed has since been implemented, but one or more others have not yet been introduced. Second Declaration of Daniel Roth ("Roth Decl. II"), ¶3. They remain confidential.[2] In his Declaration, Mr. Downs does not deny that design-around alternatives were discussed. To the contrary, he states that "the question whether there was an easy 'design around' . . . is one a patent lawyer would almost always ask." Downs Decl., ¶16.

Voice Signal discussed with Goodwin Voice Signal's business model, its financial situation, its pricing arrangements (which are the subject of non-disclosure agreements with its clients), its potential damage exposure if it were found liable, its efforts to obtain new business, the effect of the existence of this case on those efforts, the relative importance of this case to Voice Signal, Voice Signal's tolerance for litigation risk and Voice Signal's early thinking about the amounts for which it might be prepared to settle this case. Roth Decl. II, ¶¶2, 4, 5, 6. In his Declaration, Mr. Downs does not deny that pricing and other damage assessment issues were discussed. Indeed, he acknowledges that his notes contain "a reference to 'one chip per phone' and a particular number that probably refers to current pricing," as well as the names of potential Voice Signal customers. Downs Decl., ¶¶4, 16.

---

"sample pre-engagement letter" from its Prototype Lawyer's Manual, dated October, 1998), filed herewith. Here of course Goodwin did the opposite.

[2] Both Mr. Downs and Mr. Ware state that to the extent Voice Signal shared confidential information about its products, it is not reflected in their notes and they no longer remember it. No case suggests that a lawyer's statement that he has forgotten the details of confidential information provided by a client is grounds for allowing that lawyer to represent the client's opponent in the same lawsuit. Any such rule would allow an unscrupulous lawyer to avoid Rule 1.9 simply by attesting to a failure of memory. And, if the Goodwin lawyers are permitted to work on this case, there is no assurance that their memories will not be refreshed by their exposure to discovery provided, and to be provided, and arguments made, in this case.

4

In sum, the information that Voice Signal disclosed to Goodwin was confidential when provided to Goodwin, and much of it remains confidential today. That information would be extremely valuable to ScanSoft, and to ScanSoft's lawyers, in this case. In these circumstances, Goodwin may not represent ScanSoft.

### B. Goodwin Rendered Legal Advice

Goodwin's argument that it merely provided generic statements of the law applicable in any patent case is also incorrect. *See* Downs Decl., ¶¶ 4, 10. Goodwin admits that its lawyers reviewed the complaint in this case, reviewed the ScanSoft patent and conducted a search for relevant prior art that was not considered by the Patent Office. Between Goodwin's first and second meetings with Voice Signal, Mr. Downs conveyed to Voice Signal copies of references (Downs Decl., ¶10), which he described as "potentially helpful prior art." Roth Decl. II, ¶8. At about the same time, Mr. Ware sent an e-mail to Voice Signal's president, Dan Roth, in which Mr. Ware said:

> Dan, we would like to have a follow-up [sic] and discuss some things that we are thinking. We could also do some more digging over the weekend.

Roth Decl. II, ¶7.

The following Monday, March 1, 2004, the Goodwin lawyers met with Mr. Roth and Voice Signal's Chief Technology Officer, Jordan Cohen. Mr. Roth states that at this meeting there was a discussion of the ScanSoft patent-in-suit, of the prior art references forwarded by Mr. Downs, and of prior art references that Voice Signal had uncovered itself. Roth Decl. II, ¶ 8. Mr. Downs states that he does not "recall performing a claim construction analysis" (Downs Decl., ¶9), and does "not recall any . . . details of the prior art search that VST says it had performed." Downs Decl., ¶16. However, Mr. Downs acknowledges that he searched for, obtained, and sent to Voice Signal, prior art that Goodwin deemed relevant and then engaged in

5

what he calls "a brief discussion of the prior art that I had located." *Id.* The relevance of prior art could not be ascertained, or discussed intelligently with Voice Signal, without at least some analysis of the claims of the patent being asserted by ScanSoft. Further it is unlikely that Goodwin would send prior art to Voice Signal in advance of a meeting whose stated purpose was to "discuss some things we are thinking" and then fail to discuss the art that Goodwin had uncovered and its relation to the language of the claims of the patent-in-suit.[3] It is similarly unlikely that art identified by Voice Signal was not discussed, at least preliminarily, and compared to the claims of the patent asserted by ScanSoft.

