UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCANSOFT, INC., <br><br> Plaintiff, <br><br> v. <br><br> VOICE SIGNAL TECHNOLOGIES, INC., LAURENCE S. GILLICK, ROBERT S. ROTH, JONATHAN P. YAMRON, and MANFRED G. GRABHERR, <br><br> Defendants. | C.A. No. 04-10353-PBS |

### SECOND DECLARATION OF DANIEL ROTH IN SUPPORT OF VOICE SIGNAL'S REPLY CONCERNING ITS MOTION TO DISQUALIFY GOODWIN PROCTER LLP FROM REPRESENTING SCANSOFT IN THIS CASE

I, Daniel Roth, depose and say the following based on my personal knowledge.

1.  I am President of Voice Signal Technologies, Inc. ("Voice Signal"). I have reviewed ScanSoft's Opposition to Voice Signal's Motion to Disqualify Goodwin Procter LLP and the accompanying Declarations of Paul F. Ware and Anthony Downs. In order to refute certain misstatements and mischaracterizations that can be found in those papers, I hereby make this Second Declaration in support of Voice Signal Technologies, Inc.'s Reply concerning its Motion to Disqualify Goodwin Procter LLP from Representing ScanSoft in this Case.

2.  I have read the declarations of Messrs. Ware and Downs in which they say they cannot remember any confidential information shared by Voice Signal with Goodwin. During the meetings at Goodwin's offices and our attendant telephone conversations, we shared with Goodwin attorneys the confidential information relating to Voice Signal's then-current product

4019020v1

design; Voice Signal's future product plans; design strategies; design around strategies; and business models. This information was not and is not generally known.

3. As I stated in my first declaration, one of the topics discussed with Goodwin was how we might modify the design of Voice Signal's speech recognition products to move them as far away as possible from the claims of the ScanSoft patent. One such design change has been implemented, but one or more others have not yet been introduced.

4. We also discussed with Goodwin Voice Signal's financials, our pricing agreements and the potential damage exposure if we were found liable. As part of those discussions, we shared with the attorneys information about our business development status in key customer accounts, some of which are still active and non-public. We discussed the effect this lawsuit was having in our commercial relationships and the degree of importance this case has to our company.

5. Perhaps most significantly, we shared with the Goodwin attorneys our tolerance for settlement, including monetary amounts we might consider to settle this case.

6. Voice Signal licenses its technology to original equipment manufacturers (OEMs) who incorporate it into their mobile telephone products. Each license is separately negotiated. The terms of each license are strictly confidential and, in particular, Voice Signal's pricing is held in absolute confidence from its competitors. As part of our discussions with the Goodwin attorneys, we discussed Voice Signal's possible damages exposure in the lawsuit. In connection with those discussions, we shared with the attorneys information concerning our pricing, margins, and expected volumes.

7. I have also seen that Goodwin now says that it did not provide legal advice, but rather gave us generic, standard explanations of how a patent and trade secret case proceeds. We

2

did not need generic descriptions of litigation, as we had experience in litigations (including the state court action involving the exact same trade secrets claims and a patent litigation in which we were the plaintiffs). We were looking to understand how Goodwin would approach *this case*. Toward that end, we provided them with information relating to the state court action and we shared with them what we know about the industry and the prior art. We sought from them and received legal advice concerning this lawsuit. We had a discussion of what preclusive effect (if any) the judgment in the state law action would have on ScanSoft's trade secrets claim in this lawsuit. Also, prior to one of the in-person meetings with Goodwin, I and others at Voice Signal collected considerable prior art relevant to the ScanSoft patent, including both references that were before the patent office and references that were not. We described their content and shared examples. We were not satisfied with Goodwin's initial effort and asked them to conduct research and prepare a detailed plan of action for this case. In response Mr. Ware wrote me an e-mail in which he stated:

> Dan, we would like to have a follow-up [sic] and discuss some
> things that we are thinking. We could also do some more digging
> over the weekend.

And in fact they prepared a detailed plan for us which was presented in a subsequent meeting.

8. We planned to meet on Monday, March 1. Mr. Downs did some additional searching and provided us with copies of what he found, designating them as "potentially helpful prior art" and marking his e-mail communication to me "PRIVILEGED." At our meeting on March 1, we had a substantive discussion about ScanSoft's patent and, in particular, how the prior art references located to date might best be used in our defense.

3

9.  After our second meeting, I learned of a procedure for using prior art to submit issued patents to the patent office for reexamination. I sent Mr. Downs an e-mail asking him to give me his "take" on this strategy. I had a telephone conversation with Mr. Downs in which we discussed the re-examination process and he described for me the relative merits of pursuing that strategy in light of the prior art Voice Signal and Goodwin had uncovered as of that time.

Signed under the pains and penalties of perjury this __ day of December, 2005

_____
Daniel Roth