## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SCANSOFT, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 04-10353-PBS |
| | ) | |
| VOICE SIGNAL TECHNOLOGIES, INC., | ) | |
| LAURENCE S. GILLICK, ROBERT S. | ) | |
| ROTH, JONATHAN P. YAMRON, and | ) | |
| MANFRED G. GRABHERR, | ) | |
| | ) | |
| Defendants | ) | |

## SCANSOFT'S MEMORANDUM IN SUPPORT OF ITS
## PROPOSED NEUTRAL EXPERT PROCEDURE

At the *Markman* hearing on June 17, 2005, and again during status conferences on July 18th and August 15th, this Court directed the parties to select a neutral expert and then to adopt a procedure designed to facilitate the expert's informed analysis of the parties' speech recognition engine source code. The parties have now agreed on a neutral expert, Dr. Hermann Ney, and he has agreed to serve. After the parties selected Dr. Ney, ScanSoft sent a proposed procedure to Voice Signal Technologies ("VST") for its consent. ScanSoft took great care in crafting the procedure to comply with this Court's directives regarding the contours of the neutral expert's assignment. VST, however, has, counter-proposed a procedure that defies this Court's directives and, indeed, defies procedural and constitutional safeguards. It is clear that VST's procedure is designed (a) to thwart legitimate discovery, (b) to stonewall this case, and (c) to have the neutral expert decide the merits of the case rather than this Court. Thus, as argued below, ScanSoft respectfully requests that the Court endorse ScanSoft's proposed procedure.

## VST FLOUTS THE COURT'S DIRECTIVES

At the *Markman* hearing and especially at the status conference on July 18, 2005, this Court and the parties discussed how to proceed once the neutral expert was appointed. For example, this Court directed that communications with the neutral expert must be *ex parte* to protect disclosure of trade secrets and to allow each party to speak candidly with the neutral expert. VST, however, contemplated a procedure that does not require *ex parte* communications. Accordingly, VST proposed a procedure that would allow it to learn ScanSoft's trade secrets. But that is exactly what this Court has, on numerous occasions, held that VST may not have at this stage of the litigation. This Court repeated its directive at the July 18th hearing:

> THE COURT: Ex parte. Because, otherwise, you get an access to what it is -- the basic thing that I'm saying you shouldn't get unless I have --
>
> MR. FRANK: Your Honor, essentially what [ScanSoft is] going to do is tell the expert what they think are the trade secrets we have taken. That's what they should legitimately be saying to the expert. There is no reason why they should not say that in a form that we [VST's counsel] can see it. And, no reason why we should not be able to respond.
>
> THE COURT: I disagree with that. . . . It may well be that they say: Here's our source code. We think that they took these snippets of it. And, that's the kind of thing you should not have access to.

**Exhibit A**, Hearing Transcript of July 18, 2005, at 13.[1]

This Court also set forth the contours of the neutral expert's assignment, specifically commenting that the expert will not be the judge and jury on the merits of the case. Rather, the expert will simply be making a preliminary recommendation to the Court about whether either

---

[1] During the parties' Rule 7.1 conference, VST's counsel conceded that, at least, the parties could serve on each other briefs with trade secret information redacted. But VST has not conceded that the discussions with the expert be *ex parte*, as this Court requires. Accordingly, VST's "concession" does not address this Court's concern to protect trade secrets.

side has met the minimum threshold to trigger discovery.  *Id.* at 8 (the expert "can't be the judge and jury about discovery"), 10 ("He's not a mediator or a fact finder or a master"), and 13-14 ("there does not have to be proof beyond a reasonable doubt, proof by clear and convincing evidence or even proof by a preponderance of the evidence. There just has to be a prima facie case on either of your claims, <u>enough to trigger discovery</u>") (emphasis added).

As detailed below, VST wants a much higher standard--one that will, in effect, require Dr. Ney to decide the merits of the case before ScanSoft has even had a chance to discover the documents and present its case.

The Court also set forth other aspects of the procedure.  For example, the Court stated that it will write an opinion after receiving the expert's report.  **Exh. A** at 14.  VST does not want the Court to do so, thus depriving ScanSoft of the opportunity to challenge the discovery ruling, if necessary.  This Court also stated that it will permit the parties to depose the expert.  **Exhibit B**, Transcript of *Markman* Hearing, dated June 17, 2005, at 8-9.  The Court's directive permitting a deposition conforms with the safeguards of Fed. R. Evid. 706(a), which permits parties to depose court-appointed experts.  ScanSoft's procedure allows for such a deposition. But VST's proposal does not.

