# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SCANSOFT, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 04-10353-PBS |
| VOICE SIGNAL TECHNOLOGIES, INC., LAURENCE S. GILLICK, ROBERT S. ROTH, JONATHAN P. YAMRON, and MANFRED G. GRABHERR, | ) | |
| Defendants. | ) | |

## VOICE SIGNAL TECHNOLOGIES, INC.'S
## SECOND SET OF INTERROGATORIES TO PLAINTIFF

Pursuant to Federal Rule of Civil Procedure 33 and the Local Rules of the District of Massachusetts, defendant and counter-claim plaintiff Voice Signal Technologies, Inc. ("VST") requests that plaintiff and counter-claim defendant ScanSoft, Inc. ("ScanSoft") answer within thirty (30) days of service the following Interrogatories.

### DEFINITIONS

As used herein, the following terms shall have the meanings set forth below.

1. "And" as well as "or" shall be construed both disjunctively and conjunctively, as necessary, to bring within the scope of the Interrogatories all responses that might otherwise be construed to be outside their scope, and to give each Interrogatory its broadest possible meaning.

2. "Any" shall be construed also to mean "all," and "all" shall be construed also to mean "any."

3. "Concerning" means regarding, mentioning, referring to, relating to, describing, memorializing, evidencing, commenting on, constituting or containing.

4.    "Document," in the plural as well as in the singular, shall be construed in the broadest sense permissible under Federal Rule of Civil Procedure 34, and means all originals, copies and drafts of any writing or other tangible or intangible thing from which data or information can be obtained, known to you or within your possession, custody or control, including, but not limited to, all written, printed, typed, transcribed, electronically encoded matter, any sound or video recording, any photograph or graphic matter or any other thing containing information or communications or from which information or communications may be derived.

5.    "Identify" when used with respect to a document, as defined herein, means to state the type of document, the general subject matter of the document, the date of the document, and the author, addressee, recipient and current custodian and location of the document.

6.    "Identify" when used with respect to a person, as defined herein, means to state the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment.

7.    "ScanSoft," "you," and "your" shall mean ScanSoft, Inc. and any and all of its predecessors, successors, parents, subsidiaries, divisions, affiliates, employees, officers, directors, agents, attorneys, representatives, or other persons or entities who have acted or purported to act for or on behalf of any of them.

8.    "VST" shall mean Voice Signal Technologies, Inc. and any and all of its predecessors, successors, parents, subsidiaries, affiliates, servants, employees, officers, directors, agents, attorneys, representatives, or other persons or entities who have acted or purported to act for or on behalf of any of them.

2

## INSTRUCTIONS

1.    In answering the following Interrogatories, furnish all available information, including information in the possession, custody, or control of any of your attorneys, directors, officers, agents, employees, representatives, associates, investigators, divisions, affiliates, partnerships, parents, subsidiaries, and persons under your control. If you cannot fully respond to any Interrogatory after exercising due diligence to secure the information requested thereby, so state, and specify the portion of the Interrogatory that cannot be responded to fully and completely. In the latter event, state what efforts were made to obtain the requested information and the facts relied upon that support the contention that the Interrogatory cannot be answered fully and completely, and state what knowledge, information or belief you have concerning the unanswered portion of the Interrogatory.

2.    If any information requested is claimed to be privileged, please provide all information falling within the scope of the Interrogatory that is not privileged, and for each item of information contained in a document to which a claim of privilege is made, identify such document with sufficient particularity for purposes of a motion to compel.

3.    If your response to any Interrogatory is a statement that you lack the ability to comply with the Interrogatory, specify whether the inability to comply is because the particular item or category of information never existed, has been destroyed, has been lost, misplaced, or stolen, or has never been or is no longer in your possession, custody, or control, in which case identify the name and address of any person or entity known or believed by you to have possession, custody, or control of that information or category of information.

4.    If, in answering any Interrogatory, you claim there is any ambiguity in the Interrogatory or an applicable definition or instruction, you shall not use such claim as a basis for

3

refusing to respond, but shall state in your response the language you deem ambiguous and the interpretation used in responding to the Interrogatory.

5.     Your obligation to respond to these Interrogatories is continuing and your responses must be supplemented to include subsequently acquired information.

### INTERROGATORIES

Interrogatory No. 1:

Identify with particularity each trade secret that ScanSoft alleges defendants Laurence S. Gillick, Robert S. Roth, Jonathan P. Yamron, and Manfred G. Grabherr used and disclosed for the benefit of VST. For each such trade secret, state the subject matter, content, function, method of operation, creator(s), and date of conception of the trade secret, and identify all documents that describe, embody, constitute, or contain the trade secret.

Interrogatory No 2:

Excluding the trade secret(s) identified in response to Interrogatory No. 1, identify with particularity any confidential and proprietary information that ScanSoft alleges defendants Laurence S. Gillick, Robert S. Roth, Jonathan P. Yamron, and Manfred G. Grabherr used and disclosed for the benefit of VST. For any item of confidential and proprietary information identified, state the subject matter, content, function, method of operation, creator(s), and date of conception of the confidential and proprietary information, and identify all documents that describe, embody, constitute, or contain the confidential and proprietary information.

Interrogatory No. 3:

Identify each ScanSoft product that implements, embodies, contains, or employs the trade secret(s) or confidential and proprietary information identified in response to Interrogatory Nos. 1 and 2, or, if no such products exist, state how ScanSoft uses the trade secret(s) and confidential and proprietary information.

Interrogatory No. 4:

Identify the steps taken by Lernout & Hauspie Speech Products N.V. to protect from disclosure the trade secret(s) and confidential and proprietary information identified in response to Interrogatory Nos. 1 and 2.

VOICE SIGNAL TECHNOLOGIES, INC.

