UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCANSOFT, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>VOICE SIGNAL TECHNOLOGIES, INC.,<br>LAURENCE S. GILLICK, ROBERT S. ROTH,<br>JONATHAN P. YAMRON and MANFRED G.<br>GRABHERR,<br><br>    Defendants. | C. A. No. 04-10353-PBS |

**VOICE SIGNAL TECHNOLOGIES' MEMORANDUM IN SUPPORT OF
ITS MOTION FOR AN ORDER DETERMINING THAT THE NEUTRAL
EXPERT SHOULD NOT CONSIDER SCANSOFT'S MAY 5, 2006, BRIEF**

    This memorandum is submitted in support of defendant Voice Signal Technologies' Motion for an Order Determining That The Neutral Expert Should Not Consider ScanSoft's May 5, 2006 Brief. The first portion of ScanSoft's brief contains argument addressed to issues that are not before the Neutral Expert, but which are designed to prejudice his consideration of the issues that are before him. The remainder of the brief introduces, at a late stage of the Neutral Expert procedure, a large number of new alleged trade secrets without any indication that Voice Signal is using any of those newly identified trade secrets. It is an effort to sidestep the Neutral Expert's observation that the trade secrets that ScanSoft has previously identified are matters of common knowledge in the speech recognition community, and Voice Signal's extensive demonstration that Voice Signal does not use the claimed secrets. It is also an effort to burden the Neutral Expert procedure so that it will fail, and to mire Voice Signal in

4062573

endless and proliferating litigation so that Voice Signal will agree to be acquired by ScanSoft. ScanSoft's May 5 Brief has been filed as Docket No. 389.

## THE FACTS

1.   By Order dated December 29, 2005, the Court established its Neutral Expert Procedure. The procedure was adopted because ScanSoft had failed (or refused) to identify any allegedly misappropriated trade secret, and to minimize the risk that Voice Signal's own trade secrets, and thus the continued viability of its business, would be jeopardized. The procedure adopted by the Court is an approach identified in *Microwave Research Corp. v. Sanders Associates, Inc.*, 110 F. R. D. 669 (D. Mass. 1986). The Court's procedure is designed to allow a Neutral Expert to receive (a) a disclosure by ScanSoft of its alleged trade secrets and (b) a disclosure by Voice Signal of its relevant source code. The Expert is to compare the two and inform the Court as to whether there was reason to believe that alleged trade secrets are, in fact, secrets and that Voice Signal has used or copied those secrets in Voice Signal's source code. The procedure was to be completed in 60 days. Neutral Expert Procedure, ¶15.

2.   On January 27 and 30, 2006 Voice Signal provided to the Neutral Expert, and produced to ScanSoft's designated counsel, all documents and source code written by the four individual defendants during the first year of their employment at Voice Signal. On March 17, 2006, in response to the Court's further order, Voice Signal provided to the Neutral Expert, and to ScanSoft's designated counsel, *all* source code written by *all* Voice Signal employees as of June 2002, a date that is approximately sixteen months after the last of the individual defendants joined Voice Signal.

3. On February 24, 2006, ScanSoft provided a memorandum to the Neutral Expert in which it identified what it claimed were trade secrets that were used by Voice Signal. ScanSoft identified trade secrets in three categories: (i) acoustic scoring, (ii) hypothesis management, and (iii) duration modeling. Within these categories, ScanSoft identified a total of eleven separate alleged secrets.[1] ScanSoft pointed to the location in the Voice Signal source code that, it alleged, embodied the ScanSoft trade secrets.

4. On March 24, 2006, the parties met with the Neutral Expert. All of the lawyers were present for part of the meeting. Significant parts of the session were conducted on an *ex parte* basis. During the meeting:

   a. The parties and the Neutral Expert agreed that the allegedly misappropriated trade secrets were fairly described as ways of performing (i) acoustic scoring, (ii) hypothesis management, and (iii) duration modeling. Tr. 159-160.[2]

   b. Voice Signal provided a notebook in which, as to each alleged secret, Voice Signal (i) explained that it did not use the alleged trade secret and identified the entirely different technique that Voice Signal used to perform the general function to which the alleged trade secret was addressed, (ii) observed that the Voice Signal code that ScanSoft had identified was unrelated to the ScanSoft "secret" that it was said to embody, and (iii) demonstrated that the alleged ScanSoft trade secret was not a secret, but, instead, was disclosed in public domain materials that Voice Signal identified in detail.

---

[1] The alleged acoustic scoring trade secret category has six parts; the alleged hypothesis management category includes three supposed secrets; the alleged duration modeling category has two parts.

