# Exhibit A

COPY

**REDACTED**

Exhibits: (None)                    Volume 1, Pages 1 - 175

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - -

SCANSOFT, INC.,

        Plaintiff

vs.                              Docket No. 04-10353-PBS

VOICE SIGNAL TECHNOLOGIES,

INC., et al.,

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - -

MEETING WITH NEUTRAL EXPERT

Friday, March 24, 2006, 9:10 a.m.

Bromberg & Sunstein LLP

125 Summer Street

Boston, Massachusetts


*TRANSCRIPT CONTAINS MATERIAL DESIGNATED "HIGHLY*

*CONFIDENTIAL" and "HIGHLY CONFIDENTIAL - DESIGNATED*

*COUNSEL'S EYES ONLY"*


- - - - - - - - - Janis T. Young, RDR, CRR - - - - - - - - -

Farmer Arsenault Brock LLC

Boston, MA    |    617-728-4404    |    Fax 617-728-4403

```
                                                              2
 1    PRESENT:

 2        Prof. Dr.-Ing Hermann Ney

 3             RWTH-Aachen

 4             Computer Science Department

 5             Ahornstr. 55, D-52056

 6             Aachen, Germany

 7             as neutral expert

 8

 9        Lee Carl Bromberg, Esq.

10        Erik Paul Belt, Esq.

11        Lisa M. Fleming, Esq.

12        M. Brad Lawrence, Esq.

13        Courtney M. Quish, Esq.

14             Bromberg & Sunstein LLP

15             125 Summer Street

16             Boston, Massachusetts 02110-1618

17             617-443-9292     Fax 617-443-0004

18             lbromberg@bromsun.com; ebelt@bromsun.com;

19             lfleming@bromsun.com; blawrence@bromsun.com;

20             cquish@bromsun.com

21             for Plaintiff

22

23        (Continued)

24
```

FARMER ARSENAULT BROCK LLC

3

1    Sarah Chapin Columbia, Esq.

2    Robert S. Frank, Jr., Esq.

3    Christopher J. McKenna, Esq.

4    Choate Hall & Stewart LLP

5        Two International Place

6        Boston, Massachusetts 02110

7        617-248-5000      Fax 617-248-4000

8        scolumbia@choate.com; rfrank@choate.com;

9        cmckenna@choate.com

10        for Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

84

1    table.  The lookup table itself is also in the

2    materials you have, and we can provide you with a

3    pointer to the lookup table itself if that's

4    something that you would find helpful.

5             MR. McKENNA:  As I understand, we had a

6    simple PERL script that we used to populate the

7    table with HTK values.

8             And one thing I'd like to note is, in

9    the demonstration system that we referred to as

10   ELVIS, if you look in that version of the acoustic

11   scoring file with all the acoustic scoring

12   functions, you won't find a reference to a lookup

13   table.  And upon my review of their current existing

14   source code, they don't use that lookup table.  So

15   in fact, it was only used for a short period of time

16   to debug their recognizer against the known HTK

17   values.

18            Also, I would note that the lookup table

19   we're using is very simple and does not have any of

20   the optimizations.

21            MR. FRANK:  That Scansoft says are trade

22   secrets.

23            MR. McKENNA:  Right.

24            MR. FRANK:  That is, not only does Voice

HIGHLY CONFIDENTIAL

85

1    Signal not use lookup tables in the process of

2    acoustic scoring, as I understand it; the one

3    occasion when they use a lookup table I'm told

4    involves the use of a lookup table in a very

5    ordinary, publicly known way.

6            We're happy to make that table available

7    to you so you can confirm that that's the case.

8            DR. NEY:  Lookup tables are very common

9    and used in many contexts.

10           MR. FRANK:  I understand.

11           MS. COLUMBIA:  Then I don't think --

12           DR. NEY:  But I mean, to be specific in

13   the end, for me what it really boils down to is, you

14   give me, or have given me, basically the relevant

15   code for acoustic scoring.

16           MR. McKENNA:  Correct.

17           DR. NEY:  In the sense of the first

18   year, whatever it was called.

19           But at the same time, Scansoft says

20   there is some other routine that I should look at.

21   That is given here, and that is something I have to

22   discuss with Scansoft.

23           MR. FRANK:  And I think that the

24   question you should then ask yourself is, one, does

HIGHLY CONFIDENTIAL

86

1    it appear that lookup tables are used by Voice

2    Signal in the process of acoustic scoring?  Have you

3    considered what we have shown you and what they have

4    shown you?

5                Frankly, I think if you conclude that

6    Voice Signal does not, that may be the end of it,

7    having considered what we show you and what they

8    show you.

9                You may also wish to consider whether --

10   to confirm what we're telling you, which is that in

11   fact, what you're being shown by Scansoft is some

12   code that is just debugging the calculations on the

13   Voice Signal side for the purpose of causing them to

14   get to the same result as the HTK calculations.

15               You may, if you want -- and we're happy

16   to make available to you the lookup table itself,

17   and you can decide whether it's a commonly known,

18   commonly used lookup table or something unusual.

