# EXHIBIT A

Page 1

1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2
3    SCANSOFT, INC.,                          )
                                             )
4                    Plaintiff               )
                                             )
5             -VS-                           ) CA No. 04-10353-PBS
                                             ) Pages 1 - 26
6    VOICE SIGNAL TECHNOLOGIES, INC., et al, )
                                             )
7                    Defendants              )
8
9                       MOTION HEARING
10          BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT JUDGE
11
12

A P P E A R A N C E S :

13

       LISA M. FLEMING, ESQ. and ERIK PAUL BELT, ESQ.,
14   Bromberg & Sunstein, 125 Summer Street, Boston,
     Massachusetts, 02110-1618, for the Plaintiff.
15
       SARAH CHAPIN COLUMBIA, ESQ. and ROBERT S. FRANK, JR.,
16   ESQ., Choate, Hall & Stewart, 53 State Street, Boston,
     Massachusetts, 02109, for the Defendants.
17
18
                              United States District Court
19                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts
20                            May 5, 2006, 10:00 a.m.
21
22
                       LEE A. MARZILLI
23              CERTIFIED REALTIME REPORTER
                United States District Court
24              1 Courthouse Way, Room 3205
                   Boston, MA  02210
25                   (617)345-6787

1              P R O C E E D I N G S

2              THE CLERK:  The case of ScanSoft, Incorporated V.

3    Voice Signal Technologies, et al, Civil Action No. 04-10353,

4    will now be heard before this Court.  Will counsel please

5    identify themselves for the record.

6              MR. BELT:  Thank you.  Good morning, your Honor.

7    Eric Belt, and we have Lisa Fleming, Bromberg & Sunstein, for

8    the plaintiff ScanSoft.

9              MS. COLUMBIA:  Good morning, your Honor.  Sarah

10   Columbia and Bob Frank for Voice Signal.

11             THE COURT:  Now, as I understand it, the expert is

12   coming Monday?

13             MS. FLEMING:  That's correct, your Honor.

14             THE COURT:  Which is what's creating the crisis

15   here and the escalating piles of paper that I have been

16   receiving.  As I understand it, he would like to speak with

17   two independent experts.  I read the excerpt.  If there's a

18   question about that, I should talk to him.

19             I view there as being two questions.  One is

20   whether he gets to speak to an independent expert, and the

21   second is what that expert gets to see.  I have focused on

22   part one, which is that he gets to speak to an independent

23   expert designated by both sides because he's asked for it.

24   So that would be a modification of what I did because he's

25   asked for it.

1           Part two, which I did not intend to do, is expand

2    it so that the independent expert gets to look at the entire

3    source code for Voice Signal.  So that is why I'm here today,

4    to talk about the ramifications of allowing the expert to

5    talk to -- by which, I mean Dr. Ney -- to talk to one expert

6    from each side because apparently he feels that that would

7    facilitate his decision-making.  That doesn't mean that the

8    experts get to see the other side's source code, okay.

9           So, now, to the extent that some of it comes up in

10   passing in the way he articulates the question, that may be

11   an unfortunate by-product, and in that sense, I am opening it

12   up, but not that the independent expert gets to look at the

13   complete other side's source code.

14           Now, does this clarification help things?

15           MS. COLUMBIA:  Yes, your Honor.

16           MS. FLEMING:  If I may, your Honor, we do not

17   believe that it does help things.  First, with respect to

18   whether independent experts should be part of the neutral

19   expert procedure, there's no dispute about that.  Both sides

20   have said on the record that independent experts should

21   participate.

22           THE COURT:  Right, that's all I thought I was

23   doing.

24           MS. FLEMING:  The motion that we filed, your Honor,

25   that you did allow was to have our independent expert,

1  Richard Goldhor, to have access to the Voice Signal source

2  code.  And let me explain why --

3          THE COURT:  Well, all I meant was access in the

4  sense that if he asks a question about it, the expert can

5  answer; not that he gets to sit and read the whole thing.

6          MS. FLEMING:  If the neutral expert asks the

7  independent expert a question about Voice Signal

8  Technologies' source code, the independent expert is not in a

9  position today to answer that question.

