# EXHIBIT G

2

PRESENT (Continued):

    Choate Hall & Stewart LLP
       (by Robert S. Frank, Jr., Esq.,
       Sarah Chapin Columbia, Esq. and
       Christopher J. McKenna, Esq.)
       Two International Place, Boston, MA 02110,
       for the Defendants.

ALSO PRESENT:  Richard Goldhor, Ph.D.
              William Byrne, Ph.D. (via telephone)


    (Anne H. Bohan, Registered Diplomate Reporter)

                *  *  *  *  *

3

I N D E X

Testimony of:                          DIRECT      CROSS

Richard Goldhor, Ph.D.
(By Mr. Bromberg)                         5
(By Mr. Frank)                                        12

*    *    *

E X H I B I T

EX. NO.                                              PAGE

1      Declaration of Richard Goldhor,          6
       Ph.D.

*    *    *

M E E T I N G   A G E N D A

1)     Group Session                              34

2)     *Ex parte* meeting with ScanSoft          57
       counsel, Dr. Goldhor and Dr.
       Ney

3)     *Ex parte* meeting with Dr.              101
       Ney and Designated Counsel
       Lawrence

4)     *Ex parte* session with VST             111
       counsel, Dr. Byrne and Dr.
       Ney

5)     Ex parte meeting with Dr.               177
       Ney and Designated Counsel
       McKenna

6)     Group session                            192

7)     *Ex parte* presentation with VST        198
       counsel and Dr. Ney

8)     *Ex parte* meeting with Dr.             220
       Ney and Designated Counsel
       McKenna

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

4

M E E T I N G   A G E N D A, Continued

|  |  | Page |
|---|---|---|
| 9) | *Ex parte* meeting with VST counsel and Dr. Ney | 234 |
| 10) | *Ex parte* meeting with ScanSoft counsel, Dr. Goldhor and Dr. Ney | 241 |
| 11) | Group session on open issues | 283 |

5

```
 1              P R O C E E D I N G S
 2          (Present in the room are all counsel
 3          together with Dr. Goldhor and Dr. Ney)
 4          MR. BROMBERG:  Good morning, Professor Ney.
 5  We have a procedural matter to deal with before we
 6  get started with you, and we thought we ought to
 7  excuse you for five or ten minutes while we dealt
 8  with that issue, and then we will bring you back in
 9  the room to conduct the proceedings.
10          DR. NEY:  No problem.
11          (Dr. Ney left the room)
12              RICHARD GOLDHOR, Ph.D., Sworn
13                 DIRECT EXAMINATION
14  BY MR. BROMBERG:
15  Q.    Would you state your name for the record,
16  sir.
17  A.    Richard Goldhor.
18  Q.    How do you spell your last name?
19  A.    G-o-l-d-h-o-r.
20  Q.    Are you a doctor?
21  A.    I am a doctor.
22  Q.    You have a Ph.D., correct?
23  A.    I do.
24  Q.    Dr. Goldhor, I'm going to hand you a
```

09:47:03  5
09:47:16 10
09:48:21 15
09:48:27 20

6

three-page document that is captioned "Declaration
of Richard Goldhor" and ask you if you would look at
that, sir.

    A.   (Witness reviews document)  Okay.

09:48:51    Q.   Is that your signature on the third page?

    A.   Yes, it is.

    Q.   When did you sign that?

    A.   I signed that this morning.

    Q.   Is everything in that document true and
09:49:00 correct, to the best of your knowledge?

    A.   Yes, it is.

    Q.   May I have it back for a moment, please.

    A.   Sure.

    MR. BROMBERG:  Let me ask the reporter to
09:49:09 mark that.

         (Document marked as Goldhor

         Exhibit 1 for identification)

    Q.   Dr. Goldhor, could you look at Paragraph 4
of your declaration which reads:  "In the late
09:49:47 afternoon of May 3rd, I received from Mr. Lawrence a
copy of VST's submissions to the Neutral Expert."
Do you see that, sir?

    A.   Yes.

    Q.   Who is Mr. Lawrence?

7

A.    That's Brad Lawrence down at the end of the
table.   He's the Designated Counsel for ScanSoft.

Q.    Can you describe for us, please, what you
received on that day, to the best of your
recollection.

A.    Yes.   It was a box that had been delivered
by courier, and in the box there was a cover letter
from Mr. Lawrence, and there were four items in it,
four documents.

Q.    Do you recall what those documents were?

A.    I only looked at one of the --

MR. FRANK:   No, that's not the question.
What were those items?

A.    They were four printed items.   I can't
comment on three of them, because I didn't look at
them, I didn't examine them.   I did examine one
item, which was a three-ring binder that had a copy
of VST's response or arguments about a previous
brief from ScanSoft to Professor Ney.

