# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SCANSOFT, INC.,                          )
                                         )
                Plaintiff                )
                                         )
        -VS-                             ) CA No. 04-10353-PBS
                                         ) Pages 1 - 28
VOICE SIGNAL TECHNOLOGIES, INC.,         )
LAURENCE S. GILLICK, ROBERT S. ROTH,     )
JONATHAN P. YAMRON, and                  )
MANFRED G. GRABHERR,                     )
                                         )
                Defendants               )

**MOTION HEARING**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 12, 2005, 3:15 p.m.

LEE A. MARZILLI
CERTIFIED REALTIME REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

A P P E A R A N C E S:

    ERIK PAUL BELT, ESQ. and LISA M. FLEMING, ESQ.,
Bromberg & Sunstein, 125 Summer Street, Boston,
Massachusetts, 02110-1618, for the Plaintiff.

    KENNETH A. COHEN, ESQ., J. ANTHONY DOWNS, ESQ., and
PAUL F. WARE, ESQ., Goodwin Procter, LLP, Exchange Place,
53 State Street, Boston, Massachusetts, 02109, for the
Plaintiff.

    DOUGLAS J. KLINE, ESQ., Testa, Hurwitz & Thibeault, LLP,
125 High Street, Boston, Massachusetts, 02109, for the
Plaintiff.

    ROBERT S. FRANK, JR., ESQ. and SARAH CHAPIN COLUMBIA,
ESQ., Choate, Hall & Stewart, Two International Place,
Boston, Massachusetts, 02110, for the Defendants.

1              P R O C E E D I N G S

2              THE CLERK:  The case of ScanSoft, Incorporated V.

3    Voice Signal Technologies, et al, Civil Action No. 04-10353,

4    will now be heard before this Court.  Will counsel please

5    identify themselves for the record.

6              MR. COHEN:  Kenneth Cohen from Goodwin Procter

7    representing ScanSoft.

8              MR. KLINE:  Doug Kline of Testa Hurwitz

9    representing ScanSoft.

10             MR. FRANK:  Robert Frank and Sarah Columbia

11   representing the defendant, Voice Signal Technologies.

12             MR. BELT:  Eric Belt.  I also have Lisa Fleming

13   here from Bromberg & Sunstein for ScanSoft.

14             THE COURT:  We're here on our motion to

15   disqualify?

16             MR. FRANK:  Yes, your Honor.

17             THE COURT:  Do you want to be heard?

18             MR. FRANK:  Yes, thank you.  I bring this motion

19   with no particular relish.  In the week that I engaged in

20   conversation with Goodwin Procter about this, I cleared

21   another conflict involving another case before your Honor,

22   and I met with Mr. Cohen before this started to lay out the

23   facts in the hope that this could be avoided.

24             The question for your Honor is whether Goodwin

25   Procter will be permitted to become the second counsel in

1   this case for ScanSoft.  There is no suggestion that prior

2   counsel are not willing, able, and very competent to

3   proceed.  There's no suggestion of delay or disruption.  The

4   issue was raised promptly after Goodwin filed a notice of

5   appearance.  The question is whether the conversations

6   between Voice Signal Technologies, the defendants, and

7   Goodwin Procter established an attorney-client relationship

8   between Voice Signal and Goodwin Procter.

9        It is undisputed that Voice Signal had preliminary

10  conversations with Goodwin Procter at the outset of this

11  case, that the law firm met with Voice Signal on two separate

12  occasions for a period of several hours, and that after each

13  of those meetings, there were e-mail and telephone

14  communications.  It's agreed that the first meeting was more

15  general in character, and the second meeting was more

16  specific in character.

17        After the first meeting there was an extended

18  exchange of E-mails --

19        THE COURT:  Do I have all those E-mails?

20        MR. FRANK:  You do not, you do not have any of

21  them, although I am quite prepared to provide them to the

22  Court if you --

23        THE COURT:  Because one of the things that's

24  striking me as very difficult about this case is whether I

25  can address the motion to disqualify based on this very

1    contentious paper record -- "Yes I did.  No, I didn't.  I

2    don't remember this.  Yes, I did" -- or whether I need to

3    refer this to either a master or a magistrate judge to make

4    fact findings.

