## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCANSOFT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>VOICE SIGNAL TECHNOLOGIES, INC.,<br>LAURENCE S. GILLICK, ROBERT S.<br>ROTH, JONATHAN P. YAMRON, and<br>MANFRED G. GRABHERR,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 04-10353-PBS |

## VOICE SIGNAL TECHNOLOGIES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN ORDER ENJOINING NUANCE FROM SOLICITING VOICE SIGNAL EMPLOYEES

Defendant Voice Signal Technologies, Inc. ("Voice Signal") hereby submits this memorandum in support of its accompanying Motion for an Order Enjoining Nuance from Soliciting Voice Signal Employees. Voice Signal's motion is made in reaction to approaches by ScanSoft, Inc. ("Nuance")[1] to top level employees of Voice Signal, including defendant Larry Gillick.

### INTRODUCTION

This motion is necessitated by the latest link in a chain of misconduct that dates back to the beginning of this litigation. From the outset, Nuance has used this litigation to further its business objective of either acquiring Voice Signal on less than favorable terms or, in the alternative, crippling Voice Signal with burdensome discovery, legal fees

---

[1] Nuance is the corporate successor to the Plaintiff ScanSoft, Inc.

and a cloud of suspicion in the marketplace. Most recently, Voice Signal has learned that Nuance has engaged in a systematic and active effort to solicit key Voice Signal employees to leave Voice Signal to join Nuance, in direct and knowing violation of those employees' non-competition agreements. More specifically, during the last three months, a recruiter for Nuance has contacted at least four of Voice Signal's key technical and sales and marketing employees to solicit them to take jobs at Nuance. In fact, notwithstanding its accusations that he has stolen their trade secrets, Nuance even solicited Laurence Gillick, Voice Signal's Vice President of Core Technology (the most senior technical employee in the company) and a defendant in this case. Nuance approached Mr. Gillick and other key Voice Signal employees fully knowing that they are bound by non-competition agreements with Voice Signal which contractually prohibit them from working for Nuance for one year after leaving Voice Signal. Nuance's recent attempts to hire away key Voice Signal employees – in flagrant violation of their non-competition agreements – constitute its latest move in its quest to crush or acquire Voice Signal. It should be enjoined.

## FACTS

### *Nuance's Prior Attempts to Interfere with Voice Signal's Business*

The chain of Nuance's misconduct began with the filing of this lawsuit. It came on the heels of Nuance's failed attempts to acquire Voice Signal in early 2004. Nuance accused Voice Signal and four prominent speech scientists of stealing trade secrets, based entirely on circumstantial evidence. Now, three years later, Nuance still has not articulated a basis for its trade secret allegations. Moreover, the long, drawn out and expensive Neutral Expert Procedure necessitated by Nuance's vague and illusory claims

2

will soon reach the final conclusion that there is no reason to believe Voice Signal has used or is using any trade secret of Nuance.

Nuance's 2004 Complaint also included a claim for patent infringement, asserting a patent on old technology developed in the early 1990's for voice recognition in mobile phone systems using a central switch. Nuance pursued its patent claims even after the Court construed the claims such that they almost certainly are invalid. In fact, the Nuance patent has been accepted for re-examination by the United States Patent and Trademark Office with an initial office action finding it invalid as anticipated by at least five prior art references, including references authored by the inventors of the patent.

Nuance has maintained this meritless action  because it benefits from the sheer existence of the lawsuit. Nuance uses the existence of the lawsuit in the marketplace to damage Voice Signal, introducing doubt into the minds of potential customers. It has issued press releases at every turn characterizing routine court rulings as if they were victories. The last such press release was in March 2006, when Nuance "announced" the Court's routine decision regarding procedural issues before the Neutral Expert as if it were news.[2] Then, in mid March 2006, a representative of Lehman Brothers contacted Voice Signal's president and represented that the CEO of Nuance had asked him to contact Voice Signal to open acquisition talks. Voice Signal responded that it would consider such discussions, but did not feel compelled to sell the company. Less than two weeks later, on March 30, 2006, Nuance filed an action in the Eastern District of Texas, asserting counts of patent infringement against Voice Signal.[3] The Complaint alleges

---

[2]      The March 17, 2006 press release was Nuance's last because the Court admonished the parties "not to use anything about the case and this procedure to gain a business advantage by going to the press that way." Transcript of May 5, 2006 Hearing, p. 9 (copy attached as Exhibit A).