In addition, it is undisputed that Goodwin consulted with Voice Signal regarding the possibility of seeking a reexamination of the ScanSoft patent-in-suit by the Patent Office. Mr. Roth asked Mr. Downs for his "take" on the idea of putting the ScanSoft patent-in-suit into reexamination. Roth Decl. II, ¶9. Thereafter, Mr. Downs and Mr. Roth spoke by telephone and Mr. Downs gave Mr. Roth his advice regarding that idea. Roth Decl. II, ¶9.[4] Mr. Downs does not deny that this exchange occurred. He states only that "I do not recall that we specifically formulated a reexamination strategy," and that he is "reasonably certain" that he did not provide an opinion that any particular request for reexamination "would be useful." Downs Decl., ¶17. The undenied facts are (1) that Voice Signal and Goodwin had discussed relevant prior art, (2) that Mr. Roth then asked about the wisdom of submitting the patent-in-suit for reexamination, and (3) that, in response, Mr. Downs gave legal advice specific to the facts in this case. It is irrelevant that Mr. Downs did not formulate a full-blown reexamination strategy.

---

[3] In fairness, Mr. Downs does not state that these discussions did not occur. He states only that he does not recall the details of what was discussed.

[4] The discussions about a possible re-examination strategy were not "mere mentioning that such a strategy might exist." Opposition p. 12. Rather, Mr. Roth asked for, and Mr. Downs gave, advice as to the relative merits of pursuing a re-examination of ScanSoft's patent in light of the prior art that Voice Signal and Goodwin had uncovered as of that time. Roth Decl. II, ¶ 9.

Further, it is undisputed that Voice Signal provided Goodwin with copies of the papers relating to the disposition of the prior state court action between Voice Signal and Learnout & Hauspie and information relating to ScanSoft's participation in the Learnout & Hauspie case. It will be recalled that ScanSoft alleges that trade secrets developed by Learnout & Hauspie and its predecessors have been misappropriated by Voice Signal. Mr. Roth states that he provided these materials to Goodwin in order to obtain Goodwin's advice as to the preclusive effect on ScanSoft's trade secret claims of the dismissal with prejudice of the Learnout & Hauspie case, and that Goodwin then provided its views with respect to that subject. Roth Decl. II, ¶7. In his Declaration, Mr. Downs states that "this litigation history . . . was public information" (Downs Decl. ¶4), but he admits that "there were discussions" between Voice Signal and Goodwin "about the fact that the claims [by ScanSoft] against VST for trade secret misrepresentation appeared to be covered by the preexisting releases in the state law litigation." Downs Decl., ¶15. Goodwin's statements with respect to that subject were legal advice.

In sum, Goodwin rendered legal advice to Voice Signal. Its advice was tailored to the facts and circumstances of this case.[5] Goodwin characterized its communications with Voice Signal as "PRIVILEGED" and was prepared, had the engagement continued, to treat them as protected by the attorney-client privilege. Downs Decl., ¶11. It cannot now, in the context of its present desire to represent ScanSoft, deem them no longer "PRIVILEGED." The fact that Goodwin's legal advice was preliminary in nature and subject to revision upon further study -- as is any legal advice given early in any case -- does not mean that Goodwin is now free to represent Voice Signal's adversary in the same case.

---

[5] Goodwin suggests this case is comparable to *Mailer v. Mailer*, 390 Mass. 371 (1983), in which the court declined to disqualify a lawyer. Opposition, p. 6. In *Mailer*, the client went to an attorney "to learn something about Massachusetts divorces and the procedure for getting a divorce," not the client's own situation. *Id.* at 372. Here, Voice Signal had experience with trade secret and patent litigation. Roth Decl. II, ¶ 7. Voice Signal certainly did not need to spend several hours over the course of two meetings and attendant telephone and e-mail communications for a generic description of how such litigation proceeds -- and that is not what it received.

7

4017708v1

### C. Massachusetts Law

In *Bays v. Theran*, 418 Mass. 685, (1994) a prospective client discussed a future lawsuit with a lawyer "two or three times by the telephone for less than ten minutes on each occasion." The client sent the lawyer public documents and correspondence. The Court held that the lawyer's firm was disqualified from representing an opposing party in the same case because [a] the client communicated with a lawyer in that firm "with a view to possibly retaining him, [b] discussed various aspect of a . . . suit [with the lawyer], and [c] [the lawyer] counseled [the client] concerning some of the basic legal considerations involved in the suit". In *Bays*, the Court did not reach the question whether the law firm was disqualified merely because there was a "substantial relationship" between the client's communications and the case in which the law firm wished to represent the opposing party because it found that (as here) confidential information was actually disclosed to the lawyer. After *Bays* was decided, Rule 1.9 was adopted. See also *Application of Erica*, 421 Massachusetts (1997). It applies the "substantial relationship" test to situations of the type presented in this case.