## THIS COURT SHOULD ADOPT SCANSOFT'S PROCEDURES

Attached as **Exhibit C** is ScanSoft's proposed Neutral Expert Procedure.  VST's proposal is attached as **Exhibit D**.  ScanSoft requests that this Court adopt Scansoft's procedure for the expert to follow in his examination of the parties' source code.[2]

---

[2]  ScanSoft has objected to the employment of a neutral expert and has requested that the Court simply order the production of the source code under the terms of the protective order endorsed by this Court.  This Court has overruled the objection, and ScanSoft will certainly follow the Court's direction.  ScanSoft, however, wants to preserve its objection.  Therefore, this proposed procedure should not be understood as a waiver of ScanSoft's objection.

ScanSoft's proposed procedure draws from (a) this Court's directives, as detailed above, and (b) procedures suggested by an extensive review of literature on the use of neutral experts, including Federal Judicial Center guidelines (*e.g.*, a report entitled "Neutral Science Panels: Two Examples of Panels of Court-Appointed Experts in the Breast Implants Product Liability Litigation," by Laural Hooper, Joe Cecil, and Thomas Willging (2001)); the *Manual of Complex Litigation* (3rd. ed.); law review and other articles on neutral experts; case reports in which neutral and court-appointed experts have been used; Fed. R. Civ. P. 53 (Masters); and Fed. R. Evid. 706 (Court Appointed Experts).    On the other hand, as seen below, VST's procedure appears to be based on an attempt to stonewall discovery and to put the case in the hands of a layperson, unauthorized under the Constitution to decide the merits.

The parties disagree on a dozen areas of the procedure, and most of VST's proposals are unacceptable or unworkable for a variety of reasons.  For example, as seen above, this Court has already held that the parties may depose the expert.  But VST's procedure does not allow for this important procedural safeguard.  In any event, for the purpose of brevity, ScanSoft highlights below five specific instances in which VST's procedures are improper and explains why.  These five instances will give this Court a sense of VST's overall strategy to avoid discovery and thus terminate the case without a fair fight on the merits.[3]

---

[3] Although ScanSoft highlights below five specific areas in which the procedures differ, ScanSoft objects to many other VST proposals--twelve areas of disagreement in all. ScanSoft can explain the other points of disagreement (all of which Scansoft discussed with VST during the parties' Rule 7.1 conference on December 8th) at any hearing on this matter, should this Court desire.

1.      **The Expert's Standard of Review**

In keeping with this Court's directives that the neutral expert not be "judge and jury about discovery," **Exh. A** at 8, ScanSoft proposes that the Expert report "whether the materials examined contain any evidence relevant to, or likely to lead to the discovery of relevant evidence of, ScanSoft's claims of trade secrets misappropriate and/or VST's counterclaim of patent infringement." **Exh. C**, ScanSoft's [Proposed] Neutral Expert Procedure at p. 1.

In contrast, VST proposes that the expert, in fact, act as judge, jury, mediator, fact finder, etc. Specifically, VST would require the expert to "make an initial determination whether (1) there is any substantial evidence that VST copied or is using any portion of the identified Dragon NaturallySpeaking source code; and (2) if so, whether that portion is protectible as a trade secret, i.e., whether it is something that was, in fact, secret (not otherwise known or available to the public . . .)." **Exh. D**, VST's [Proposed] Neutral Expert Procedure at ¶ 12 (emphasis added).[4]

As seen above, this Court requires a far lower threshold showing--one that merely is "enough to trigger discovery." **Exh. A** at 14 . A party seeking discovery need show only that the

---

[4]      In addition to improperly high threshold that ScanSoft must meet, VST's proposal contains at least two other defects. First, it is imbalanced. While VST's procedure requires ScanSoft to prove, and the neutral expert to find, "substantial evidence" of trade secrets misappropriation, the procedure, as presently written, only requires that VST prove, and the expert find, "any evidence of infringement of the '630 patent." **Exh. D** at ¶ 12. during the Rule 7.1 conference, VST's counsel conceded that this imbalance was an "oversight." In any event, to correct the imbalance, VST would have both parties show substantial evidence. That standard is still wrong, as explained above.