By its attorneys,

Robert S. Frank, Jr. (BBO No. 177240)
Sarah Chapin Columbia (BBO No. 550155)
Paul D. Popeo (BBO No. 567727)
Paul E. Bonanno (BBO No. 646838)
Wendy S. Plotkin (BBO No. 647716)
CHOATE, HALL & STEWART
Exchange Place, 53 State Street
Boston, MA 02109
(617) 248-5000

Dated: January 28, 2005
3793381_2.DOC

I HEREBY CERTIFY THAT A TRUE COPY OF
THE ABOVE DOCUMENT WAS SERVED
UPON THE ATTORNEY OF RECORD FOR
EACH OTHER PARTY BY MAIL/HAND ON

DATE 1/28/05 SIGNATURE _____

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SCANSOFT, INC.,                        )
                                       )
                Plaintiff              )
                                       )
        -VS-                           )  CA No. 04-10353-PBS
                                       )  Pages 1 - 102
VOICE SIGNAL TECHNOLOGIES, INC.,       )
LAURENCE S. GILLICK, ROBERT S. ROTH,   )
JONATHAN P. YAMRON, and                )
MANFRED G. GRABHERR,                   )
                                       )
                Defendants             )

MARKMAN HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

    LEE C. BROMBERG, ESQ., ERIK PAUL BELT, ESQ.,
and LISA M. FLEMING, ESQ., Bromberg & Sunstein,
125 Summer Street, Boston, Massachusetts, 02110-1618,
for the Plaintiff.

    ROBERT S. FRANK, JR., ESQ., PAUL D. POPEO, ESQ.,
and SARAH CHAPIN COLUMBIA, ESQ., Choate, Hall & Stewart,
53 State Street, Boston, Massachusetts, 02109,
for the Defendants.

                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        June 17, 2005, 2:10 p.m.

                LEE A. MARZILLI
        CERTIFIED REALTIME REPORTER
        United States District Court
        1 Courthouse Way, Room 3205
            Boston, MA  02210
            (617) 345-6787

1    patent.

2          Now, the third issue which is key to me that I'd

3    like to sort of work through is this trade secrets issue

4    because now I have a better familiarity with the case.  And I

5    was sort of thinking -- can I just throw this out so you

6    don't all have heart failure at the end.  I can't read those

7    documents.  I mean, that would be crazy for me to do

8    something in camera.  I started skimming through them.  I had

9    no idea what they were talking about.  We have two experts in

10   this room who are independently hired experts.  Why don't I

11   disclose the documents to them, and counsel can consult with

12   the expert on what they mean and whether they support your

13   claim.  And when similarly other documents are turned over

14   that ScanSoft must turn over under your claims for

15   infringement, et cetera, your expert will look at them.  And

16   that way it's not an in-house person, it's not a competitive

17   situation, and I'd have sort of signed waivers.  I don't know

18   that your experts would be willing to do it, or maybe there's

19   some palpable conflict that I'm not familiar with, but that

20   struck me as a good way out.  And I noticed some courts were

21   doing that, which is getting an outside expert.  And since we

22   have two people sitting right here, I thought maybe during

23   the break you could ask whether there would be any conflict

24   that would preclude it.

25          MR. BROMBERG:  That's acceptable to us, your

1   Honor.  I think that would work well.

2           MR. FRANK:  It's not acceptable to us, your Honor,

3   and I can explain why if you want.

4           THE COURT:  You know what, you're going to have to

5   come up with something because I can't read those documents.

6   It's clear I wouldn't create any harm in it because I can't

7   even understand them.

8           MR. FRANK:  Our proposal is that we get together

9   and agree on a genuinely neutral expert to look at them.

10          THE COURT:  Well, maybe the two experts today can

11  get together today and agree on a third one.

12          MR. FRANK:  And that would be an acceptable way,

13  your Honor.

14          THE COURT:  That would be acceptable to me too, but

15  we've got to break this logjam, and I can't look at those

16  documents in camera, and we've to get them the documents.

17  And so it should be an independent expert who's able to look

18  at them in conjunction with counsel because they've got to

19  make an assessment about whether it does or does not support

20  their claim.  Now, they can each be each respective's

21  experts, or it can be someone that they both can go outside

22  now and figure out who they both agree is an expert, but it's

23  got to be somebody who can talk with counsel, explain what

24  they mean to him, because I'm assuming Mr. Bromberg, as smart

25  as he is, probably won't understand what half this means

```
 1    either.  He needs to be able to have someone interpret them.
 2              MR. BROMBERG:  You're absolutely right, your Honor.
 3              MR. FRANK:  If I may, your Honor.
 4              THE COURT:  Yes.
 5              MR. FRANK:  What we would propose is that it's fine
 6    with us if the two experts get together and select a neutral
 7    expert so that there's as little partisanship in that as
 8    possible.  The second thing that we would be prepared to do
 9    is to have the plaintiffs provide whatever code they think
10    was copied, may have been copied by our side.  And the expert
11    can look at the code that we have produced, and if that
12    expert finds in there the, you know, copying or the use of
13    the core idea and thinks it's genuinely a secret -- that is,
14    that the idea in question is not generally known -- that
15    seems to us to be a fair way to go forward.  We're concerned
16    about the misuse of this material, and we believe that
17    there's substantial --
18              THE COURT:  I understand.  This is what I'm going
19    to do.  I think, if there's a concern about the partisan
20    experts, pick a third name.  Have the person --
21    Mr. Bromberg's firm will have to explain what the theory of
22    the trade secrets are to him so that he'll know or she will
23    know what to look for, and then at some point you can either
24    sit down in a mutual meeting where the expert explains what
25    he has or has not found with all of you sitting there.  We
```

1    can do it by means of deposition, and you'll both pay the

2    person.

3              MR. FRANK:  Fine.

4              MR. BROMBERG:  Your Honor, we --

5              THE COURT:  And the counsel will be there, and

6    counsel will be able to talk to this expert, and this expert

7    will walk through those documents, because I can't do it.

8    And so maybe by within a week someone can come up with

9    another name, and we'll just see if the person is willing to

10   do it.  Whatever the big bucks are, you'll divvy them up

11   between everybody, and we'll just get this off the dime.