[2] Citations to the transcript are attached as Exhibit A to the Declaration of Wendy S. Plotkin filed herewith. All Exhibits cited in this brief are attached to that Declaration.

c.  The Neutral Expert observed repeatedly that the trade secrets identified by ScanSoft were common techniques that are widely used in speech recognition; indeed used by his own students.  Tr. 85, 89-90, 101, 126-127, 129, 134, 149, 157-158.

d.  ScanSoft stated that it needed additional time to assess Voice Signal's source code and that it wished to use software tools to assist its code analysis.  Tr. 117-120

e.  Voice Signal agreed that ScanSoft's designated counsel and the Neutral Expert could use any software tools they wished to evaluate to Voice Signal source code. Tr. 164-165.

f.  The Neutral Expert gave ScanSoft a second chance to identify "those parts of the [Voice Signal] source code that ScanSoft thinks are in conflict with their trade secrets."  The Expert said to Voice Signal that before he could draw the conclusion that Voice Signal did not use the identified "secrets," he needed to evaluate the relevant portions of the code for each of Voice Signal's speech recognition engines that performed the functions of (i) acoustic scoring, (ii) hypothesis management and (iii) duration modeling.  Tr. 149-150, 157, 159-160.  He asked Voice Signal to provide him with a detailed listing for each engine of the source code relating to the functional areas of acoustic scoring, hypothesis management, and duration modeling.

g.  The parties agreed that these submissions would be made by April 7, 2006.  Tr. 160 (later extended to April 10, 2006).  They agreed that these submissions would be factual, not argumentative in nature.  Tr. 161.

h.  The Neutral Expert said that at the next meeting he might wish to hear a technical explanation of ScanSoft's alleged trade secrets from a ScanSoft expert, and a technical explanation of how, if at all, Voice Signal performed the relevant functions from a Voice Signal expert.

  i. The next meeting was scheduled for May 8, 2006.

5. On April 10, 2006, Voice Signal provided to the Neutral Expert a specific identification of each part of the source code for each of its speech recognition engines that performed the three identified functions. For its part, ScanSoft provided a more detailed description of the three previously-identified categories of trade secrets. It did not identify any new material in the Voice Signal code that, it alleged, embodied those trade secrets. ScanSoft said that it possessed other trade secrets. It referenced them in general terms, but it did not identify anything in the Voice Signal code that embodied those other secrets. *See* Voice Signal's April 10 Submission to the Neutral Expert, ScanSoft's April 10 Submission to the Neutral Expert.

6. Nearly a month later, after the close of business on Friday, May 5, 2006 (the last business day before the next session with the Neutral Expert), ScanSoft served on Voice Signal's designated counsel, and delivered to the Neutral Expert's hotel, a 35-page brief, with 24 exhibits, entitled "ScanSoft's Supplemental Brief for Neutral Expert on Misappropriation of Trade Secrets." Conceptually, the brief had two parts. In the first part, ScanSoft argued what it calls "circumstantial evidence" of trade secret misappropriation -- that some of the individual defendants went to work for Voice Signal promptly after leaving Learnout & Hauspie, and that Voice Signal announced a demonstration product eight months later. ScanSoft further argued that Voice Signal has "stonewalled" discovery. It did not mention that ScanSoft had refused to identify its trade secrets or that the Court, not Voice Signal, has established the parameters of discovery in this case. In the second part of its brief, ScanSoft identified what it states are *seventeen* new categories of trade secrets (containing, by Voice Signal's count, *forty-two* new alleged trade secrets). In its brief, ScanSoft did not provide any ScanSoft source code that

embodies these supposed trade secrets, and did not identify any Voice Signal source code that, ScanSoft alleges, uses or copies any of the newly asserted ScanSoft trade secrets.

7. On May 7, 2006, Voice Signal delivered to the Neutral Expert a letter (Exhibit B attached) asking that he not consider ScanSoft's May 5 Brief, pending a determination by the Court as to (a) whether the arguments in the brief directed to non-technical matters were appropriate for consideration by the Neutral Expert, and (b) whether ScanSoft's identification of a large number of new trade secrets came much too late in the Neutral Expert process.

8. The Expert focused on the three trade secret categories that ScanSoft first identified on February 24, 2006. On May 8, 2006, a further session was held with the Neutral Expert. To Voice Signal's knowledge, the forty-two new trade secrets were not discussed. The Neutral Expert requested, and Voice Signal agreed to provide (on June 2), certain additional materials relating to the three trade secret categories that ScanSoft had previously identified. There was extensive discussion of issues relating to Voice Signal's counterclaim patent. Each side agreed to provide additional submissions to the Expert (on June 2 and 16) addressed to patent-related issues. A further meeting with the Neutral Expert is scheduled for June 29, 2006. It is anticipated that with substantial effort, this procedure will lead to a draft report by the Neutral Expert addressing the three trade secret categories and the counterclaim patent by August 1, 2006.[3]

---

[3] A rough transcript of this session exists, but is presently unavailable to counsel other than designated counsel on each side. The parties have agreed jointly to request an extension of the schedule established in the Court's Neutral Expert procedure in recognition of the Neutral Expert's teaching commitments, which extend into mid-July.