19               MS. COLUMBIA:  Then the third piece of

20   this first trade secret, which I'm not sure it makes

21   sense to walk through live, but you have in your

22   book, is a mapping of this acoustic scoring trade

23   secret -- it starts at Page 5 -- to a Dragon patent

24   which is attached with your materials that discloses

HIGHLY CONFIDENTIAL

87

1    the trade secret.

2              That patent published in 1988, and has

3    now expired; but as I said in my beginning

4    presentation, anything that's been disclosed in a

5    patent is publicly available, and cannot as a matter

6    of law be a trade secret.

7              So I don't know whether you need to get

8    to that part of your analysis or not; but in the

9    event you feel you need to, we've sort of set out

10   for you a mapping of the trade secret to that

11   patent.

12             DR. NEY:  Maybe a question of

13   clarification for me.

14             MS. COLUMBIA:  Yes?

15             DR. NEY:  First of all, you said this

16   patent expired?

17             MS. COLUMBIA:  Yes.

18             MR. FRANK:  No.  Actually, I know that.

19             The patent, in the trade secret

20   context -- we're not now on the patent infringement

21   side of the case -- in the trade secret context of

22   the case, a question is whether whatever is claimed

23   to be secret is actually secret, or whether it is

24   publicly known.

HIGHLY CONFIDENTIAL

88

1          If something is disclosed in a patent,

2     it is publicly known.  It is conceivable that the

3     thing that is disclosed in the patent could be

4     covered by the patent, and conceivable that the use

5     of that technique would be a patent infringement.

6          But that's not claimed here.  And in any

7     event, this patent has expired, so it couldn't be

8     claimed.  Once a patent has expired, one is free to

9     use whatever is disclosed in it.

10          DR. NEY:  Okay.

11          MR. McKENNA:  So I think that prompts us

12    to the second topic of how Voice Signal's function

13    really works with regards to hypothesis management.

14          Generally, there are two well-known ways

15    to update states involving histories.  One way is to

16    add or merge probabilities, likelihood scores having

17    the same histories.  Another way is to just pick the

18    better-scored likelihood and move on without merging

19    any of the hypotheses.

20          So in Voice Signal's source code, we

21    choose not to merge hypotheses in the management of

22    it, but to choose the better score.

23          In order to give you evidence of that, I

24    point you to Appendix H, where we update our

HIGHLY CONFIDENTIAL

89

1    hypotheses in our speech-recognition model.

2              DR. NEY:  I do not have to discuss

3    technical details, but I'm not able to follow your

4    distinction between these two methods.  You pointed

5    out two general approaches, because in general, in

6    virtually all systems that I know of, they do

7    merging of hypotheses, which is also called

8    recombination of hypotheses.  They do this merging

9    by picking the hypothesis with the maximum score or

10   minimum distance, depending on the type.

11             But I think we do not have to discuss

12   this technical --

13             MR. McKENNA:  Sure.

14             DR. NEY:  Okay; all right.  I will see,

15   when I look at the code, whether this is clear.

16             MR. McKENNA:  But at the time, you need

17   to handle multiple active hypotheses while you

18   update a state.

19             DR. NEY:  I mean, you have to go from

20   one time frame to the next.

21             MR. McKENNA:  That's correct.

22             DR. NEY:  And the typical procedure is,

23   the different transitions you can select to arrive

24   at the next, what, crit point or state, given time

HIGHLY CONFIDENTIAL

90

1   T, and then you have to select one of these

2   transitions.  Typically what is used in, I guess,

3   99.99 percent of all systems is, you select the

4   transition with maximum overall score.

5           MR. McKENNA:  Right.  So we pick out of

6   two hypotheses the maximum score and move on.

7           DR. NEY:  So that's what all systems, as

8   far as I know, do.

9           MR. McKENNA:  And that's what we do.

10          So we don't manage the active hypotheses

11  to determine if any two are the same, to merge and

12  add the probabilities.  We simply don't do that in

13  our source code.  But we do what you referred to as

14  what's widely known as just picking the highest-

15  scoring hypothesis and moving on to the next frame.

16          MS. COLUMBIA:  Would it be helpful for

17  this one, Chris, if we left so that you could lay

18  side by side what Scansoft has alleged is a trade

19  secret and actively distinguish that from what we

20  do?

21          MR. FRANK:  I think that might be

22  helpful.

23          MS. COLUMBIA:  I'm concerned that we're

24  not addressing exactly what's in the trade secret.

100

1          One point I would point you to the

2    source code would be back to Appendix H, where we

3    were updating hypotheses.  As I understand, that

4    would be one area where, if you were considering

5    duration modeling, you would do it at that point of

6    processing.

7          If you think there's other areas I need

8    to point and clarify to you, please do get back to

9    us, and we can bring them to your attention.

10         I also want to note, Appendix M -- and

11   this will be in the source code of the CDs we're

12   going to provide to you today -- I just quickly

13   point you to a source code listing, a function

14   called segment.c on Page 2 of Appendix M.

15         So in the middle of that page, you'll

16   see some bold comments on Page 2, and just a comment

17   from Voice Signal confirming that they don't have a

18   duration model.