10          THE COURT:  Well, that may be, that may be.  And it

11  may be that we're going to have to carefully craft a way for

12  Dr. Ney to use the independent expertise from both sides.

13  That may happen.  That's why I allowed it.  And to the extent

14  that he asks a question which gives a window on the voice

15  code, that may be inevitable, but that doesn't mean -- the

16  reason I did this whole procedure was not to give both side's

17  experts full, whole-hog exposure to the source code.  If some

18  comes up, it does, and I'm going to have to trust Dr. Ney on

19  that.  Am I pronouncing that correctly?

20          MS. COLUMBIA:  I think it's Ney, your Honor.

21          THE COURT:  Ney?  I have to write that down.  All

22  right, am I talking to him on the 11th, by the way?  Is that

23  the theory?  Because they never called back and confirmed, so

24  I --

25          MS. FLEMING:  The reason we didn't call back is,

1   Dr. Ney has been in transit since we got the call saying you

2   were available on the 12th of May, so he has not been in

3   contact with us.

4           THE COURT:  Do I write it in the calendar or not?

5   That becomes a critical question for me.

6           MS. COLUMBIA:  Yes, your Honor.  I think he had

7   asked to speak with you, and we'll confirm his availability,

8   but I think your availability soon after the May 8 meeting

9   would be very useful to talk with him.

10          THE COURT:  Someone needs to get back to my

11  secretary, who sort of went through panic mode when I told

12  her, "Oh, they're all talking about this date," and she said,

13  "No one's confirmed it with me."  So you really need to do

14  that, or I lose the spot.  It's not on the calendar, which is

15  a very dangerous place for you to be.

16          MS. FLEMING:  We'll give her a call and confirm

17  that it's on your calendar.

18          THE COURT:  Or at least have my secretary

19  tentatively write it in so it's reserved for you.

20          MS. FLEMING:  Your Honor, may I address the issue

21  that you raised with respect to --

22          THE COURT:  Yes.  I mean, that's why we did this

23  whole thing.

24          MS. FLEMING:  Well, your Honor, I agree, back then

25  that was why we did it, but things have changed.  And the

1  reason that they've changed is, this neutral expert procedure

2  we've been working under since the order in December has gone

3  as far as it can go.  It's run its course.  We have

4  designated counsel here for ScanSoft.  He is prepared to tell

5  you, your Honor, that he's taken this as far as he can go.

6         THE COURT:  I understand that.  You know, attorneys

7  aren't trained this way.  I mean, they have limited

8  training.  I understand.  That's why I'm willing to modify it

9  and allow some independent expert to answer questions.

10         MS. FLEMING:  But he can't answer the questions

11  Dr. Ney wants unless the independent expert has access to

12  their code.  Can I just explain?  The reason for that is,

13  Professor Ney has said on the record that he's uncomfortable

14  with the amount of source code he has to look at.

15         THE COURT:  When I hear from him, maybe I'll modify

16  it.  At this point I'm not willing to turn the whole order on

17  its head.  I thought what I was doing was allowing

18  independent experts to familiarize themselves with the basic

19  claims here, and to specify in better detail than counsel was

20  able to do -- I understand that -- what the claims were, the

21  alleged trade secrets, the things that you're worried about,

22  and maybe answer questions that Dr. Ney might have:  Well,

23  what about this?  Would you consider that to be X?  I'm

24  making it up because I -- and it may be that he's going to

25  ask certain questions coming from the code.  If he does, he

1   does.  And in that sense, your guy will have -- I assume it's

2   a guy, right?

3          MS. FLEMING:  Yes.

4          THE COURT:  -- will have access to the source

5   code.  I don't want that to be viewed as any kind of

6   violation, and that's why I allowed it.  But I had not

7   understood until I read their opposition that you want him to

8   sit down and read the entire source code.

9          MS. FLEMING:  Well, you are correct, your Honor,

10  that our independent expert will be able to answer all of

11  Dr. Ney's questions on our own source code.  That's fair and

12  that's true, and that should happen.  What Voice Signal has

13  asked by asking you to reconsider your order and to have

14  ScanSoft not have access to their source code is, there's no

15  ability in this case --

16         THE COURT:  You know, can I say one thing?  You

17  guys flip me motions and then tell me the meeting is May 8.