Q.    Can you describe, Dr. Goldhor, what you
looked at in that binder, sir.

A.    Yes.   The binder contained this set of
arguments and also a set of appendices.   I actually
didn't have very much time, so I chose to just look

8

1    at that document of the four things in the box, and

2    I just read the main part, sort of skimmed through

3    the main part of this document.  I did not examine

4    any of the appendices.

09:51:50 5    Q.    In skimming through, do you recall what you

6    saw in that document, sir?

7    A.    Yes.  It was a comment on the three areas

8    of technology that we had identified in the original

9    brief, and it was VST's comments on each of those

09:52:12 10    arguments, which essentially were comments to the

11    effect of, We don't do the same thing that ScanSoft

12    does in these three areas, we do something

13    different.  And there were also arguments, as I

14    recall, to the effect of, Even if we were to do

09:52:32 15    these, implement these same algorithms, that they're

16    not trade secrets.

17    Q.    Do you recall, Dr. Goldhor, whether or not

18    that document that you reviewed had any excerpt of

19    VST source code in it?

09:52:53 20    A.    I don't really have a clear memory other

21    than there was at least one place, I think one place

22    in which there was some source code.  I don't

23    actually remember at this point what that was.  It

24    was just something kind of in the line of the same

9

1    sort of arguments that I described.  But I don't

2    recall the sort of point of the code.

3        Q.    Now, have you told us everything about what

4    you did to look at any material that was in that

09:53:30  5    box?

6        A.    Yes, that's correct.  As I say, I just

7    skimmed through the main part of this one document

8    out of the four.  I then took that document and

9    another folder with me to the meeting that we had

09:53:50 10   the next day, which would have been last Thursday,

11   and I took the other documents and I put them in a

12   locked storage area.

13        Q.    Did you look at those -- at that document

14   -- well, strike that.  At a certain point you

09:54:10 15   returned that document and the other materials to my

16   office, correct?

17        A.    Yes, that's correct.

18        Q.    When did you do that, sir?

19        A.    That was on Friday afternoon.  I received a

09:54:19 20   phone call -- several phone calls Friday morning

21   from your colleague saying not to look at it anymore

22   and to return it, and I packed it all up and drove

23   down to your office and returned it.

24        Q.    Did you look at any of those documents,

10

1    other than what you've already described?

2        A.    The only other thing that I looked at was

3    on Thursday, at your offices.  One of the other four

4    documents was a slim folder that had basically, I

09:55:06  5    think, a summary.  What I saw was a table that

6    summarized the CDs that had been given to Professor

7    Ney, sort of listed CDs 1 through 6, and a short

8    description in terms of really just of a root of a

9    file specification.  And Brad and I looked at those.

09:55:35 10        Q.    Now, your declaration says that you did

11   pick up a laptop at my office.

12        A.    Yes, that's correct.

13        Q.    When was that, sir?

14        A.    That was Thursday afternoon.

09:55:49 15        Q.    Can you tell us what you did with that

16   laptop from the time it came into your possession.

17        A.    Yes.  So, basically, at your office with

18   the Designated Counsel, we looked at the file

19   structure.  Most of the discussion was focused

09:56:15 20   around that one table from the VST material that I

21   had gotten on Wednesday and sort of pointing out

22   where on the hard drive of the laptop the

23   corresponding material could be found.  I did not

24   look at any source code from that laptop, either at

1   that time in your offices with Mr. Lawrence or later

2   when my conversation with Mr. Lawrence was

3   completed.

4            I left your offices, I returned out to

09:56:58 5   Bedford where my offices are, and I spent probably

6   about an hour looking and trying to understand what

7   my options were for doing a thorough examination of

8   the source code, and in the course of doing that I

9   looked at the system configuration.  But, again, I

09:57:24 10   did not look at any source code, I did not attempt

11   to look at any source code.

12       Q.   How about on Friday?

13       A.   Friday morning I attended a funeral, and

14   when I got back to my offices -- oh, excuse me, let

09:57:39 15   me go back just a little bit.  At the end of the day

16   on Thursday, I took the laptop and I locked it up in

17   a storage room that I had along with other documents

18   that I received on Wednesday.  Then on Friday

19   morning I had a funeral, I was not in the office at

09:57:55 20   all until something like 12:15, 12:30.  I sat down

21   at my desk, checked my phone messages, found the

22   phone messages from your colleagues, and packed

23   everything up in the trunk of my car and came down

24   to your offices.