5          MR. FRANK:  Well, let me say this:  What I hope to

6    do this afternoon is to try to confine my argument to that

7    which is essentially undisputed.  And let me concede that

8    there are a number of facts which are in dispute, and it may

9    be that you will choose at the end of this to do that, but

10   let me point out what is undisputed, and then you can

11   decide.  The first of these meetings was on February 26,

12   2004.  After that meeting, Paul Ware of Goodwin Procter

13   e-mailed the president of Voice Signal saying, "Dan, We would

14   like to have a follow-up and discuss some things that we are

15   thinking.  We could also do some more digging over the

16   weekend," and then there's some discussion about when they

17   might get together.

18          Thereafter -- that occurred at 10:44 in the morning

19   on February 27 -- at 12:01 that day, Mr. Downs of Goodwin

20   Procter sent an E-mail to Mr. Roth, the president of Voice

21   Signal, in which he said, "In advance of our get-together, is

22   there any information you can fax or e-mail to us

23   concerning, for example --" a particular subject matter and

24   particular documents that were executed in connection with

25   that subject matter?  And one of the things that I'm

1    conscious of here, your Honor, is not waiving the

2    attorney-client privilege.

3        THE COURT:  Yes.  And to boot, some of this

4    information, if I become a fact-finder in any way -- as I was

5    reading this, I was struck with the fact Goodwin Procter has

6    attacked your affidavit as being too general.  I was trying

7    to figure out a solution for that because in some ways, if

8    you disclose it, you're disclosing the heart of the matter.

9    On the other hand, how do they respond without the

10   specifics?  And I was thinking that it might make sense to

11   have either a magistrate judge or a master who has no vested

12   stake in the matter, you know, someone who won't be trying

13   it, sit and parse through it all.

14       MR. FRANK:  Let me say this.  In <u>Bays V. Theran</u>,

15   which is the central Massachusetts law case, the judge

16   disqualified counsel based upon a description of the subject

17   matters that were discussed as distinguished from the

18   specifics of those discussions.  And I'm perfectly prepared

19   to describe those subject matters, and indeed I'm prepared to

20   go further, as long as there's not going to be some claim of

21   privilege waiver that follows from my having disclosed --

22       THE COURT:  I tell you what.  I won't interrupt.

23   You say what you have to say.  I'll let opposing -- just know

24   in the back of my mind is the concern about whether I need a

25   fact-finding, because it's heavily disputed what was said and

1    what wasn't said and how much of it was advice versus public

2    information and that sort of thing.  So you go do your thing,

3    but just keep that in the back of your mind.

4            MR. FRANK:  So this is at noon on Friday,

5    February 27.  "In advance of our get-together --" this is

6    Goodwin Procter to Voice Signal -- "is there any information

7    that you can fax or e-mail to us concerning, for example, the

8    prior litigation between Voice Signal and Lernout & Hauspie

9    and releases that were executed or the filing made by

10   ScanSoft in an effort to avoid the effect of your earlier

11   settlement (and any decision on that filing)?  I'd be happy

12   to review whatever you have handy, even if it's partial."

13           At 1:04 Mr. Roth responded with a description of

14   certain events in connection with the prior litigation, which

15   events would not have been known to ScanSoft or some of which

16   events would not have been known to ScanSoft and some of

17   which would have been known to ScanSoft.  It's a description

18   generically of events that occurred in the prior litigation

19   between Voice Signal on the one hand and Lernout on the other

20   hand and ScanSoft's efforts to intervene in that litigation

21   at a prior point in time.

22           At 12:47 that same day, Mr. Roth sent certain

23   documents to Goodwin Procter, which were a settlement

24   agreement and certain releases, nonpublic documents that were

25   given to Goodwin Procter in response to Mr. Downs's request

1    for further factual information.   Later that afternoon at

2    5:06, Mr. Roth sent four separate court papers relating to

3    the prior lawsuit.  At 7:05 that evening, Mr. Downs of

4    Goodwin Procter sent an E-mail to Mr. Roth which he marked

5    "privileged" in which he said, "After a brief search, here

6    is some potentially helpful prior art, none of which is cited

7    in the patent."

8          Thereafter the parties met for an extended period

9    on February 1, and the following, I think, can be distilled

10   from the conflicting affidavits:  First, there was a

11   discussion of prior art and its relationship to the patent in

12   suit in this case.  Everyone agrees that there was discussion

13   of the prior art that Goodwin Procter had dug up for Voice

14   Signal and provided to Voice Signal.  The point of dispute is

15   whether there was also a discussion that day of prior art

16   that Voice Signal had dug up and which it says it disclosed

17   to Goodwin Procter and which Mr. Downs says he has no memory

18   of seeing.