[3]      At about the same time, a Nuance representative contacted Voice Signal's retained expert, Dr. Bill

that Voice Signal has infringed three patents. Each of those patents has now been submitted to the USPTO for re-examination.

### *Nuance Is a Direct Competitor of Voice Signal*

Voice Signal and its speech scientists were the pioneers in developing reliable speech recognition software for small mobile devices (cell phones, BlackBerry, etc.) capable of delivering a positive user experience in interacting with such devices using speech rather than a keypad. Today Voice Signal remains a key player in that business. In recent years, through acquisition of several companies (including ART, which it acquired in connection with settling a lawsuit brought by Nuance in this Court), Nuance has gradually broken into the business of speech recognition for small devices. Nuance is now engaged in research, development, manufacturing, marketing, selling and licensing activities involving speech recognition software for handheld devices. As a result of its infiltration into Voice Signal's market, Voice Signal and Nuance are now, as this Court has recognized, "head on competitors."[4]

### *Voice Signal Has Valid Agreements with its Employees Prohibiting Them From Working For a Competitor Following Their Employment*

Because of the highly competitive nature of Voice Signal's business, which is built on confidential and proprietary technical information and trade secrets, Voice Signal requires its employees to sign Proprietary Information and Inventions Agreements (the "Agreements"). See, e.g., Affidavit of Laurence S. Gillick ("Gillick Aff."), ¶ 2 & Exhibit A; Affidavit of Chris Reiner ("Reiner Aff."), ¶ 3 & Exhibit A; Affidavit of Mira Genser

---

Byrne. Dr. Byrne was known to Nuance as Voice Signal's retained expert working closely with Voice Signal and counsel in connection with communications with the Neutral Expert. The Nuance representative pursued Dr. Byrne to propose that Nuance fund research to be conducted under Dr. Byrne's supervision at Cambridge University. Nuance continued to pursue the subject with Dr. Byrne into late 2006. Columbia Aff. at ¶¶2-3 This is yet another example of Nuance trying to undermine Voice Signal inside and outside the legal proceedings.

[4]      Transcript of March 16, 2005 hearing, p. 4. See Exh. A.

4

("Genser Aff."), ¶ 3 & Exhibit A; and Affidavit of Lars Fjeldsoe Nielsen ("Nielsen

Aff."), ¶ 2 & Exhibit A. Among other things, the Agreements prohibit Voice Signal

employees from working for a competitor for one year following termination of their

employment from Voice Signal. In relevant part, Paragraph 7 of the Agreements, entitled

"Restrictive Covenants," provides:

> In view of the unique nature of the business of the Company and the need
> of the Company to maintain its competitive advantage in the industry, I
> agree that, for a period of one (1) year after the termination of my
> employment with the Company for any reason whatsoever, I shall not,
> directly or indirectly, within the United States of America or its Territories
> or Possessions or within any other country in which the Company or any
> affiliate of the Company is engaged in or actively contemplating engaging
> in any activity described below (i) engage in, (ii) own an interest in, be
> employed by, or consult for, or act as an advisor to, any business, person
> or entity which engages in, or (iii) otherwise participate in any way in
> research, development, manufacturing, marketing, selling or licensing
> activities, or in any other activity, involving the application of voice
> recognition technology (which term specifically includes, without
> limitation, speech algorithms) to any of the following: (a) consumer
> electronics; (b) microcontrollers, DSPs, ASICS or other engines that are
> now or may subsequently become available for running speech
> algorithms; (c) toys and games; (d) home automation; (e) wireless
> communication or data products; (f) retail electronics; and (g) any class of
> products with respect to which the Company then does, or is then
> contemplating doing, business[.]