Goodwin confuses the issue by suggesting that Voice Signal has not met its burden of proof, because it has not divulged the details of its privileged communications with Goodwin. *See* Opposition pp. 2-4, 11-12, 14-17, and 19. First, Goodwin's argument is inconsistent with Massachusetts law. In *Bays*, the Court affirmed a disqualification order that was based upon general statements as to the "nature, topics and extent of communication between" the lawyer and the client. 418 Mass. at 693-94. Second, Goodwin's argument, if accepted, would impose on any client an impossible burden. In order to disqualify a law firm, the client would be required to disclose the detailed contents of otherwise privileged communications to its adversary, and its adversary's new counsel, thus reminding counsel of anything that had been

forgotten and waiving the attorney-client privilege as to the subject matters that were discussed and then revealed in a disqualification proceeding.

Goodwin cites *ebix.com v. McCracken*, 312 F. Supp. 2d 82 (D. Mass. 2004), in support of its assertion that Voice Signal bears the burden of proof on this motion. Opposition, p. 4. The *ebix* case does not place the burden on the client to prove the existence of an attorney-client relationship. Rather, in *ebix*, Judge Collings held that the burden is on the former client to prove that there is a substantial relationship between the earlier representation of the former client and the present representation of the client's adversary, because "*the client need never prove that the attorney actually misused confidences*." *Id.* at 90. Here, there is no dispute as to the existence of a substantial relationship between the two matters; the same lawsuit is involved.

Consistent with the Supreme Judicial Court's precedent and based on the undisputed evidence that Goodwin consulted with Voice Signal with respect to the substance of this litigation, that Voice Signal shared confidential information with Goodwin, and that Goodwin gave advice at both as to "basic legal considerations" and as to the particular facts of this case, Goodwin should be disqualified from representing ScanSoft.[6]

## II. Even If This Court Were To Apply The Reasoning Of The Out-Of-State Cases Relied Upon By Goodwin, Voice Signal's Motion To Disqualify Should Be Granted.

Goodwin relies on cases decided in other jurisdictions. It cites *B.F. Goodrich Co. v. Formosa Plastics Corp.*, 638 F.Supp. 1050 (S.D. Tex. 1986), a case decided under Fifth Circuit precedent. There, B.F. Goodrich's in-house lawyers conducted formal interviews with five lawyers. Each candidate was interviewed using the same set of questions. The Court, reviewed the undisputed list of topics covered during the interview and found, based on the evidence, that

---

[6] Voice Signal is not asking the Court to disqualify Goodwin as a "prophylactic device for protecting the attorney-client relationship." *See Inverness Medical Switzerland GMBHZ v. Alan Labs, Inc.*, 2005 WL 1491233 *4 (D. Mass. June 23, 2005). It seeks Goodwin's disqualification to prevent the real harm that will result if Goodwin is permitted to switch sides in this case, given the confidential information shared by Voice Signal with the same Goodwin lawyers who now seek to represent ScanSoft in this case.

no confidential information was conveyed by the Goodrich lawyer to the candidates. *Id.* at 1052. The Court stressed that "only Goodrich attorneys met with the candidates and those attorneys regulated what information was furnished to each candidate." *Id.* at 1052.

Here, by contrast, Goodwin met with executives of Voice Signal, not its lawyers. Voice Signal understood that its communications with Goodwin were confidential and protected by the attorney-client privilege -- a view that Goodwin confirmed in its contemporaneous e-mail correspondence. Voice Signal's president has submitted a declaration detailing the topics that were discussed, many of which did involve the disclosure of confidential information. Therefore, even if a decision of a court in the Southern District of Texas were deemed a statement of Massachusetts law, it would not change the result: Goodwin should not be permitted to switch sides and represent ScanSoft in this case.[7]

### III. Even If This Court Were To Apply ABA Model Rule 1.18 – Which Has Not Been Adopted In Massachusetts – Goodwin Should Be Disqualified.

Finally, Goodwin argues that the Court should apply an ABA model rule that has *not* been adopted in Massachusetts. Opposition pp. 9 - 10. Goodwin cites no authority for the proposition that this Court should ignore the Supreme Judicial Court's Rules of Professional Conduct in favor of a model rule that the Court has not adopted.

Even if the Court were to look to model rule 1.18, Goodwin should be disqualified from representing ScanSoft in the very same litigation about which it consulted with Voice Signal. Model Rule 1.18 adds an admonition that a lawyer should not represent a client with interests adverse to a *prospective client* in a substantially related matter "if that lawyer received

---

[7] The other case relied upon by Goodwin is equally distinguishable. *Clark Capital Management Group, Inc. v. Annuity Investors Life Ins. Co.*, 149 F.Supp. 2d 193 (E.D. Pa. 2001) presented a situation where outside counsel for one party to a trademark infringement case made a few telephone calls to another outside lawyer regarding the possible retention of the second lawyer as local counsel for the client. The second lawyer was not retained. A different lawyer in his firm was later approached to represent the adverse party in the litigation. Unlike the facts here, the lawyer never met with the client, there was no evidence that the lawyer received confidential information, and the lawyer who had the brief telephone conversations was not the lawyer seeking to represent the adversary.