Second, in essence, VST's procedure misapprehends the nature of ScanSoft's trade secrets case. Theft of trade secrets is not necessarily like copyright infringement. That is, VST proposes a line-by-line comparison between its source code and ScanSoft's Dragon NaturallySpeaking code. That would be a copyright infringement approach. But VST's misuse of trade secrets may be more nuanced than simple copying of lines of code. Indeed, the limited discovery that VST has allowed to leak through its discovery barriers shows that the defendants may have misused ScanSoft's trade secrets even without copying. The nature of the misappropriate is a subject of another day, however.

requested information is in any way relevant to the party's claims and defenses. Fed. R. Civ. P. 26(b)(1); *Campbell v. U.S.*, 167 F. Supp.2d 440, 448 (D. Mass. 2001)(Gorton, J.). And relevance, for the purposes of discovery, is broadly defined. *See, e.g., Equal Employment Opportunity Commission v. Electro-Term, Inc.,* 167 F.R.D. 344, 346 (D. Mass. 1996) ("As a general matter, relevancy must be broadly construed at the discovery stage such that information is discoverable if there is any possibility it might be relevant to the subject matter of the action").

ScanSoft should not, as VST proposes, be required to prove its case or to make some higher threshold showing--such as "substantial evidence"-- before gaining access to the discoverable information. *See, e.g., ITT Electro-Optical Prods. Div. of ITT Corp. v. Elec. Tech. Corp., et al.,* 161 F.R.D. 228, 231 (D.Mass. 1995) (Neiman, MJ) ("if relevancy and need are shown, the trade secrets should be disclosed"); *Upjohn Co. v. Hygieia Biological Labs.*, 151 F.R.D. 355, 358-59 (E.D. Cal. 1993) (party seeking competitor's highly sensitive technical documents required to show relevance, which is broadly construed in discovery disputes).

Accordingly, VST's approach is designed to make ScanSoft prove its case to the neutral expert--before even having the benefit of full discovery. Clearly, VST wants to avoid a fair fight on the merits. But as a matter of law, ScanSoft is entitled to prove trade secrets theft, in the first instance, to a jury. *Data General Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 340, 359-361 (D.Mass. 1993) (Skinner, J.) (jury decided trade secret claims); *see also Control Center, L.L.C. v. Lauer*, 288 B.R. 269, 278 (M.D. Fla. 2002) ("action seeking damages for the misappropriation of Control Center's trade secrets is clearly legal in nature" and, as such, plaintiff has a Seventh Amendment right to a jury trial); *LinkCo, Inc. v. Fujitsu Ltd.,* 232 F. Supp.2d 182, 192, n.11 (S.D.N.Y. 2002) ("the legal nature of a trade secret misappropriation claim is also evident from the right to a jury trial in these actions").

ScanSoft is also entitled to have a jury decide whether it infringes VST's counter-claim patent ("the '630 patent"). *See Markman v. Westview Instruments,* 517 U.S. 370, 377 (1996) ("there is no dispute that infringement cases today must be tried to a jury"). Indeed, ScanSoft is entitled to have VST meet its burden of proving infringement by a preponderance of the evidence to a jury. VST would avoid this burden, however, by having the expert find "any evidence" of infringement. This Court must not allow VST's procedures for this reason alone.

    2.    ***Ex Parte* Communications.**

As seen above, this Court has already ruled against VST and has already held that the communications with the expert, Dr. Ney, be *ex parte*. VST's proposal, however, does not require *ex parte* communications. Rather, it would permit *inter parties* communications and briefing. *See* **Exh. D** at ¶ 11. Accordingly, VST's procedure is improper given this Court's directive and concern that VST not be allowed access to ScanSoft's trade secrets.

    3.    **Production of Source Code and Related Documentation**

ScanSoft has taken great care in defining the term "Source Code" and what the parties must produce to enable the neutral expert to review the source code. *See* **Exh. C**, ScanSoft's [Proposed] Neutral Expert Procedure at ¶¶ 5-6 (definitions of "VST Source Code" and "ScanSoft Source Code") and ¶ 9 (specifying the format for the source code and what software tools and documentation must accompany it). One reason that ScanSoft has taken such care is that it knows that, if left to its own devices, VST will produce incomplete source code that can not be run on a computer and cannot be fully reviewed by the expert. VST has narrowly defined "source code" and has left out of its procedure all of the safeguards and tools that an expert will need to compile, execute, and run the source code.

As this Court knows, the source code, if printed on standard paper, would be voluminous and would take weeks or months to review. Accordingly, it makes sense to produce the source code in a readily usable format. Ensuring that the source code can be run on a computer, however, is not so simple as VST would have this Court believe. Accordingly, ScanSoft's procedure requires both parties to produce the tools that Dr. Ney will need to gain access to the source code and run it.