12             MR. BROMBERG:  Your Honor, my only concern is that

13   we already have retained an expert, and actually we have a

14   different expert who is also here, Mr. Goldhor, for the --

15   you know, he's an expert in speech recognition software,

16   so --

17             THE COURT:  Maybe he'll be mutually agreeable, but

18   if he isn't mutually agreeable, then there have got to be

19   other people out there that both can walk through it and

20   decide.  And exactly the same person will be used for

21   whatever documents that you provide to them, and that way the

22   person is hopefully going to be neutral, you know, with

23   respect to stock interests and consulting agreements,

24   et cetera, with respect to both sides, and he'll be our

25   court-appointed expert to walk through the trade secret and

 1    source code kinds of issues.

 2         MR. FRANK:  That's fine with us.

 3         THE COURT:  Okay?  And you'll work out a procedure;

 4    you know, what's sauce for the goose is sauce for the gander;

 5    and whichever side works for one will work for the other,

 6    because you've got certain requests too, right?

 7         MR. FRANK:  We have been trying to get from them

 8    the code that underlies their accused product for six months.

 9         THE COURT:  Because you want to know if there's an

10    infringement.

11         MR. FRANK:  Because we want to know if there is an

12    infringement.

13         THE COURT:  Fine.  This is exactly the kind of

14    thing we'll have this neutral person do.  It will not be

15    discloseable to anyone in the firms, and it will create or

16    destroy a good-faith belief on both sides' parts with respect

17    to either trade secret or infringement.  So that's why

18    there's an incentive on both sides to come up with an expert

19    you can agree on and a procedure you can agree on because

20    it's going to affect both sides.

21         MR. BROMBERG:  Okay, your Honor, with respect to

22    the -- well, we'll see what we can do by way of agreement.

23         THE COURT:  Right.  I don't want to take too much

24    time because we have so much to do today, but it's been

25    worrying me ever since I got the pile that that wasn't

 1    realistic for me to be doing it, and it was holding the

 2    litigation at a standstill.  And I also noticed the footnote

 3    in the Markman hearing that you're going to have a similar

 4    problem.  So since you're head-on-head competitors, that's

 5    the best I can do.

 6         MR. FRANK:  Let me just say this.  We have since

 7    the beginning of this case asked the other side to identify

 8    what trade secrets they --

 9         THE COURT:  You know what, I'm past the issue.  I'm

10    past it, all right?  I'm going on.  I need to cut the -- and

11    I cannot look at those documents.  So that's what we're going

12    to do.  They'll disclose the source code that they think has

13    been copied to the independent expert.  The independent

14    expert will go through and see whether there are any trade

15    secrets that are reflected that would show that, and then

16    provide either a good-faith belief or a nongood-faith belief

17    on behalf of Mr. Bromberg that there have been some theft of

18    trade secrets.

19         And similarly on the infringement issue, you'll

20    tell him the source code.  And, of course, the two of you

21    will have it, but I'm assuming it's meaningless giving that

22    to you, to the two firms.  And you'll say the source code

23    that you think has been infringed, and the expert will have

24    to figure out from your source code whether there's an

25    infringement or not.  And then we'll get a neutral,

 1   independent report that will be in camera and secret, and

 2   we'll see where to go from there.  I don't know how else to

 3   do this.  And we'll divvy up the payments 50/50.  And

 4   hopefully you'll come up with someone who's, you know, as

 5   knowledgeable as the experts in this case obviously are.

 6          All right, so now let's start with your Markman

 7   issue.

 8          MR. BROMBERG:  Okay, your Honor, in connection with

 9   the Markman hearing, we have prepared a booklet of exhibits,

10   and so I'd like to hand that up to you now.  I have two

11   copies for the Court.  And apropos with your question about

12   what's really in dispute here, the first two tabs, Tab 1 is

13   the three issues on the '966, and Tab 2 is what we thought

14   were the five issues on the '630, and hopefully that

15   simplifies and focuses it better.

16          THE COURT:  So this is what I'm hoping to do.  I'm

17   going to give you a half an hour on your issues.  That's it.

18   I've read it.

19          MR. BROMBERG:  Okay.

20          THE COURT:  I'm going to give you a half an hour on

21   your construction of your three claims under '966 and a half

22   an hour to respond, and then we're going to take a break for

23   the Court Reporter because this is thick going.  And then

24   we're going to do hopefully, you know, maybe a half an hour

25   on the three to five issues and then a half-an-hour response.

1    covers, we're not so sure here, even if you took every single

2    one of -- do you know for a fact that if we gave you every

3    single one of your definitions as you want them, do you know

4    of a product that infringes?

5            MS. COLUMBIA:  We have accused specific products of

6    infringement.  Because our patent goes to the guts of how the

7    voice recognizer works, we can't know until they produce

8    their source code.

9            THE COURT:  So that's what we need to know, we need

10   to tell that expert to look at under your definitions.

11           MS. COLUMBIA:  Yes, your Honor.

12           THE COURT:  And then also under their definitions,

13   and we'll see what's a fair debate.  Does that make some

14   sense?

15           MS. COLUMBIA:  We have no objection to proceeding

16   that way, your Honor.

17           THE COURT:  Does that make some sense?

18           MR. BROMBERG:  Well, your Honor, let me say two

19   things.  We don't object to deferring these issues until we

20   see if there is anything to them, but we do object to the

21   proposition that a neutral, independent expert can be the

22   decision-maker about any of these things.

23           THE COURT:  Sure, but they're going to at least get

24   me through this impasse on who sees what.  I'll at least have

25   some neutral person look at it and say under their -- we

1    could even call the person a court-appointed expert if you're

2    all more comfortable with me doing it that way, both for

3    purposes of discovery and for purposes of possible

4    infringement.  And then eventually I will give that --

5    obviously the lawyers will have the report, but we'll have to

6    have it in a format so the experts can look at it too, but at

7    least I'll know something is there from both ends.  I mean,

8    it can be secret with me.  I won't understand what they're

9    saying anyway.  Besides, you've both talked me into believing

10   this rug is blue, so. . .