**ARGUMENT**

I.  **The Portion Of ScanSoft's Brief That Identifies Dozens Of New Alleged Trade Secrets Comes Much Too Late And Has Been Submitted For An Improper Purpose**

The Court's Neutral Expert procedure requires ScanSoft to identify to the Neutral Expert the trade secrets that it claims Voice Signal misappropriated, and requires Voice Signal to produce its "First Year Code" for the Neutral Expert's examination. Voice Signal produced the source code ordered by the Court. ScanSoft was given two chances to identify any allegedly misappropriated trade secrets. After an ample opportunity to review Voice Signal's code, ScanSoft identified three categories of trade secrets that, it said, were found in Voice Signal's source code.

At the parties' March 24 session with the Neutral Expert, the Expert stated repeatedly that the "secrets" that ScanSoft had identified were not secrets at all, but were, rather, widely known, even rudimentary, speech recognition techniques.[4] Voice Signal submitted materials that, among other things, (a) confirmed that the so-called secrets were well-known, (b) demonstrated that Voice Signal's code did not, in any event, utilize those "secrets," and (c) established that the particular parts of the Voice Signal code that ScanSoft had identified were wholly unrelated to those secrets.

Thereafter on April 10, at the Neutral Expert's request, Voice Signal identified every line of code that performs the functions that would be performed by the three categories of ScanSoft "secrets" if those "secrets" had been used. ScanSoft has identified nothing further in Voice Signal's code that ScanSoft alleges uses ScanSoft's secrets.

---

[4] Professor Ney said: The "things that are addressed here [in ScanSoft's brief] are, lets say, common in all recognizers." Tr. 111-112. " . . . [T]his [ScanSoft "secret"] is quite, quite known in the community." Tr. 129. " . . . [A]ll of these functions have to be addressed in any recognizer and the solutions that are well known are not different from, or not that much different from, what is described here [in ScanSoft's brief], at least conceptually." Tr. 132. ". . . [W]hen my students implement these things, the implementation might be similar to what is suggested here" in ScanSoft's brief. Tr. 134.

Faced with the probable demise of its trade secrets claim, ScanSoft is now attempting to inject into the Neutral Expert procedure seventeen new supposed trade secrets categories (containing, by Voice Signal's count, forty-two new alleged secrets) *without any indication that it has found those trade secrets in Voice Signal's code*.  ScanSoft could as easily have identified these new purported secrets months ago -- except, of course, that it did not then (as it does not now) have any basis for asserting that Voice Signal is using those secrets.

ScanSoft should be precluded from advancing this very large number of new supposed secrets at this stage of the Neutral Expert procedure.  First, ScanSoft had a fair chance to identify -- and could have identified -- these secrets back in February.  It failed to do so.  Instead of narrowing the issues as the Expert procedure advances, ScanSoft is doing its best to proliferate them.  Second, ScanSoft has identified nothing in the Voice Signal code that suggests that Voice Signal is using the newly-minted secrets.  ScanSoft merely invites the Expert to hunt for those secrets in the Voice Signal code.  Third, the indiscriminate identification of new alleged secrets -- a literal quintupling of the issues -- will place a nearly impossible burden on the Neutral Expert.  It is designed to make the process unworkable, to force its abandonment, and to allow ScanSoft to argue that its lawyers and experts should now be allowed plenary access to Voice Signal's source code -- something ScanSoft has repeatedly urged, and the Court has repeatedly rejected, in the past.  Fourth, the addition of an enormous number of new supposed secrets will delay the Neutral Expert procedure for many months.  The process should come to a conclusion.  ScanSoft would prefer otherwise.[5]

---

[5] Voice Signal is not making this up.  Attached as Exhibit C to this memorandum is an e-mail sent by ScanSoft to the Neutral Expert today without prior notice to, or consultation with, Voice Signal.  The e-mail is an outrageous attempt to influence the Expert in advance of his telephone conference with the Court tomorrow.  It asserts that the "practical solution" is to allow ScanSoft's expert unlimited access to Voice Signal's source code so that he can search for an alleged ScanSoft secret somewhere, anywhere, in Voice Signal's code.