19         So since we don't do duration modeling,

20   there's no need for us to do any type of form of

21   optimizations to the duration model, and then we

22   don't use duration models in combination with any

23   kind of acoustic scoring.

24         So basically Appendix D and Appendix H

HIGHLY CONFIDENTIAL

101

1   show you where we do acoustic scoring and where we

2   do hypothesis management; and in either of those

3   sections, you won't see any incorporation of

4   durational scoring, because we simply don't do it.

5          DR. NEY:  The terminology may be a

6   little bit misleading.  Actually, any system does

7   some sort of duration modeling.  Even if you do not

8   do it explicitly, there's some implicit duration

9   modeling in all the systems.  It's a question of

10  whether the method that you are using as a code is

11  similar to what is claimed to be a trade secret or

12  not.

13         MS. COLUMBIA:  If there's something that

14  you would need to see to determine that that you

15  don't have, we would be anxious to give it to you.

16         MR. McKENNA:  And then to Section 2 of

17  this category, on Page 14, there's a file called

18  calculate score -- excuse me; a function called

19

20

21              Redacted

22

23         .          But in this code, we have not used any

24  duration modeling in this function.

HIGHLY CONFIDENTIAL

102

1           And then if we move to the next area

2    of -- we believe this trade secret is publicly

3    known.  On Page 16, we point you to the same Dragon

4    patent, the '803 patent.  As you'll see in the

5    following pages, 17 and 18, there are sections of

6    that patent that we draw your attention to, and we

7    do believe after reading that section of the patent

8    that you'll conclude what Scansoft claims is a trade

9    secret is publicly known, as it's clearly disclosed

10   in this patent.

11           (Pause)

12           DR. NEY:  Okay.  Sorry.

13           MR. McKENNA:  Just to repeat myself, we

14   point your attention to the Dragon '803 patent, and

15   on Pages 17 and 18, as you see, I cite specific

16   sections of that patent.  I think, after you read

17   the patent and those cited sections, you'll see that

18   the Scansoft alleged trade secret is actually not a

19   trade secret as it's described in this patent.

20           MS. COLUMBIA:  I think we're about done.

21   Just organizationally, so that when you go away, you

22   have the narrative piece, which goes through each of

23   the trade secrets, and for each, points you to see

24   that we don't do that in our code, then addresses

HIGHLY CONFIDENTIAL

110

1   original instance, went through the file structure,

2   there were many folders that had absolutely no files

3   in them because they weren't authored or edited by

4   the individuals.

5           So it was kind of like trying to -- you

6   try to track where data is going, and it would go

7   places and you never knew what would come back from

8   it because it would go off into an empty folder.

9           Just, I believe it was last Friday

10  night, about 8:00 -- 7:30, it was finally done.  I

11  received what purports to be the full versions of

12  the code.  However, on -- Tuesday?

13          MR. BELT:  Tuesday, yes.

14          MR. LAWRENCE:  There was an "Oops; we

15  didn't give you everything," and they gave us some

16  more stuff.  So it's been kind of this running

17  production; we keep getting more and more.

18          Based on what they've told us, I think

19  they're done giving us stuff now, that we've got

20  everything.  But I have not assimilated how

21  everything fits together, because, as I'm sure you

22  know, it's a fantastically big number of files that

23  are involved, all the H files, C files.

24          DR. NEY:  The problem is -- well, for

1    the procedure now, that I'm not allowed -- to make

2    this clear, I'm not allowed to discuss basically

3    three categories for these trade secrets; we cannot

4    discuss them among -- or in a session, only with --

5            MR. LAWRENCE:  The brief you're looking

6    at, does it say "Scansoft" on the front?

7            DR. NEY:  It does.

8            MR. LAWRENCE:  You can talk about all of

9    this you want with all of us here.

10            MR. BROMBERG:  But if you want to talk

11    about, well, how about this one compared to the

12    code --

13            MR. BELT:  Then we'll step out.

14            MR. LAWRENCE:  Because in that brief, we

15    show you Dragon source code from our product, Mrec

16    product, our code.  That's fair game to talk about

17    with all of us here.

18            The places that I've identified or that

19    we have citations to certain portions --

20            MR. BELT:  In the VST code.

21            MR. LAWRENCE:  -- in the VST code, these

22    guys step out for.

23            DR. NEY:  That means that things that

24    are addressed here are, let's say, common in all

FARMER ARSENAULT BROCK LLC

HIGHLY CONFIDENTIAL

112

1  recognizers.  The first one is, let's say, the

2  likelihood calculations; and the second one, the

3  management of hypotheses; and number three, what

4  combination of acoustic scores, or in that case --

5  it says Gaussian modes, but it should be Gaussian

6  models, yes.

7           That's fairly common, that's in general,

8  the things that show up in our recognizer.

9           So it would be important, then, that you

10  point out exactly -- or that VST is asked exactly

11  what are the places in their code where this

12  corresponding function is performed?

13           Because for me, the problem, I'm getting

14  lots of material.  I mean, it's impossible to look

15  at.  And in the end, I think it boils down to

16  looking at these specific parts of the code.