18  It looks like you just both want your respective experts to

19  be able to go in there and have a meeting with Dr. Ney, which

20  seems perfectly reasonable to me.  When you slip in there

21  suddenly -- wow, I mean, I'm going through a pile like this

22  every day you slip in there -- suddenly it's turning the

23  whole order on its head.  You know, that's not what I

24  intended, and that's why I'm holding the hearing here today.

25         MS. FLEMING:  Your Honor, what I'm concerned about

1   is that Monday's --

2           THE COURT:  I'm not doing it, I'm not doing it.  If

3   I talk to Dr. Ney on the 12th and I decide to change my mind,

4   maybe I'll be here.  But for the meeting on the 8th, they

5   should be there to answer questions about their own source

6   code and about the claims that you're making with respect to

7   the other guy's source code.  And then if he wants to ask

8   questions, I leave it up to him.  Okay, that's where we're

9   at.  If I decide after talking to Dr. Ney that he can't do it

10  that way, that there's a big gap, maybe I will have to

11  rethink the whole thing, but this is taking way too long.

12          Both sides have been a little bit involved here in

13  nitpicking each other to death and not trying to work things

14  through.  Maybe there are a ton of things that are being

15  worked through that I don't see, and maybe I'm being unfair

16  here, but I think at this point I am not going to let your

17  expert read the entire source code for the other side.  And I

18  add to that -- let me just say, are your people here from

19  Nuance or ScanSoft?

20          MS. FLEMING:  No, your Honor.

21          THE COURT:  I was horrified by that press release.

22  Were you involved with that?

23          MS. FLEMING:  We knew that the press release

24  issued.

25          THE COURT:  Well, how can you -- you're using this

1    litigation for business purposes.  That really is not

2    kosher.

3              MS. FLEMING:  Your Honor, if I may, both sides --

4              THE COURT:  Both sides should not do it.  I am now

5    issuing a direct order that no one can use anything about

6    this case and this procedure to gain a business advantage by

7    going to the press that way.  I mean, the way it looked

8    was -- maybe from an outsider, but I'm into circumstantial

9    evidence -- you put that in there, then you send Lehman

10   Brothers, and then you launch a suit in Texas.  That's what

11   it looks like, that I'm being used as a pawn in business

12   matters.  Now, maybe they're doing the same thing and you

13   haven't filed it.  I'm saying what I've seen that you've

14   done, and that's extremely troubling to me.

15             MS. FLEMING:  Your Honor, if I may, the business

16   issues are completely separate from this litigation.  The

17   distinct disadvantage in this case is that there's been no

18   discovery in the case; and every time we get closer to

19   resolving this on the merits, Voice Signal runs into court

20   and asks you to put a halt to it.

21             THE COURT:  No, I'm not putting a halt to it.  This

22   is moving forward.  The independent experts are going to go

23   to him and do whatever Dr. Ney wants them to do.  And if

24   Dr. Ney feels that there's a gap and he thinks that what I've

25   asked him to do is not doable, then I will address that.

1          MS. FLEMING:  Okay, I just respectfully suggest

2    that the meeting on May 8 will not go as far as it could,

3    your Honor, if we could have the ability to have access to

4    discovery.

5          THE COURT:  It may be.  Now, what about this Texas

6    suit?  Is that just the flip side of what we're doing here?

7    What's going on there?  Who brought that suit?  Is that your

8    firm?

9          MR. BELT:  No, your Honor.

10         THE COURT:  Who's the law firm involved in that?

11         MR. BELT:  O'Melveny & Myers in Los Angeles.

12         THE COURT:  And have you given them access to

13   anything we've done here?

14         MR. BELT:  No.

15         THE COURT:  I want a complete Chinese wall,

16   complete, and I want you to give me an affidavit saying

17   there's a complete Chinese wall.  I want nothing that's been

18   learned in this suit to go to that, nothing.

19         Now, I think it's nuts, and I don't know -- who's

20   the judge in the Eastern District?