12

 1          MR. BROMBERG:  Thank you, Dr. Goldhor.

 2                    CROSS EXAMINATION

 3     BY MR. FRANK:

 4          Q.   Dr. Goldhor, I understand that you received

09:58:26 5     a call on May 2nd?  Tuesday, May 2nd?

 6          A.   Um-hum.

 7          Q.   From whom did you receive that call?

 8          A.   That was from Lisa Fleming.

 9          Q.   What did Ms. Fleming say to you?

09:58:37 10         A.   She said that -- the nearest that I can

11     recall, she basically said that a request to the

12     Court had been granted that would give me access to

13     the VST source code, that I would be receiving some

14     documents the following day, it would be sent out by

09:59:02 15     courier, and that I could now have access to this

16     laptop that VST had provided the Designated Counsel.

17     We talked about how I would get that.

18               We concluded that since I would be coming

19     down, there was already a meeting planned for me to

09:59:22 20     come down Thursday morning, that I would pick up the

21     laptop at that point.  That was about it.

22          Q.   Did she tell you what she wanted you -- or

23     did she ask you to do something with respect to the

24     materials that you would be receiving?

13

1       A.    Not really.  The only discussion along

2   those lines was my saying, "You understand I'm not

3   going to have a chance to look at the source code,

4   I'm not going to have any opinions about the source

09:59:50  5   code for the meeting with Professor Ney on Monday."

6   And she said, "Oh, yes, I understand.  That's for

7   afterwards."

8       Q.    Did she ask you -- before you said you

9   would not have opinions for Monday, did she ask you

10:00:03 10   to examine the source code?

11      A.    No, sir, she didn't.  That was just my

12   trying to make sure that her expectations weren't

13   different from mine.

14      Q.    So you want to leave it that she told you

10:00:13 15   that you would be receiving the source code but that

16   she did not ask you to do anything with the source

17   code?

18      A.    Yes, that's correct.

19      Q.    She told you also that you would be

10:00:24 20   receiving briefing materials?

21      A.    Yes, that's right.

22      Q.    Did she tell you that there was any

23   restriction on your use of the briefing materials?

24      A.    She didn't explicitly say, as far as I

14

1    recall.  It was my understanding that all this was

2    highly confidential information and that I needed to

3    treat it with the same sort of respect and degree of

4    confidence that I was treating the ScanSoft

10:00:59 5    material.

6        Q.    Did she ask you to review the materials

7    that would be sent to you?

8        A.    No, sir.  I think that that was sort of

9    understood as the long-term goal, but at this point

10:01:14 10    I know that I was focused, and I believe that she

11    was focused, on this meeting today with Professor

12    Ney.  And it was my desire, and I made it clear that

13    she agreed and had the same expectation, that

14    working with the VST material was something that was

10:01:31 15    going to happen afterwards.

16        Q.    What did she say?  I'm not asking for your

17    understanding; I'm asking for what she said.

18        A.    It's what I already told you, that this

19    court order had been granted and that this material

10:01:46 20    was coming.

21        Q.    Now, I take it that on Wednesday, you

22    received a box containing four items plus a cover

23    letter?

24        A.    Yes, that's correct.

15

1    Q.    Do you have the cover letter?  This is Mr.

2 Lawrence's cover letter?

3    A.    Yes, that's right.

4    Q.    What was the substance of what was said in

10:02:13 5 the cover letter?

6    A.    It was mostly just, as I took it, kind of a

7 formal accounting for the record of what the

8 contents would be.  And it focused my attention on

9 two of the documents rather than the other two.  One

10:02:32 10 of the things that it said, this is probably the

11 thing to read first, was this VST argument that I

12 have already described.

13        MR. FRANK:  Do we have the cover letter in

14 the room?

10:02:51 15        MR. LAWRENCE:  Are we on the record?

16        MR. FRANK:  Yes, we're on the record.  And

17 the record should show I've turned to Mr. Lawrence

18 and asked him whether we have the cover letter in

19 the room.

10:02:58 20        MR. LAWRENCE:  I do not.

21        MR. FRANK:  Does Bromberg & Sunstein have

22 the cover letter in the room?

23        MS. FLEMING:  I'm looking.  We do not.

24        MR. FRANK:  Are you prepared to provide us

16

1   with a copy of the cover letter?

2           MR. BROMBERG:  Well, if we can come up with

3   a copy, we'll provide it to you.

4           MR. FRANK:  Well, I suspect the copy

10:03:22 5  exists.  Are you prepared to provide us with a copy,

6   assuming that it has not been completely erased from

7   the computer system?

8           MR. BROMBERG:  Yes.

9   BY MR. FRANK:

10:03:36 10  Q.   Now, on Wednesday, as I understand it, one

11  of the things that you looked at was a notebook that

12  had a number of attachments.