19         Second, Voice Signal says that it discussed ways in

20   which the design of its product might be changed so as to

21   move it further away from the claims of the patent.

22   Mr. Downs's responsive affidavit says that the question of

23   whether there was an easy design-around is something that a

24   patent lawyer would almost certainly ask, Paragraph 16 of his

25   affidavit, but that he did not specifically recall any

1   discussion of design-arounds.

2       Third, in his affidavit, Mr. Roth says there was a

3   subject of pricing, of damage exposure, of the effect that

4   the mere bringing of the case was having on Voice Signal and

5   about VoiceSignal's early discussions of settlement.

6   Mr. Downs says in his affidavit that he sees in his affidavit

7   a reference to one chip per phone, a number that he believes

8   is a price number, and the names of certain customers.

9       Fourth, Voice Signal sent information to Goodwin

10  Procter, it's undisputed, about the prior litigation.  Some

11  of it was client work, or at least VoiceSignal's narrative

12  description of things that had happened.  Some of it were

13  documents that were not in the public record and not

14  available to ScanSoft, and some of it were documents that

15  were in the public record and could with effort have been

16  obtained.  There is, I think, no -- they were requested by

17  Goodwin Procter and provided, and it is a fair inference that

18  they were thereafter discussed at the meeting on March 1

19  between Goodwin Procter on the one hand and Voice Signal,

20  just as it is a fair inference that if Goodwin Procter

21  supplied prior art for the purpose, that there was a

22  discussion of that prior art and of its relationship to the

23  patents.

24      Fifth, it is undisputed that after the second

25  meeting, Mr. Roth sent an E-mail to Goodwin Procter in which

1    he sought advice with respect to the advisability of putting

2    the relevant patent into reissue and stated two separate

3    potential tactical reasons why that might be a good idea.

4    His affidavit states that Mr. Downs responded to his inquiry

5    about the wisdom of doing such a thing and that they

6    discussed the pros and cons of a reexamination proceeding.

7    Mr. Downs's affidavit says that he does not recall coming to

8    a conclusion, but there's no dispute that those two possible

9    benefits of a reexamination proceeding were discussed.  And

10   it's undisputed that Goodwin Procter marked its E-mails or

11   certain of its E-mails to Voice Signal as "privileged," and

12   there is no explanation for why those E-mails would have been

13   marked as "privileged" if Goodwin Procter did not believe

14   that there either was then an attorney-client relationship,

15   or that if they were later retained, it could be asserted

16   that there was then an attorney-client relationship.

17        Now, the test is set forth in Bays V. Theran, and

18   that involved a situation in which the --

19        THE COURT:  I know the case.

20        MR. FRANK:  Okay, two or three telephone

21   conversations each for less time.  And the Court said that

22   the facts found by the judge that the client communicated

23   with the lawyer by mail and telephone with a view to possibly

24   retaining him, that the client discussed with the lawyer

25   various aspects of a potential suit, and that the lawyer

1    counseled the client concerning some of the basic legal
2    considerations involved in the suit, those facts warranted
3    the judge's conclusion that an attorney-client relationship
4    had been formed because -- and those facts are awfully close
5    to these facts.

6         The thing that had not been decided at the time of
7    the Bays case was whether the court would require, require a
8    disclosure, a proof of disclosure of confidential
9    information, or whether all that it would require is the
10   existence of a substantial relationship between the
11   consultation on the one hand and the lawsuit in which the
12   lawyer or that law firm wished to represent the other side
13   after that in the same case.  And after Bays, the Supreme
14   Judicial Court adopted Rule 1.9 of the Rules of Professional
15   Conduct, which expressly adopts the substantial relationship
16   test, and which applies if there's a substantial relationship
17   between the prior representation and this representation,
18   undisputed here because it's the same case, and if the
19   parties are adverse to one another, undisputed because this
20   is the same case, and they're simply switching from one side
21   to the other.

22        The rest of the response essentially is that -- and
23   Bays says that if the substantial relationship test applies,
24   later adopted by rule, "A subsequent representation is
25   prescribed on the sole ground that the later suit, simply

1    because of its substantial relation to the former one,

2    exposes the attorney to an intolerably strong temptation to

3    breach his duty of confidentiality to the former client.  The

4    former client need never prove that the attorney actually

5    misused the confidences to the client's disadvantage."