Id.

### *Despite Its Knowledge of the Agreements, Nuance Has Actively Solicited Voice Signal Employees to Leave Voice Signal to Join Nuance*

Nearly two years ago, on February 25, 2005, Voice Signal produced to Nuance

copies of its Agreements with the four individual defendant-employees, including that of

Mr. Gillick. Affidavit of Sarah Chapin Columbia ("Columbia Aff."), ¶ 1; see Gillick

Aff., Exhibit A. All of the Agreements produced contain substantially identical

restrictive covenants. Nuance has been in possession of these agreements since at least

5

that date, and plainly knew that at least Mr. Gillick was subject to these specific contractual obligations.

Notwithstanding its knowledge and possession of the Agreements, in recent months Nuance has actively and repeatedly solicited key Voice Signal employees to leave Voice Signal to join Nuance. Nuance's approaches to Voice Signal's key employees have come on the heels of negative developments for Nuance in this or other litigation with Voice Signal. Most recently, on January 23, 2007, within two weeks after the parties received the draft report of the Neutral Expert in this case, a recruiter identifying herself as "Caitlin" from JCSI, Inc. contacted at least three key Voice Signal employees, all of whom are parties to such Agreements, and informed them she had been retained by Nuance and wished to speak with them regarding opportunities to work for Nuance. In a subsequent conversation with Mr. Gillick, Caitlin stated that she was working off a list of target employees, including himself, in an effort to recruit them to join Nuance. The details of these and related solicitations are as follows:

1.  Solicitation of Laurence Gillick, Vice President of Core Technology

Laurence Gillick was contacted two weeks ago by Nuance's recruiter. Gillick Aff., ¶ 3. The most senior technical employee and a six-year veteran of Voice Signal, Mr. Gillick is privy to all of the company's substantial volume of highly proprietary technical information and trade secrets, which would be invaluable to a competitor. Id., ¶ 1. In light of the sensitivity of his position, Mr. Gillick, upon commencement of his employment, was asked and agreed to enter into an Agreement prohibiting him from working for a competitor for one year following termination of his employment with Voice Signal. Id., ¶ 2 & Exhibit A.

6

On January 23, 2007, Mr. Gillick received a voicemail from "Caitlin" in which she indicated that she was a recruiter for Nuance. Id., ¶ 3 and Exhibit B. On January 24, 2007, Mr. Gillick returned Caitlin's phone call. Id., ¶ 4. During the course of their conversation, Caitlin confirmed that she was working for Nuance and further informed Mr. Gillick that she was working off a list of target employees in the course of her recruiting efforts for Nuance. Id.

### 2. Solicitation of Chris Reiner, Vice President of Global Accounts

Chris Reiner, Voice Signal's Vice President of Global Accounts and a seven-year veteran of senior management, has been solicited three times by Nuance recruiters over the last three months. Reiner Aff., ¶¶ 1, 2, 4. In his position as a key marketing and sales executive of Voice Signal, Mr. Reiner has extensive knowledge of Voice Signal's business development and strategy, sales activities and customer relationships. Id., ¶ 2. In light of the sensitivity of his position, Mr. Reiner, upon commencement of his employment, was asked and agreed to enter into an Agreement prohibiting him from working for a competitor for one year following termination of his employment with Voice Signal. Id., ¶ 3 & Exhibit A.

On November 15, 2006, Mr. Reiner was contacted by Kirk Wilcox, a Senior Recruiter at Nuance, via the business networking website "LinkedIn" on which Mr. Reiner was profiled. In his message, Mr. Wilcox told Mr. Reiner that he was "recruiting for a Sr. level role here at Nuance that [he] would like to discuss" with Mr. Reiner. Id., ¶ 4 & Exhibit B.