4017708v1

information from the prospective client that would be significantly harmful to that person in the matter." Goodwin concedes that Voice Signal was a "prospective client" when Voice Signal's executives met with Goodwin lawyers for several hours and when Goodwin corresponded with those executives, marking its e-mails as "PRIVILEGED." Goodwin contends, however, that the information it received from Voice Signal would not be "significantly harmful" to Voice Signal. Goodwin states that "no such harm is asserted here." *Id*. at p. 10. This statement is incorrect.

Voice Signal did not address the issue of prejudice in its prior memorandum because it is well established under Massachusetts law that the Court need not find actual use of the client's confidences in order to disqualify a lawyer who was not retained by a client. *Bays v. Theran*, 418 Mass at 691, states that under the "substantial relationship test" (later codified in Massachusetts Rule 1.9 and confirmed in *Adoption of Erica*, 426 Mass. SJ, 61 (1997)) "a subsequent representation is proscribed . . . simply because of the substantial relationship to the former one" because such a relationship "exposes the attorney to an intolerably strong temptation to breach his duty of confidentiality…The [former] client need never prove that the attorney *actually* misused the confidences…" [emphasis by the Court]; *see also* Rodriguez v. Montalvo, 337 F. Supp. 212, (D. Mass 2004) (Gorton, J.) ("the former client is not required to prove that the attorney actually misused the information"). The legal standard in Massachusetts Rule 1.9 may not support ScanSoft's position as well as model rule 1.18, but it is the legal standard.

Further, and contrary to Goodwin's assertions, the confidential information shared by Voice Signal with Goodwin during the meetings and other communications at the outset of this case will provide an advantage to ScanSoft. Voice Signal discussed with Goodwin Voice Signal's possible damage exposure if it were found liable in this case, its position in the market, the effect that the mere existence of this case was having on Voice Signal's efforts to obtain new businesses, the importance of this case to Voice Signal, Goodwin's and Voice Signal's thoughts

about possible settlement, and Voice Signal's tolerance for litigation risk. Roth Decl. II, ¶4-6. That information would be invaluable to ScanSoft, and to Goodwin acting as ScanSoft's counsel, as this case proceeds.

As part of the preliminary damages analysis, Voice Signal shared with Goodwin confidential information regarding its pricing, margins and expected sales volumes. Roth Decl. II, ¶6. Facts relating to Voice Signal's damage exposure have not yet been the subject of discovery in this case. The parties have agreed to defer all damage discovery until after fact discovery relating to liability issues, in part because both parties believe that subject to be enormously competitively sensitive.

Voice Signal discussed with Goodwin several potential design around alternatives to move Voice Signal's products as far away as possible from the claims of the ScanSoft patent-in-suit. Roth Decl. II, ¶ 3. While one such design change was later made and is now (but was not then) publicly known, another has not yet been publicly disclosed. *Id.*

The prior art that Goodwin and Voice Signal identified and evaluated is not known to ScanSoft. Voice Signal has not provided to ScanSoft the results of its prior art searches in discovery in this case. To the contrary, ScanSoft's motion seeking precisely that information was opposed by Voice Signal, and denied by the Court, as protected by the work product doctrine. It will not have to be disclosed until later in this case. Order dated January 14, 2005, at 7-8. If Goodwin is allowed to represent ScanSoft, information that this Court has deemed protected will be in the possession of ScanSoft's counsel.

Therefore, even if the Court were to apply ABA Model Rule 1.18, Goodwin should be disqualified from representing ScanSoft in this lawsuit.

4017708v1

## CONCLUSION

ScanSoft is, and will continue to be, represented by very capable counsel at Bromberg & Sunstein.  Goodwin would be a second law firm representing ScanSoft in this case.  There are many other firms available to ScanSoft if it believes that two law firms are better than one.  However, the communications between Voice Signal and Goodwin render Goodwin an impermissible choice.  Goodwin should not be permitted to represent ScanSoft in this case.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated:  December 5, 2005 | VOICE SIGNAL TECHNOLOGIES, INC. |
|  | By its attorneys, |
|  | /s/ Wendy S. Plotkin<br>Robert S. Frank, Jr. (BBO No. 177240)<br>Sarah Chapin Columbia (BBO No. 550155)<br>Paul D. Popeo (BBO No. 567727)<br>Wendy S. Plotkin (BBO No. 647716)<br>CHOATE, HALL & STEWART LLP<br>Two International Place<br>Boston, MA  02110<br>(617) 248-5000 |

4017708v1