Another purpose of ScanSoft's more detailed procedure, however, is to ensure that the parties have fully produced the complete source code. ScanSoft has worked closely with its retained software expert, Dr. Goldhor, to devise a procedure that will ensure that the complete source code is produced by both parties. This detailed procedure is important because, unfortunately, VST has already demonstrated its unwillingness to produce the complete and usable form of its source code.

As this Court may recall, it has already ordered VST to produce to ScanSoft certain user interface source code. But as seen in Dr. Goldhor's accompanying declaration (**Exh. E**), VST produced user interface source code that was incomplete. It could not be compiled and run on a computer because many software files were missing. Dr. Goldhor found other deficiencies (*i.e.*, missing information) in the produced code. The end result is that the missing data prevented Dr. Goldhor from completing his analysis of the user interface source code. In his declaration, Dr. Goldhor outlines what source code typically contains and what is missing from the code that VST produced. [5]

---

[5] Dr. Goldhor's declaration is redacted to shield information that VST has designated as Confidential or Highly Confidential, but ScanSoft will provide the Court with an unredacted version upon request.

Moreover, VST has admitted that the source code it lodged with this Court may not contain the tools necessary to review it.

ScanSoft wants to ensure that Dr. Ney will not experience the same problems that Dr. Goldhor encountered when attempting to review VST's user interface code. That is why ScanSoft proposed procedure details the documentation necessary to use the source code. Thus, this Court should adopt ScanSoft's more detailed safeguards and reject VST's *laissez faire* approach.

**4.      VST's Procedure Deprives ScanSoft of the Assistance of Counsel**

In accordance with the protective order that this Court endorsed in this case, ScanSoft's procedure allows the parties' outside litigation counsel (but not the parties themselves) to review the other side's source code and related documentation. *See* **Exh. C** at ¶ 12. VST's procedure does not. Without this protection, counsel will not be able to direct Dr. Ney in what to look for and, as a result, the neutral expert process will be inefficient and unworkable. That confusion and inertia is what VST wants.

**5.      VST's Improper Narrowing of the Term "VST Source Code"**

VST defines the source code it must produce to the expert in a way that appears to preordain the result, without any adjudication on the merits. Specifically, VST limits the definition of "VST Source Code" to the work performed by the individual defendants (Messrs. Gillick, Roth, Yamron, and Grabherr) during their first year of employment at VST **Exh. D** at ¶ 5. That narrow definition is problematic for a number of reasons, such as the arbitrary time limit. But most important, it ignores that the individual defendants may not have actually written all of the source code themselves. Rather, as the very limited discovery to date suggests, the individual defendants likely directed other VST employees to write all or significant portions of the code.

Indeed, the limited discovery suggests that that the defendants shared with others the trade secrets they had learned at ScanSoft's predecessors (L&H and Dragon) so that the other employees could then write the code, directly benefiting from those trade secrets. Accordingly, the definition of "VST Source Code" cannot be so limited as VST desires.

ScanSoft's definition, seen in ¶ 5 of its proposed procedure (Exh. C), defines the challenged source code more simply. The procedure would require VST to produce the source code for VST's speech recognition products (as identified in ¶ 5) regardless of which VST software engineer actually wrote the lines of code. The point is that the defendants' misuse of the trade secrets taints the entire enterprise, the entire software development program.

* * *

As seen above, VST has designed procedures that will prevent the neutral expert from doing his job effectively and that, indeed, will stack the deck in VST's favor. VST has done everything to resist discovery in this case, and its proposed procedure is one more example of its stonewalling tactics. This Court must not let VST continue to delay this case and stonewall discovery. Otherwise, there will never be a resolution on the merits.

**CONCLUSION**

Accordingly, ScanSoft respectfully requests that the Court adopt ScanSoft's proposed procedure for the employment of the neutral expert.


Dated:  December 16, 2005                    SCANSOFT, INC.,
                                             By its attorneys,

                                             /s/ Erik P. Belt
                                             Lee Carl Bromberg, BBO # 058480
                                             Erik Paul Belt, BBO # 558620
                                             Lisa M. Fleming, BBO # 546148
                                             Jack C. Schecter, BBO # 652349
                                             Rebecca L. Hanovice, BBO # 660366
                                             BROMBERG & SUNSTEIN LLP
                                             125 Summer Street
                                             Boston, Massachusetts 02110-1618
                                             (617) 443-9292
                                             ebelt@bromsun.com


02639/00509  451215.1