11            So let's do this.  It's late on a Friday.  It's

12   been well briefed.  I'm very thankful that a number of things

13   have been honed in.  I'm going to be here next week, the end

14   of next week, but then I'm on vacation the last week in June,

15   and then I'm back for most of July and August.  So when do

16   you think you could come up with and find a neutral expert by

17   using both of your experts?  Do you think we could do this by

18   the second week in August?

19            MR. FRANK:  Your Honor, let me say --

20            THE COURT:  Excuse me.  The second week in July?

21            MR. BROMBERG:  Yes, your Honor.

22            MR. FRANK:  Why don't you turn us loose for some

23   defined period of time and see if we can agree.

24            THE COURT:  July 15 come up and find an expert who

25   can give us the time fairly rapidly?

1           MR. FRANK:  Yes, and I would add one more thing.

2    If we are unable to agree, then we should each nominate

3    someone, and your Honor can pick him out of a hat.

4           THE COURT:  Fair enough.  That's fine, okay.  And

5    then whoever that is, I'll designate an independent expert,

6    who will give me a first cut-through on trade secrets as well

7    as infringement.  And it obviously is not the final say.  I

8    don't think I get off that easy.

9           Is it possible that the answers that are provided

10   to facilitate a settlement -- I'm going to be working on, by

11   the way, the ScanSoft patent in any event.  That I'm not

12   putting off.  But it could help work through some of these

13   issues in a way that could help you enter into settlement

14   discussions.

15          I guess I'm putting this inartfully.  The question

16   I have is:  I'm going to be working on an opinion on the

17   ScanSoft, but if you've got some opinions from this

18   independent person that could help bring the parties

19   together, I wouldn't want for me to issue an opinion that

20   upset the apple cart one way or another.

21          MR. FRANK:  Your Honor, we have deposition

22   testimony that says that they have no idea whether we used

23   any trade secrets of theirs or not.  We can present that to

24   you.  They're not interested in that.  This case is about --

25   has little to do with the legal merits.

```
 1              THE COURT:  Put the trade secrets aside for a

 2    minute.  I'm talking about some sort of cross-licensing or

 3    something like that.

 4              MR. FRANK:  We're all ears.  This case is motivated

 5    by something other than the merits of the case, and therefore

 6    I think it's very unlikely that it's going to settle.

 7              THE COURT:  Well, that may be.  I'm simply saying,

 8    whatever this independent expert says may support or defeat

 9    that theory.

10              MR. FRANK:  I predict that if your Honor were to

11    rule that there was nothing to any of this stuff, they'd sue

12    us for something else because their objective has to do with

13    continually suing us.

14              THE COURT:  Yes, but assume for a minute that the

15    independent expert says, "There's no trade secret here.

16    They've told us about the source code.  Don't worry about it,

17    there's nothing here that's related to it," or contrarily

18    that "Yes, there is," the question that I have is, would that

19    move you closer to settlement?

20              MR. FRANK:  Mr. Bromberg?

21              MR. BROMBERG:  Well, you mean apart from the patent

22    claim, your Honor?

23              THE COURT:  No.  Globally.  I mean, why would you

24    settle the trade secrets and not settle the -- I know that a

25    couple of the other cases have settled, right?  Or at least
```

1    one other one has, right?

2            MR. BROMBERG:  Yes, one other one did settle, your

3    Honor.  The resolution of the trade secret claim in one

4    direction or the other could spark settlement discussions.  I

5    believe your Honor's ruling on the '966 patent could have the

6    same effect.

7            THE COURT:  Well, I'm going to be chugging along,

8    I'm not going to stop then, because that's very discrete and

9    limited, and I can do something with it.  I'm going to hold

10   off on this to find out, once you've turned over all your

11   source code to this independent expert, whether or not

12   there's anything under their definitions that's going to be

13   infringing and whether it's infringing under yours, and then

14   I'll know if there's a real serious dispute here.  And then

15   we'll meet without the parties here with the independent

16   expert and possibly with an expert from each side to argue

17   the case, with clear protective orders against disclosing it

18   to the competing parties.  That's how I envision this

19   happening.

20           So just let me know where you are on July 15.  And

21   I'm around, and you can run in sometime around then, and I

22   will try and figure out a procedure if you don't agree,

23   okay?

24           MR. FRANK:  That's fine, your Honor.

25           MR. BROMBERG:  Your Honor, just one more thing.  I

```
 1    think it goes with what you said, but we're out of time on
 2    our schedule.  And I'm assuming that -- this is for
 3    discovery, et cetera -- I'm assuming that those dates are
 4    just pushed off while these issues get resolved?
 5                 THE COURT:  You know, I'm always nervous about
 6    that.  Should I just say pushed off three months?  I mean, I
 7    just don't want to leave it open-ended.
 8                 MR. BROMBERG:  That would be fine.
 9                 THE COURT:  Or do you want to just sit and talk by
10    the 15th and come up with an alternative schedule?
11                 MR. FRANK:  Let me make a distinction, your Honor.
12    We are stuck on the trade secret side clearly on this
13    question of who converted what.
14                 THE COURT:  Right.
15                 MR. FRANK:  On the other hand, with respect to the
16    '966 patent, there has been a full opportunity for
17    discovery, and we think we're at the deadline.  We think that
18    part should be over.
19                 THE COURT:  Both of those make sense.
20                 MR. BROMBERG:  No, that's wrong, your Honor.
21                 THE COURT:  You know, it's now five of 5:00, and
22    obviously there's some disagreement, not surprisingly.  So I
23    think what needs to happen is, I think what we're better off
24    doing is in a fresh way coming in, if Robert can find us a
25    half an hour in July.  I'll know where you are in finding an
```

1    expert. I'll know what our timetable is. If you'll both

2    give me proposals as to how you think it should continue.