ScanSoft's belated identification of an enormous number of new trade secrets can have only two motivations. ScanSoft is grasping at straws to save its failing trade secret claim. ScanSoft has yet to identify anything that (a) is a ScanSoft secret (b) that is being used by Voice Signal. These new trade secrets are alleged now, months after the Neutral Expert Procedure began, in the hope they will persuade the Expert to persuade the Court to allow ScanSoft's expert to peruse Voice Signal's code. ScanSoft then hopes that ScanSoft's expert will find something that will (for the first time) provide a basis for ScanSoft's trade secret claims. As Voice Signal has repeatedly argued in the past, discovery should not be used to search for a claim.

Moreover, ScanSoft's May 5 Brief is part of a pattern of conduct that the Court noted at its May 5 hearing in this case. ScanSoft issued a misleading press release. The sole purpose of the press release was to injure Voice Signal and lower its value in the market. Simultaneously, ScanSoft approached Voice Signal through Lehman Bros. with a fresh offer to purchase Voice Signal. Then, ScanSoft sued Voice Signal in Texas, alleging, for the first time, that a product that was introduced more than a year ago infringes three ScanSoft patents. Now, ScanSoft proposes to add, by its count, seventeen new trade secret categories to this case -- without any basis for asserting that the new "secrets" within these categories are to be found in Voice Signal's source code. This last maneuver -- which occurred on the same day that the Court admonished ScanSoft about the misuse of this case for business purposes -- is designed, *inter alia*, to mire Voice Signal in litigation for years, to burden it with unsustainable litigation cost, and to force it to accept ScanSoft's purchase offer. It is an intentional and outrageous abuse of the litigation process.

Voice Signal has addressed, and will continue to address, the three alleged trade secret categories that ScanSoft identified at the appropriate time in the Neutral Expert procedure. However, ScanSoft's attempt, late in the Neutral Expert proceeding, to delay the conclusion of,

and vastly to proliferate, that proceeding -- all without any basis for asserting that the new "secrets" are actually present in Voice Signal's code -- should be precluded.

## II. The Remainder of ScanSoft's May 5 Brief Is Addressed To Questions That Are Not Before The Neutral Expert.

The other portions of ScanSoft's May 5 Brief are addressed to matters that are not appropriate for consideration by the Neutral Expert. The Neutral Expert procedure is designed to provide technical assistance to the Court. The Expert is to compare ScanSoft's alleged trade secrets to the portions of ScanSoft code that are said to contain ScanSoft's trade secrets and to advise the Court as to whether there is reason to believe that the alleged secrets are in fact secrets and have been used or copied in Voice Signal's code. The Neutral Expert is to provide to the Court the expertise that the Court itself lacks.

ScanSoft's argument -- apart from its identification of forty-two new trade secrets -- is addressed to other issues. It is a presentation of what ScanSoft call "circumstantial evidence" of trade secret misappropriation and a complaint that Voice Signal has (in ScanSoft's view) improperly resisted discovery. Arguments of this type are properly addressed to the Court, not the Neutral Expert. They do not call upon the Expert to use his expertise. They are, instead, an effort to prejudice the Neutral Expert's consideration of the technical questions identified in the Court's Neutral Expert Procedure.[6]

Moreover, in a further abuse of the Neutral Expert Procedure, ScanSoft incorporated these non-technical arguments in a brief that is only available to Voice Signal's designated counsel. By that maneuver, ScanSoft has prevented Voice Signal's trial counsel from reading

---

[6] There is a spectacular irony in ScanSoft's conduct. ScanSoft has argued that the Court, not the Expert, should make the decisions in this case. The Court has said that it will make the decisions, but needs consultation with an expert regarding technical matters that are presently beyond its comprehension. ScanSoft has now resorted to arguing to the Neutral Expert matters that the Court is fully capable of understanding, thus, effectively urging him to draw conclusions about those matters -- i.e., to draw conclusions regarding matters that are fully within the Court's technical competence and that, as ScanSoft correctly argues, should be made by the Court.

the relevant portion of ScanSoft's brief and responding to ScanSoft's arguments.  This portion of ScanSoft's brief has no purpose other than to improperly influence the Neutral Expert by arguing matters that, ScanSoft knows, are not before him.

## CONCLUSION

     For the reasons stated above, the Court should determine that the Neutral Expert should not consider ScanSoft's May 5 Brief.

     Respectfully submitted,

     VOICE SIGNAL TECHNOLOGIES, INC.

     By its attorneys,

     /s/ Wendy S. Plotkin
     Robert S. Frank, Jr. (BBO No. 177240)
     Sarah Chapin Columbia (BBO No. 550155)
     Paul D. Popeo (BBO No. 567727)
     Wendy S. Plotkin (BBO No. 647716)
     Richard C. Abati (BBO No. 651037)
     CHOATE, HALL & STEWART
     Two International Place
     Boston, MA  02110
     (617) 248-5000

Dated:  May 11, 2006