17           MR. LAWRENCE:  Yes.  I mean, that would

18  be -- and given that we've had --

19           DR. NEY:  And you have done that, or

20  not?  That is my question.

21           MR. LAWRENCE:  Well, initially, based on

22  small portions of code that we had, we attempted to

23  identify where some was.  This was without using any

24  analysis tools; all it was was going through each

117

1   If the three trade secrets address functions that

2   must be implemented in any recognizer, so VST could

3   give the source code that they are using for these

4   three functions, show it to me.

5           And you had a look at their full

6   system -- or you will have; I'm not sure -- and then

7   you could ask me to look at specific places where

8   you think these kinds of trade secrets are catched

9   up on.

10          MR. LAWRENCE:   As an initial matter,

11  that makes sense.  However, as we were discussing

12  earlier, there's a whole bunch more to the layout of

13  the whole system, because when we filed this brief,

14  we didn't have access to their whole source code.

15          DR. NEY:  I understand that.

16          MR. LAWRENCE:  So there may be a lot

17  more things that, now that we have everything, that

18  become identifiable.

19          DR. NEY:  Yes.

20          MR. LAWRENCE:  Again, without having

21  some sort of analysis tool to actually see the

22  structure -- because right now it's just files, and

23  they're uncompileable because the computer we have,

24  I can't load anything on, so I can't compile it -- I

118

1   can't watch how data goes through.

2           So without that, I can't see the

3   structure, and that structure, there's a lot of the

4   setting up of Mrec and all the other things came

5   from an understanding of the structure; and I can't

6   see that to evaluate whether those decisions are

7   consistent between Mrec and the VST code.

8           So what may be important is that, in

9   order to help you identify these things, that I'm

10  allowed to have access to some sort of analysis tool

11  in order to evaluate the code at a macroscopic level

12  instead of this microscopic level.

13          DR. NEY:  You're not allowed to right

14  now, or what are the constraints?

15          MR. LAWRENCE:  Right now, the computer

16  that I have that was provided by VST has all input

17  functions disabled, so I cannot load a program onto

18  it.

19          DR. NEY:  I see.

20          MS. FLEMING:  Maybe that's something we

21  could take up in the group session.

22          DR. NEY:  So that means right now it's

23  only you and me that have access to -- maybe even

24  not me now.  I'm not sure what is on the computer.

HIGHLY CONFIDENTIAL

119

1    That's the same or related?

2              MR. LAWRENCE:  I don't know what you've

3    gotten recently.

4              MR. BELT:  Theoretically you should have

5    exactly what he has.

6              DR. NEY:  But you said you got a recent

7    update.

8              MR. LAWRENCE:  Yes, I got one on Tuesday

9    and the previous Friday.  So I had two recent

10   updates.  I don't know if they've given those to you

11   or not.

12             DR. NEY:  The problem is, there's huge

13   amounts of files and code, and....

14             MR. LAWRENCE:  So I think that some sort

15   of analysis tool would make both of our jobs easier,

16   and especially if you and I can work possibly on the

17   same one so we have the same kind of analysis

18   abilities.

19             MR. BELT:  Are there particular tools

20   that you use in your everyday work, or that you're

21   familiar with?

22             DR. NEY:  No.

23             MR. BROMBERG:  I mean, do you think it

24   would be useful for you to be able to use such an

HIGHLY CONFIDENTIAL

120

1    analysis tool on the VST code?

2            DR. NEY:  I mean, so far I'm not -- I

3    was not aware that this was going to be my job, to

4    look at the whole code.  I expected to have to look

5    at specific parts that are pointed out to me by you

6    or by the other side.

7            MR. BELT:  Well, yes, that's ideally

8    what we would like to be able to do.

9            DR. NEY:  But to analyze the whole

10   recognizer, that's not an effort I had envisaged so

11   far.

12           MR. LAWRENCE:  If I had the tools, I

13   might be able to offload some of that work from you,

14   is what I'm getting at.

15           DR. NEY:  Maybe that's something we can

16   address in the plenary session.

17           I feel I understand the situation as far

18   as the general methods are concerned that are

19   brought up in these trade secrets, but what is

20   difficult to work on is the code and the

21   implementation.

22           MR. BROMBERG:  Right; that makes sense.

23   And I think it is part of the dilemma of this case.

24           As I said in the plenary session, the

HIGHLY CONFIDENTIAL - DESIGNATED COUNSEL'S EYES ONLY

126

1   just going to be varied by which parameter you're

2   passing in; but the way you're operating with it,

3   making decisions with it, if that's the same, that

4   would be at the level that we're saying, that's what

5   you've learned from us, is how to make those --

6   that's what our trade secret is.

7           So it's not an exact copy.  It would be

8   taking what you've learned from it, applying it.

9           DR. NEY:  But the problem also is that,

10  let's say the company might say this is a trade

11  secret.  There are many things you can do, a huge

12  variety of methods, and all methods are known.  But

13  then under certain conditions, it turns out one

14  method is maybe more useful and more suitable.