21         MS. COLUMBIA:  Judge Folsom.

22         THE COURT:  I think it is forum shopping.  I think

23   it has nothing to do about Massachusetts.  It's just the

24   juries tend to return great verdicts in the Eastern District,

25   and they have good judges that know the law.  I don't know

1    that it's hiding.  It's well known.  Everyone is flocking to

2    the Eastern District of Texas because, A, the judges know the

3    law, and, B, the juries are very generous.

4            (Discussion off the record.)

5            MS. COLUMBIA:  I was just saying, your Honor, we

6    have filed a motion under 1404(a) in the Texas action asking

7    Judge Folsom to transfer venue to this court.

8            THE COURT:  Fine, and maybe he will and maybe he

9    won't.  I'm not going to enjoin him.  That's what the judges

10   do.  I'm not going to enjoin the prosecution of a suit down

11   there.  This happens.  It's actually common, not uncommon.

12   So I understand.  And I am very familiar with the facts and

13   circumstances of this case, and I am concerned about it.  But

14   at the very least, the following three things I'm ordering:

15   I'm denying the motion to enjoin the Texas suit, but I am

16   more than willing to take the suit if the judge down there

17   wants to transfer it up here.  But I do not make any finding

18   that it's for a nefarious purpose of trying to funnel

19   information from this suit down to the Texas suit.  I don't

20   have a basis for that, and I'm not going to do that right

21   now.  I think it's what you hear in these patent conferences,

22   that it's a hot patent court, okay.

23            Two, I am giving a direct order that neither side

24   shall go to the press and comment on this litigation.  I was

25   deeply troubled by what happened in that press release.  And

1  you may be right, there was one from the other side.  I don't

2  want this being used to depress other -- you're making a

3  representation to me that Voice Signal issued a press release

4  regarding some of my procedural orders here?

5         MR. BELT:  There was a press release the next day

6  from Voice Signal on Saturday in the Boston Globe.

7         MS. COLUMBIA:  I'm unaware of it, your Honor.  I

8  don't doubt Mr. Belt.

9         THE COURT:  All right, I want you both to

10 communicate this to your clients, and I give you a direct

11 order that neither side shall comment to the press about the

12 proceedings in this -- I don't want to make it too broad.

13 I'm talking only about the back-and-forth involving this

14 expert neutral procedure.  I mean, I'm not saying you can't

15 issue a press release if you start a new suit or something.

16 I'm talking about, I don't want this procedure being used for

17 business and competitive advantage, and it's just wrong.

18        Second, there will be a complete and absolute

19 Chinese wall between your law firm and O'Melveny.  I don't

20 want lawyers talking about the case together, and I don't

21 want any information from this suit going to that suit.

22        Now, if in fact it all comes up here, I'm not

23 against -- if I'm in control of what's happening so that I

24 think that it's just a question of lessening the expense of

25 discovery, I'm going to probably lift that Chinese wall.  But

1    I can't be sure about what's happening, and they've made

2    certain allegations, and I want to make sure -- while I'm

3    sure counsel is playing aboveboard, I was really troubled by

4    the sequence of events of a press release and then an

5    immediate visit by Lehman Brothers and then a lawsuit in

6    Texas.   That's troubling.

7              MR. BELT:   I will just say, your Honor, the lawsuit

8    in Texas is different patents, and it's not the trade secrets

9    here, and it's not the '966 patent.

10             THE COURT:   I wouldn't know.   I am simply saying,

11   that sequence of what happened in March is really a problem

12   for me because it makes me think that you're using me as a

13   pawn for business advantage.   I wasn't born yesterday.   I

14   know this happens.

15             MR. BELT:   Yes, I hear what you're saying, your

16   Honor.   I just want to also make sure that the record

17   understands that I would disagree with that.   We're certainly

18   not doing that, and this is really a legitimate case to

19   protect our intellectual property.

20             THE COURT:   Oh, it may be.   I've never said this

21   case.   My instant case in front of me may well be.   I don't

22   know.   That's why I have this expert procedure.   It's been

23   elaborate, it's been expensive, it's been time-consuming, and

24   I want it to be over.   So I would prefer if you conferred and

25   tried to work things out.