13      A.   Yes, sir.

14      Q.   I'm holding it up (exhibiting document).

10:03:53 15 Without asking you to review it in detail, is it

16  correct, it is Voice Signal's March 24, 2006

17  submission to the Neutral Expert?  Are the materials

18  that I'm holding up the notebook that you received

19  on my representation?

10:04:11 20  A.   It looks similar, yes.

21      Q.   Is it correct that you read the discourse,

22  which consists of 18 pages and is at the beginning

23  of the notebook?

24      A.   That sounds about right.

17

1      Q.   And did not read the various -- anything at

2  all in any of the tabbed sections A through K?

3      A.   Yes, that's correct.

4      Q.   Now, the part that I've called "the

10:04:44 5  discourse," did you receive a redacted version of

6  that document or an unredacted version of that

7  document?

8      A.   I believe it was unredacted.

9      Q.   Is it correct that you read the entire

10:04:59 10  document?

11      A.   I would say I skimmed through it.

12      Q.   How long did you spend reading that

13  document?

14      A.   Maybe 20 minutes.

10:05:10 15      Q.   Did you observe in it lines of source code?

16      A.   I'm a bit embarrassed by this.  My memory

17  is that there was one chunk of source code.

18      Q.   Did you read that source code?

19      A.   I probably skimmed through it.  I don't

10:05:30 20  remember treating it any differently from any of the

21  rest of the discourse, as you've described it.

22      Q.   Did Mr. Lawrence or anyone else tell you

23  that you should not look at any of the materials

24  that were in the box that Mr. Lawrence sent to you?

1      A.    No, they didn't.

2      Q.    You said that you then went to Bromberg &

3  Sunstein on Thursday of last week?

4      A.    Thursday, that's correct.

10:06:07 5      Q.    And you said you took the notebook and you

6  said another folder.

7      A.    Yes, a manila folder, which was sort of the

8  second of the four items in the box.

9      Q.    That was Voice Signal's submission of April

10:06:26 10  10th containing what I would describe as a roadmap

11  through the source code that was provided to

12  Professor Ney, correct?

13      A.    That description sounds compatible with the

14  one page that was all that I really focused on, and

10:06:47 15  I hadn't read any of that stuff at all until I got

16  to the meeting on Thursday.  At the end of the

17  meeting on Thursday, as I said, Mr. Lawrence and I

18  examined one page, which contained a chart listing

19  six CDs and a short description of the contents of

10:07:07 20  each of those six CDs.

21      Q.    Did you look at other charts?

22      A.    No.

23      Q.    Did you read the text of that submission?

24      A.    The text of that chart I read, yes.

19

1     Q.    But did you read the rest of the text?

2     A.    No.

3     Q.    Did you read the rest of the text at any

4     time?

10:07:26  5     A.    No, sir, I didn't.

6     Q.    How long were you -- who was present at

7     your Bromberg & Sunstein meeting on Thursday of last

8     week?

9     A.    The attorneys that are here today.

10:07:45 10    Q.    All four?

11    A.    Plus Jay Sandvos, yes.

12    Q.    So it would be Mr. Bromberg -- I beg your

13    pardon.

14    A.    Excuse me.  I may be incorrect about Erik

10:08:04 15   being present.

16    Q.    Mr. Bromberg, Ms. Fleming, Mr. Lawrence and

17    Mr. Sandvos?

18    A.    Yes.

19    Q.    How long did that meeting last?

10:08:17 20   A.    It lasted for probably four hours or so.

21    Q.    So you spent four hours.  In fairness, I

22    see some conversation on the other side of the

23    table.  Are you confident that Mr. Bromberg was

24    there?

20

1       A.    No.   I'm sorry.   We've had several meetings

2  and I may be mistaken about that.   Let me start

3  again.

4            Ms. Fleming was there, Mr. Lawrence was

10:08:46  5  there.   Excuse me.   Courtney Quish was there, Jay

6  Sandvos was there.

7       Q.    Now, that meeting you said lasted about

8  four hours; is that correct?

9       A.    Right.

10:09:10  10       Q.    When did it begin?

11       A.    It began a little bit after ten o'clock.

12       Q.    And continued until sometime?

13       A.    Sort of midafternoon, right.

14       Q.    Who is Jay Sandvos?

10:09:30  15       A.    An attorney at Bromberg & Sunstein.

16       Q.    Would you tell me, please -- withdrawn.   Is

17  it correct that you were on that occasion given a

18  laptop containing the VoiceSignal source code that's

19  been produced in this case?

10:09:57  20       A.    Yes, that's correct.