6          Now, the Goodwin Procter response is on two or

7    three levels, and I'll just talk about one or two of them,

8    and that will be enough.  One is that Mr. Downs states that

9    he does not remember the details of his communications with

10   Voice Signal.  And I respectfully suggest two things with

11   respect to that:  One, that can't be the test.  I don't

12   question Mr. Downs's integrity, but I do say that if the test

13   is merely that a lawyer comes in and says that he does not

14   remember the details of the conversation, that that leaves

15   the door wide open for unscrupulousness.

16         More to the point, if Mr. Downs is anything like

17   me, once he gets up to his armpits in this case, he will

18   remember things about that conversation or he may remember

19   things about that conversation --

20         THE COURT:  To your knowledge, are Mr. Ware and

21   Mr. Downs involved in the case right now, or has that been

22   put on hold?

23         MR. FRANK:  I know that it's proposed that Mr. Ware

24   be lead counsel.  In fairness, I should say that it is said

25   that Mr. Downs will not be participating in the case.  In the

1  <u>Bays</u> case, the lawyer requested was simply another lawyer in
2  the same law firm.  Mr. Ware, who was involved in both of the
3  communications with Voice Signal, has put in an affidavit in
4  which he acknowledges that there were promises of
5  confidentiality made, but says that his memory of the
6  conversations is very limited.  I simply make the point that
7  it is, accepting the truth of that -- and I have no basis for
8  challenging it, just as I could not challenge it in any other
9  case -- accepting the truth of that, the chances that his
10 memory will be jogged by extended exposure to the facts are
11 something that cannot otherwise be valued.

12          THE COURT:  Would it cure your problem as a
13 practical matter if we carved Mr. Ware and Mr. Downs out of
14 this case with a Chinese wall?

15          MR. FRANK:  No.  First, I think, as a legal matter,
16 that is not the question.  There's a case called --

17          THE COURT:  Well, you may be right as a legal
18 matter, but I'm just talking about as a pragmatic basis, if
19 you took the two of them out of it and you had Mr. Kline or
20 someone else who had no involvement with Voice --

21          MR. FRANK:  The answer is obviously, as a practical
22 matter, that reduces the risk.  But to be weighed against
23 that is the fact that ScanSoft already has very good counsel,
24 that there are any number of lawyers in the world who could
25 be retained as second counsel who are just as competent as

1    the very competent lawyers at Goodwin Procter.

2              THE COURT:  Well, can I ask you this?  Has this

3    dispute essentially put this whole litigation on hold?

4              MR. FRANK:  No, but it hasn't helped any.

5              THE COURT:  Well, who's been moving it along,

6    Mr. Bromberg?

7              MR. FRANK:  Bromberg & Sunstein.  We've been

8    negotiating -- for example, we will be presenting to you very

9    shortly -- my firm is stuck in a dispute with Bromberg &

10   Sunstein about the procedures for the court-appointed expert

11   which we're going to --

12             THE COURT:  Because I don't want to put the whole

13   thing on hold.  I mean, Goodwin should just be sort of

14   sidelined while the rest of the case is going forward.

15             MR. FRANK:  Absolutely, and it is going forward.

16             THE COURT:  And you have a claim on your claim

17   construction at some point that I've never really gotten

18   resolved, right?

19             MR. FRANK:  That is correct, although, again, just

20   to remind you of how you got to where you are, we got to the

21   argument about claim construction and --

22             THE COURT:  I got annoyed because there were so

23   many different terms that you raised, just like a phone book

24   full.  But I still need to address that, right?