Notwithstanding Mr. Reiner's reply that Nuance's attempted solicitation was "[n]ot such a hot idea," Mr. Reiner was contacted by Nuance's Head of International

Recruitment, Alan Kitaman, via LinkedIn just one month later, on December 18, 2006. Id., ¶¶ 4,5 & Exhibit B. Finally, on January 23, 2007, Mr. Reiner received a voicemail from Caitlin, the Nuance recruiter who was soliciting a whole list of employees. Id., ¶ 6. Caitlin informed him that she had been retained by Nuance and wished to speak with him regarding opportunities to work for Nuance. Id. & Exhibit C.

### 3. Solicitation of Mira Genser, Vice President of Marketing Communications

Mira Genser, Voice Signal's Vice President of Marketing Communications and another key Voice Signal employee, has also been solicited by Nuance. Genser Aff., ¶¶ 1, 5. In Ms. Genser's position, she has acted as Voice Signal's point of contact with industry analysts, financial analysts and the media, and has an extensive knowledge regarding Voice Signal's product launches and business strategies, among other things. Id., ¶ 2. In light of the sensitivity of her position, Ms. Genser, upon commencement of her employment, was asked and agreed to enter into an Agreement prohibiting her from working for a competitor for one year following termination of her employment with Voice Signal. Id., ¶ 3 & Exhibit A.

Like her peers Messrs. Gillick and Reiner, Ms. Genser received a voicemail from Caitlin on January 23, 2007. Id., ¶ 5. As was the case in her other voicemails to Voice Signal personnel, Caitlin indicated that she was recruiting for Nuance and wished to speak with Ms. Genser regarding employment opportunities there. Id. & Exhibit B. This was not the first time that Ms. Genser had been solicited by a Nuance recruiter. Id., ¶ 4. In the summer of 2006, a recruiter contacted Ms. Genser regarding new job opportunities. Id. Based on the substance of the conversation, Ms. Genser knows the employment opportunities involved Nuance. Id.

8

4. Solicitation of Lars Fjeldsoe Nielsen, Vice President of Market
   Development for Europe

Lars Fjeldsoe Nielsen, Voice Signal's Vice President of Market Development for

Europe, has received two phone calls in the past couple months by recruiters apparently

looking to fill management positions for Nuance in Europe. Nielsen Aff., ¶ 1, 3. Like

Mr. Reiner, Mr. Nielsen has extensive knowledge of Voice Signal's European business

development and strategy, sales activities and customer relationships. Id., ¶ 1. In light of

the sensitivity of his position, Mr. Nielsen, upon commencement of his employment, was

asked and agreed to enter into an Agreement prohibiting him from working for a

competitor for one year following termination of his employment with Voice Signal. Id.,

¶ 2 & Exhibit A.

In the second phone solicitation by one of Nuance's agents, Mr. Nielsen was told

he was "perfectly suited" to become the general manager for their European operations,

and was even offered a generous salary. Id., ¶ 3.

## ARGUMENT

As set forth in its Motion, Voice Signal is seeking an order from this Court

enjoining Nuance from soliciting its current employees. Because Voice Signal is not

requesting that the Court enter a preliminary injunction against Nuance, this Court need

not make formal findings regarding the elements required to obtain injunctive relief.

However, an order enjoining Nuance from its improper solicitations is wholly appropriate

here because (1) Voice Signal can establish the elements of a tortious interference with

contract claim; (2) Voice Signal will suffer irreparable injury if Nuance's conduct is not

enjoined; (3) the harm that Voice Signal will suffer if no order is issued outweighs any

injury that Nuance will suffer if enjoined; and (4) the order will not harm and indeed will

9

further the public interest. <u>Touchpoint Solutions, Inc. v. Eastman Kodak Co.</u>, 345 F.

Supp. 2d 23, 27 (D. Mass. 2004).

     I.     Nuance Has Tortiously Interfered with Key Voice Signal Employees'
            Contracts.

     Massachusetts courts have repeatedly held that a party who induces an employee

to breach his non-competition agreement with a former employer shall be liable to that

employer for tortious interference with contractual relations. <u>See</u> <u>National</u>

<u>Merchandising Corp. v. Leyden</u>, 370 Mass. 425 (1976); <u>W.B. Mason Co., Inc. v. Staples,</u>

<u>Inc.</u>, 2001 WL 227855 (Mass. Super. Ct. Jan. 18, 2001); <u>Darwin Partners, Inc. v.</u>

<u>Signature Consultants, LLC</u>, 2000 WL 33159238 (Mass. Super. Ct. March 24, 2000);

<u>Cambridge Internet Solutions, Inc. v. Avicon Group</u>, 1999 WL 959673 (Mass. Super. Ct.