3    Right now the deadlines are in place, so there's no more

4    discovery unless I allow more discovery. And I may. I just

5    don't know. That's obviously not going to be true of the

6    trade secrets piece if I let it go forward, but under the

7    '966 it may.

8         MR. BROMBERG: Well, your Honor, with due respect

9    to the Court, the last time we were here you said you would

10   not let the curtain come down on me being deprived of all

11   discovery on the trade secret claims.

12        THE COURT: But it doesn't apply to trade secrets,

13   I agree.

14        MR. BROMBERG: Okay, that's fine. On the patent

15   side, your Honor, we have an order from Magistrate

16   Judge Alexander that says, "Turn over your source code," turn

17   over his source code to ScanSoft so ScanSoft can look at it

18   and assess the infringement issue.

19        THE COURT: I just took care of that issue.

20        MR. BROMBERG: But we haven't had a chance to look

21   at it yet, your Honor.

22        THE COURT: No, no, now you're not hearing me.

23   That's why I'm setting up the independent expert is to deal

24   with that.

25        MR. BROMBERG: I understand that, your Honor.

1   THE COURT:  So right now all discovery is under the

2   old deadlines until I get to impose new deadlines.  And you

3   obviously aren't agreeing, so I'm going to set up another

4   status conference so you can give me your respective

5   proposals and all of us aren't exhausted after a long week.

6   So that's the best bet.  I won't cut you off at the knees, I

7   promise, particularly on trade secrets.  I won't do that to

8   you, but I just don't think I'm ready -- it's now five of

9   5:00 -- to go head to head on a scheduling order, especially

10  since it will be so much more helpful when I have an expert

11  in mind, I have a timetable in mind, I'll know what to think

12  about it.  So in July, like around the 15th, 16th, the next

13  week, the 20th, somewhere in there?

14          THE CLERK:  July 18 at 2:00 p.m.

15          THE COURT:  All right, so it gives you basically a

16  month to get an expert in line, give me alternative sets of

17  proposals.  We'll be working on this, and hopefully we'll be

18  done with it by the end of the summer and so I don't start a

19  new clerk on it, but if not, it will create some delay.

20          MR. BROMBERG:  Your Honor, we do have some

21  depositions scheduled right now.  Are you saying that we

22  should not do them or just go ahead and --

23          THE COURT:  That's fine.  If they have been

24  prescheduled, do them.