15          So that is -- I don't know exactly how

16  to handle such a situation, because I'm -- let's say

17  many of the methods are known or well-known.  So

18  it's not clear; it's not clear to what degree that

19  really a trade secret is.

20          Companies typically, my impression, have

21  the tendency -- or companies say, "Okay, we want to

22  keep everything proprietary, just to be on the safe

23  side."  But as a matter of fact, let's say these

24  recognizers that I'm seeing here in many aspects

HIGHLY CONFIDENTIAL - DESIGNATED COUNSEL'S EYES ONLY

127

1    look similar to recognizers that are being

2    implemented by students.  So....

3             MR. LAWRENCE:  If that's the case --

4             DR. NEY:  That makes it a little bit

5    difficult.  There are some details now -- maybe we

6    can go through these things.

7             MR. LAWRENCE:  If that's the case, that

8    there are things that we're asserting is a trade

9    secret, and you're seeing it in your students' work,

10   then it's not a trade secret.  We'll admit that.

11   We're not trying to extend --

12            DR. NEY:  Yes, yes.

13            MR. LAWRENCE:  I mean, so if that's the

14   case, that's the case.

15            DR. NEY:        *Redacted*

16        is, let's say, commonly used.  Now, you

17   really have to look at the details of it, whether

18   this specific method is so special or different from

19   what is known.

20            MR. LAWRENCE:  Right.

21            DR. NEY:  And the second step, as we

22   said, that really would be important to see is the

23   VST code, how they do that, is really what it boils

24   down to.

HIGHLY CONFIDENTIAL - DESIGNATED COUNSEL'S EYES ONLY

128

1            MR. LAWRENCE:  Right.

2            DR. NEY:  And then the next thing is the

3    hypothesis management.  Again, to form my question

4    here, actually, here I would need some

5    clarification, maybe.  Hypotheses are used at least

6    at two places, in two contexts of a speech

7    recognizer, of such a speech recognizer.

8            One is what I call pure acoustic

9    modeling, or pure acoustic search, or pure acoustic

10   hypothesis.  That means, in the Mrec model, you have

11   to look at how to combine, merge, recombine

12   hypotheses.  That's one thing.

13           The other thing is, when you have a word

14   end, or when you have word-end hypothesis, then you

15   have to check whether you can merge these hypotheses

16   or not by including -- and at that time, you have to

17   use language modeling.  So some people call this

18   language-model recombination or language --

19   language-model merging of hypotheses, let's say, or

20   merging of hypotheses for word-end hypotheses, or

21   something like this.

22           From here, you say, it's not clear what

23   you address.  Maybe when I look at the code -- there

24   was more the language modeling.  Is that right?

HIGHLY CONFIDENTIAL - DESIGNATED COUNSEL'S EYES ONLY

129

1        MR. LAWRENCE:  Yes.

2        DR. NEY:  So it's not about the

3   acoustic --

4        MR. LAWRENCE:  It has an acoustic

5   component, because if you look, you have --

6        DR. NEY:  I think I've been given the

7   code Uvidas.  What page was that?

8        MR. LAWRENCE:  Actually, I believe all

9   of this discussion could go on with the rest of the

10  group here, because this is our brief.

11       DR. NEY:  Yes; it's about -- I see it's

12  a language model.

13       MR. LAWRENCE:  Right, and it has the --

14  and the merger, you have this *     *Redacted*     *  *  *  *

15       *        *        *  *

16       DR. NEY:  Yes.  Now, this, as such, is

17  quite, quite known in the community; and where you

18  might have differences is how to do this *Redacted*  *  *

19  efficiently, because efficiency is a crucial aspect.

20       MR. LAWRENCE:  Correct.  And when you

21  get into the code that we've identified -- you'll

22  see it's Page 30, roughly, and 33 -- that's where --

23       DR. NEY:  Maybe we can discuss this with

24  your colleagues.  Okay; yes.  Maybe we can discuss

FARMER ARSENAULT BROCK LLC

HIGHLY CONFIDENTIAL - DESIGNATED COUNSEL'S EYES ONLY

130

1    it with your colleagues, because it concerns only

2    the Scansoft --

3                MR. LAWRENCE:  Okay.  I will bring them

4    back in.  We can go off the record for a second.

5                (Recess taken; Attorneys Bromberg, Belt,

6    Fleming and Quish entered the room.)

7                         *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

HIGHLY CONFIDENTIAL

131

1                          * * * * *

2              (Present in the room with Dr. Ney:

3      Attorneys Bromberg, Belt, Fleming, Lawrence and

4      Quish only.)

5              MR. LAWRENCE:  Just to bring everyone up

6      to speed, we were kind of going through each of the

7      trade secrets that we have identified so far as

8      being possible for being in the code; and that we

9      have identified in our code, in our brief, the

10     locations where this is located.

11             As of right now, I don't believe we have

12     given you a full set of the Dragon -- of the Mrec

13     code.

14             MS. FLEMING:  Correct.

15             MR. LAWRENCE:  We pulled out the

16     relevant portions --

17             DR. NEY:  I do not feel I need more

18     code.