1          Why couldn't you both just agree on each other's

2     independent experts?  Why did it have to come to me?  And

3     then you could have narrowly defined the issue and focused

4     it.  You're moving for me to reconsider my order that they

5     get full access to the source code.  You all raise a big

6     emergency, he's coming in May 8, which is why I didn't wait

7     14 days, which would have been nuts because it was after

8     May 8.

9          MR. BELT:  Your Honor, well, first of all, the

10    timing of our motion was because we got an E-mail from

11    Dr. Ney saying, "I'd like independent experts there."  And as

12    far as independent experts go, we do agree to their

13    independent expert, Dr. Wooters; he can be there.  What we

14    don't agree to is for VST to bring its fact witnesses, which

15    are the employees of VST.

16          THE COURT:  I'm giving you one independent expert

17    apiece who will sign onto whatever the protective orders have

18    been.  That's what I'm giving you.

19          MR. BELT:  And I think that's reasonable.

20          THE COURT:  And if that's inadequate, I will talk

21    to Dr. Ney on the 11th and see what we can find out.  I don't

22    know how else to do this because when -- was it you who gave

23    me the ream of materials?  I can't understand it.  I thought

24    Voice Signal's suggestion was a perfectly valid one.  It

25    turns out, even your expert lawyers don't understand it, so

1  that's why we need the independent experts and Dr. Ney.  So I

2  can't figure out whether there's enough there or whether this

3  is just a sneaky way of getting competitive information.  I

4  don't know, don't know.  I don't know another way of doing

5  this.  This is expensive, this is time-consuming, and I want

6  it to be over so that we can either move on with this or end

7  it.

8          MS. COLUMBIA:  There is one more issue, your Honor,

9  if I may.

10         THE COURT:  Yes.

11         MS. COLUMBIA:  On our side, for the independent

12 expert, Mr. Wooters is not available.

13         THE COURT:  On the 8th?

14         MS. COLUMBIA:  On the 8th.  So we had retained a

15 gentleman named Dr. Byrne, who's in Cambridge in the U.K.  We

16 brought him over here before the last meeting with Dr. Ney

17 and got him up to speed because, obviously, the only people

18 who really know the Voice Signal code are the people at

19 Voice Signal.  So we spent time with Dr. Byrne, got him

20 familiar with the Voice Signal code, had him review the

21 first-year code produced to Dr. Ney; brought him to the

22 March 24 meeting with Dr. Ney thinking he might be able to be

23 useful to answer Dr. Ney's questions.  ScanSoft objected.

24 Rather than take time while Dr. Ney was here to fight that

25 out with him, we put Dr. Byrne in a conference room to read

1   the paper for the day, and we did what we could do without

2   him.

3           THE COURT:  Do you have a problem with Byrne?

4           MR. BELT:  Yes, we do, your Honor.

5           THE COURT:  Why?

6           MR. BELT:  He wrote part of the code.  His name is

7   all over the first-year documents.  He's a fact witness --

8           THE COURT:  He wrote part of their code?

9           MR. BELT:  Their code he wrote.

10          THE COURT:  So what?

11          MR. BELT:  Because it then becomes a fact

12  investigation, your Honor.  And if he's going to talk about

13  the development of the code, we want to be able to

14  cross-examine him and --

15          THE COURT:  Excuse me.  Overruled.  You can have

16  him there.  Just I want to get this over with, over with.

17          MR. BELT:  Also he's a friend of Dr. Ney's.

18          THE COURT:  Overruled.  He's not a friend.  He

19  knows him at a conference.  They all know each other.  We

20  went through this last time.  You each get an independent

21  expert.  They get to talk to Dr. Ney.

22          MR. BELT:  He is joined at the hips -- I'm sorry,

23  your Honor, but he is joined at the hips with VST.  His name

24  is on --

25          THE COURT:  Does he have a financial interest?

1          MR. BELT:  Yes.  He's a paid consultant and has

2    been before this case.

3          THE COURT:  Does he have a stock interest?

4          MS. COLUMBIA:  No.  He was a part-time consultant

5    in 2001 and early 2002.  He has no financial interest

6    whatsoever in the company.