21       Q.    Did you remove that laptop from Bromberg &

22  Sunstein's offices?

23       A.    Yes, I did.

24       Q.    Did you discuss with the people you

21

1   identified at Bromberg & Sunstein your observations

2   with respect to the portion of the March 24th

3   submission that you had read?

4       A.    No, sir.  The VST material was not the

10:10:29  5   subject of the main part of the meeting.

6       Q.    Without telling me in detail, tell me what

7   the subject of the main part of the meeting was.

8       A.    Today's meeting.

9       Q.    But I take it there was some discussion

10:10:45 10   about the VoiceSignal source code and what it

11   showed, correct?

12       A.    No, there really wasn't.

13       Q.    How much time did you spend with Mr.

14   Lawrence going over the chart that you described?

10:11:06 15       A.    Well, the chart was part of a discussion

16   that lasted, I'd say, 45 minutes, maybe in terms of

17   total elapsed time an hour.  It was at the end of

18   the meeting after all the attorneys and other people

19   had left.

10:11:31 20       Q.    Tell us what was said between you and Mr.

21   Lawrence in as much detail as you can recall during

22   that hour period.

23       A.    I don't have any detailed recollection of

24   the actual dialogue.  I can tell you that the effect

22

of it was to give me an overview of the organization

of material on the laptop.  There was also a

discussion -- my main focus was on what my options

were for getting effective access to that material.

10:12:16  I was interested as to whether I could move the hard

drive to another machine or not.

There was a discussion about the boot-up

procedure, a discussion about the -- Mr. Lawrence

described a driver which the kernel thought was

10:12:42  present but really wasn't present and the need in

the past to interrupt the boot procedure and modify

it by hand.  So it was discussion of that sort.

Q.    Now, you did look at source code that

afternoon, correct?

10:12:57  A.    I did not look at source code, from the

laptop.

Q.    You did look at source code that afternoon,

did you not?

A.    There were three fragments of source code

10:13:06  that were on the printout that Mr. Lawrence and I

looked at briefly, yes.

Q.    What was the conversation -- withdrawn.

Will you tell us what you said -- I'll withdraw that

as well.  Would you tell us what Mr. Lawrence said

23

1   to you and what you said to Mr. Lawrence regarding

2   the three pieces of source code that he showed you.

3      A.   So let's see.  The first piece of source

4   code was about five lines of code.  It was what I

10:13:42 5   would call a cliche, that is, a commonly used sort

6   of sequence or organization of code, and it has to

7   do with the differences between the language C and

8   the language C++.  And it basically said, if this is

9   being compiled by a C++ compiler, then it uses the

10:14:16 10   keyword class, and if it's not being compiled by a

11   C++ compiler, then it uses the keyword struct.  And

12   Mr. Lawrence had found this interesting.

13         And I looked at it, and I said, "Well,

14   that's the typical sort of thing that you see when a

10:14:40 15   programmer is trying to write code that could be

16   used for -- compiled under both the C++ and a C

17   build environment."

18      Q.   Tell us what else was discussed about the

19   source code that Mr. Lawrence had printed out and

10:14:54 20   shown to you.

21      MR. BROMBERG:  If I may interject just for

22   a moment, I want to state on the record that to the

23   extent that there is a discussion in Dr. Goldhor's

24   answers about attorney-client communication or work

24

1    product, we preserve those privileges and do not

2    believe this questioning should constitute a waiver.

3         MR. FRANK:  I think it's not

4    attorney-client privileged; it might be work

10:15:28 5    product.  I think the inquiry is appropriate.  It's

6    for someone else to decide at some other time

7    whether there's a waiver that results from this.

8    But your position is on the record.

9         MR. BROMBERG:  Right.  And I'm not

10:15:42 10    instructing him not to answer.

11         MR. FRANK:  I understand.

12    Q.    What else did Mr. Lawrence say to you about

13    the source code, the VST source code that he had

14    printed out and shown to you?

10:15:52 15    A.    Well, in terms of what Mr. Lawrence said to

16    me, it was basically just kind of a question to the

17    effect of, Can you explain this to me?  Or what do

18    you think about this?

19         The other two fragments were really each a

10:16:12 20    single line, and each of those lines was what you

21    might call the prefix to a class definition.  One

22    was a class definition for a bigram model and the

23    other was a class definition for a unigram model.

24    Q.    What did you say to Mr. Lawrence about that

25

1    printout, that portion of the VoiceSignal source

2    code that he had printed out?

3        A.    Sure.  I pointed out to Mr. Lawrence that

4    both the unigram model and the bigram model, as

10:16:59  5    shown in those two lines of code, were subclasses of

6    or inherited from a single-base subclass, language

7    model subclass, as opposed to having the bigram

8    model inherit from the unigram model.  And I said

9    that that structure, that sort of data structure or

10:17:27 10    class structure, was, in that sense, different from

11    the structure that the ScanSoft code used.