25             MR. FRANK:  I'm sure your Honor -- what your Honor

```
 1    said was that it was not possible to tell at that time
 2    whether these issues were real issues or not real issues
 3    because we had not seen the source code for their product.
 4    Your Honor said that one of the things that the
 5    court-appointed expert should undertake is to consider
 6    certain factual issues looking at that source code so that we
 7    could tell whether these were issues that we're working on --
 8            THE COURT:  Or just abstract definitional things.
 9    All right, so thank you very much.  I have another case I
10    think at 4:00?  Is that what time?
11            THE CLERK:  No, 3:30.
12            THE COURT:  We're busy this afternoon.  All right,
13    so why don't we just hear from you.  I'm obviously
14    concerned.
15            MR. COHEN:  I understand, your Honor.  Let me try
16    to explain where we agree and where we disagree to get rid of
17    some underbrush.  The test, as Mr. Frank says, is to try to
18    determine whether Goodwin Procter ended up in an
19    attorney-client relationship with VST as a result of these
20    preliminary meetings.  One step below that ultimate question,
21    however, I think there are two really large disagreements
22    about the analytical structure for figuring this out, and let
23    me try briefly to do those and then say just a few words
24    about the facts, because I may not be able to solve your
25    factual questions, given what you said to Mr. Frank.
```

```
 1              First, the VST papers and Mr. Frank today ignore
 2    what may be the largest single fact in the situation, or more
 3    than a fact, maybe a lens through which one should
 4    appropriately look at the two meetings and accompanying
 5    E-mails that Mr. Frank has described, and that is that unlike
 6    the situation in Bays and unlike the situation in Mailer
 7    V. Mailer, Norman Mailer's divorce from his third of many
 8    wives, which were the two leading --
 9              THE COURT:  Is that what the Mailer is?
10              MR. COHEN:  It is.  Monroe Inker talked to
11    Mrs. Mailer number three and then ended up representing
12    Norman Mailer, and that's what led to that dispute.  Those
13    are the two leading SJC cases that we've got on the table.
14    In those cases, we have individuals, relatively
15    unsophisticated individuals calling a lawyer, briefly,
16    preliminary discussions.  The question is whether the
17    discussions went far enough to establish an attorney-client
18    relationship.
19              Here we have a sophisticated high-tech company
20    with, I think, in-house counsel, but, in any event, Choate
21    Hall representing it already on other matters, explicitly
22    saying, presumably to Mr. Frank as well as to Mr. Ware,
23    "We're trying to choose counsel.  We want to interview you
24    in order to decide whether to hire you or not."  That doesn't
25    mean that there cannot have been too much interaction and
```

1    hence an attorney-client relationship established.  I'm not
2    trying to say there's a legal safe harbor there, but I am
3    trying to say this is a highly relevant factor because many
4    of the cases that talk about figuring out whether preliminary
5    discussions led to an attorney-client relationship phrase the
6    question in terms of, was there a reasonable expectation, a
7    reasonable belief on VST's part in this situation, that
8    Goodwin Procter in this situation had become its lawyer?
9    Usually in these cases the fight is whether there was such a
10   belief, and the fight is whether it was reasonable or not,
11   given the circumstances.

12          Here I suggest to you that if we do look backwards
13   at where the players' heads were a year and a half ago, VST
14   would have told you, or us or Choate Hall or anyone else,
15   that they had not yet hired Goodwin Procter, they were trying
16   to decide whether to hire Goodwin Procter; and that far from
17   the question about reasonable belief or not that Goodwin was
18   already its lawyer, I don't think there was any belief at all
19   that Goodwin was its lawyer.  They were interviewing Goodwin
20   and trying to figure out, how will you go if hired?

21          THE COURT:  The word "privileged,
22   confidential," all those.  The question is, here it's not
23   black and white.  It's gray here.

24          MR. COLEMAN:  It is not at all black and white.

25          THE COURT:  And why doesn't Goodwin Procter -- it's

1    a sophisticated firm, this must happen all the time -- send a

2    letter to people saying, "Don't send us stuff.  I'm not your

3    lawyer until --"  I mean, this shouldn't have happened.

4              MR. COHEN:  It should not have happened.  This is a

5    problem in significant part of our own making, and that isn't

6    dispositive all by itself either, but it's clearly a factor.

7    This is complicated.  And what I want to tell you second

8    about the place at which Choate Hall and we disagree about

9    the analytical structure is that this is not a sort of an

10   off switch/on switch:  If you find X, then you're

11   disqualified.  If you don't find X, then you're still in the

12   game.  The analysis at the SJC is in a very fundamental way,

13   which I'll spend two minutes on, if I may, fuzzier than that.

14   And where it leaves the trial court judge, it seems to me, is

15   free to exercise judgment in following what -- you said

16   you're familiar with the Bays case.  My take on that and the

17   Mailer case is not so much about the stated standard but

18   about where are we when the dust settles?  Despite all the

19   discussion of confidential information and legal advice

20   given, where are we at the end of those cases?

21             And, by the way, confidential information is again

22   a factor in determining attorney-client privilege.  It is not

23   itself a dispositive "Sorry, you're gone, you have to leave

24   the courtroom" issue.  It is one of the major factors, again,

25   in determining whether an attorney-client relationship came

1    about.