Sept. 21, 1999). Courts have also taken the further step of enjoining parties from hiring

away their competitors' contractually-bound employees. <u>See, e.g.</u>, <u>New England Patriots</u>

<u>Football Club, Inc. v. University of Colorado</u>, 592 F.2d 1196, 1200 (1st Cir. 1979); <u>W.B.</u>

<u>Mason</u>, 2001 Wl 227855, at *8; <u>Darwin Partners</u>, 2000 WL 33159238, at *5-6.

     To state a claim for tortious interference with contractual relations, Voice Signal

must demonstrate that (1) the pertinent employees had contracts with Voice Signal; (2)

Nuance knowingly induced the employees to breach those agreements; (3) Nuance's

interference, in addition to being intentional, was improper in motive or means; and (4)

Voice Signal was harmed by Nuance's actions. <u>Draghetti v. Chmielewski</u>, 416 Mass.

808, 816 (1994); <u>Cavicchi v. Koski</u>, 67 Mass. App. Ct. 654, 657 (2006). Voice Signal

can easily establish each of these four elements.

A.    Voice Signal Had Contracts With Each of the Employees.

Messrs. Gillick, Reiner and Nielsen and Ms. Genser are all parties to binding Proprietary Information and Inventions Agreements with Voice Signal. Gillick Aff., ¶ 2 & Exhibit A; Reiner Aff., ¶ 3 & Exhibit A; Genser Aff., ¶ 3 & Exhibit A; and Nielsen Aff., ¶ 2 & Exhibit A. The Agreements prohibit them working for a competitor for a period of one year following termination of their employment from Voice Signal. Because Nuance is a competitor as defined in the Agreements, they are contractually prohibited from working for Nuance for one year following their termination from Voice Signal.[5]

B.    Aware of the Agreements, Nuance Nevertheless Engaged in a Systematic Effort to Recruit Voice Signal's Employees.

Nuance has had copies of Voice Signal's Agreements for two years. It has direct knowledge of their existence and terms. Despite this knowledge, Nuance's recruiter systematically contacted and solicited Voice Signal individuals. In at least three cases, she left a message stating that she had "recently been retained by Nuance," which was "growing rapidly," and that she would be interested in speaking with them about the opportunity to work for Nuance. Gillick Aff., ¶ 3 & Exhibit B; Reiner Aff., ¶ 6 & Exhibit C; Genser Aff., ¶ 5 & Exhibit B. When one of the employees, Mr. Gillick, returned her

---

[5] There can be no credible argument that the Agreements are not valid or enforceable. Under Massachusetts law, non-competition agreements are enforceable if they are (1) necessary to protect legitimate business interests, (2) supported by consideration, and (3) reasonably limited under all the circumstances, including time and geographic scope. See, e.g., All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). For the reasons set forth in Section I(D) infra, the Agreements are critically important to protect Voice Signal's confidential information and customer relationships. Because Voice Signal employees (including the four solicited by Nuance) sign their agreements upon commencement of employment, they are supported by consideration. Finally, because the restrictions last for only one year and are limited to Voice Signal's narrow industry and the locations where Voice Signal does business, they are reasonably limited in time and scope.

call, she further admitted that she was working off a list of potential targets, including

Mr. Gillick, and was contacting them in an effort to recruit them to work for Nuance.