25          Anybody want the Miriam Webster definition of

# Exhibit C

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
--------------------------------
SCANSOFT, INCORPORATED,        :      Civil Action
                    Plaintiff  :      No. 04-10353-PBS
                               :
          V.                   :      Courtroom No. 19
                               :      1 Courthouse Way
VOICE SIGNAL TECHNOLOGIES, INC.:      Boston, MA 02210-3002
ET AL,              Defendant  :      2:30 p.m., Monday
--------------------------------      July 18, 2005
```

Status Conference


Before:      THE HONORABLE PATTI B. SARIS,
             UNITED STATES DISTRICT JUDGE




APPEARANCES:

Bromberg & Sunstein, LLP,
   (by Lee Carl Bromberg, Esq. and Lisa M. Fleming, Esq.
   and Erik Paul Belt, Esq.)
   125 Summer Street, Boston, MA 02110-1618,
   on behalf of the Plaintiff.

Choate, Hall & Stewart,
   (by Robert S. Frank, Jr., Esq. and Sarah C.
   Columbia, Esq.),
   53 State Street, Exchange Place, Boston, MA 02109,
   on behalf of the Defendant.



                  Marie L. Cloonan
                Official Court Reporter
           1 Courthouse Way - Suite 5209
         Boston, MA 02210-3002 - (617)439-7086
         Mechanical Steno - Transcript by Computer

FORM CSR - LASER    REPORTERS PAPER & MFG. CO.    800-626-6313

2

1          THE CLERK:  The case of ScanSoft, Incorporated v.

2    Voice Signal Technologies, Et Al, Civil Action No. 04-10353,

3    will now be heard before this Court.

4          Will counsel please identify themselves for the

5    record.

6          MR. BROMBERG:  Lee Bromberg, Bromberg & Sunstein,

7    for the plaintiff, ScanSoft, your Honor.

8          MR. BELT:  Erik Belt, also Bromberg & Sunstein.

9          MS. FLEMING:  Lisa Fleming, Bromberg & Sunstein,

10   for the plaintiff.

11         MR. FRANK:  Robert Frank and Sarah Columbia,

12   Choate, Hall & Stewart, for the defendants.

13         THE COURT:  Let me just say, I received today --

14   more accurately -- read today the affidavit suggesting

15   various experts for Voice Signal and expressing concern

16   about ScanSoft's experts because of -- most from MIT and

17   some of the research was funded through ScanSoft.

18         I was wondering if you had a response to any of his

19   proposed independent experts, whether there were any laws or

20   any conflicts, that you noticed.

21         MR. BROMBERG:  Well, your Honor, we just got Mr.

22   Frank's affidavit also at about 1:15.  So, I had a chance to

23   look at it quickly.

24         And, I think that the reason we selected the people

25   from MIT, MIT is a world-renowned research institute, it's

3

1    cutting edge in this area.  We knew that these people, being

2    at that layout would have hands-on experience reading and

3    writing source code.  And, we think that they --

4         THE COURT:  Normally I would say that was great,

5    the fact that some other guy came out of there and into

6    ScanSoft it didn't worry me as much as it did that -- that

7    some of their research is funded by ScanSoft.

8         MR. BROMBERG:  Well, they don't fund research, your

9    Honor.  They have, in the past, provided a stipulated grant

10   and, in exchange for that, their technical people get to sit

11   in at certain conferences.

12        THE COURT:  It's too close.

13        MR. BROMBERG:  Well, your Honor, the problem with

14   the people that VST listed is that all of them appear to be

15   senior figures in the speech recognition field.  But, one we

16   know for sure -- of course, we haven't contacted either our

17   people or their people.  We thought that there should be no

18   contact until we jointly approach them.

19        But, all of their people, there's nothing in the

20   public record that indicates that they have any hands-on

21   experience with reading or writing code for the last 20

22   years and things have changed a lot in that time.

23        THE COURT:  You know, this should have all been

24   talked about before I came here.  This is most unfortunate

25   that this is where we're at.

4

1          Do you know whether that's true?

2          MR. FRANK:  Your Honor, it is my understanding that

3    these people are among the best regarded people in the

4    field.  They are in academic institutions.  I believe -- we

5    certainly would -- we selected them believing that they

6    could look at this code and know what was a trade secret and

7    know what was garden variety stuff and recognize it and read

8    it.

9          If it turns -- in order to do this, the expert

10   would have to be able to read two different languages, in

11   effect, C plus plus and C, because one of the parties is in

12   one language and the other is in the other language.

13         We believe that they -- we wouldn't have picked

14   them if we thought they couldn't do this job.  We're not

15   picking people who can't do the job.

16         THE COURT:  Well, was there any conflict?

17         MR. BROMBERG:  Well, your Honor --

18         THE COURT:  That you know of?

19         MR. BROMBERG:  Sorry?

20         THE COURT:  That you know of.

21         MR. BROMBERG:  Yeah.  Well, with respect to their

22   claim that Mr. Phillips knows all the MIT people, he knows

23   all of these people at least as well.  It's a small

24   community and they all interact at conferences.  And, one of

25   the problems is that Jordan Cohen, the chief technology

5

1    officer at Voice Signal, is a very prominent figure in

2    DARPA.  In fact, he was hired by Dragon to secure grants

3    from DARPA.  And, that's exactly what he did.

4              THE COURT:  I have no idea what DARPA is.

5              MR. BROMBERG:  DARPA is the Defense -- a Defense

6    Department Funded Reseach Agency that put a lot of money

7    into speech recognition.

8              THE COURT:  Why is that significant?  Which expert

9    does that knock out?

10             MR. BROMBERG:  That's significant because a number

11   of these experts have DARPA connections, your Honor.

12             THE COURT:  Well, is there anybody there that you

13   say doesn't have a connection out of his list?

14             MR. BROMBERG:  Well --

15             THE COURT:  I wasn't so keen on the guy from

16   Germany simply because it was too far away and I thought he

17   couldn't come in and testify easily.  I was sort of thinking

18   about Johns Hopkins because Baltimore seems pretty close,

19   and closer than Berkeley.  But, I don't have a strong

20   feeling if there's a consensus on someone.

21             MR. BROMBERG:  Right.

22             We don't think that the man from Johns Hopkins who

23   is a senior guy, we don't think he could read code.

24             THE COURT:  Tell me which of this group just seems

25   like the best bet from your vantage?

6

1           MR. BROMBERG:  From our vantage point, the one that

2    might work is Phil Woodland.  He's in Cambridge, in the UK,

3    but he seems to be, from the information we can get without

4    talking to him, he seems to be --

5           THE COURT:  All right.

6           MR. BROMBERG:  -- a possibility.

7           THE COURT:  Has he agreed to do it?  Have you

8    talked to him?

9           MR. FRANK:  No, no.  We haven't, we have not.

10   We've not approached any of these people.  But, we'll go to

11   Mr. Woodland.  I mean, that's fine.

12          THE COURT:  All right.

13          Why don't you try him.  See if he's willing to do

14   it.

15          MR. FRANK:  Okay.

16          THE COURT:  And, if not, I don't want to come back

17   in here and have this -- you should be talking.  Find out

18   what this other -- make me a priority list.  I think it is

19   -- if, in fact, ScanSoft is funding research and meeting

20   with folks in this position at MIT, it's too close for

21   comfort.

22          There may be another organization -- you just named

23   one -- where there may also be affiliations that are too

24   close for comfort or it just may generally be something that

25   people, you know, see each other at a conference once every

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

7

1    other year.  I don't see that as too close for comfort.  I

2    mean, providing funding is a different order of magnitude.

3    I don't think it matters that anyone was from -- that

4    Phillips was originally from MIT.  That would not have been

5    enough for me.

6            MR. BROMBERG:  Right.  He's been out of there since

7    '94, your Honor.

8            THE COURT:  Right.  That isn't enough.

9            The fact that they continue to fund the research

10    and they meet at regular -- what did you say it was?

11            MR. BROMBERG:  Conferences --

12            THE COURT:  Conferences, regularly --

13            MR. BROMBERG:  -- speeches.

14            THE COURT:  -- is a little harder for me.

15            Now, I don't know what the degree of concern is

16    about DARPA.  All right.  I don't know.

17            But, let's start with this guy from England, see if

18    he's willing to do it, work down the list in terms of order

19    of priority.  My last priority, personally, is the guy from

20    Germany.  Woodland, ideally speaking, as a court-appointed

21    expert, it will be easy to communicate with him, and that

22    doesn't sound easy.  It sounds as if there could be problems

23    getting him here to testify.  Although, I'm not sure it's

24    any greater between England and Germany.  But, maybe

25    language barriers.  I don't know.

8

1          But, if you want to go to him, go to him, if he's

2     willing to commit to coming here and explaining this to me.

3          Now, I've got a very vigorous protest from ScanSoft

4     that at some point, whoever this neutral arbiter is can't be

5     the judge and jury about discovery.  I think that's fair

6     enough.  But, it's got to be enough to explain to me why he

7     -- since there are no shes -- why he believes that either

8     there's a prima facie case of a trade secret violation or

9     there isn't.

10          And, accordingly, if he thinks there's a prima

11     facie case of a trade secret violation, we have discovery.

12     If he thinks there isn't, at that point I'm going to have to

13     hear about the appropriate procedure.  Then, he'll have to

14     explain why not in a way that you and your independent

15     experts can look at it.  Because, I -- and, then, I'll just

16     have to make a decision --

17          MR. BROMBERG:  Your Honor, we --

18          THE COURT:  -- as to whether or not the discovery

19     should go forward.

20          And, I think briefs should be filed under seal with

21     him to explain what the basic contentions are or he won't

22     understand it.

23          MR. BROMBERG:  That's right.  We agree with that,

24     your Honor.   And, we did file a proposed procedure.  We

25     just file that --

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1            THE COURT:  Ex parte.  Because, otherwise, you get

2      an access to what it is -- the basic thing that I'm saying

3      you shouldn't get unless I have --

4            MR. FRANK:  Your Honor, essentially what they're

5      going to do is tell the expert what they think are the trade

6      secrets we have taken.  That's what they should legitimately

7      be saying to the expert.  There is no reason why they should

8      not say that in a form that we can see it.  And, no reason

9      why we should not be able to respond.

10           THE COURT:  I disagree with that.  But, I do agree

11     it should be on the record.  It may well be that they say:

12     Here's our source code.  We think that they took these

13     snippets of it.  And, that's the kind of thing you should

14     not have access to.

15           MR. FRANK:  If I --

16           THE COURT:  And, vice versa.

17           You know, I'm trying to -- this is what I'm going

18     to do.  No discussions with the expert, except on the

19     record.  It can be ex parte, if that's what the expert

20     wants.  If the expert prefers just written questions, so be

21     it.  But, every discussion should be on the record.  And, if

22     there's any challenge later on, it will be there, sealed, in

23     my files.

24           I'm going to want to talk to him, just to explain

25     it to me, whether there's a conclusion that -- and, there

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

14

1   does not have to be proof beyond a reasonable doubt, proof

2   by clear and convincing evidence or even proof by a

3   preponderance of the evidence.  There just has to be a prima

4   facie case on either of your claims, enough to trigger

5   discovery.  So, it isn't a huge burden on either side, but

6   neither can it be a fishing expedition.

7            I think -- I sort of leave it up to this gentleman

8   what procedure he'd find the most helpful.

9            But, at the end of the day, he's my independent

10  expert, and I just need to have someone explain to me

11  whichever conclusion he's written.  And, I should write a

12  little, you know, opinion, briefly, you know, either

13  agreeing or not agreeing with what he's done.

14           And, I imagine each of your experts, one side or

15  the other, may well disagree with it.  And, I'll have to

16  listen to what the disagreement is just so that it's fair.

17           Now, it turns into a procedural nightmare, simply

18  because I understand it means turning over your most highly

19  sought-after confidential information.  It should be --

20  aren't we doing it two ways?  This is a two-edge sword, both

21  sets of claims.  So, one side might be happy and not the

22  other side.

23           Now, once I agree to turn over all this stuff or

24  not turn it over -- if I turn it over, it would only be to

25  counsel the outside experts, not to the inside people.

15

1              MR. FRANK:  Yeah.  We're a long way from that.  I

2        believe we'll never get there.

3              THE COURT:  Okay.  You may be right.

4              MR. FRANK:  I believe, and I repeat, that the

5        expert -- that we should be given an opportunity to

6        demonstrate that whatever it is that's said to be a trade

7        secret isn't a trade secret at all, but is publicly

8        available.  And, I would be pleased to have your Honor have

9        the assistance of an independent expert to judge that.

10       Because, candidly, none of us -- your Honor, myself -- I

11       couldn't tell you what's -- I could not look at this stuff

12       and tell you what's in the public domain.

13             But, I want you to have expert assistance to

14       determine, A, what's being -- whether stuff is being used

15       and, B, if it's being used, if it's just stuff that people

16       in this field know how to do or whether it's some secret in

17       fact.

18             And, I would urge you to take expert -- whatever

19       expert assistance you want on both those questions.

20             THE COURT:  Okay.

21             Now, on the other questions, I did get supplemental

22       -- why don't you all try and reach that guy from Great

23       Britain in the next week or two, work down the list and

24       confer.

25             Should I just have another status in case it all

# Exhibit D

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
 2

 3

      _____
 4                                  )
   SCANSOFT, INC.,                  )
 5                                  )
          Plaintiff,                )
 6                                  )
      v.                            )    C.A. No. 04-10353-PBS
 7                                  )
   VOICE SIGNAL                     )
 8 TECHNOLOGIES, INC.,              )
   LAURENCE S. GILLICK,             )
 9 ROBERT S. ROTH,                  )    HIGHLY CONFIDENTIAL
   JONATHAN P. YAMRON,              )
10 and MANFRED G. GRABHERR,         )
                                    )
11          Defendants.             )
      _____ )
12

13

14

15

16

17      DEPOSITION OF JEANNE McCANN, a witness called
18 by and on behalf of the Defendants, taken pursuant to
19 the applicable provisions of the Federal Rules of
20 Civil Procedure, before Dana Welch, CSR, Registered
21 Professional Reporter, and Notary Public, in and for
22 the Commonwealth of Massachusetts, at the offices of
23 Choate, Hall & Stewart, 53 State Street, Boston,
24 Massachusetts, commencing at 9:03 a.m.
```