19             (Laughter)

20             MR. LAWRENCE:  That's why we did that,

21     just to point you.

22             But our expert, Richard Goldhor, knows

23     exactly where all of this stuff is, and can really

24     expand upon questions that you may have about what's

132

1    going on, if possible.

2         Go ahead.

3         DR. NEY:  So I think I understand quite

4    well the points addressed here on Page 1 and 2.

5         The thing is that all of these functions

6    have to be addressed in any recognizer, and the

7    solutions that are well-known are not different or

8    not that much different from what is described here,

9    at least conceptually.

10        In the end, we have to consider two

11   aspects:  the idea, the concept as such, and the

12   implementation in the code, because it might very

13   well be the case that the concept as such is known

14   and well-known, but then still the code is, what,

15   identical or could be simply taken over.  And I have

16   to look at both aspects, yes?

17        MR. BROMBERG:  Yes.

18        DR. NEY:  Now, for me, it's maybe

19   helpful to understand why you think and what in

20   particular you think is the trade secret here in

21   these three cases, because, as I said, at least

22   in -- all three, let's say, all three functions have

23   to be implemented in any speech recognizer.

24        So the first one refers to the fact that

HIGHLY CONFIDENTIAL

133

1  you somehow have to do your acoustic scoring fast;

2  you have to compute your not-likelihoods in a very

3  efficient way.  There are a couple of tricks around.

4          And the second one is the -- what is it

   *Redacted*

5  called here? --

6                        out it's the same.  And also,

7  that is a sort of memory problem, and there are

8  various ways of solving it, and one way of doing

   *Redacted*

9  this is to use b

10         And number three is, in a speech

11  recognizer, you have the e

12

13                *Redacted*

14

15

16          Yes; so there might be specific details

17  that I still have to find out and study, but let's

18  say the general concept of the things is well-known.

19  So for me, it's important to understand what is the

20  specific proprietary thing about them, or trade

21  secret thing about them.

   *Redacted*

22                     models, that's a little bit --

23  let's say, basically you get this type of dependence

24  of duration in any basic recognizer.  You can extend

HIGHLY CONFIDENTIAL

134

1  it a little bit, but this is -- so it would be

2  important for me to have maybe more information

3  about that, or should I -- again, this may be a

4  procedure, a trial procedure.  Should I do

5  everything I do exactly based on that one, or...?

6           So just to be clear about this, when my

7  students implement these things, the implementation

8  might be similar to what is suggested here.  Maybe

9  there might be differences, but it's not so, let's

10 say, so specific, so unique.

11           MR. BROMBERG:  Well, I guess --

12           DR. NEY:  All the things before these

13 existed were known to me.  Maybe not the details of

14 these *

15                  *Redacted*

16                              These are well-known

17 things.

18           Now, the details are then, okay, should

19 I use them in this type of recognizer or a different

20 one under this condition or another condition and so

21 on?

22           MR. LAWRENCE:  Right.

23           DR. NEY:  That is something which is

24 maybe different from; it depends on the situation.

135

1   So that's the general concept.

2           The other aspect then is the

3   re-implementation in terms of the code.

4           MR. LAWRENCE:  I think what you're kind

5   of driving at is always -- always -- the problem in

6   trade secret issues.  And I think the best way to

7   kind of approach it is, I mean, if it's within the

8   general knowledge, in like public papers and stuff

9   of that matter, then at the highest level -- and we

10  tried to give it to you at several different levels,

11  the highest, the mid, and the nitty-gritty details.

12  If the public art that's out there says do this, the

13  general concept, well, then maybe the general

14  concept is a little too broad.

15          But then if there's specific

16  implementations and specific things that we've done

17  that are different from what's disclosed in the

18  references that are out there, and what we're

19  utilizing -

20                          *Redacted*

21

22          Then at that level, it may be a

23  trade secret, because nothing's out there disclosing

24  it.

149

1                      * * * * *

2                (All counsel are present in the room

3      with Dr. Ney.)

4                MR. BROMBERG:  We talked about what's

5      next, when we were talking with Professor Ney, and I

6      imagine you did to some extent; but Professor Ney

7      had some ideas and --

8                DR. NEY:  Yes; okay.

9                So as I said, I think, before, the trade

10     secrets, in my view, concern two aspects:  the

11     general method and the details of the

12     implementation.  I think, for the general method, I

13     feel right now I have enough information.

14                Now, for the implementation, I probably

15     need more information.  Not that I'm asking for more

16     code -- I think I'm getting actually too much

17     material -- but I need maybe specific, specific

18     parts.

19                So first of all, these trade secrets

20     that we are discussing, they concern, let's say,

21     functions that you find in any speech recognizer.

22     So my suggestion would be that I could get those

23     specific parts of the code for the VST engine or for

24     the VST programs that we are here discussing that

150

1  perform these functions.

2          And then at the same time, the technical

3  expert on Scansoft, on the Scansoft side, he has

4  access to the VST code, and he could provide me with

5  those parts of the code that he believes are in

6  conflict with these trade secrets.