7          THE COURT:  Overruled.  So I want it to be over,

8    and I want to talk to Dr. Ney, and if he feels that he can't

9    do it, then I'm going to have to go back to your request.

10          MR. BELT:  Okay, because we do have the concern

11    about Dr. Byrne.  Because he wrote part of the code, we would

12    ask that in any conversation that Dr. Byrne has with Dr. Ney,

13    that we are allowed to be there.  In other words, that

14    section does not get to be --

15          THE COURT:  I leave that procedure up to Dr. Ney.

16    I need to get through the discovery.  Everything is a pitched

17    battle.  I get -- what adjective? -- overwrought motions from

18    you.  I get a sequence of events that I found so troubling,

19    which basically does cast a cloud over what you're doing.  It

20    does.  It makes it seem like you're just trying to buy the

21    company and you're trying to whack them into shape.  If you

22    want to buy it, fine, it's a good way to settle.  I often

23    have patent cases that settle.  But I don't want to be used

24    as part of it to depress the stock value.

25          MR. BELT:  I hear you, your Honor, and I will say,

1  this case was brought to enforce our intellectual property,

2  and in fact it was brought long before.  I mean, it's just

3  not connected.

4          THE COURT:  I believe that initially speaking.

5          MS. COLUMBIA:  It was connected with the last

6  attempt to acquire the company.

7          THE COURT:  Excuse me.  I'm not sure I agree with

8  that.  I understand why they're worried:  Their top people go

9  over and work for your people.  I understand why that raises

10 a concern if they think that there are similar products and

11 that it will be using source code.  I am not making a finding

12 as far as the original filing.  But I am, you know, like the

13 footprints in the snow, circumstantial evidence.  When I

14 issue a ruling and I see a one-sided press release, and then

15 I see Lehman Brothers go in, and then when I see that fails,

16 I see a suit in Texas all within two weeks, what inference

17 can I draw?

18         MS. FLEMING:  Well, all the while, your Honor, we

19 still don't have discovery in the case, and two years has

20 past.  We still don't even know if we have the full source

21 code from Voice Signal.

22         THE COURT:  You know what?  I've done what I can

23 do.  You both trust Dr. Ney, and so do I.

24         Now, here's the big issue:  I don't know what I can

25 accomplish on the phone on the 11th.  I don't know enough

1   about -- I don't remember enough for starters about the case,

2   and I'm viewing that as a preliminary discussion with him.

3   And it may be that -- I don't know if there's another --

4   maybe you can get on the phone with Robert and maybe have a

5   more fulsome time with him in person.

6        MS. COLUMBIA:  We can discuss that with him on

7   Monday.

8        THE COURT:  What would be useful?  Because I'm not

9   sure, verbally, he may just simply be asking you what format

10  it makes sense for him to report to me.

11       MS. COLUMBIA:  I will say, Judge, his English is as

12  good as mine, so I don't think you'll have any language

13  difficulties.

14       THE COURT:  Well, that's actually very good to

15  know.

16       MS. COLUMBIA:  Sometimes on the telephone, language

17  difficulties can be magnified, and I just wanted to let you

18  know that his English is perfect.

19       THE COURT:  For me, the bigger issue is going to be

20  understanding it well enough, because you've both made the

21  point, and I think it's a hundred percent fair, that I make

22  the decision and not he, and that he not be the one to be the

23  ultimate decision-maker.  And so I just need to -- they're

24  making fun of me, but -- you know the President's recent

25  statement, "I'm the decider"?  It's become well known in my

1    office.

2         So I will be the decider, but I need to understand

3    it, and I don't know that I can do that over the telephone.

4    And my thought would be some sort of a written report, and

5    then having him -- this is my thought -- come over and

6    explain it to me if I don't understand it.

7         MS. COLUMBIA:  I'm sure that that can be arranged,

8    your Honor.

9         THE COURT:  That's how I've thought about it.  And

10   then all I do at that point is let it go forward.

11        Now, I have another issue with you.  I understand

12   that Judge Alexander disqualified Goodwin Procter.

13        MS. FLEMING:  Yes, and there were objections

14   filed.

15        THE COURT:  So has she issued a written opinion

16   yet?