12        Q.    Did you discuss anything else about that

13    portion of the VoiceSignal source code that Mr.

14    Lawrence printed out for you?

10:17:45 15        A.    No, sir.

16        Q.    Did you identify anything in that source

17    code that you believed was unique or novel or

18    otherwise secret to ScanSoft?

19        A.    There was no discussion of that sort one

10:18:02 20    way or the other, and I made no comments one way or

21    the other.

22        Q.    Did you see anything in that source code

23    that you thought was secret or unique to ScanSoft?

24        A.    I didn't look at anything.

26

1    Q.    Did you see anything in the lines that you

2  did look at that you thought was secret or unique to

3  ScanSoft?

4    A.    Not in those lines, no.

10:18:20  5    Q.    Did you see anything -- did those lines,

6  taken together with other materials that you had

7  seen, suggest to you that some secret or unique

8  ScanSoft idea or code had been used by VoiceSignal?

9    A.    While those lines, either by themselves or

10:18:40  10  taken in conjunction with other material, don't

11  suggest to me -- they really don't suggest anything

12  to me at all, but they by themselves are only tiny

13  fragments.

14    Q.    What did you say to Mr. -- apart from what

10:19:03  15  you've already testified, did you say anything else

16  to Mr. Lawrence about the lines of VoiceSignal code

17  that you were shown?

18    A.    No, sir.

19    Q.    What else did you discuss with Mr. Lawrence

10:19:14  20  during the hour-long discussion of VoiceSignal

21  materials?

22    A.    The rest of the discussion centered around

23  what my options were for getting access to that

24  code.  As I've already indicated, whether it would

27

1    be possible to remove the hard drive and put it in

2    an external box, how to boot the machine, what the

3    password was.  Mr. Lawrence recounted earlier

4    problems that he'd had with the mouse.  There was a

10:19:46  5    discussion of the fact that the battery didn't last

6    very long.

7        Q.    What did Mr. Lawrence tell you about the

8    use of the hard drive or what use you could make of

9    the hard drive?

10:20:01 10        A.    He really didn't tell me anything.

11        Q.    I take it you asked him whether you could

12    remove the hard drive and put it or install it in

13    another machine; is that correct?

14        A.    I asked him whether there was a legal or

10:20:24 15    procedural restriction on that, and he said

16    something to the effect of, not that he knew of.  I

17    reserved for myself the issue of whether there were

18    technical problems or limitations.

19        Q.    Did you in fact remove the hard drive from

10:20:49 20    the laptop that you were provided?

21        A.    Yes, I did.

22        Q.    What did you do with the hard drive after

23    you removed it?

24        A.    I turned it over and I looked at the

28

1    maker's label on it, and I took a careful look at

2    the connector on it.  And having done that, I then

3    put it back.

4        Q.    Apart from what you've testified, did you

10:21:14  5    do anything else with the hard drive as

6    distinguished from the laptop as a whole?

7        A.    No, sir.  After -- well, after I got back

8    to my offices, given the information that I had on

9    the make of the hard drive, I did a search of the

10:21:34  10    Web, and I located the installation manual and the

11    sort of technical specifications of the drive.

12        Q.    Then what did you do?

13        A.    So this was late in the afternoon after I

14    had gotten back to my office.  I looked at that.  I

10:21:54  15    read through the manual.

16        Q.    The hard drive manual?

17        A.    The hard drive manual that I had gotten off

18    the Web.  And I then did a search on the Web looking

19    for boxes, external drive boxes that would make it

10:22:15  20    possible for me to put the hard drive in an external

21    case, connect it to my PC or some other PC via a USB

22    or FireWire interface, but then at the end of the

23    day take it and put it in a locked storage cabinet.

24        Q.    Did you obtain any equipment of any type to

1   use with the hard drive that had been provided to

2   you?

3       A.    No, sir, I didn't.

4       Q.    Now, how much time did you then spend with

10:22:54  5   the laptop that had been provided to you by Bromberg

6   & Sunstein?

7       A.    Well, I described, I received the laptop at

8   this meeting in the middle of the day.  I left the

9   Bromberg offices midafternoon, got back to Bedford

10:23:18 10   probably around four o'clock in the afternoon.  At

11   that point the laptop was on my desk.  I left work

12   around six o'clock, and before I left, I put it in

13   this locked storage room.

14       Q.    What did you do during the period of time

10:23:35 15   that you were working with the laptop?