2         The interesting thing about <u>Bays</u>, which took me a

3    second reading to see, is that while they were affirming a

4    trial court's decision to say, you know, there was

5    confidential information, in fact there it was concrete in a

6    way, to answer one of your other questions that I'll get to

7    in a minute.  You can see without waiving the privilege

8    really what was being discussed.  There was confidential

9    information about the way in which the common area

10   calculations in this condo were calculated, full information

11   given, according to the SJC's report of the trial judge, and

12   some legal advice about that.  So we have both confidential

13   information and we have a legal advice given.  And while they

14   affirm what the trial court did, what the trial court did was

15   in the first order say, "Sorry, you're disqualified," and in

16   a second order say, "You know, we're not going to kick you

17   out of the case after all.  We're going to let you keep

18   representing the other side, the new client, except where

19   that confidential information gives you a real advantage."

20   They bifurcated the trial and said, "You can't try it on the

21   93A trial, but you can on the other."

22         THE COURT:  As a practical matter, your client has

23   been beating down my door -- well, ScanSoft, Mr. Bromberg's,

24   "Hurry up, hurry up, hurry up, get this going," pressure,

25   pressure, pressure, all right?  "There are trade secrets.

1    They're killing our company." As a practical matter, it's

2    either going to take me a few months to write up this mess,

3    or I'm going to refer it to a master to make fact findings.

4    And while this is happening, I can't have your firm

5    involved.

6          MR. COHEN:  That may be right, and then the client,

7    if you come out there at the end of this discussion, then the

8    client will have to decide if they want us to pursue this in

9    front of the magistrate or not.  I understand that will be an

10   issue that --

11         THE COURT:  But in the meantime, the case is going

12   to move forward, and I would enjoin your participation in

13   it.  So I've got a problem because the words "privileged"

14   were used, the words "confidential, I'll keep your

15   confidentiality" were involved.  There's an allegation that

16   they were seeking legal advice from Goodwin before Goodwin

17   was even hired, and that in exchange, prior art was

18   investigated.  I mean, this is not a slam-dunk for you.

19         MR. COHEN:  It is not at all a slam-dunk, although

20   the cases also have resolved issues without resolving -- that

21   is, there are other ways than referring this to a master.

22   And maybe you'll decide at the end that that's what you have

23   to do.  I do not say this is a trivial issue.  I understand

24   there are some disputes of fact, but, for example, in the

25   Mailer case, the ex-wife, about to be ex-wife, says that she

1    told Monroe Inker a whole lot of stuff about their intimate

2    relationship and the grounds for divorce, and he denied that,

3    and the trial judge said, "No, it's just implausible."  And

4    to some extent, if you don't want to go there, obviously --

5            THE COURT:  I don't buy it.  I know Mr. Downs and

6    Mr. Ware.  I've had many patent cases.  It's not implausible

7    that they were trying to be as helpful as possible so that

8    they'd get the business, and they're fabulous lawyers,  so

9    it's not implausible.  It's not like telling your sexual

10   intimate details.  I mean, of course they're going to try and

11   help.

12           MR. COHEN:  Yes, but at the level of -- a patent

13   case is not the same as, how do you calculate the common area

14   percentages in a condo?  If you imagine two meetings of

15   approximately an hour each and all these topics being

16   discussed, I don't think it's plausible that Goodwin could

17   have gone beyond saying "No claim construction.  We haven't

18   seen the patent file.  We haven't seen whatever --"  There's

19   no allegation that whatever prior art VST had already thought

20   about was ever actually given as opposed to talked about.  It

21   seems implausible that they could have given legal advice,

22   "This is the answer," as opposed to, "Here's what we'll

23   explore if you hire us."

24           And the problem with this level of generality,

25   which you referred to already, "How do I decide?" it seems to

1   me that where they have some ultimate burden to show that we
2   should be disqualified here to overcome the right of an
3   entity to choose counsel on its own, that what happened in
4   those other cases?  Without giving away the privileged
5   information, there were ways to talk about the information
6   disclosed that made it clear to the courts there, as opposed,
7   I suggest, to the affidavits here that say, for instance, "We
8   talked about our products including future products."  Well,
9   it's a year and a half later.  And time, by the way, is the
10  factor in the cases before.  Things get stale.  They may be
11  confidential but now public.  They may be confidential but
12  obviously to be discovered in plain view in discovery in this
13  case once there's litigation.