Thus, despite its clear knowledge of the agreements, Nuance has systematically

and openly recruited Voice Signal's key employees to leave Voice Signal and work for

Nuance, a direct and prohibited competitor under the Agreements.  There can be no

clearer evidence that Voice Signal would prevail on the merits of the second element of

its tortious interference claim -- that Nuance has knowingly induced Voice Signal's

employees to breach their contracts.  See Melo-Tone Vending, Inc. v. Sherry, Inc., 39

Mass. App. Ct. 315, 319 (1995) (finding persuasive in tortious interference claim that

defendant was not only aware of plaintiff's contract but had received a copy of it).[6]

> C.    Nuance's Attempts to Interfere With the Agreements Are Just One
> More Link in the Chain of Nuance's Sustained and Improper
> Efforts to Destroy Voice Signal.

Nuance has not only interfered with Voice Signal's Agreements, it has done so

with the clear and improper motive to harm Voice Signal.  Over a course of years,

Nuance has engaged in acrimonious and meritless litigation with Voice Signal in an

effort to cripple it economically.  After a failed attempt to acquire Voice Signal, Nuance

retaliated by filing a second piece of litigation against Voice Signal.  Nuance has further

used the litigation to disparage Voice Signal through press releases and to its customer

base.  Nuance has now turned its efforts to raiding Voice Signal's employees.

---

[6] While none of the employees referenced in this Motion have taken the final step of breaching their
agreements by commencing work for Nuance, Voice Signal does not know how many more of its
employees have been solicited.  It would be unjust to require Voice Signal to wait until some unknown
number of its employees have been successfully lured away before any action is taken to prevent Nuance's
blatantly wrongful activity.  See, e.g., United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953) ("The
purpose of an injunction is to prevent future violations, and, of course, it can be utilized even without a
showing of past wrongs.") (internal citation omitted).

Nuance's pattern of conduct makes it amply clear that it has charted a focused course to destroy Voice Signal. The systematic attempt to raid Voice Signal's employees is only the most recent act driven by retaliatory motives and ill-will that far exceed the scope of healthy competition. Courts have repeatedly held that such motives are improper for purposes of establishing the third element of a tortious interference claim -- interference with its contracts for an improper motive or by improper means. See Draghetti, 416 Mass. at 817 (finding sufficient evidence of improper motive of "retaliation or ill will" where there is "evidence of 'strained relations'" between the parties); Cavicchi, 67 Mass. App. Ct. at 658 ("As to improper motive, evidence of retaliation or ill-will toward the plaintiff will support the claim."); Schwanbeck v. Federal-Mogul Corp., 31 Mass. App. Ct. 390, 412 (1991), rev'd on other grounds, 412 Mass. 703 (1992) (for purposes of tortious interference claim, improper conduct "may include ulterior motive (e.g., wishing to do injury)").

> D.   Voice Signal Will Be Immeasurably Damaged if Nuance's
>       Systematic Employee Solicitations Are Allowed to Continue.

Nuance's targets include some of Voice Signal's most critical employees. Mr. Gillick is Voice Signal's most senior technical employee, has been with the company for six years, and is privy to virtually all of the company's substantial volume of highly confidential technical information. Similarly, Mr. Reiner, Voice Signal's Vice President of Global Accounts and a member of senior management for seven years, has extensive knowledge of its business development efforts and highly confidential customer sales and pricing arrangements. Mr. Nielsen plays the same role with regard to Voice Signal's European marketing efforts and clientele. Mira Genser, Voice Signal's Vice President of Marketing Communications and its point of contact with industry analysts, financial

analysts and the media, has extensive knowledge regarding Voice Signal's product
launches and business strategies.

Hence, each and every one of Nuance's known targets plays a key role at Voice
Signal. If any one of them were successfully solicited by Nuance, Voice Signal would be
immeasurably damaged by both the loss of their services and the inevitable
misappropriation by Nuance of the voluminous and exquisitely confidential information
in their possession. Moreover, these employees likely constitute only a fraction of the
employees Nuance has targeted. If Nuance's efforts are allowed to continue unabated,
the damage to Voice Signal can only increase.