Page 2

1 APPEARANCES:
2 For the Defendants:
3    CHOATE, HALL & STEWART, P.C.
     Exchange Place
4    53 State Street
     Boston, Massachusetts  02109
5    (617) 248-5000
     rfrank@choate.com
6    By:  Robert S. Frank, Jr., Esq.
7 For the Plaintiff:
8    BROMBERG SUNSTEIN, LLP
     125 Summer Street
9    Boston, Massachusetts  02110-1618
     (617) 443-9292
10   lfleming@bromsun.com
     By: Lisa Fleming, Esq.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1            I N D E X
2
     WITNESS: JEANNE McCANN          PAGE NO.
3
     By Mr. Frank              4
4
     Certificate of the Reporter       263
5
6
7
         E X H I B I T S
8
     NO.   DESCRIPTION        PAGE NO.
9
10 1 - Affidavit of Jeanne McCann        13
11 2 - SS 020265 - 268            78
12 3 - SS 016318 - 323           115
13 4 - SS 020416 & 17           131
14 5 - SS 020239 & 40           143
15 6 - SS 016324 - 339           163
16 7 - SS 020639 - 44           171
17 8 - SS 020617 - 619          185
18 9 - 500                190
19 10- SS 020589             194
20 11- SS 020581 - 584         199
21 12- SS 020566 - 569         214
22 13- SS 020305 & 06         228
23 14- SS 020570 - 74          233
24 15- SS 020169 & 70         257