7          So I would get two selected pieces of

8  code:  one from the VST party, VST side, that is,

9  let's say, addressing these general functions as

10  they are needed in any large-vocabulary speech

11  recognizer; and from the Scansoft side, those parts

12  of the code that Scansoft thinks are in conflict

13  with their trade secrets.

14          Is that okay?  That would be my

15  suggestion on how to proceed.

16          MS. COLUMBIA:  That's fine with us.

17          MR. LAWRENCE:  One clarification:  I

18  believe I heard you say -- and I just want to make

19  sure -- that you wanted our expert to identify --

20          DR. NEY:  Well, okay; that's one aspect.

21  Again, I do not overlook all these legal aspects and

22  implications, but, I mean, all this business really

23  gets into technical details.  I'm not sure it's

24  possible and whether it's really a good idea or not,

157

1   we have already provided and then state what he

2   wants, and we will provide it.

3          DR. NEY:  Yes.  Actually, what we

4   discussed in the meeting with -- sorry; I forgot

5   your name.

6          MS. COLUMBIA:  Chris.

7          DR. NEY:  -- Chris, concerning the three

8   or four functions, yes, these functions that you can

9   find in any recognizer.  Maybe I have to write them

10  down again, but I think it's -- okay.

11         MS. COLUMBIA:  I was just going to ask,

12  in what form is it most useful to you?  We could

13  point you to it in the laptop that you have --

14         DR. NEY:  If you tell me where it is

15  there, or if you send me corresponding printings;

16  whatever.  Whatever; it does not matter.

17         MS. COLUMBIA:  We can do it either way.

18         DR. NEY:  Yes, right, right, yes.

19         And then from the other side, those

20  parts of the code where you think the trade secrets

21  are touched upon.

22         MR. BROMBERG:  Okay.

23         DR. NEY:  Other than that -- I'm

24  repeating this -- I'd say these functions are needed

158

1    in any large-vocabulary speech recognizer, and the

2    concepts of the methods are known; so in the end it

3    boils down to looking at the code, I think, or large

4    parts, large -- many questions, I think, can be

5    answered by looking at the code.

6              MS. COLUMBIA:  And I have not seen the

7    brief, but it's my understanding that the Scansoft

8    brief on trade secrets actually includes large

9    sections from the Dragon code.

10             MR. BROMBERG:  Correct.

11             MS. COLUMBIA:  So I presume that Dr. Ney

12   has what he needs from the Dragon code to assess

13   that?

14             Or do you need something more?

15             DR. NEY:  Right now, no.

16             MS. COLUMBIA:  Okay.  I need to get my

17   calendar, but should we maybe put some dates for

18   that submission and see if we can find a date that's

19   appropriate for a follow-up meeting?

20             MR. LAWRENCE:  Real quick:  One thing I

21   wanted to clarify on this procedure, the

22   identification of the three areas -- Professor Ney

23   is referring to them as three concepts in every

24   single recognizer -- the identification of that in

159

1    the VST code from VST, that comes first, and then we

2    respond with where we think it is?

3              DR. NEY:  No, no; my suggestion was in

4    parallel.  It was two questions.  A question to

5    Scansoft is, "Where do you think, or what are the

6    parts of the code that are in contradiction with

7    these trade secrets?"

8              And the question to VST is, "Show me

9    those parts of your code where you perform these

10   three functions."

11             MS. COLUMBIA:  Is there any reason we

12   can't say the three functions out loud so that --

13             MR. LAWRENCE:  No, we --

14             DR. NEY:  Basically it's the three --

15             MS. COLUMBIA:  The three we talked about

16   were acoustic scoring, hypothesis management and

17   duration modeling.

18             DR. NEY:  Right.  Duration modeling, I

19   would like to clarify, it's -- as I said before,

20   even if you do not have an explicit duration model,

21   there's still some sort of duration modeling.  So

22   how can we call this?  This is basically --

23             MR. BROMBERG:  You had said during our

24   session, Professor Ney, emission probability scores.

FARMER ARSENAULT BROCK LLC

160

1    Does that capture it?

2          DR. NEY:  Yes.  Let's say combination of

3    emission probability scores with transition scores.

4    Basically it's the acoustic search; some people

5    would call it acoustic search or acoustic

6    recombination, acoustic merging of hypotheses.

7          MR. FRANK:  I'm sorry, sir; would you

8    say those words again?

9          DR. NEY:  Merging of acoustic

10   hypotheses.  Because the term, duration -- what do

11   you call it?

12         MS. COLUMBIA:  Duration modeling.

13         DR. NEY:  Duration modeling is maybe a

14   little bit too narrow.

15         MS. COLUMBIA:  Can I step out for a

16   moment to get my calendar?

17         (Ms. Columbia left the room and

18   returned; discussion off the record.)

19         MS. COLUMBIA:  So we have agreed that by

20   April 7, the parties will make the submissions that

21   Dr. Ney has requested, which are, on Voice Signal's

22   part, to provide him with either pointers to where

23   in the code he has to look or printouts of the code

24   that correspond to the three functionalities that

1  are covered by the alleged trade secrets -- and

2  we've agreed that those are acoustic scoring,

3  hypothesis management and durational modeling -- and

4  that durational modeling is broad enough to cover

5  things like emission probability scores and

6  transition scores.