17        MR. BELT:  I don't think I've seen that.

18        MS. FLEMING:  I don't think there was an opinion.

19        MR. BELT:  She did say in her ruling that a

20   memorandum would be coming.

21        THE COURT:  All right, and so you just want to be

22   able to -- will you be taking the oar on that, or will

23   Goodwin Procter?

24        MS. FLEMING:  Goodwin Procter, your Honor.

25        THE COURT:  You know, actually, Judge Alexander and

1    I talked because we went back and forth on whether it was

2    more appropriately addressed as a report and recommendation

3    or whether it was a nondispositive motion.  I thought that

4    was actually a little neat threshold issue, so -- I mean, I

5    actually didn't for sure know the answer to that, but it may

6    be nondispositive.  And so some help when that memo comes out

7    might be on whether it's an abuse-of-discretion standard or

8    whether it's a de novo.  She and I batted that around.

9    That's just one of those neat little things that I get

10   interested in on how I think about it.  But I do know she had

11   an evidentiary hearing, right?

12          MR. BELT:  She did.

13          THE COURT:  So at least with respect to the

14   findings of fact, that's probably going to be the record.  So

15   then we can address that then.

16          MS. COLUMBIA:  Your Honor, may I raise two

17   additional things before we go?

18          THE COURT:  Yes.

19          MS. COLUMBIA:  One is, you said at the beginning

20   that you were going to require some sort of affidavit from

21   Bromberg & Sunstein with respect to communications with the

22   O'Melveny firm.  The piece of the time line that comes before

23   the press release is, of course, our production of the source

24   code.  And I understand what your rulings are, but we are

25   concerned about the timing of the Texas case vis-a-vis our

1  production of the source code.

2          THE COURT:  Oh.  When do you think you can get to

3  them and just guarantee that nothing has been sent from the

4  company?

5          MS. FLEMING:  We have a declaration from

6  Mr. Lawrence, who is the only person who has had access to

7  Voice Signal's source code and source code documentation.  We

8  have that, and we're prepared to submit that today.

9          THE COURT:  All right.  Well, have I got it

10  already?

11          MS. FLEMING:  It's right here.  No.  Mr. Lawrence

12  signed it this morning.

13          THE COURT:  All right.

14          MS. FLEMING:  But I do want to say for the record,

15  your Honor, there is not a shred of evidence in that motion

16  that suggests that Bromberg & Sunstein has done anything

17  outside of the provisions of the protective order or the

18  neutral expert procedure, and to suggest otherwise, your

19  Honor, quite frankly, is a Rule 11 issue from my perspective.

20          THE COURT:  As long as I've got verification here

21  that nothing's happened.  And could you file an affidavit in

22  the next week or so saying that you've sort of set up a

23  Chinese wall between yourself and O'Melveny?

24          MS. FLEMING:  Yes, we will do that, your Honor.

25          MS. COLUMBIA:  Your Honor, if I could, the second

1    issue just relates to Dr. Byrne.

2              THE COURT:  So have you seen a copy of this?

3              MS. COLUMBIA:  I have not, your Honor.

4              MR. BELT:  We just got their motion last night.

5              THE COURT:  I understand, I understand.  Do you all

6    confer before you file these things so you can narrow --

7              MR. BELT:  We do on our side.

8              THE COURT:  Why don't you confer.

9              MS. COLUMBIA:  We do, your Honor, and generally

10   speaking, it's not fruitful, in both directions.  And as your

11   Honor correctly observes, there are things that we work out

12   that don't get to you, but on the things that do get to you,

13   we're very rarely able to limit the disputes.

14             THE COURT:  Well, have you given them a copy of

15   this now, this affidavit?

16             MS. COLUMBIA:  I was just handed it, your Honor.

17             THE COURT:  Well, why don't you sit down for a

18   second and read it.

19             (Pause.)