16       A.    Well, when I got back to my office, I

17   checked my e-mail, I answered some phone calls, I

18   did some other stuff like that.  But it was during

19   this time that I was looking at the Internet to see

10:23:55 20   what the boxes were that were available.  I also had

21   seen from the bootup process that a technology

22   called DriveLock seemed to be in use, so I did some

23   investigation of that to understand what that

24   technology was.

30

1    Q.    What else did you do with the laptop?

2    A.    I went through the boot process itself to

3  verify that the DriveLock technology was in fact

4  being used, and I looked at the system configuration

10:24:29  5  of the laptop to try to understand, again, sort of

6  what the options were in terms of what could be

7  connected up to it and so on.

8    Q.    Have you told us now everything that you

9  did with that laptop from the time that you received

10:24:43 10  it -- from the time that it was first physically in

11  your presence at Bromberg & Sunstein to the time

12  when you physically returned it to Bromberg &

13  Sunstein?

14    A.    Just to go into a little bit more detail of

10:24:55 15  the last point, the system configuration, I looked

16  at a special directory, a system directory called

17  /dev, which is the directory in which you can get

18  some indication of the known devices that are on the

19  machine.  And I was particularly interested as to

10:25:23 20  whether the laptop knew what flash drives were, what

21  USB ThumbDrives were.  I had one.  Being an

22  engineer, I just hooked one up to see what would

23  happen.  It didn't seem to -- the laptop didn't seem

24  to recognize the presence of the ThumbDrive.

31

1          I then did a little research on the Web,

2     found a short description of ways to make USB hard

3     drives known to Linux machines, which recommended

4     using a built-in system utility called modprobe.  I

10:26:12 5     tried that, I didn't get any useful information,

6     concluded that I didn't have the right privileges.

7          And the final thing I did was to examine a

8     text file called /etc/modprobe.conf, which is a

9     system configuration file which was present and had

10:26:37 10     the right format but didn't contain any useful

11     information.

12          And just about at that point, as Mr.

13     Lawrence had warned me, the machine died; it was

14     pretty clear the battery had worn down.  And I

10:26:54 15     looked at my watch and realized it was six o'clock

16     and said, "Okay, that's it for the day," and locked

17     it up and went home.

18     Q.    Now, you say when you got back to the

19     office -- I understand from your declaration that

10:27:07 20     you attended a funeral on Friday morning, you got

21     back to your office --

22     A.    Yes, sir.

23     Q.    -- and there were telephone messages there.

24     From whom were those messages?

32

1    A.    From Lisa Fleming and from Courtney Quish.

2    Q.    Which was the first?

3    A.    I believe the very first one was from

4 Courtney.

10:27:26  5    Q.    What did that say?

6    A.    That said, "Don't look at any of the

7 material again.  Be prepared to wrap it up and bring

8 it back.  Give us a call as soon as you get this

9 message."

10:27:39 10    Q.    Then the next thing you heard, I assume, is

11 a message from Ms. Fleming?

12    A.    Saying essentially the same thing, yes.

13    Q.    When you returned those materials, did you

14 provide a cover letter or some other identification

10:28:00 15 of what it was that you were returning?

16    A.    No, sir.

17    Q.    You told us that Mr. Lawrence provided you

18 with a laptop on Thursday afternoon of last week.

19    A.    Um-hum.

10:28:34 20    Q.    To your understanding, was he retaining a

21 copy of a laptop or a laptop that had the same

22 materials on it?

23    A.    No, sir.  He was turning it over with a

24 great deal of contentment that this was now my baby

33

and not his.

    Q.   Did you in fact at any time remove any data or copy any data from what you found on the laptop to any other medium or device?

10:29:15    A.   No, sir.  None whatsoever.

    MR. FRANK:  I think that's all I have. Thank you.

    MR. BROMBERG:  Nothing further from me.

    MS. COLUMBIA:  Let's take five minutes.

10:41:49    (Recess)

34

1          (Present in the room are all counsel

2          together with Dr. Goldhor and Dr. Ney)

3         MR. FRANK:  Professor Ney, let me explain

4  the context.  You sent us an e-mail perhaps two

10:42:08 5  weeks ago saying that you would like to have experts

6  present at this session.  The ScanSoft lawyers filed

7  a motion seeking permission, a motion with the Court

8  seeking permission to have the experts present and

9  requesting the Court's permission for ScanSoft's

10:42:38 10  expert to have access to Voice Signal's source code,

11  as distinguished from the prior procedure where

12  ScanSoft's experts would only have access to

13  ScanSoft's own trade secrets.

14         The Judge allowed that motion, I think on

10:43:01 15  Tuesday of last week.