14          It's easy enough to say there was discussion of our
15  products, but that doesn't really convey any real likelihood
16  that there is something secret about the products that isn't
17  known from the kind of case, the kind of patent it is, the
18  kind of --

19          THE COURT:  But that's where it's impossible for me
20  to decide because it's not that it's so implausible; it's
21  just that if they disclose the level of detail you want, A,
22  if I keep you in the case, that they've now refreshed their
23  recollection, and to boot, I'll find out, and it could be
24  something that is or isn't relevant to some decision I make
25  which may be prejudicial to them.  I don't know.  So that's

1    why I'm probably not the best fact-finder here.

2            MR. COHEN:  Well, I wanted to disclose the E-mails

3    as well.  And when we thought about it for a minute, because

4    we think in the end that they will show that there is not

5    enough here, but we thought about it and said, wait, since

6    it's unclear yet, unresolved yet whether we did establish an

7    attorney-client relationship, we felt we could not give you

8    the E-mails.  And Mr. Frank is, I think, right about where we

9    are on the E-mails.  I would think that the E-mails and the

10   other evidence are something that a magistrate judge or

11   another finder of fact or somebody could decide to look at

12   easily --

13           THE COURT:  Who's the magistrate judge on this,

14   Judge Alexander?

15           MR. COHEN:  -- could look at quite quickly, if you

16   wanted to go that way.  And that would help give a sense of,

17   is this really legal advice, or is this raising issues to be

18   thought about --

19           THE COURT:  Well, I will tell you, they've raised a

20   prima facie case for disqualification, just based on the word

21   "privilege" being used, "confidential," the allegation that

22   Mr. Downs did research and came up with some prior art,

23   discussion of settlement, et cetera.  Whether it proves up, I

24   don't know, but I certainly can't leave you in the case while

25   this is out there.  Now, so I can either -- and maybe what

1   would make some sense is to go back and talk to your client

2   about what should happen here.  I have three choices.  One, I

3   could get all these E-mails and, based on the current record,

4   just make a decision.  Two, I could refer it to

5   Judge Alexander for fact-finding and enjoin participation for

6   Goodwin Procter while -- so the rest of the case essentially

7   can move on.  I mean, I guess the third option would be some

8   sort of pragmatic, yes, Mr. Kline could do it but not the

9   attorneys involved, but it sounds as if that that's not

10  something that Mr. Frank is interested in.  So I suggest you

11  just have some heartfelt discussions with your client.

12         But in the interim, this is what I'm going to do:

13  I am going to take this under advisement.  I will either

14  refer it to a magistrate judge or issue an opinion on the

15  record.  I'll think about that.  But in the meantime, Goodwin

16  Procter shouldn't be involved.  Bromberg should be involved

17  as it has been all along.  I assume they're still counsel,

18  right?

19         MR. COHEN:  They are, your Honor, that's correct.

20         THE COURT:  And you need to be getting me stuff,

21  right?

22         MR. FRANK:  Yes.

23         THE COURT:  And so how far along is that master's

24  issue?

25         MR. FRANK:  We have exchanged proposed procedures,

1    and I think it would be fair to say that they're quite

2    divergent.  We need to serve them up to you, I respectfully

3    suggest, along with a short explanation by each of us as to

4    why we think, each of us thinks its version is consistent

5    with your prior orders and otherwise appropriate.  For our

6    part, we can certainly do that by the end of this week, and I

7    assume that you can as well.

8            MR. BELT:  We can.

9            MS. FLEMING:  Yes.

10           THE COURT:  So my proposal with respect to that, if

11   your Honor will permit it, is that by close of business on

12   Friday, we submit to you both our respective proposals with

13   respect to a court-appointed master procedures.

14           THE COURT:  Does that sound okay?

15           MR. BELT:  Yes.

16           MS. FLEMING:  In addition, your Honor, we did

17   submit a joint letter to the Court recommending the

18   appointment of Professor Hermann Ney.

19           THE COURT:  Where's he from?

20           MS. FLEMING:  He's in Germany, your Honor.

21           THE COURT:  Oh, yes, the German.  So he's going to

22   fly in here?

23           MS. FLEMING:  He has represented that he will make

24   himself available.

25           THE COURT:  The closest you could find a guy

 1    without a conflict was Germany?

 2            MS. FLEMING:  That's right, your Honor, and we

 3    worked at this for a long time.