Because Nuance's known efforts, if successful, are substantially likely to damage
Voice Signal, and because its other solicitations may already have caused such damage,
Voice Signal could prove the fourth and final element of its tortious interference claim.
See Darwin Partners, 2000 WL 33159238, at *5 (holding that where employees with
confidential customer information were solicited by competitor, the potential future loss
of goodwill and misuse of confidential information constitutes damage that is "likely to
be irreparable in that, once it occurs, it cannot be undone and its financial implications
are almost impossible to measure").[7]

II.    Voice Signal Will Suffer Irreparable Injury If the Court Does Not Enjoin
       Nuance's Misconduct. By Contrast, Nuance Will Suffer No Injury
       Whatsoever If Enjoined.

For the reasons set forth in Section I(D), Voice Signal will suffer irreparable
injury if Nuance's conduct is not enjoined and Nuance's rampant solicitations of key
employees are permitted to continue unabated. See Shipley Co. v. Clark, 728 F. Supp.

---

[7] As noted in footnote 6, Voice Signal need not wait until Nuance had succeeded in its quest to cause
damage before seeking an order enjoining its misconduct.

818, 827 (D. Mass. 1990) (unknown or future violations of employee's restrictive covenants constitute irreparable harm); Darwin Partners, 2000 WL 33159238, at *5 (future loss of goodwill and confidential information presented by raiding of employees are interests that "are very difficult to quantify and are appropriate to enforce by means of equitable relief."). Moreover, Voice Signal may also suffer (or has already suffered, unbeknownst to it) irreparable harm as a result of Nuance's solicitations of other employees. In order to prevent this additional and substantial irreparable harm, Voice Signal requires an order that Nuance provide it with the names of all Voice Signal employees whom it or its agents have contacted for recruiting purposes in the last six months.

By contrast, because Voice Signal is simply requesting an order that Nuance refrain from recruiting its employees and disclose the identity of any other recent Voice Signal targets, Nuance cannot claim that it will be injured in any way if such an order is issued. In this instance, Nuance is not being asked to relinquish any employees it has already hired. It is merely being asked to refrain from wrongfully soliciting Voice Signal's current employees and to disclose any such prior activity. If Nuance wishes to increase its competitive advantage, it has the option to recruit from other competitors or to invest its own time, money and efforts in hiring and training personnel. It cannot claim that an inability to take advantage of Voice Signal's employees causes any harm to it whatsoever, let alone harm that outweighs the potential injury to Voice Signal if Nuance is allowed to lure away its key employees and the highly confidential and competitive information in their possession.

15

III.    The Order Will Not Harm, and Indeed Will Further, the Public Interest.

Voice Signal seeks only to prevent Nuance from wrongfully attempting to interfere with its valid contracts, and to have the opportunity to repair any damage Nuance may have done by soliciting other employees. This request in no way harms the public interest. As one Massachusetts court noted, "in the course of researching this opinion, this Court could find no Massachusetts cases in which a court struck down a non-competition or non-solicitation clause because it jeopardized public policy, except in those cases dealing with agreements between doctors, lawyers or securities brokers." Bowne of Boston, Inc. v. Levine and Merrill Corp., 1997 WL 781444, at *5, n.1 (Mass. Super. Ct. Nov. 25, 1997). Far from harming the public interest, granting the requested order will further the public interest by ensuring the enforcement of valid contracts and discouraging wrongful activity to undermine them.

CONCLUSION

As demonstrated above, Nuance has engaged in a deliberate and systematic effort to raid its employees, in direct and knowing violation of Voice Signal's valid Agreements. Voice Signal respectfully requests that the Court grant the requested order enjoining Nuance from soliciting its employees and requiring it to disclose the names of prior solicited employees, as set forth in its principal Motion for an Order Enjoining Nuance From Soliciting Voice Signal Employees.

16

Respectfully submitted,

VOICE SIGNAL TECHNOLOGIES, INC.

By its attorneys,


/s/ Sarah Chapin Columbia
Robert S. Frank, Jr. (BBO No. 177240)
Sarah Chapin Columbia (BBO No. 550155)
Paul D. Popeo (BBO No. 567727)
Wendy S. Plotkin (BBO No. 647716)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000


Dated: February 7, 2007

17

4172469v7