Page 4

1 WHEREUPON,
2          JEANNE McCANN,
3 having been duly identified, swore or affirmed
4 that her testimony would be the truth, the
5 whole truth, and nothing but the truth,
6 testified as follows:
7          DIRECT EXAMINATION
8 BY MR. FRANK:
9    Q.  Good morning, Ms. McCann.  Would you
10 state your name for the record, please.
11   A.  Jeanne McCann.
12   Q.  Where do you live, Ms. McCann?
13   A.  Wellesley, Massachusetts.
14   Q.  Street address, please?
15   A.  14 Chatham Circle, Wellesley,
16 Massachusetts.
17   Q.  Are you presently employed?
18   A.  Yes.
19   Q.  By whom are you employed?
20   A.  By ScanSoft, Inc.
21   Q.  What is your present position for
22 ScanSoft?
23   A.  My present position at ScanSoft is
24 senior vice-president research and development.

Page 5

1    Q.  Starting with college, what is your
2 educational background?
3    A.  My bachelor's degree is from Simmons
4 College in Boston, Massachusetts, with
5 specialties in math, physics and education.  I
6 have an M.B.A. from Babson College with
7 specialty in finance and computer systems.
8    Q.  When did you graduate from Simmons?
9    A.  In 1972.
10   Q.  And from Babson?
11   A.  1976.
12   Q.  I'm just going to ask you some
13 questions that are designed to elicit your
14 employment history since Babson.  What did you
15 do after you obtained your degree from Babson?
16   A.  I went to Babson while I was working.
17 So my first employment --
18   Q.  So let me stop you there and ask you
19 where you were working at the time?
20   A.  In 1972, after I had graduated from
21 Simmons, I went to work for Liberty Mutual
22 Insurance Company in their systems development
23 group, their internal software development
24 group.  I worked at Liberty Mutual in Boston,

2 (Pages 2 to 5)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 50

1       THE DEPONENT: I'm not sure.
2 BY MR. FRANK:
3    Q. Okay. Now, when you prepared this
4 affidavit, Exhibit 1, were you aware of any
5 particular trade secret of L&H or Dragon that
6 was being used or had been used by Mr. Gillick?
7       MS. FLEMING: Objection.
8       THE DEPONENT: No.
9 BY MR. FRANK:
10    Q. How about Mr. Robert Roth?
11    A. No.
12    Q. How about Mr. Yamron?
13    A. No.
14    Q. Have you since learned anything that
15 has caused you to believe that a particular
16 Dragon or L&H trade secret has been or is being
17 used by Mr. Gillick?
18       MS. FLEMING: Objection.
19       THE DEPONENT: The information that we
20 have about Voice Signal products is from
21 their press releases and other public
22 sources.
23 BY MR. FRANK:
24    Q. I would ask the reporter to read you my

Page 51

1 question again and I'll ask you to answer my
2 question.
3    A. Okay.
4       THE COURT REPORTER: "Question: 'Have
5 you since learned anything that has caused
6 you to believe that a particular Dragon or
7 L&H trade secret has been or is being used
8 by Mr. Gillick?'"
9       MS. FLEMING: Objection.
10       THE DEPONENT: No.
11 BY MR. FRANK:
12    Q. Same question for Mr. Robert Roth.
13       MS. FLEMING: Objection.
14       THE DEPONENT: No.
15 BY MR. FRANK:
16    Q. Same question for Mr. Jon Yamron.
17       MS. FLEMING: Objection.
18       THE DEPONENT: No.
19 BY MR. FRANK:
20    Q. Same question for Mr. Manfred Grabherr.
21       MS. FLEMING: Objection.
22       THE DEPONENT: I don't believe I've
23 ever made a statement about Manfred
24 Grabherr.

Page 52

1 BY MR. FRANK:
2    Q. Fair enough. The -- did ScanSoft --
3 withdrawn. Did Dragon from time to time
4 publish the work that it did?
5       MS. FLEMING: Objection.
6       THE DEPONENT: Yes. The Dragon
7 research team from time to time would
8 publish papers about work that they did.
9 BY MR. FRANK:
10    Q. And was there a policy or other writing
11 at Dragon that described what should and what
12 shouldn't be published?
13    A. There may have been. I'm not aware of
14 it.
15    Q. Okay. Was there some principle that
16 was applied with respect to what should or
17 shouldn't be published?
18       MS. FLEMING: Objection.
19       THE DEPONENT: There may have been. I
20 would not have been aware of it. The
21 research group would have been aware of
22 that.
23 BY MR. FRANK:
24    Q. In paragraph 32 of your affidavit, you

Page 53

1 refer to or you use the acronym ASR stands for
2 Automated Speech Recognition?
3    A. That's correct.
4    Q. Okay. And elsewhere in your affidavit
5 you use the expression "ASR algorithms." What
6 is an ASR algorithm?
7    A. An ASR algorithm would be a formula
8 used to build up a program that would be able
9 to take in speech in wave forms, digitize it
10 and recognize it.
11    Q. I take it that's a very general term?
12    A. Yes.
13    Q. Okay. And fair to say that some ASR
14 algorithms are in the public domain and others
15 are not?
16       MS. FLEMING: Objection.
17       THE DEPONENT: Yes.
18 BY MR. FRANK:
19    Q. Some were used by Dragon and some were
20 not?
21       MS. FLEMING: Objection.
22       THE DEPONENT: I'm not sure I
23 understand that last question.
24 BY MR. FRANK:

14 (Pages 50 to 53)