7              DR. NEY:  Maybe one more modification?

8              MS. COLUMBIA:  Yes.

9              DR. NEY:  Acoustic scoring should

10 include fast calculation of not-likelihoods.

11             MS. COLUMBIA:  Fast calculation of --

12             DR. NEY:  Of not-likelihoods, efficient

13 or fast calculation of not-likelihoods, acoustic

14 not-likelihoods.

15             MS. COLUMBIA:  And I think we've agreed

16 that those will be materials, not arguments; that

17 what Dr. Ney is interested in is in seeing the code.

18             And on the Scansoft side, Scansoft will,

19 by April 7, provide Dr. Ney with guidance on where

20 it thinks he should look in the Voice Signal code

21 for evidence that Voice Signal has used the Scansoft

22 trade secrets.

23             And we then just agreed to schedule a

24 meeting for May 8, and that the meeting may take

162

1    place here in Boston or it may take place in

2    Germany, and that that decision will be made

3    sometime later.

4                DR. NEY:  I'm sorry; for coming back to

5    the dates, you said the 1st of May would not be

6    possible.  Maybe you could write down one or two

7    alternatives, that I have some flexibility.  So what

8    about the 28th of April or 5th of May?

9                MS. COLUMBIA:  Those are both fine with

10   us.

11               MR. BROMBERG:  Those are both problems

12   for me.

13               MS. COLUMBIA:  Both problems?

14               DR. NEY:  Okay; both problems.

15               MR. BROMBERG:  I have a trial starting

16   on April 10, and the question is, will it be done

17   that week or not?

18               MS. COLUMBIA:  It probably won't even

19   start, Lee.

20               MR. BROMBERG:  No, it's going to start.

21               DR. NEY:  So there's no real alternative

22   until the 8th of May.

23               MS. COLUMBIA:  There's probably an

24   alternative if we go further out.

FARMER ARSENAULT BROCK LLC

163

1          DR. NEY:  So what about later dates?

2    12th of May?

3          MS. COLUMBIA:  Actually, the 12th is not

4    okay for me.

5          DR. NEY:  No?  Okay.  Well, then you're

6    already on the 15th.  Again, that's a Monday, the

7    15th of May.

8          MR. BROMBERG:  Yes, that's possible.

9          DR. NEY:  But that means Fridays are

10   basically not possible.  I was looking for some

11   other --

12         MS. COLUMBIA:  Did you ask about May 5?

13         DR. NEY:  I think you said it's not

14   possible.

15         MR. BROMBERG:  May 5 is not good for me,

16   but May 12 is okay.  That's the next --

17         MS. COLUMBIA:  But I can't do it.

18         DR. NEY:  And before May, everything is

19   difficult, yes?

20         MR. BROMBERG:  Yes.

21         MS. COLUMBIA:  Although I suppose if

22   your trial either doesn't start or finishes early,

23   we can discuss whether there's a way to move the

24   meeting up.

164

1          MR. BROMBERG:  Right.

2          DR. NEY:  So to summarize, the only

3    dates we have now is 8th of May, 12th of May and

4    15th of May; is that right?

5          MS. COLUMBIA:  The 12th is not

6    available.

7          MR. BELT:  May 8 to May 15.

8          MS. COLUMBIA:  Looking only at Mondays

9    and Fridays.

10          DR. NEY:  So it's only 8th and 15th of

11    May?

12          MS. COLUMBIA:  Yes.

13          DR. NEY:  Before that is also difficult,

14    and after that is probably too late.

15          MR. FRANK:  Yes.

16          DR. NEY:  So -- yes; okay.

17          MS. FLEMING:  Sarah, did you finish with

18    what's on the record, the dates?

19          MS. COLUMBIA:  On the dates.

20          MS. FLEMING:  Just one more piece of

21    agreement is that the parties have agreed that each

22    side will allow the other to load tools on for

23    searching on the software that's been delivered by

24    the other side in order to facilitate meeting the

1   deadlines that have been established.

2          MS. COLUMBIA:  Yes.

3          DR. NEY:  One more question on my side.

4   I'm supposed to look at the specific parts of the

5   code that we were just discussing.  What about other

6   parts of the code?

7          MR. FRANK:  Let me repeat something that

8   I said out of your presence, and see if there's

9   agreement.

10          I said that it is not our expectation

11   that Dr. Ney would have to search around in the code

12   in general for parts -- assuming that we have

13   actually provided the parts of the code that perform

14   these functions, and your side has actually

15   identified those parts of the code where you believe

16   that your trade secrets are being used, that that is

17   all that Dr. Ney would have to do; that he would not

18   otherwise have to conduct an independent

19   investigation through the code on his own.

20          I think that's the substance of what I

21   said I believed when we were separated, and I want

22   to see if you agree to that.

23          MR. BROMBERG:  Reluctantly, we don't

24   agree, because as we were saying to Dr. Ney also