20             MS. FLEMING:  Your Honor, just in the interest of

21   full disclosure, let me be clear that Mr. Lawrence's

22   affidavit does say that we did give the source code to the

23   independent expert yesterday, or the 3rd, whatever the 3rd

24   was, and that was based on your ruling.  He hasn't done

25   anything --

1          THE COURT:  Did you know what was being challenged?

2          MS. FLEMING:  Well, they didn't file until 4:00.

3          MS. COLUMBIA:  I wrote counsel a letter on the 2nd

4   letting counsel know that we were moving to stay and

5   asking --

6          THE COURT:  Why didn't you tell me that while we

7   were having the discussion -- stop.  Why didn't you tell me

8   that when I just did the order?  We just had a 15-minute

9   discussion about it.  I didn't know you had already turned it

10  over to Goldhor and he hasn't done anything with it yet.

11         MS. FLEMING:  He hasn't done anything with it.

12         THE COURT:  I want an affidavit from him saying he

13  hasn't looked at it.

14         MS. FLEMING:  That's exactly what we'll do.

15         THE COURT:  Fine, all right.  You know, you should

16  have told me that rather than sitting on this thing.  I want

17  to know these things.

18         MS. FLEMING:  Your Honor, we're here today because

19  they filed this motion last night.

20         THE COURT:  I know, but we had this discussion

21  20 minutes ago.  Twenty minutes ago we had this whole

22  discussion, and you didn't breathe a word that he already had

23  it.  I didn't know that.

24         MS. FLEMING:  Your Honor, he has not done anything

25  with it.

1          THE COURT:  Maybe, but just tell me it.  I just

2   want to know.  I want to believe that you're telling me

3   everything.  And so when we had this whole discussion about

4   it 15, 20 minutes ago about how I only intended access to the

5   extent that Dr. Ney thought it was appropriate to have

6   access, you should have said, "Oh, you know, by the way,

7   we've already relied on this.  What should I do about it?"

8          MS. FLEMING:  Well, your Honor, I would immediately

9   fix it.  Obviously your order says --

10          THE COURT:  Tell me.

11          MS. FLEMING:  Understood, your Honor.

12          THE COURT:  Just tell me.

13          MS. FLEMING:  Understood.  I just want the Court to

14   be clear that nothing has been done with it other than the

15   delivery of it.

16          THE COURT:  Fine.  I don't want him to look at it.

17   I want him to return it.

18          MS. FLEMING:  Understood.

19          THE COURT:  And to the extent he has looked at it,

20   I want to know the extent to which he's looked at it.

21          MS. FLEMING:  And we'll submit an affidavit to that

22   effect.

23          THE COURT:  And I don't want him to tell a soul

24   about it if he's looked at it.

25          MS. FLEMING:  Understood.

1          THE COURT:  And I may disqualify him if he's looked

2  at it.  So does anyone know if he's looked at it?  Is it your

3  impression he's not looked at it?

4          MS. FLEMING:  It's my impression he has not looked

5  at it, your Honor.

6          THE COURT:  Who's here right now?  Who's worked

7  with him?

8          MS. FLEMING:  Mr. Lawrence is here.

9          THE COURT:  Mr. Lawrence, has he looked at it?

10         MR. LAWRENCE:  Not to my knowledge.

11         THE COURT:  All right, get on the phone as soon as

12  you leave here, and I want an affidavit that he hasn't.  Who

13  are you, this woman back there?

14         MR. LAWRENCE:  That phone call has already been

15  made.  We told him, "Don't do anything."

16         THE COURT:  Perfect, okay.

17         MS. FLEMING:  Thank you, your Honor.

18         THE CLERK:  Court is in recess.

19         (Adjourned, 10:35 a.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )

4  DISTRICT OF MASSACHUSETTS    ) ss.

   CITY OF BOSTON               )

5

6

7

8           I, Lee A. Marzilli, Official Federal Court

9  Reporter, do hereby certify that the foregoing transcript,

10 Pages 1 through 26 inclusive, was recorded by me

11 stenographically at the time and place aforesaid in Civil

12 Action No. 04-10353-PBS, ScanSoft, Inc. Vs. Voice Signal

13 Technologies, Inc., et al, and thereafter by me reduced to

14 typewriting and is a true and accurate record of the

15 proceedings.

16          In witness whereof I have hereunto set my hand this

17 5th day of May, 2006.

18

19

20

21

22

23          _____

            LEE A. MARZILLI, CRR

24          OFFICIAL FEDERAL COURT REPORTER

25