16         DR. NEY:  Can I interrupt for me to

17  understand.  That means the expert now of the other

18  party -- I'm sorry.

19         MR. FRANK:  Allow me to finish the story,

10:43:15 20  because we're in Chapter 1 of a several-chapter

21  novella.

22         Promptly after we received that order, we

23  informed -- my side, VoiceSignal, informed ScanSoft

24  that it intended to appear before the Court to ask

35

1    the Court to reconsider its position.  The Judge had

2    allowed ScanSoft's motion without first having

3    received a response from the VoiceSignal side, and

4    we said that should hear the response from the

10:43:54 5    VoiceSignal side before you make a final decision.

6    And we then filed a motion, a formal paper in the

7    Court, asking that ScanSoft's expert not be

8    permitted to see Voice Signal's source code.

9         We had a hearing with the Judge on Friday

10:44:18 10   morning of last week.  She said, in substance, that

11   it was not her intention that ScanSoft's expert

12   should see the VoiceSignal source code.  It was her

13   intention, as had previously been stated, that

14   ScanSoft's expert would have access to ScanSoft's

10:44:44 15   trade secrets and would be free to discuss those

16   trade secrets with you at a technical level that was

17   higher than or more detailed than the lawyers are

18   capable of providing, but that it was not her

19   intention that he would receive access to the

10:45:06 20   VoiceSignal source code or that he could discuss

21   with you anything about what was in the VoiceSignal

22   source code.

23        Equivalently, the VoiceSignal expert could

24   discuss with you how the VoiceSignal source code

36

1   works, but he would not have access to ScanSoft's

2   trade secrets.

3           And the exchange that we just had out of

4   your presence was designed to find out how much

10:45:49  5   access ScanSoft's expert had to the VoiceSignal

6   source code between last Tuesday and last Friday.

7   And we made a record of what that is for the

8   consideration of the Court.

9           But I think we are agreed that the ground

10:46:10  10   rules, at least for today, are that you may discuss

11   with ScanSoft's expert, Dr. Goldhor, the particular

12   things that ScanSoft asserts are trade secrets and

13   may question him fully about that.  But that he may

14   not talk to you about anything relating to the

10:46:38  15   VoiceSignal source code; he may neither make

16   comments about the source code or make suggestions

17   to you about that source code.

18           By the same token, Dr. Byrne, our expert,

19   who is in London but is available by telephone --

10:46:52  20   Cambridge, sorry.

21           MR. BROMBERG:  Pretty close.

22           MR. FRANK:  -- will be available to talk to

23   you about the VoiceSignal source code but not about

24   the ScanSoft trade secrets.  Is that fair?

37

        MR. BROMBERG:  I think that's an accurate

statement.  And if I could just make a brief --

well, strike that.  So are you planning to have Dr.

Byrne on the phone during --

10:47:14    MR. FRANK:  Dr. Byrne is in his office in

Cambridge.

        I should tell you one other thing, and that

is, you may recall from our last session that there

was an objection by ScanSoft as to whether Dr. Byrne

10:47:29 could be the person who was the VoiceSignal expert.

The Judge said that he could be, he could act as the

VoiceSignal expert.  By the time that got sorted

out, which was last Friday, it just was not

physically possible for Dr. Byrne to come today

10:47:47 because of his other academic commitments at

Cambridge.  But he is available in his office, and

it's our expectation that to the extent Dr. Ney

wants it, he's available on the phone and will

answer any questions that you have to the extent

10:48:04 that he can.

        MR. BROMBERG:  I guess that in view of the

Judge's ruling, we have no objection to Dr. Byrne

participating by telephone or being here, for that

matter.  I understand he has to participate by

38

telephone under the circumstances, and that's fine

with us.

          I just wanted to say, Professor Ney, that

Mr. Frank has given us an accurate description of

what transpired.  I think that Dr. Goldhor, our

expert, did not in fact look at the VST source code

on the computer.  He has acknowledged seeing I think

seven lines that were printed out.  So that's the

extent of what he looked at.  I don't know what

VST's position will be about that going forward;

that remains to be seen.

          However, what Judge Saris did say on

Friday -- a couple of things of interest.  One of

them is she's reserved May 12th at 11 a.m. to speak

to you by telephone for whatever purpose you wish.

          MR. FRANK:  11 a.m. our time.

          MR. BROMBERG:  Yes, 11 a.m. Eastern

Daylight Time.  I guess that would be five o'clock

in Aachen.

          DR. NEY:  Yes, it would.

          MR. BROMBERG:  Okay.  And she did say that

her ruling on May 2nd that Dr. Goldhor gets to look

at the VST code, she reversed herself on that.  She

said, "That's not what I intended."  She intended