 4            MR. BELT:  He speaks very good English.

 5            THE COURT:  I hope so because, remember, he's got

 6    to teach me what this is all about.

 7            MR. FRANK:  Yes, he does, and he understands that

 8    that's part of the role.  May I have two sentences?

 9            THE COURT:  Yes, and then I have a criminal

10    pretrial.

11            MR. FRANK:  The core question here is or the core

12    consideration is that there is no prejudice whatever to

13    ScanSoft if Bromberg & Sunstein, which is very good,

14    continues to represent them.  There is substantial potential

15    prejudice to VoiceSignal if people at Goodwin Procter were in

16    the position where they were receiving confidential

17    information.  And there's no dispute but that Goodwin Procter

18    encouraged the submission of information.  I read to you part

19    of that E-mail.  No dispute that they marked their E-mails

20    "privileged," and no dispute that in the cases we're talking

21    about, Bays and Mailer, the client was overtly seeking --

22            THE COURT:  Yes, could you submit those E-mails to

23    me and delete out anything you think I shouldn't see; I mean,

24    just the stuff you read?

25            MR. FRANK:  Certainly.  Oh, you'll have them

 1    tomorrow.

 2             THE COURT:  Does that make sense?

 3             MR. COHEN:  It does, your Honor, and I would

 4    suggest that we should probably write to the Court within the

 5    next few days after consulting with our client about whether

 6    a reference to Magistrate Alexander would be appropriate or

 7    whether, gee, given the time that would take, the client is

 8    going to change its mind or not.

 9             THE COURT:  Yes, I think that makes a lot of sense.

10             MR. COHEN:  I do too.  I do think we should not

11    forget that -- you've quoted this before -- that I think

12    Mr. Frank is turning the burden on its head to say, gee,

13    there will be no prejudice to the client if it doesn't use

14    Goodwin Procter.  We start with the premise that the client,

15    unless there's disqualification grounds shown, is entitled to

16    the counsel of its choice.

17             THE COURT:  My point is that they've clearly made

18    enough of a case to have me take this seriously, so I'm going

19    to either sit myself and look through the E-mails and the

20    affidavits -- and I hate doing that because I know how

21    scripted both sides can be on the affidavits -- or just have

22    somebody here, live bodies.  Now, it could be me, but that

23    would take a really long time because I'm starting a big

24    trial in January.

25             MR. COHEN:  We'd rather have the magistrate do it

1  in the interest of time.  And the E-mails of course are not

2  scripted because on both sides they were done without this in

3  mind.

4       THE COURT:  Right.  And the bottom line is, the

5  other concern about me doing it is that there may be things

6  that should come out which you don't want me to hear that may

7  affect my judgment of the case, willfulness, inequitable

8  conduct, all those kinds of things that you just might not

9  want me to hear.  And so I think it does make some sense to

10  have a report and recommendation, but I think it will take a

11  while.  It's Christmastime, and I just can't see holding up

12  this whole suit when both sides have been banging down my

13  door on it.  I sort of wondered why I wasn't hearing from

14  anyone.

15       MR. COHEN:  Well, we're not suggesting that you

16  wait, and we'll try to move as rapidly as we can in front of

17  the magistrate if the client still wants us to do that.

18       THE COURT:  Right.  And I think, you know, two

19  great firms in the city, on balance, there may be a more

20  practical solution to all of this, so I look forward to

21  hearing from you in a few days.

22       MR. COHEN:  Thank you, your Honor.

23       (Adjourned, 3:55 p.m.)

24

25

```
 1                    C E R T I F I C A T E

 2

 3
     UNITED STATES DISTRICT COURT )
 4   DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
 5

 6

 7

 8          I, Lee A. Marzilli, Official Federal Court

 9   Reporter, do hereby certify that the foregoing transcript,

10   Pages 1 through 28 inclusive, was recorded by me

11   stenographically at the time and place aforesaid in Civil

12   Action No. 04-10353-PBS, ScanSoft, Inc. V. VoiceSignal

13   Technologies, Inc., et al, and thereafter by me reduced to

14   typewriting and is a true and accurate record of the

15   proceedings.

16          In witness whereof I have hereunto set my hand this

17   18th day of December, 2005.

18

19

20

21

22

23   _____
     LEE A. MARZILLI, CRR
24   OFFICIAL FEDERAL COURT REPORTER

25
```